# EXHIBIT A

SUM-100

## SUMMONS ON SECOND AMENDED COMPLAINT
### (CITACION JUDICIAL)

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):* TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *in his individual and Official Capacity,* CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH; STEVEN M. BURDICK, *in his individual and Official Capacity,* EXECUTIVE VICE PRESIDENT, CHIEF FINANCIAL OFFICER OF TETRA TECH; STEPHEN C. ROLFE, *in his individual and Official Capacity,* MANAGING AGENT OF TETRA TECH; JUSTIN E. HUBBARD, *in his individual and Official Capacity,* MANAGING AGENT OF TETRA TECH; LENNAR, INC.; and FIVE POINT HOLDINGS, LLC., and DOES 1-100 Inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* BAYVIEW HUNTERS POINT RESIDENTS, DANIELLE CARPENTER, CATHERINE MUHAMMAD, *Including All Parties Listed In Exhibit A;* and Doe Plaintiffs 1-40,000, on behalf of themselves, and all others similarly situated,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*

**CASE NUMBER**
*(Número del Caso):*
CGC-18-566188

SAN FRANCISCO COUNTY SUPERIOR COURT
400 McALLISTER STREET
SAN FRANCISCO, CA 94102-4514

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
CHARLES A. BONNER, ESQ. SBN: 85413      LAW OFFICES OF BONNER & BONNER
475 GATE FIVE ROAD, SUITE 212            (415) 331-3070
SAUSALITO, CA 94965

DATE:                                    Clerk, by _____, Deputy
*(Fecha)* FEB 13 2019                    *(Secretario)* CLERK OF THE...JUDITH C.   *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

{SEAL}

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Tetra Tech, Inc
   under: ☒ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

CEB Essential Forms
ceb.com

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

HUNTERS POINT

# EXHIBIT A

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1. ABERCROMBIE, MICHAEL JAMES
2. ABERNATHY, JOANNE
3. ABNEY, HASSAN SALIN
4. ABNEY, RENEE
5. ABRAM, RASHAAN
6. ABRAM, TRINITY
7. ADAMS, BERRY L.
8. ADAMS, BHANICA
9. ADAMS, CHRISTOPHER
10. ADAMS, DINA LEE
11. ADAMS, JESCINA
12. ADAMS, WARNETTA
13. ADAMS-MOORE, JERELL
14. ADAMS-SIMS, TALENA
15. ADDISON, CURTIS AURTHER
16. ADDISON, CYNTHIA
17. ADDISON, SHANNON C.
18. AFALAVA, LUSA
19. AGREDANO, JR., DANIEL by Mayra Bermudez
20. AGREDANO, MARIANNA by Mayra Bermudez
21. AGUALLO, FRANCISCO
22. AHMED, JHONYELLE OLIVIA
23. AKIL, RASHAAD
24. AKINSON, CHARLES
25. ALBERT, JR., RAYMOND
26. ALE, CECILIA
27. ALEXANDER, KENISHA
28. ALEXANDER, MARQUEZ L.
29. ALEXANDER, RHONDA
30. ALFAFARA, ARIC LEE
31. ALFAFARA, JOSEPH PRINCE
32. ALHARK, JANASHA
33. ALLAH, ALASIA Z.
34. ALLEN, DEANNA
35. ALLEN, TAMARA
36. ALLEN, TARA
37. ALLEN, TIFFANY ANGEL
38. ALLEN, YVONNE
39. ALTMAYER, OLANDA JAVAE MARIE

1

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

40. AMEPEROSA, ANTHONY
41. AMEPEROSA, ANTHONY JACKSON F.
42. AMEPEROSA, SHARON
43. AMERSON, VICTOR
44. ANDERSON, ANDREA
45. ANDERSON, ELIZABETH
46. ANDERSON, JAMIE
47. ANDERSON, LAMONT
48. ANDERSON, LANNA
49. ANDERSON, LARON RAYMOND
50. ANDERSON, LATEISHA
51. ANDERSON, NICOLE LATRICE
52. ANDERSON, RAVON ERIC
53. ANDERSON, RONALD RAY
54. ANDERSON, SAMYAH by Jacquettia Banks
55. ANDERSON, TRAVON EDWARD
56. ANDERSON, WILLIAM
57. ANDREWS, JALIEL
58. ANG, SHEILA B.
59. ANGEL, DELOREAN DELBERT
60. ANGEL, SERENA
61. ANGEL, VERENA L.
62. ANGEL-SHORT, MOANEE NARIAH
63. ANTHONY, CALISTE
64. ANTHONY, PATRICIA A.
65. ANTIONE, LINDA
66. ANTOINE, HEIDI
67. APPLETON, ANDRE
68. APPLETON, RAMEIA
69. APPLON, CARL
70. ARD, MONIQUE
71. ARDOIN, JOHNATHAN
72. ARMSTRONG, CHARLENE
73. ARMSTRONG, LAWANDA J.
74. ARMSTRONG, RONNIE
75. ARMSTRONG, TAMELIA
76. ARMSTRONG, TIFFANY
77. ARNESSA HODGES
78. ASEGED, ESKENDER
79. ASH, MONIQUE YVONNE

2

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

80. ATKINSON, CHARLES
81. ATKINSON, LUCILLE
82. ATKINSON, WILLIAM
83. AUGUST, NICOLE
84. AUMOEUALOGO, LOLITA,
85. AUMOEUALOGO, TAIEPISI
86. AUSTIA, JR II, ROBERT ARTURO
87. AUZENNE, MARTIN
88. AUZENNE, SHEILA
89. AYATCH, MAKHAI by Tiesha Tonshay Hendricks
90. BABERS, JOHNNYE B
91. BABERS, LINDA FAYE
92. BAGBY, MAMIE
93. BAGBY, TEIARY
94. BAILEY, ASA,
95. BAILEY, ALLEGRA VIOLA LOUISE
96. BAILEY, GISELLE
97. BAILEY, JEMAL
98. BAILEY, MARSHAWN
99. BAILEY, MAXINE
100. BAILEY, REGINALD
101. BAILEY, RICHARD M.
102. BAILEY, TAYLOR by Felicia Sanders
103. BALINTON, DARIO J.
104. BALLARD, ASHLEY
105. BALLARD, TONY L.
106. BANK, LEE ANN
107. BANKS MUHAMMAD, MARK
108. BANKS, DE'ANDRA
109. BANKS, JACQUETTIA
110. BANKS, JAZZ
111. BANKS, LAMAR
112. BANKS, MARCEL
113. BANKS, MARKEL
114. BANKS, NICOLE
115. BANKS, PAMELA
116. BANKS, QUEEN-VANESSA
117. BANKS, RHONDA N.
118. BANKSTON, EUGENE
119. BARNES JOHNSON, MRESHELLE DENISE

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 120. | BARNES, BILL |
| 121. | BARNES, BOBBY TRAMMEL |
| 122. | BARNES, BRENTON |
| 123. | BARNES, BRIANA |
| 124. | BARNES, CHRISTIAN MILESTONE |
| 125. | BARNES, CLARISSA ANN |
| 126. | BARNES, JACKIE |
| 127. | BARNES, JACQUELINE M. |
| 128. | BARNES, LATASHA JOHNSON |
| 129. | BARNES, MIWANDA |
| 130. | BARNETT, LESTER |
| 131. | BARRETT, JEWEL |
| 132. | BARRNES, JR., BOBBY TRAMMEL |
| 133. | BARRON, SR., ANDRES L. |
| 134. | BARTOK, KRISTEN ANN |
| 135. | BASPED, JESSIE VICTORIA |
| 136. | BASS, KARCHE KRYSTLE |
| 137. | BASSETTI, CAROL LYNN |
| 138. | BATTLE, FE S. |
| 139. | BATTLEY, BELINDA |
| 140. | BAXTER, JERRY |
| 141. | BEAN, ELVIS R. |
| 142. | BEASLEY, ERNESTINE |
| 143. | BEASLEY, JEREMY ULYSSES-THADDEUS |
| 144. | BEASLEY, MARK |
| 145. | BEASLEY, WILLIE RAY |
| 146. | BEE, TERRY |
| 147. | BEHERA, SAMBIT |
| 148. | BELL, AUDREY |
| 149. | BELL, DAMONE |
| 150. | BELL, DORA |
| 151. | BELL, FALETEINE L. |
| 152. | BELL, JUDY |
| 153. | BELL, KRISTEN E JASON |
| 154. | BELL, LARENZO |
| 155. | BELL, SR., KILAMANJARO |
| 156. | BELL, VICENT KEITH |
| 157. | BELLOT, SHEVONNA |
| 158. | BELTCHER, ISAIAH ZACKERY |
| 159. | BENDER, SUSIE M. |

4

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

160. BENDER, TRUEMAN
161. BENJAMIN, AARON NEAL
162. BENNETT, DIANE
163. BENNETT, UVONNE
164. BENSON, MYESHA
165. BENTON, DAVID ANTHONY
166. BENTON, DERRICK JEROME
167. BENTON, JR., DAVID J.
168. BENTON, TONYA
169. BERGANS II, MARVIN AUSTIN
170. BERMUDEZ, MAYRA
171. BERMUDEZ, MAYRA ALEJANDRA
172. BERRY, BELLA
173. BERRY, DEVANCE
174. BERRY, DOLLIE IVORY
175. BERRY, ERVIN
176. BERRY, GLORIA
177. BERRY, JAMMIE
178. BERRY, LARRY
179. BERRY, MYQUITA by Verna Jean Berry
180. BERRY, NATALIE
181. BERRY, TANIA
182. BERRY, VERNA JEAN
183. BERTRON, BRUNO
184. BIBBS, ERICKEA N.
185. BIGGINS, BETTY
186. BISHOP, ANDREA
187. BISHOP, CHELICE
188. BISHOP, JACQUELINE
189. BISHOP, SHALANDA
190. BISHOP-HOLMES, SHA'LIYAH
191. BLACK, OMAR ASAD M.
192. BLACK, SHARON ROCHELLE
193. BLACK, SR., TRAVIS TERRELL
194. BLACKBURN, EBONY by Antoinette Fort
195. BLACKWELL, ANITRA
196. BLAKELY, DARNELL
197. BLAKLEY, SOPHRONIA
198. BLANCHARD, FRANCES
199. BLANKENSHIP, LEROY

5

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 200. | BLANKENSHIP, SHERRITA |
| 201. | BLATCHER, ANTHONY |
| 202. | BLATCHER, DEREK |
| 203. | BLUE, LYEISHIA |
| 204. | BLUFORD, BONNIE |
| 205. | BLUFORD, HEIDI DEANNA |
| 206. | BLUFORD, JANNETTE |
| 207. | BLUFORD, MARKIDA |
| 208. | BLUFORD, NICHOLAS GEORGE |
| 209. | BLUFORD, TATIANA R. |
| 210. | BLUFORD, TRAVIS T. |
| 211. | BLUFORD, VALENTINA ROSHAWN |
| 212. | BLUFORD, VALERIE K. |
| 213. | BODDIE, JAVEONA |
| 214. | BODDIE, JAVON |
| 215. | BOISSIERE, SHEIBA |
| 216. | BOLDS, DARIENE |
| 217. | BOLMER, ARMANI |
| 218. | BOLMER, VICTORIA DONNA ARMOND |
| 219. | BOLTON, LONNIE RAY |
| 220. | BOND, JAMES L. |
| 221. | BOONE, AUKAYLA B. SMITH |
| 222. | BOOTH, KAREN D |
| 223. | BORELA, SHANTE |
| 224. | BORELA, TIFFANY |
| 225. | BOUDREAUX-MATTHEWS, MICHELLE |
| 226. | BOUIE IV, GEORGE |
| 227. | BOYD, JODIE |
| 228. | BOYD, RAYMOND C. |
| 229. | BOYDEN, KAMARAH by Kashina Garner |
| 230. | BOYLAND, RHONDA RENEE |
| 231. | BRADFORD, AMELA |
| 232. | BRADFORD, DENISE MARIE |
| 233. | BRADFORD, LACHELE A |
| 234. | BRADFORD, LORETHA |
| 235. | BRADLEY, MARGARET M. L. |
| 236. | BRADLEY, SAMUEL HENRY |
| 237. | BRANCH, MALORIE JAMELIA |
| 238. | BRANCH, SR., ANDRE |
| 239. | BRANNER, JEFFREY |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 240. | BRANNER, MARVVIN L. |
| 241. | BRANNER, SHAMIKA TENE |
| 242. | BRANNER, SR., JEFFREY |
| 243. | BRANNER, TAMIKA |
| 244. | BRAUD, DAVONTE |
| 245. | BRAUD, DIMITRA |
| 246. | BRAY, GLENN D. |
| 247. | BREAUX, DARYL |
| 248. | BREAUX, GUSSIE M |
| 249. | BREAUX, PAMELA MARIE |
| 250. | BREAUX, STEVEN J. |
| 251. | BREED, COMELIA |
| 252. | BREED, HATTIE |
| 253. | BREED, PAUL |
| 254. | BREED, PRISILLA ANN |
| 255. | BREWER, SHARON |
| 256. | BREWSTER, ALICIA |
| 257. | BREWSTER, ANTHONY |
| 258. | BREWSTER, ANTHONY R. |
| 259. | BREWSTER, ESAU |
| 260. | BREWSTER, EVANGELA |
| 261. | BREWSTER, JANITA |
| 262. | BREWSTER, JOEANNE |
| 263. | BREWSTER, LINDA S. |
| 264. | BREWSTER, MALONE |
| 265. | BREWSTER, MICHAEL |
| 266. | BREWSTER, OTIS |
| 267. | BREWSTER, SONIA |
| 268. | BREWSTER, TALERIA |
| 269. | BREWSTER, VIOLA |
| 270. | BREWSTER, VIOLET |
| 271. | BRIDGES, GWENDOLYN M. |
| 272. | BRITT, BRIAN |
| 273. | BRITT, GILMA M. |
| 274. | BRITT, WILLIE L. |
| 275. | BROOK, ETHAN |
| 276. | BROOKS, CHARLES |
| 277. | BROOKS, EARL EUGENE |
| 278. | BROOKS, JUSTIN |
| 279. | BROOKS, KELVIN DWAYNE |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 280. | BROOKS, RONALD |
| 281. | BROOM, ALICE |
| 282. | BROOM, MICHAEL |
| 283. | BROUSSARD, ALEXIS ALANDRA |
| 284. | BROUSSARD, CAMILLE |
| 285. | BROUSSARD, CASIMIR N |
| 286. | BROUSSARD, ERIC |
| 287. | BROWDER, CESENA MICHELE |
| 288. | BROWN , DARRELL |
| 289. | BROWN, ALEXIS |
| 290. | BROWN, BARBARA |
| 291. | BROWN, CONSTANCE |
| 292. | BROWN, CYNTHIA |
| 293. | BROWN, DEBORAH |
| 294. | BROWN, DENISE L. |
| 295. | BROWN, DEONTE O. |
| 296. | BROWN, DEWEY |
| 297. | BROWN, DUANE M. |
| 298. | BROWN, DWIGHT M. |
| 299. | BROWN, E'LAYA by Denise L. Brown |
| 300. | BROWN, EMIL |
| 301. | BROWN, EUNICE K |
| 302. | BROWN, GEARY L. |
| 303. | BROWN, JANET |
| 304. | BROWN, JOHNNY |
| 305. | BROWN, KELLE J. |
| 306. | BROWN, KENNETH |
| 307. | BROWN, LAMONT |
| 308. | BROWN, LATRELLE |
| 309. | BROWN, MARQUEZ |
| 310. | BROWN, NEVAEH by Ronnie Mack Brown |
| 311. | BROWN, PAMELA |
| 312. | BROWN, ROBERT |
| 313. | BROWN, ROGER LEE |
| 314. | BROWN, RONNIE MACK |
| 315. | BROWN, SHARAE LATRICE |
| 316. | BROWN, SHARON |
| 317. | BROWN, SHAWNTE DANIELLE |
| 318. | BROWN, SHEREE ETHEL |
| 319. | BROWN, SHIRLEY A. |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

320. BROWN, TAMMY M.
321. BROWN, VANESSA
322. BROWN, WYWNOKA
323. BRUCE, AMELIA BONITA
324. BRUNO, BERTRON
325. BRYANT, ANNETTE
326. BRYANT, DEANDRA
327. BRYANT, DINA MARIE
328. BRYANT, DINO R
329. BRYANT, GREGORY
330. BRYANT, MYRONE LEE
331. BRYANT, NEFARTARI
332. BRYANT, RASHEIDA
333. BRYANT, TIZEYAH
334. BUCHANAN, ZHARIA U.
335. BUCKLEY, MARY
336. BUCKLEY-CHUNG, SAMANTHA
337. BUCKLEY-CHUNG, SYLISIA
338. BULLARD, TOSCA IRENE
339. BULLOCK, CIARA
340. BULLOCK, LISA
341. BULLOCK, PAUL
342. BURLESEN, JR., ALBERTO JAMES
343. BURNLEY, GWENDOLYN OTIS
344. BURRELL, ANTONIO
345. BURROUGHS, JAVANEA
346. BUSBY, ADRIENNE M.
347. BUSBY, ANITRA
348. BUSBY, ANITRA
349. BUSBY, ANTRONN
350. BUSBY, DOSHON
351. BUSBY, KERRINE FATIMA
352. BUSBY, SR., ANTRONN
353. BUTLER, EARL MONEE
354. BUTLER, EULA CEIL
355. BUTLER, JAMAL X.
356. BUTLER, JASMINE
357. BUTLER, JOHN HARVEY
358. BUTLER, TIFFANY
359. BYRD, JUMA

9

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 360. | BYRD, LINDA |
| 361. | BYRD, ROBERT |
| 362. | CADE, LARENDA LYNETTE |
| 363. | CAEL, HARRY |
| 364. | CAEL, PATRICIA D. |
| 365. | CAEL, TANEASHA |
| 366. | CAEL, TERESA |
| 367. | CAGE, ANGEL |
| 368. | CAIN, KASHUNDA |
| 369. | CAIN, SAMONE |
| 370. | CALDWELL, FAIDA |
| 371. | CALDWELL, KISHIRA |
| 372. | CALDWELL, RHONDA |
| 373. | CALHOUN, TRACI |
| 374. | CALLIER, FAY C. |
| 375. | CALLIER-JOHNSON, MONA L. |
| 376. | CALLOWAY, ALICE |
| 377. | CALLOWAY, JAMISI |
| 378. | CALLOWAY, JR., MATTHEW |
| 379. | CALLOWAY, KIM ROCHELLE |
| 380. | CAMPBELL, DENISE |
| 381. | CANADA, PAMELA DENISE |
| 382. | CANALES, ROLANDO JOSE |
| 383. | CANCUN, MARCUS |
| 384. | CANDLEY, PATSY |
| 385. | CANNEDY, KIYANNA MONET |
| 386. | CANNON, CHASITY M |
| 387. | CANNON, TRE'ZHAN |
| 388. | CANSINO, KRYSTLE |
| 389. | CARMICHAEL, JAZMYNE LANIECE |
| 390. | CARMON, MARCUS |
| 391. | CARPENTER, DANIELLE |
| 392. | CARPENTER, KISSI KENYA |
| 393. | CARPENTER, TE-ONZAY L. |
| 394. | CARR, GINA M. |
| 395. | CARRILLO, ANTONIO G. |
| 396. | CARROL, MICHAEL JAMES |
| 397. | CARSON, ANIYAH |
| 398. | CARSON, JANNA |
| 399. | CARSON, SHAELA |

10

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 400. | CARTER, BELINDA FRANCINE |
| 401. | CARTER, BRIAN |
| 402. | CARTER, BRIDGET |
| 403. | CARTER, GREGORY L. |
| 404. | CARTER, JOYCE MARIE |
| 405. | CARTER, LA'SHAWNA |
| 406. | CARTER, LYNELL |
| 407. | CARTER, NICHELLE NICOLE |
| 408. | CARTER, RICKY |
| 409. | CARTER, SHARON G. RICHARDSON |
| 410. | CARTER, TASHANA D. |
| 411. | CARTWRIGHT, ANTHONY LEE |
| 412. | CASEY, KATHLEEN |
| 413. | CATO, AISHA |
| 414. | CATO, ALISHA |
| 415. | CATO, TIERANEE |
| 416. | CELESTINE, PARIS |
| 417. | CENTENO, LUISA AMALIA |
| 418. | CHAMBERS, DENNIS |
| 419. | CHAMBERS, GREGORY |
| 420. | CHAMBERS, JONATHAN C. |
| 421. | CHANTHA, SARETH |
| 422. | CHAPMAN, ALIZE |
| 423. | CHARLES, DWAYNE J. |
| 424. | CHEATUM, LANEICE |
| 425. | CHEATUM, LANIYA |
| 426. | CHEERES, BYRON |
| 427. | CHERRY, JASON ERIC |
| 428. | CHHITH, DORA |
| 429. | CHKINEF, MO |
| 430. | CHRISTIAN, MAURICE SIMEON |
| 431. | CHRISTIE, DIAHANNA |
| 432. | CHRISTIE, GLORIA |
| 433. | CLARK, LESTER |
| 434. | CLARY-BROWN, CAROLYN |
| 435. | CLAYBORN, BRIDGETTE |
| 436. | CLAYBORN, JANESSE |
| 437. | CLAYBRON, SR., GREGORY |
| 438. | CLAYTON, PLADEE |
| 439. | CLAYTON, PLADEE TOMMY |

11

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

440. CLAYTON, TIA
441. CLAYTON, TOMANI by Shamika Thomas
442. CLAYTON, TOMARI by Shamika Thomas
443. CLAYTON, TYCE by Shamika Thomas
444. COATS, ROBERT LEE
445. COATS, ROCHELL L.
446. COBB, MARIE
447. COGMAN, SERENE
448. COHN, WANDA
449. COLE , JON
450. COLE, LOIS ANN
451. COLE, SHA-RITA L.
452. COLEMAN, CESENA
453. COLEMAN, NORRIS
454. COLEMAN, THERESA LYNN
455. COLEMAN-ROACH, DEBORAH
456. COLEMON, KIMBERLY
457. COLLIER, AKILI
458. COLLIER, KIASI
459. COLLIER, MELODY DANIEL
460. COLLIER, WILLIAM H.
461. COLLINS, DELACEY JERMAINE
462. COLLINS, DUKE
463. COLLINS, GWENISHA
464. COLLINS, JASMINE
465. COLLINS, JERROYN KEIARE
466. COLLINS, KEVIN
467. COLLINS, LARRY
468. COLLINS, LaSHAWNDA
469. COLLINS, LATRINA DENISE
470. COLLINS, LAURIE
471. COLLINS, RAHSHEDIA
472. COLLINS, TOMMIE
473. COLVIN, AC
474. COLVIN, DARLENA M.
475. COLVIN, LEONARD
476. COLVIN, MAURICE
477. COLVIN, RENEE
478. COLVIN, RENEE
479. COMBS, JA'SHAWN

12

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

480. CONLEY, ANTHONY M.
481. CONLEY, LISA E.
482. CONLEY-BRILEY, PAUL DAVE D.
483. CONNER, ANDY
484. CONNER, SHARON MARTIN
485. COOK, IESHA NECOLE
486. COOK, ROBERT L.
487. COOPER, BARBARA CAROLYN
488. COOPER, BETTY
489. COOPER, LEMARLIN
490. COOPER, LOIS
491. COOPER, PRECIOUS J.
492. CORLEY, DARNELL
493. CORLEY, LYNNELL
494. CORLEY, MONIQUE
495. CORLEY, MYLANI
496. CORLEY, QUIANJN
497. COSY, RONALD
498. COULAH, TRAMAINE
499. COURSEY, BELINDA
500. COUSSINAT, JASMINE MARLA ANDREA
501. COVINGTON, LEWIS JAMES
502. CRANER, EDDIEMAC
503. CRANER, JIMMY LEE
504. CRATER, SHIRLEY
505. CRAWFORD, EBONEE
506. CRAWFORD-LEWIS, SHIRLEY
507. CRENSHAW, MARY
508. CRISWELL, BETTY
509. CRISWELL, CATRINA
510. CRITTLE, RITA L.
511. CROSBY, THELMA
512. CROSLEY, ASHLEY
513. CROSLEY, NATASHA
514. CROWDER, JAYANN
515. CRUSE, DALE J.
516. CUMMINGS, CHRISTIN DEAN
517. CUMMINGS, HAKEEM
518. CUNNINGHAM, ANGELA C.
519. CUNNINGHAM, ANITA

13

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

520.     CUNNINGHAM, LEE
521.     CUNNINGHAM-LOWERY, NIKCOLE
522.     CURRY, GERALD
523.     CURRY, RENITA
524.     DANCY, KIMBERLY ANN
525.     DANIEL, MICHAEL
526.     DANIEL, MICHELLE
527.     DANIEL, RUBY
528.     DANIEL, WILLIAM ALBERT
529.     DANIELS, BRYAN L.
530.     DANIELS, CLEVELAND J.
531.     DANIELS, HEZZACK
532.     DANIELS, JAYSHA RENIA L
533.     DANIELS, LARRY H.
534.     DANIELS, NAJUAWANDA
535.     D'ASCENZO, MARK ANTHONY
536.     DAVID-JACOBS, CHAUNCY FELICIA
537.     DAVID-JACOBS, SILVIA
538.     DAVIS, ANGEL
539.     DAVIS, ANTHONY by LaShunda Hollis
540.     DAVIS, BENJAMIN D.
541.     DAVIS, DE'JAH
542.     DAVIS, JANET KAYE
543.     DAVIS, KEANTAY
544.     DAVIS, LEANDER S
545.     DAVIS, LISA CHENNETTE
546.     DAVIS, SHAWNETTA
547.     DAVIS, SHELA TENE'
548.     DAVIS, SOBRINA S.
549.     DAVIS, STEPHEN MICHAEL
550.     DAVIS, TIA MICHELLE
551.     DAWES, LAQUAN
552.     DAWSON, MARILYN LOUISE
553.     DEAN, ANGELA M.
554.     DEANDA, JORGE M.
555.     DEAN-RIVERS, DEBORAH E.
556.     DeCOY, REBECCA
557.     DEL CHIARO, JASMINE
558.     DEMINGS, EVETTE
559.     DEMUS, LASHANDA

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 560. | DEMUS, LOIS MICHELLE |
| 561. | DESCLAMPS, HL ALEXANDER |
| 562. | DESCLAMPS, JESSIE |
| 563. | DEVORE, BARRY K. |
| 564. | DIALS, ENNA M. |
| 565. | DIAS, AALIYAH by Angela Smith |
| 566. | DIAS, AMIR by Angela Smith |
| 567. | DIAS, ANDRE |
| 568. | DIAS, ASHANTI by Angela Smith |
| 569. | DIAS, JR., ANDRE by Angela Smith |
| 570. | DIKON, A. |
| 571. | DILLARD, ANTHONY |
| 572. | DILLON, ERIC WARREN |
| 573. | DILLON, YVONNE MARIE |
| 574. | DISMUKES, CHRISTOPHER JEROME |
| 575. | DIXON, AIREL ARTRESE |
| 576. | DLE CHIARO, JASMINE |
| 577. | DOATY, MARIE |
| 578. | DOMINIQUE, DOORTHY |
| 579. | DOMINIQUE, KAREN |
| 580. | DOMINIQUE, LEE ANDREW |
| 581. | DOMINIQUE, SADE |
| 582. | DONAHUE, MICHELLE |
| 583. | DONAHUE, VIVIAN |
| 584. | DONEHUE-STIGER, NINA L. |
| 585. | DORN, SR, YUL D |
| 586. | DOSS, CORNELL |
| 587. | DOUGLAS, WHITLEY |
| 588. | DRAPER, TONI R |
| 589. | DUDLEY, DONALD |
| 590. | DUDLEY, JOSEPH R |
| 591. | DUKES, TYRONE |
| 592. | DUNCAN, CAMILLE |
| 593. | DUNCAN, JR, CANDISS |
| 594. | DUNCAN, ROBERT |
| 595. | DUNCAN, SR, ROBERT |
| 596. | DUNN, KELVIN SEYMOURN |
| 597. | DUNN, RITA |
| 598. | DUNSON, MEGAN L. |
| 599. | DURAN, DAVID STEPHEN |

15

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 600. | DURDEN, JOHNTA DELION |
| 601. | DUTY, LAURA |
| 602. | DYSON, KARWANNA |
| 603. | EALY, ROSIE M. |
| 604. | EARBY, PERCY |
| 605. | EARBY, ZAIRE |
| 606. | EARLE, CHRISTOPHER |
| 607. | EAST, JAI |
| 608. | EDMUNDS, RAVEN by LaTasha Telfor |
| 609. | EDWARD, GUINN |
| 610. | EDWARDS, APRIL DELAINE |
| 611. | EDWARDS, GIONE |
| 612. | EDWARDS, KEOSHA LEONA |
| 613. | ELDER, AARONISHA |
| 614. | ELDER, ALANNA |
| 615. | ELDER, JR., MARCELLUS AARON |
| 616. | ELLINGTON, EULA |
| 617. | ELLIS , KIMIANTE |
| 618. | ELLIS, DEVIN |
| 619. | ELLIS, GRETA |
| 620. | ELLIS, JR., HENRY DEWAYNE |
| 621. | ELLISON, ESTHER |
| 622. | ELLISON, ETHEL |
| 623. | ELLISON, RONALD |
| 624. | ELLIS-SMITH, JAMELA |
| 625. | ELMORE, CHRISTOPHER |
| 626. | EMERSON, JR., FREDERICK JAMES |
| 627. | ENNIS , MARTY |
| 628. | ENNIS, ANITRA |
| 629. | ENNIS, BILLY |
| 630. | ENNIS, IVORY |
| 631. | ENNIS, SABRINA |
| 632. | ENNIS, SR, BILLY |
| 633. | ENNON, LORETTA |
| 634. | ENNON, LORRAINE |
| 635. | ENNON, WALTER |
| 636. | ESCOBAR, CARLA |
| 637. | ESCOBAR, DORA L. |
| 638. | ESCOBAR, JAIRO |
| 639. | ESPINOZA, JUAN MACIEL |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 640. | ESPREE, CHARLESVESTER |
| 641. | ESPREE, QUINDELLA MARQUES |
| 642. | EUBANKS, ROYALE |
| 643. | EVANS, CAROLYN L. |
| 644. | EVANS, GARY M. |
| 645. | EVANS, MAURICE |
| 646. | EVANS, RUBY |
| 647. | EVERETT, ARIANA by Raquel Tompkins |
| 648. | EVERETT, MALACHI by Raquel Tompkins |
| 649. | EVERETT, RONALD |
| 650. | EVERETT, SKYLAR by Raquel Tompkins |
| 651. | FAAFITI, EASTER SAKA |
| 652. | FAAFITI, MAFAUFAUGA |
| 653. | FAATAUI, ADELE |
| 654. | FAATAUI, CENTURY DAVID |
| 655. | FAATAUI, DONNA |
| 656. | FAATAUI, ELIZABETH |
| 657. | FAATAUI, FELICIA REBECCA |
| 658. | FAATAUI, KRYSTAL |
| 659. | FAATAUI, PAUL VAOSEA |
| 660. | FAATAUI, PELENISE |
| 661. | FAATAUI, VEVESI RUBEN |
| 662. | FAILS, BEVERLY A. |
| 663. | FAILS, LENETTE |
| 664. | FAIRLEY, KENNETH |
| 665. | FALESOGA, DAVID |
| 666. | FARLEY, JOURNEY LABRE |
| 667. | FARR, DANIEL |
| 668. | FELICIANA, STEPHAN M. |
| 669. | FERGUSON, LAMONTE ELLIOTT |
| 670. | FERGUSON, LOIS MARIE |
| 671. | FERRANDO, JASON |
| 672. | FIELDS, JR., DUWAN |
| 673. | FIELDS, NIKO |
| 674. | FIELDS, RICO |
| 675. | FIELDS, ROBERT |
| 676. | FIELDS, SR., DUWAN |
| 677. | FIELDS, TAMNICA D. |
| 678. | FIGUEROA, NATHALIE F. |
| 679. | FINAMORE, CARL |

17

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 680. | FISHER, EVELYN |
| 681. | FISHER, KATHLEEN |
| 682. | FISHER, VINCENT |
| 683. | FLEETON, LINILA |
| 684. | FLEMING, DARLENE |
| 685. | FLORES, CLEMENTE |
| 686. | FLORES, DILCIA |
| 687. | FLORES, NELSON |
| 688. | FLOWER, DORIS |
| 689. | FLOWERS, ELLIOTT |
| 690. | FONTENOT, JABARI |
| 691. | FONTENOT, RICKY |
| 692. | FOOTS, LOUISE |
| 693. | FORBES, ANGELIQUE N. |
| 694. | FORBES, ANTOINIQUE |
| 695. | FORBES, SHEILA |
| 696. | FORT, ANTOINETTE |
| 697. | FORTE, ALMETA JENKINS |
| 698. | FORTE, BURNETTE |
| 699. | FORTE, XZARAMIYA by Burnette Forte |
| 700. | FORTENBERRY, LARONDA L. |
| 701. | FOSTER, DEREK |
| 702. | FOSTER, IJINANYA |
| 703. | FOSTER, NINA |
| 704. | FOSTER, ORLAND KEITH |
| 705. | FOWLS, JAMELA |
| 706. | FRANCIS, JANISA RANIQUE |
| 707. | FRANK, BRIANNA |
| 708. | FRANK, FRANDIS |
| 709. | FRANK, JERALDINE |
| 710. | FRANKLIN, ARETHA |
| 711. | FRANKLIN, BERNADINE A. |
| 712. | FRANKLIN, BONNIE M. |
| 713. | FRANKLIN, EARLINE |
| 714. | FRANKLIN, GEORGE |
| 715. | FRANKLIN, LEON |
| 716. | FRANKLIN, PATRICIA |
| 717. | FRANKLIN, PATTY JO |
| 718. | FRANKLIN, TRACY |
| 719. | FRANKS, JEANAE |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 720. | FRANKS, JEANNAE |
| 721. | FRANKS, RAFIQUE |
| 722. | FRAZIER, MYRON D. |
| 723. | FREEMAN, PHYLLIS |
| 724. | FRELOT, DA'SHUAN |
| 725. | FREYMAN, YEVGENIY |
| 726. | FRIEDMAN, BONNIE |
| 727. | FRYE, MALIK ZAIRE |
| 728. | FUNG, GRACE |
| 729. | FURLOUGH, LOYCE MARIE |
| 730. | GAFFNEY, REGINA M. |
| 731. | GAGE, YVONNE L. |
| 732. | GAGE, YVONNE L. |
| 733. | GAINES, ALEX |
| 734. | GAINES, ALEXIS |
| 735. | GAINES, DERRICK |
| 736. | GAINES, DWAYNE H. |
| 737. | GAINES, DWAYNE H. |
| 738. | GAINES, FREDERICK |
| 739. | GAINES, JEANETTE ALICIA |
| 740. | GAINES, JENNIFER |
| 741. | GAINES, JOUDERE AREMEL |
| 742. | GAINES, MYRA |
| 743. | GAINES, RASHALANDA |
| 744. | GAINES, SHANTANICE |
| 745. | GAINES, YOLANDA |
| 746. | GAINO, MILDRED H. |
| 747. | GAINS, CHRISTOPHER |
| 748. | GANS, ROBERT L. |
| 749. | GANS, SHARON L. |
| 750. | GANTT, BRIAN |
| 751. | GARBYS, NICOLE |
| 752. | GARCIA, ALFONSO ALVIN |
| 753. | GARCIA, NAKISHA JOSIE |
| 754. | GARCIA, SINGIN T. |
| 755. | GARDNER, CHARLES by Andrea Smith |
| 756. | GARDNER, JR., CHARLES |
| 757. | GARDNER, LARENDA RENE |
| 758. | GARDNER, MeCALE LATEEF |
| 759. | GARDNER, SHANTEL TRISHA FAYE |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 760. | GARNER, DYESHA |
| 761. | GARNER, EURMA |
| 762. | GARNER, KASHINA |
| 763. | GARNER, KASHINA L. |
| 764. | GARNER, REGINA |
| 765. | GARNER, TARIAN L. |
| 766. | GARRETT, LADIAMOND CORDELLIA |
| 767. | GARRETT, MARY CHRIS'TI'ROANAN |
| 768. | GARRETT, NONA |
| 769. | GARRITT, JAZMANIKA |
| 770. | GARVIN, JR., CARLOS |
| 771. | GASPARD, LASHONA |
| 772. | GASTINELL, KEVIN L. |
| 773. | GASTINELL, KYMBER |
| 774. | GASTINELL, LORENZO |
| 775. | GASTINELL, VARLANDER S. |
| 776. | GENOCHIO, RACHEL |
| 777. | GEORGE, JEFFERY W. |
| 778. | GETER, DISHON IRVING |
| 779. | GIBSON, MARK |
| 780. | GIBSON, MARKETTA LUVINA |
| 781. | GIBSON, TAMMIE LAVETTE |
| 782. | GILBERT, MELVIN CORY |
| 783. | GILBERT, ROSETTA MAE |
| 784. | GILBERT, SCHARLENE |
| 785. | GILLIAM, SHY'LAH by Twavida Plummer |
| 786. | GILLIS, CHARLES J. |
| 787. | GLASPIE, EMIL |
| 788. | GLASPIE, GLENDON B |
| 789. | GLASPIE, LASHUNDRA |
| 790. | GODALL, HARRY |
| 791. | GOINS, EMMANNUEL |
| 792. | GOLSON, GELETTI |
| 793. | GOODALL, SABRINA M. |
| 794. | GOODWIN, JASON |
| 795. | GORDON, JEREMIAH |
| 796. | GORDON, QUNNICE AGUSTUS |
| 797. | GOULD, SHARON RENEE |
| 798. | GRADY, SANDRA |
| 799. | GRANT, LORRAINE |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 800. | GRANT, NICOLE V. |
| 801. | GRAY, ARBEE |
| 802. | GRAY, GIOVANNI |
| 803. | GRAY, III, PHILIP |
| 804. | GRAY, JEREMIAH |
| 805. | GRAY, SHARON D. |
| 806. | GRAY-JONES, DAWN |
| 807. | GRAY-ROY, DEBRAH ANN |
| 808. | GRAYS, BETTY |
| 809. | GRAYS, DARIUS |
| 810. | GRAYS, EARL |
| 811. | GRAYS, EARLVONTE |
| 812. | GRAYSON, FREDERICK C. |
| 813. | GRAYSON, KYLA LOURIAL |
| 814. | GREEN- BISSIG, VICTORIA YVETTE |
| 815. | GREEN, ASANEKO YAKEYLEE |
| 816. | GREEN, BRITTANY |
| 817. | GREEN, CALLIE |
| 818. | GREEN, DANIELLE |
| 819. | GREEN, DEANNA L. |
| 820. | GREEN, DEBORAH |
| 821. | GREEN, DENAE |
| 822. | GREEN, MAURICE ALEXANDER |
| 823. | GREEN, PRINCESS |
| 824. | GREEN, RICHARD MARTIN |
| 825. | GREEN, ROBERT |
| 826. | GREEN, ROSALYN Y. |
| 827. | GREEN, SR., RODNEY MAURICE |
| 828. | GREEN, YVONNE |
| 829. | GREENWOOD, DAVID |
| 830. | GREENWOOD, DAVIOUS A. |
| 831. | GREENWOOD, NEFATERIA |
| 832. | GREGORY, ELSTON |
| 833. | GRENOCHIO, RACHEL |
| 834. | GRICE, MISTEE U. |
| 835. | GRICE-ROBINSON, MYESHIA |
| 836. | GRIER, SHEILA |
| 837. | GRIFFIN, DEBORAH ANN |
| 838. | GRIFFIN, JACQUELINE |
| 839. | GRIFFIN, KARLEEN L. |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 840. | GRIFFIN, OZEL |
| 841. | GRIFFIN, TRACY |
| 842. | GRIFFIN, XANDRINE S. |
| 843. | GRIFFIN, XZERIC X. |
| 844. | GRIFFIN-JOHNSON, LaRHONDA |
| 845. | GROSS, NADIA |
| 846. | GUBSON, ANTHONY |
| 847. | GUBSON, CASSANDRA |
| 848. | GUBSON, CHARLES |
| 849. | GUBSON, JARVIS |
| 850. | GUBSON, TERRISHE |
| 851. | GUBSON, TROY |
| 852. | GUERRERO, MARICELLA |
| 853. | GUEVARA, DOLORES O. |
| 854. | GUIDRY, ORLANDO |
| 855. | GUIDRY, WINNIE DELORES |
| 856. | GUINN, EDWARD |
| 857. | GUNTER, JAMES |
| 858. | GUNTER, JERMAINE |
| 859. | GUTU, TAIEPISI |
| 860. | HAINES, BRIDGET MARIE |
| 861. | HALL, BERTHA LEE |
| 862. | HALL, DONALD WAYNE |
| 863. | HALL, LARITA |
| 864. | HALL, MARUIN |
| 865. | HALL, SHIRLEY JEAN |
| 866. | HALL, TERRANCE |
| 867. | HALL, TERRENCE DEAN |
| 868. | HALL, WILLIAM C. |
| 869. | HAMILTON, HANIYAH by Francelle White |
| 870. | HAMILTON, REGAN |
| 871. | HAMILTON, REGINA L. |
| 872. | HAMILTON, THOMAS W. |
| 873. | HAMPTON, CEDRICA |
| 874. | HAMPTON, DeSHANE |
| 875. | HAMPTON, MICHAEL |
| 876. | HAND, III., ROBERT |
| 877. | HANDY, KIM |
| 878. | HANDY, KIM |
| 879. | HANKERSON, SHEMETA |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

880. HANNA, CYRIL
881. HARDEN, DONTRELL LEE
882. HARDY, JAMES OLIVER
883. HARGRAVES, SR., JERMAINE
884. HARPER, EMOND LEON
885. HARPER, HA'KEEM OMAR G.
886. HARPER, RAMONDO L.
887. HARPER, SR., TOMMY EARL
888. HARRELL, DONNISHA
889. HARRELL, FELICIA
890. HARRELL, HENDERSON B.
891. HARRELL, LINDA C.
892. HARRELL, MARYLE C.
893. HARRELL, SEFO S.
894. HARRIS, ARIANNA
895. HARRIS, CONSTANCE
896. HARRIS, LATESHA
897. HARRIS, MYISHEA
898. HARRIS, PARIS MAURICE
899. HARRIS, RACINE
900. HARRIS, RACINE LYNNETTE
901. HARRIS, TAZIA
902. HARRIS, TOMMY LEE
903. HARRISON, ADELYA
904. HARRISON, AJA
905. HARRISON, AKIDA
906. HARRISON, AKIDE
907. HARRISON, AMIL
908. HARRISON, AMILI
909. HARRISON, ARIAHN
910. HARRISON, JESSICA ELYSSE
911. HARRISON, LARRY D.
912. HARRISON, ROMAN
913. HARRIS-WELCH, D'NIQUE CHRISTOPHER
914. HARRIS-YOUNG, SHEILA V.
915. HART, GAYLE
916. HART, MOTAIGUS
917. HARVEY, DIA KENYATTE
918. HARVEY, JR., DIA Q.
919. HARVEY, MONICA

23

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 920. | HAVARD, JEROME CARL |
| 921. | HAVARD, SHARON LOUISE |
| 922. | HAWKINS, DAVID L. |
| 923. | HAWKINS, DEVON FREDRICK |
| 924. | HAWKINS, ERICK |
| 925. | HAWKINS, JASMINE V. |
| 926. | HAWKINS, NARSHON |
| 927. | HAWKINS, VERLAINE |
| 928. | HAWKINS, ZAIRE |
| 929. | HAYDEN, LAHROL AHMAD |
| 930. | HAYES, ALAN A. |
| 931. | HAYES, CHASITY A. |
| 932. | HAYES, KAREN |
| 933. | HAYES, TASHIA |
| 934. | HAYS, RAMONA ALFREDA |
| 935. | HAZAARD-HAWKINS, ERICK ANTHONY |
| 936. | HAZARD , LAVONNE |
| 937. | HAZARD, ADRIAN JAMES |
| 938. | HAZARD, EDNA MARIA |
| 939. | HAZARD, KAREEM |
| 940. | HEARD, JANAE |
| 941. | HEARNE, LEILANI |
| 942. | HEBERT, EMIL DRAYVONN |
| 943. | HECKARD, ROSE MARY |
| 944. | HECTOR, MICHELLE PEPPARS |
| 945. | HELM, WILLIAM L. |
| 946. | HELTON, JEFFREY |
| 947. | HENDERSON, CONSTANCE R. |
| 948. | HENDERSON, DELANA |
| 949. | HENDERSON, I, TROY |
| 950. | HENDERSON, JOHN MARK |
| 951. | HENDERSON, JR., TROY |
| 952. | HENDERSON-HOSKINS, PATRICIA |
| 953. | HENDRICKS, MICHAEL ROBERT |
| 954. | HENDRICKS, TIESHA TONSHAY |
| 955. | HENRY, DENEITRA |
| 956. | HENRY, JERALENE |
| 957. | HENRY, MICHAEL D. |
| 958. | HENRY, MIESHAEL |
| 959. | HENRY, SHEILA LOUISE |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 960. | HENTREL, MARTHA RENEE |
| 961. | HEPBURN, EMANUEL |
| 962. | HERBERT, BARBARA S. |
| 963. | HERBERT, DIAMOND |
| 964. | HERNANDEZ -RAMIREZ, ANGEL ALONZO |
| 965. | HERNANDEZ, MARIA ALLEGRA |
| 966. | HERNANDEZ, SEQUIOA |
| 967. | HERNANDEZ-HERNANDEZ, JOSE ALEXIS |
| 968. | HESLIP, BARBARA ANN |
| 969. | HESLIP, WOODROW |
| 970. | HESTER, PATRICIA |
| 971. | HICKERSON, CHARLES A. |
| 972. | HICKERSON, JR., ROBERT M. |
| 973. | HICKERSON, TYRIQ |
| 974. | HICKS, HELEN L. |
| 975. | HIGGINS, BETTY J |
| 976. | HIGGINS, JERRY |
| 977. | HIGGINS, SONJA |
| 978. | HIGGINS, TRISTAN |
| 979. | HIGGS, JOVANDA NICOLE |
| 980. | HIGH, E'NIYA by Denise L. Brown |
| 981. | HILL, AREYANA |
| 982. | HILL, DAISY LEE |
| 983. | HILL, KENNETH LEE A. |
| 984. | HILL, RALEIGH WILLIE |
| 985. | HILL, RAPHAEL |
| 986. | HILL, SEMETHA |
| 987. | HILL, SHERMAN |
| 988. | HILL, TINY MARIE |
| 989. | HILL, TONYA |
| 990. | HILLIS, RAYNARD H. |
| 991. | HILL-SCOTT, ANNETTE |
| 992. | HINES, KAIA by Kim Handy |
| 993. | HINES, STETSON JOVAN |
| 994. | HINES, STETSON JUAN |
| 995. | HOCKETT, COWYA LAMOND |
| 996. | HOFFMANN, CATIUSSI |
| 997. | HOFFMANN, JEREMY |
| 998. | HOGAN, II., JAMES EUGENE |
| 999. | HOGG, CADMUS |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| 1000. | HOGG, CUNTIS |
| 1001. | HOGG, DENNIS |
| 1002. | HOLCOMB, MERCEDES |
| 1003. | HOLCOMB, MICHELLE |
| 1004. | HOLLIDAY, JR., LAWRENCE D. |
| 1005. | HOLLIER, MARKIEDA |
| 1006. | HOLLINGWORTH, LEONARD |
| 1007. | HOLLINS, KEION |
| 1008. | HOLLINS, KERRY |
| 1009. | HOLLINS, TACORA |
| 1010. | HOLLIS, BRANDON by LaShunda Hollis |
| 1011. | HOLLIS, LASHUNDA M. |
| 1012. | HOLLOWAY, DONALD RAMON |
| 1013. | HOLLOWAY, TRISH |
| 1014. | HOLMES, AARON |
| 1015. | HOLMES, DAMON |
| 1016. | HOLMES, DAVID |
| 1017. | HOLMES, FATINA |
| 1018. | HOLMES, MARGIE |
| 1019. | HOPKINS, CATINA |
| 1020. | HORNER, KIMBERLY D. |
| 1021. | HOSKINS, BRITTANY |
| 1022. | HOSKINS, CHANEL |
| 1023. | HOWARD, CUSANDA LYNN |
| 1024. | HOWARD, JASMINE JAHWANA |
| 1025. | HOWARD, JERIMOND |
| 1026. | HOWARD, JR., LONELL by Lonell Howard, Sr. |
| 1027. | HOWARD, LEONARD DOUGLAS |
| 1028. | HOWARD, LEONARD RASHAD |
| 1029. | HOWARD, LISA MONIQUE |
| 1030. | HOWARD, SAMANTHA |
| 1031. | HOWARD, SR., LONELL |
| 1032. | HOWARD, THERESA |
| 1033. | HOWARD, VERNA L. |
| 1034. | HUBARD, LINDA FAYE |
| 1035. | HUBBARD, TAMMIA M. |
| 1036. | HUBBARD, TE'ANDRE |
| 1037. | HUBBART, JENNIFER D. |
| 1038. | HUDNALL, EVELYN |
| 1039. | HUDNALL, JAMES HENRY |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1040.    HUDSON, ALAYIA by Queen-Vanessa Banks
1041.    HUDSON, ALI MUSTAFA
1042.    HUDSON, JR., ORLANDO NIMROD
1043.    HUDSON, ROBERT
1044.    HUDSON, SR., ORLANDO NIMROD
1045.    HUESO, ADELA ANDREA
1046.    HUESO, MARIO
1047.    HUFF, MAE
1048.    HUGHES, DARRELL
1049.    HUGHES, JR., PERRY
1050.    HUGHES, KRISTY
1051.    HUGHES, KRYSTLE
1052.    HUGHES, PERRY
1053.    HUGHES, SHADE T.
1054.    HUGHES, STEPHANIE L.
1055.    HUMBLE, HEATHER A.
1056.    HUMPHREY, MICHAEL
1057.    HUMTER, GLORIA J.
1058.    HUNTER, JR., ROOSEVELT
1059.    HUNTER, RUTHA
1060.    HUNTER, VINCENT
1061.    HUNTLEY, ASIA by Corinne Huntley
1062.    HUNTLEY, CATHERINE
1063.    HUNTLEY, CORINNE
1064.    HUNTLEY, CRYSTAL by Corinne Huntley
1065.    HUNTLEY, KEVIN
1066.    HURD, RAY ANTWOINE
1067.    HURST, HOPE
1068.    INGRAM, DALONNA
1069.    INYANG, SR., LEMUEL
1070.    IRVING, ANGELIQUE
1071.    IRVING, TERNELL
1072.    IVY, ROBERT
1073.    JACK, FRANCIS N.
1074.    JACK, JOHN FITZGERALD
1075.    JACK, VANCE
1076.    JACKSON HAYDEN, EMMA
1077.    JACKSON, BRENDA D.
1078.    JACKSON, DARRELL EUGENE
1079.    JACKSON, DELRICCO J.

27

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1080.   JACKSON, DEWAYNE
1081.   JACKSON, FREDERICK
1082.   JACKSON, GERALD ALONZO
1083.   JACKSON, GREGORY A.
1084.   JACKSON, ISAIAH by LaShunda Hollis
1085.   JACKSON, JUANITA
1086.   JACKSON, KATINA
1087.   JACKSON, RAICHELE
1088.   JACKSON, SR., DOMINICK
1089.   JACKSON, SR., JERMAINE
1090.   JACKSON, TAMMIE MARIE
1091.   JACKSON, TANESHA
1092.   JACKSON, THOMAS W.
1093.   JACKSON, TOMMY LEE
1094.   JACKSON, TONI
1095.   JACKSON, VERA L.
1096.   JACKSON-FRAZIER, THERESA
1097.   JAGDISH, SANJAY by Aisha Malone
1098.   JAMES, LIBBIE ANN
1099.   JAMES, LORNA P.
1100.   JAMES, THOMAS
1101.   JASPER, DARAE MARLENE
1102.   JEFFERSON, DEJA
1103.   JEFFERSON, JAMES C.
1104.   JEFFERSON, JNAI
1105.   JEFFRIES, TIFFANY
1106.   JENKINS, CARMEN PIA
1107.   JENKINS, CHERLENA
1108.   JENKINS, DEBORAH R.
1109.   JENKINS, GERALDINE
1110.   JENKINS, JACQUIA LA'RUTH
1111.   JENKINS, MICHAEL OTIS
1112.   JENKINS, NICOLE SHARRON
1113.   JENKINS, TIMOTHY
1114.   JENNINGS, KALEN
1115.   JENNINGS, RACHELLE
1116.   JETT, JUNETTA
1117.   JIANG, HUANG WEN
1118.   JIANG, SHAO LAN
1119.   JIANG, XIUQI

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1120. | JIANG, ZHENG ZHANG |
| 1121. | JINKS, LYNORK |
| 1122. | JOHNS, ERAINA |
| 1123. | JOHNS, HAROLD B. |
| 1124. | JOHNSON, ALBERT |
| 1125. | JOHNSON, ALVIN LEE |
| 1126. | JOHNSON, ANDREA |
| 1127. | JOHNSON, ANGELA |
| 1128. | JOHNSON, ANIRELL |
| 1129. | JOHNSON, ANTONIO |
| 1130. | JOHNSON, ANTONIO J. |
| 1131. | JOHNSON, ANTONIO JULIUS |
| 1132. | JOHNSON, AUDRIANA MARIE |
| 1133. | JOHNSON, BERNICE |
| 1134. | JOHNSON, CHERISE LYNETTE |
| 1135. | JOHNSON, CORA |
| 1136. | JOHNSON, CORNELL MACKEY |
| 1137. | JOHNSON, DAMAR |
| 1138. | JOHNSON, DAVID CORNELL |
| 1139. | JOHNSON, DEANNA |
| 1140. | JOHNSON, DEMARCUS J. |
| 1141. | JOHNSON, DENISHIA |
| 1142. | JOHNSON, DERWAYNE |
| 1143. | JOHNSON, DOROTHY |
| 1144. | JOHNSON, ELMIRA |
| 1145. | JOHNSON, ERIC |
| 1146. | JOHNSON, ERINNE |
| 1147. | JOHNSON, GERALD |
| 1148. | JOHNSON, HORACE |
| 1149. | JOHNSON, INITA |
| 1150. | JOHNSON, JERAY |
| 1151. | JOHNSON, JR, VINSON |
| 1152. | JOHNSON, JR., ANTHONY |
| 1153. | JOHNSON, JULIA L |
| 1154. | JOHNSON, KANYCE |
| 1155. | JOHNSON, KYMOREA |
| 1156. | JOHNSON, LESSIE L. |
| 1157. | JOHNSON, LOUIS |
| 1158. | JOHNSON, MALIK by Tianna Elaine Johnson |
| 1159. | JOHNSON, MARCUS |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1160.    JOHNSON, MAURIYAN
1161.    JOHNSON, MOESHE
1162.    JOHNSON, NEEDRA
1163.    JOHNSON, NIKKO ISIAH
1164.    JOHNSON, QUANISHA
1165.    JOHNSON, ROSELA
1166.    JOHNSON, SHAKISHA
1167.    JOHNSON, SIDNEY
1168.    JOHNSON, SR, ANTONIO
1169.    JOHNSON, SR, VINSON
1170.    JOHNSON, SR., ANTHONY
1171.    JOHNSON, SR., DARNELL
1172.    JOHNSON, TASHA
1173.    JOHNSON, TASHEANNA CHRISTY
1174.    JOHNSON, TIANNA
1175.    JOHNSON, TIANNA ELAINE
1176.    JOHNSON, TRACIE
1177.    JOHNSON, TRAVELLE DEMARCO
1178.    JOHNSON, VERONICA
1179.    JOHNSON, VERONIQUE M.
1180.    JOHNSON-MARCHAEL, CHANARAE B.
1181.    JOHNSON-MCKEEVER, CHANDRA R.
1182.    JOLIVETTE, MELISSA
1183.    JONES , RHAJONE
1184.    JONES, ANTWON
1185.    JONES, ARMANI
1186.    JONES, ASHFORD
1187.    JONES, BANAY NICOLE
1188.    JONES, BREANNA by LaTasha Telfor
1189.    JONES, CHARLES LYNN
1190.    JONES, CONNER
1191.    JONES, DAMARCO
1192.    JONES, DANIELLE MONIQUE
1193.    JONES, DAVIE
1194.    JONES, DEBRA LOLITA
1195.    JONES, DEMARION
1196.    JONES, DONAE
1197.    JONES, DONALD R.
1198.    JONES, DONNELL
1199.    JONES, EDWARD EARL

30

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1200.    JONES, ELOIS
1201.    JONES, ERIC B.
1202.    JONES, IESHA
1203.    JONES, JAMES C.
1204.    JONES, JAMES D.
1205.    JONES, JAMES MARIO CLAYTON
1206.    JONES, JARHONDA
1207.    JONES, JONEL L.
1208.    JONES, JR., CHARLES LEE
1209.    JONES, JR., FLETCHER
1210.    JONES, KEISHA
1211.    JONES, KYRA AVINA
1212.    JONES, MARLO
1213.    JONES, MARSHA LEE
1214.    JONES, MAXINE P.
1215.    JONES, MELISSA
1216.    JONES, PAMELA
1217.    JONES, QUEEN ESTER
1218.    JONES, RAMON
1219.    JONES, SADRIENA
1220.    JONES, SHIRLEY
1221.    JONES, SONJA DENISE
1222.    JONES, SYEEDA
1223.    JONES, THEASTER
1224.    JONES, TINA M.
1225.    JONES, TOMEKA M.
1226.    JONES, VIRGINIA RAE
1227.    JONES-BEASLEY, SONYA
1228.    JORDAN, SAMUEL by Deandra Bryant
1229.    JORDAN, SHANTE SADE
1230.    JORDON, EARLASHA CANDY
1231.    JOSEPH, ABDALLAH
1232.    JOSEPH, ALICE
1233.    JOSEPH, ASAD
1234.    JOSEPH, GLADYS
1235.    JOSEPH, LA'NESHA
1236.    JOSEPH, LA'SHONDA
1237.    JOSEPH, MAHER
1238.    JOSEPH, RAYLINA RAYCHELLE
1239.    JOSEPH, RAYMOND E.

31

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1240. | JOSEPH, TAMY |
| 1241. | JOSEPH, TANYA |
| 1242. | JOSHUA, ENYESE |
| 1243. | JUAREZ, BRIANA MONIQUE |
| 1244. | JUAREZ, ESTHER |
| 1245. | JUAREZ, JOSE ANGEL |
| 1246. | JUAREZ, XAVIER JAMES |
| 1247. | JUSTIN, KIM L. |
| 1248. | JUSTIN, LATRICE |
| 1249. | KALIFA, ISA M. |
| 1250. | KARAN, AMANDA |
| 1251. | KEARNEY, CYNTHIA |
| 1252. | KEASLEY, KEVIN |
| 1253. | KELLEY, BRITTNEY |
| 1254. | KELLEY, BRUCE |
| 1255. | KELLEY, BRYAN |
| 1256. | KELLEY, DOROTHY YVETTE |
| 1257. | KELLEY, KIMBERLY |
| 1258. | KELLEY, MICHELLE |
| 1259. | KELLEY, MYRON |
| 1260. | KELLEY, SHEILA |
| 1261. | KELLOM, MUHAMMAD |
| 1262. | KELLY, ARTEMESE FELICIA |
| 1263. | KELLY, BRITTENNE RENEE |
| 1264. | KELLY, CLARA B. |
| 1265. | KENDRICK, DIANA G. |
| 1266. | KENDRICK, DOMINIQUE |
| 1267. | KENDRICK, NATASHA |
| 1268. | KENNY, CARLA D. |
| 1269. | KERAN, AMANDA |
| 1270. | KESS, ROXANE CIARA |
| 1271. | KIDD, LAWANDA |
| 1272. | KINCAID, AIMEE |
| 1273. | KINCAID, DEONTE |
| 1274. | KING, DANYEL |
| 1275. | KING, DEBORAH |
| 1276. | KING, DURAN ORLANDO |
| 1277. | KING, FRANZO W. |
| 1278. | KING, MARINA |
| 1279. | KING, MELVIN CALDWELL |

32

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1280.    KING, MILDRED
1281.    KING, SHARDAE
1282.    KING, SUSIE MAE
1283.    KITTLES, DEANDRA
1284.    KITTLES, JR., DARIUS RAI
1285.    KITTLES, PO
1286.    KITTLES, SIMONE
1287.    KNIGHT, ANTHONY
1288.    KNIGHT, NACHE
1289.    KNIGHT, SANDIATA
1290.    KNIGHTEN, CYNTHIA MARIE
1291.    KUKA, MALAMA SARAH
1292.    KUKA, PRINCESS
1293.    KYER, TERRIE
1294.    LaCROSSE, SARA NICOLE
1295.    LAGERHAUSEN, BRIAN SCOTT
1296.    LAKE, IV., JOSEPH
1297.    LAKE, JOSEPH EL MALIK
1298.    LALLIEIRSOC, MURRAY T.
1299.    LAMPKINS, ARNOLD
1300.    LAMPKINS, AYJAE by Lesi Sepulona
1301.    LAMPKINS, III., ARNOLD LEON
1302.    LAMPKINS, SELINA by Lesi Sepulona
1303.    LANDRY, DANIEL B
1304.    LANDRY, MARCUS B
1305.    LANDRY, TAVIS TERRELL
1306.    LANE, RONNIE
1307.    LANE, TONETTE
1308.    LANUZA, ELIAS
1309.    LANUZA, ISAIAH by Magdalena Lanuza
1310.    LANUZA, ISRAEL by Magdalena Lanuza
1311.    LANUZA, JR., ELIAS by Magdalena Lanuza
1312.    LANUZA, MAGDALENA
1313.    LANUZA, MAGDALENA
1314.    LARK, HATTIE
1315.    LARK, RITA P
1316.    LARRY, JAMES J.
1317.    LATHAN, MAURICE
1318.    LATIMER, FAITH EILEEN
1319.    LATIMORE, BEAUVLEN LOUISE

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1320. | LATIMORE, KHALIQ A. R. |
| 1321. | LAURY, TYRONE |
| 1322. | LEAE, CHRISTENSEN |
| 1323. | LEAE, ELISHA |
| 1324. | LEAEA, MARLENA |
| 1325. | LeBLANC, SHEREE D. |
| 1326. | LE'BRANE, THERECE MARIE |
| 1327. | LEDBETTER, CARMEN |
| 1328. | LEDBETTER, DIANNE |
| 1329. | LEDBETTER, JANICE MARIE |
| 1330. | LEDBETTER, JR., ELIJAH |
| 1331. | LEDBETTER, MICHELLE MARTIN |
| 1332. | LEE, CHARLIE |
| 1333. | LEE, CURTIS DWAYNE |
| 1334. | LEE, JACQUELINE KAY |
| 1335. | LEE, JASON DWAYNE |
| 1336. | LEE, NYISHEA |
| 1337. | LEE, PAULINE |
| 1338. | LEE, ROBBIE C. |
| 1339. | LEE, SR., JUSTIN M. |
| 1340. | LEE, TAUREAN DOROTAE |
| 1341. | LEE, TOMMY |
| 1342. | LEGGETT, ROSEMARY |
| 1343. | LELAIND, ANTIA MARIE |
| 1344. | LEMMONS, DEBRA ANN |
| 1345. | LEONARDI, JOSEPH |
| 1346. | LEREMIS, SELOTIA A. by Cecilia Alc |
| 1347. | LESTEER, VERNON |
| 1348. | LESTER, HASINA |
| 1349. | LESTER, JAMES VERNON |
| 1350. | LESTER, TAHIRA |
| 1351. | LEWIS, BRITTANY |
| 1352. | LEWIS, CHARISE |
| 1353. | LEWIS, CHERYL RENEE |
| 1354. | LEWIS, DELFONSE |
| 1355. | LEWIS, FONDA NICOLE |
| 1356. | LEWIS, JAMESZELL |
| 1357. | LEWIS, LONZEL |
| 1358. | LEWIS, REGINA |
| 1359. | LEWIS, STARLENA |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1360. | LEWIS, TATIANA |
| 1361. | LEWIS, THERESA RENEE |
| 1362. | LEWIS, TYRONE S. |
| 1363. | LEWIS, YOLANDA FAY |
| 1364. | LIANG, CHAO JUN |
| 1365. | LIANG, IAN H |
| 1366. | LIANG, RUI HUA |
| 1367. | LIGE, DAMIANA |
| 1368. | LITTLETON, CHAD ZAIRE |
| 1369. | LIU, DEION |
| 1370. | LIU, HECTOR JIA |
| 1371. | LIU, JEFFREY P. |
| 1372. | LIU, LILLIAN |
| 1373. | LIU, MICHAEL |
| 1374. | LIU, NINI |
| 1375. | LIU, PETER |
| 1376. | LIUM, JAYLINA |
| 1377. | LIUM, LAYLINE |
| 1378. | LIVINGSTON, VELMA |
| 1379. | LOCKETT, JR., DENNIS K. |
| 1380. | LOCKETT, JUNIOUS |
| 1381. | LOCKETT, LAVERNE |
| 1382. | LOCKETT, MICHAEL |
| 1383. | LOCKHART, HOWARD |
| 1384. | LOFTON, DEVONTA |
| 1385. | LOFTON, MALCOLM |
| 1386. | LOFTON, MARNITHA |
| 1387. | LOGAN, VANESSA TEVIS |
| 1388. | LOGAN, VENITTA |
| 1389. | LOGGINS, ATOLYA |
| 1390. | LOGGINS, JULIUS |
| 1391. | LOMAX, BRENDA |
| 1392. | LOMAX, BRIANA |
| 1393. | LOMAX, CHRISTOPHER |
| 1394. | LOMAX, TIMOTHY D. |
| 1395. | LOPEZ, JESSICA |
| 1396. | LOPEZ, OLIVIA ELIZABETH |
| 1397. | LOPEZ, OYUKI |
| 1398. | LOUIE, JENNIFER |
| 1399. | LOVE, JAYDA by Antoinette Fort |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1400. | LOVE, THERESE NATASHA |
| 1401. | LOVE, VICTOR R. |
| 1402. | LOWERY, DEZARAY |
| 1403. | LOYD, AZIZI |
| 1404. | LOYD, HANNE MUNK |
| 1405. | LUCAS, JR., MARVELLUS ANTHONY |
| 1406. | LUCAS, JUANITA J. |
| 1407. | LUCKETT, DIANE DENISE |
| 1408. | LUM, KEALA |
| 1409. | LUMSEY, DENNIS R. |
| 1410. | LUO, XIAO WEN |
| 1411. | LYNCH, ABREEON |
| 1412. | LYNCH, JESSE |
| 1413. | LYNELL, JOYCE |
| 1414. | LYONS, TANICA |
| 1415. | MABRAY, CHANTELLE |
| 1416. | MABRAY, JOSIE |
| 1417. | MABRAY, TIFFANY |
| 1418. | MACK, ANN |
| 1419. | MACK, JOHNIESHA JADA |
| 1420. | MACK, JOHNNY JAVON |
| 1421. | MACKEY, LATANIA DIONNE |
| 1422. | MACKEY, LELAND |
| 1423. | MACKEY, RENA |
| 1424. | MACKEY, TERRY |
| 1425. | MADKINS, TATINIESHA |
| 1426. | MAGEE, KELLISHA ELIZABETH |
| 1427. | MAHASIN, AMIR |
| 1428. | MAHASIN, JIHAD WALEED |
| 1429. | MAHASIN, OMAR QAWI |
| 1430. | MAHASIN, SALAHUDIN |
| 1431. | MAHASIN-WALLS, ANTAR RASHEED |
| 1432. | MAJOR, CHARLENE |
| 1433. | MALIK, HANEEFA |
| 1434. | MALIK, ISMAIL ABDUL |
| 1435. | MALONE, AISHA |
| 1436. | MALONE, BETTY |
| 1437. | MALONE, DRUMON LAWRENCE |
| 1438. | MALONE, JUWAN ELIJAH |
| 1439. | MALONE, SICARD |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1440. | MALONEY, MAURICE J. |
| 1441. | MANIGO, JIMMIE LEE |
| 1442. | MANIGO, JIMMIE LYNCH |
| 1443. | MANIGO, JOE LEE |
| 1444. | MANNING, AMANI CHAZ |
| 1445. | MANSFIELD, LASONIA PATRICE |
| 1446. | MANUEL, JABARI M. |
| 1447. | MANUEL, JAIDA T. |
| 1448. | MANUEL, LATRICE MONIQUE |
| 1449. | MANUELS, EBONY A. |
| 1450. | MARCHALL, CHANARAE |
| 1451. | MARKHAM, PHOEBE |
| 1452. | MARMAN, DEVON |
| 1453. | MARMAN, SR., DEVON |
| 1454. | MARSHALL, CATHALENE |
| 1455. | MARSHALL, DAVON R. |
| 1456. | MARSHALL, JEAN |
| 1457. | MARSHALL, KING ROYALTY by Yolanda Marshall |
| 1458. | MARSHALL, MIRACLE |
| 1459. | MARSHALL, SAMUEL |
| 1460. | MARSHALL, TOMEICKA |
| 1461. | MARSHALL, YOLANDA |
| 1462. | MARTIN, CYNTHIA MARIE |
| 1463. | MARTIN, ELAINE |
| 1464. | MARTIN, JALISCO MARRELL |
| 1465. | MARTIN, JA'RAYA |
| 1466. | MARTIN, MICHELLE |
| 1467. | MARTIN, ROBERT JAMES |
| 1468. | MARTINEZ, DIVINA M. |
| 1469. | MARVEL, JABARI RICHARD |
| 1470. | MASINA, NEIMA |
| 1471. | MASINA, SOPHIA |
| 1472. | MASON, LISHANIQUE J. |
| 1473. | MATHEWS, I'EASHA L, |
| 1474. | MATHEWS, LAKEISHA |
| 1475. | MATLOCK, MICHAEL |
| 1476. | MATOS, PRISCILLA |
| 1477. | MATTHEWS, AMINA |
| 1478. | MATTHEWS, ERICA |
| 1479. | MATTHEWS, JENNEFERE LEE |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1480.    MAXEY, II., JANET
1481.    MAYBON, ROBERT
1482.    MAYES, CLIFFORD DARNELL
1483.    MAYFIELD, MIKAYLA by Zulaika Mayfield
1484.    MAYFIELD, ZULAIKA
1485.    MAYS, DUNTE by Alise Minor
1486.    MAYS, PARIS
1487.    MCALISTER, KENNETH
1488.    MCBRIDE, ANTOINETTE
1489.    MCCALL, ELONDA D.
1490.    MCCLENDON, AHMONDRA
1491.    MCCLINTON, HELEN
1492.    MCCOY, AIYANA LEE
1493.    McCREE, DARIUS LEAEA
1494.    MCDANIEL, CHARLES LAMAR
1495.    MCDANIEL, CLARA E.
1496.    MCDANIEL, CLARISSA L.
1497.    MCDANIELS, TIMOTHY
1498.    McDONALD, GERALD J.
1499.    MCDONALD, STEVEN
1500.    McDOWELL, ISAIAH
1501.    MCDOWELL, JOHNTE
1502.    MCFARLAND, KIMONESHA LASHA
1503.    MCFARLAND, LATASHIA
1504.    MCGEE, KELLY
1505.    MCGHEE, III, ORASE by Pamela Marie Breaux
1506.    MCGHEE, JORDAN by Pamela Marie Breaux
1507.    MCGHEE, ORASE
1508.    McGHEE, SHAQUETT
1509.    MCGILBERY, SHERREL A.
1510.    MCGINNIS, KATRICE
1511.    MCGINNIS, LEON
1512.    McGINNIS, LEVON
1513.    McGINNIS, VIVIENNE
1514.    MCGINNIS, VONTRICE
1515.    McGLOTHIN, BRICE
1516.    McGLOTHIN, CURTIS
1517.    MCGLOTHIN, GIRTHA
1518.    MCGLOTHIN, RUMEKA
1519.    McGLOTHIN, ZACHARIAH

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1520.    MCGOWAN, JOSEPH D.
1521.    MCGOWAN, MAURISHA
1522.    MCGUIRE, ANGELIQUE
1523.    MCGUIRE, ZION by Angelique McGuire
1524.    MCKEEVER, EBONY
1525.    MCKEEVER, JAMES
1526.    MCKEEVER, SEMA J AREVON
1527.    MCKINNON, LEILANI by Stacy Hermain Stewart
1528.    MCLEMORE, ASHLEY NICOLE
1529.    MCNAIR, JONATHON C.
1530.    MCNAMARA, GREGORY
1531.    MCNAMARA, JOHN
1532.    McNEIL, MARK ANTHONY
1533.    McPETERS, MONIQUE NICOLE
1534.    MCPHEETERS, MARY
1535.    McWHORTER, JOHN
1536.    MEAN, JOHNNY
1537.    MEAN, SAROEUN
1538.    MELTON, ANTHONY E.
1539.    MENDEZ, ALBERT RICARDO
1540.    MERCER, BERTHINA
1541.    MEREDITH, ISHMAEL
1542.    MEREDITH, LANAESHA
1543.    MEREDITH, NICOLE
1544.    MEREDITH, RAYMOND
1545.    MERRIHEW, ANITA MIGNON
1546.    MERRIHEW, MORGAN WILEY
1547.    MERRITT, RANDY
1548.    MICHAELS, ANITA C.
1549.    MICKELS, JUSTICE
1550.    MILBURN-WEBB, URSULA M.
1551.    MILLER, ERIC EUGENE
1552.    MILLER, LAGENA G.
1553.    MILLER, MONIQUE
1554.    MILLER, RAQUEL
1555.    MILLER, REGGIE
1556.    MILLER, TANESHIA
1557.    MILLER, TRENELL DAESHAWN
1558.    MILLIGAN, ARMISSA
1559.    MIMS, DELIAH

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1560. MIMS, LAMONT
1561. MIMS, LILIAN
1562. MINER, SHEILA
1563. MINKINS, MARYANN
1564. MINOR, AARON MONTRELL
1565. MINOR, ALISE
1566. MINOR, JR., SAMUEL
1567. MINOR, SAMUEL
1568. MINOV, ANDRE
1569. MITCHELL, ANTHONY
1570. MITCHELL, AUBRA
1571. MITCHELL, BREYANNA
1572. MITCHELL, JR., MAURICE ANTONIO
1573. MITCHELL, KIARI ANTONESE NATASHA
1574. MITCHELL, MAXINE COLETTE
1575. MITCHELL, NIKOH GLEN
1576. MITCHELL, TOMASA LUCILLE
1577. MIXON , JARIEL
1578. MIXON, CATHERINE
1579. MIXON, KATIRIA
1580. MIXON, LADASHA
1581. MOBLEY, ANTOINETTE
1582. MOFFETT, AJEENAH
1583. MOLEX, LEELA VIRGINIA
1584. MONCADA, LUCIA G.
1585. MONDY, MONICA
1586. MONROE, CARMELITA
1587. MONTEZA, FIORELLA
1588. MONTFORD, G'ECHELE
1589. MONTFORD, GREGORY
1590. MONTFORD, KEITH
1591. MONTGOMERY, LINDA ANN
1592. MOOR, RAYMOND
1593. MOORE, AYANNA
1594. MOORE, DIANE M.
1595. MOORE, LEE E.
1596. MOORE, LEROY
1597. MOORE, NATALIE
1598. MOORE, RICKEY D.
1599. MOORE, ROBYN L

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1600. | MOORE, VELMA |
| 1601. | MOORE, WILLIAM L. |
| 1602. | MORGAN, ANGELA |
| 1603. | MORGAN, DELVON |
| 1604. | MORRIS, JAMES |
| 1605. | MORRIS, SR., TAVARIS JOVAN |
| 1606. | MORRIS, TAVARIS JOVAN |
| 1607. | MORRIS, VERLA |
| 1608. | MORRISON, ANDREA |
| 1609. | MORTON, ALAHJAWON |
| 1610. | MORTON, IVORYONNE by Yvonne Lanette Gage |
| 1611. | MOSS, JOAN |
| 1612. | MOSS, MILLARD FILLMORE |
| 1613. | MOSS, PIA |
| 1614. | MOSS, PIERRE by Yolanda Marshall |
| 1615. | MOZEKE, JA'NI by Patsy Candley |
| 1616. | MOZEKE, TRE'MAYNE by Patsy Candley |
| 1617. | MUHAMMAD, AISHA by Lejeannia Richardson |
| 1618. | MUHAMMAD, ALBERT |
| 1619. | MUHAMMAD, ALESHA by Catherine Muhammad |
| 1620. | MUHAMMAD, ALITASH |
| 1621. | MUHAMMAD, ANTHONY MARQUIS |
| 1622. | MUHAMMAD, ARSHAD ZAHIR |
| 1623. | MUHAMMAD, ARYSSA ZARIA by Catherine Muhammad |
| 1624. | MUHAMMAD, AZRAA |
| 1625. | MUHAMMAD, CATHERINE |
| 1626. | MUHAMMAD, CHRISTOPHER |
| 1627. | MUHAMMAD, COLLEEN |
| 1628. | MUHAMMAD, CYRIL |
| 1629. | MUHAMMAD, ELYASAN by Tynetta S. Muhammad |
| 1630. | MUHAMMAD, ERICA |
| 1631. | MUHAMMAD, FATIMA SUCI |
| 1632. | MUHAMMAD, FATIMAH by Sati Samad |
| 1633. | MUHAMMAD, HALIMAH S. |
| 1634. | MUHAMMAD, MARTHA K. |
| 1635. | MUHAMMAD, MARYAM |
| 1636. | MUHAMMAD, MILES |
| 1637. | MUHAMMAD, RAHIMA |
| 1638. | MUHAMMAD, SAADIQ by Erica Muhammad |
| 1639. | MUHAMMAD, SALAMAN |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1640. MUHAMMAD, SHARIEFF by Lejeannia Richardson
1641. MUHAMMAD, TORAH CLARA by Linda Muhammad-Baxter
1642. MUHAMMAD, TYNETTA S.
1643. MUHAMMAD, Y'HOSHUA by Erica Muhammad
1644. MUHAMMAD, YOLANDE COLE
1645. MUHAMMAD-BAXTER, LINDA
1646. MULLINS, FRANCES
1647. MUNK, LEE
1648. MURPHY, DONALD
1649. MURPHY, LARRY L.
1650. MURRAY, MARKETTA
1651. MYLES, PATRICIA ANN
1652. NALLS, II., RONALD DOUGLAS
1653. NARCISSE, A. RENE
1654. NED, DEANDRE
1655. NEELY, MAIJOR I. by Tarian L. Garner
1656. NELSON, ANDREYA by Latashia McFarland
1657. NELSON, PARIS by Andrea Smith
1658. NELSON, TELRON
1659. NELSON, TERESSA by Catina Hopkins
1660. NEWT, NICOLE NASHAE
1661. NGUYEN, ANH XUAN
1662. NGUYEN, THUONG
1663. NIKO, JERICHO SULE
1664. NISBY, DERYL
1665. NORMAN, DENNIS K.
1666. NORMAN, GENETE
1667. NORMAN, MICHAEL
1668. NORTH, BESSIE
1669. NUQUI, SR., ALLAN M.
1670. NZEREM, CHIDOLE
1671. NZEREM, IFEYINWA
1672. NZEREM, UZOAMAKA
1673. OBERES, GIRLIE FERAREN
1674. OBRIEN, JR., DAVID
1675. OGANS, JR, CRAIG ALLEN
1676. O'GILIVIE, WAYNE
1677. OLDS, LENORA
1678. OLIVER, DIANE
1679. OLIVER, FRANK L.

42

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1680. | OLIVER, GEORGIE |
| 1681. | OLIVER, JONATHON DAVID |
| 1682. | OLIVER, MAURICE |
| 1683. | OLIVER, REGINALD LEON |
| 1684. | OLIVER, TERRY |
| 1685. | OLIVER, TRACEY LAURICE |
| 1686. | O'NEAL, AALIYAH J. M. |
| 1687. | O'NEAL, MANDON ISAIAH |
| 1688. | O'NEIL, JUDY |
| 1689. | ONYEADOR, OBINNA |
| 1690. | OREGANA, ALCUIN |
| 1691. | ORNELAS, MARIO JOSE |
| 1692. | ORTEZ, STEPHANIE |
| 1693. | ORTEZ-TOUSSAND, IASIAH by Stephanie Ortez |
| 1694. | ORTUA, JR., ZACARIAS R. |
| 1695. | ORTUA, LOLITA |
| 1696. | OSBORNE, JEANETTE |
| 1697. | OSBORNE, LAMAR S. |
| 1698. | OTIS, LUMONT M. |
| 1699. | OW, MATTHEW |
| 1700. | OWENS, BRADLEY |
| 1701. | OWENS, DOUGLAS |
| 1702. | OWENS, GLORIA |
| 1703. | OWENS, LESSIE M. |
| 1704. | OWENS, LYNETTE |
| 1705. | OWENS, MARY |
| 1706. | OWENS, SHEILA |
| 1707. | OWENS, TINA MARIE |
| 1708. | PAGE-BOND, PATRICIA L. |
| 1709. | PALMER, JANICE LYNN |
| 1710. | PAOPAO, ESETA |
| 1711. | PAOPAO, FOTOLE |
| 1712. | PAOPAO, FOTU FOTU |
| 1713. | PARISH, BRENDA K. |
| 1714. | PARISH, CHRIS |
| 1715. | PARISH, OSCAR J. |
| 1716. | PARKER, KIMBERLY N. |
| 1717. | PARKER, MARSHAI |
| 1718. | PARKER, MIZELLE |
| 1719. | PARKER, RODNEY |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1720. | PARKER, SHEILA |
| 1721. | PARKER, VEOTIS LEE |
| 1722. | PARRA-MCGLOTHIN, PALOMA |
| 1723. | PATTERSON, ANTHONY EARL |
| 1724. | PATTERSON, GLORIA |
| 1725. | PATTERSON, KEYS |
| 1726. | PATTERSON, TIAJHANNA |
| 1727. | PATTON, DOROTHY |
| 1728. | PATTON, IV., EVERETT |
| 1729. | PATTON, JORDAN |
| 1730. | PATTON, JR., EVERETT E. |
| 1731. | PATTON, MILDRED L |
| 1732. | PATTON, VATIMA |
| 1733. | PAYNE, DEBBIE |
| 1734. | PAYNE, REMI |
| 1735. | PEACOCK, NAKEISHA |
| 1736. | PEANG, NATALIE N. |
| 1737. | PEARSON, GLORIA |
| 1738. | PELESAUMA, TAMAITAIOLEAO TAI |
| 1739. | PELESEUMA, EMELIANO ANI |
| 1740. | PEPPARS, LINDA |
| 1741. | PERCY, LAKITYA |
| 1742. | PERKINS, JR., SYLVESTER MICHAEL |
| 1743. | PERKINS, ROSEMARIE LINTZ |
| 1744. | PERKINS, SYLVESTER |
| 1745. | PERRY, SHERRA ROSNER |
| 1746. | PERRY-SMITH, CYNTHIA FRANCES |
| 1747. | PERSONS, LATRICE M. |
| 1748. | PETE, JESSICA J. |
| 1749. | PETERS, HENDERSON |
| 1750. | PETERSON, DOROTHY MAE |
| 1751. | PETERSON, LYNELL |
| 1752. | PHILLIPS, AMIR |
| 1753. | PHILLIPS, CHLOE M.T. by Tarian L. Garner |
| 1754. | PHILLIPS, ERIC D. |
| 1755. | PHILLIPS, ERICA DEANNA |
| 1756. | PHILLIPS, JR., ERIC DWAYNE |
| 1757. | PHILLIPS, KHAMAL |
| 1758. | PHILLIPS, RAINE GAYNELL by Tarian L. Garner |
| 1759. | PHILLIPS, RITA H. |

44

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1760.   PHILLIPS, RITA RENEE
1761.   PHILLIPS, TRACIE
1762.   PHILLIPS, ZOE B.O. by Tarian L. Garner
1763.   PHIPPS, JOSEPH NATHANIEL
1764.   PICKETT, CAROLE ELAINE
1765.   PICOT, ANGELIQUE
1766.   PIEERCE, ROBERT
1767.   PIERCE, ERICA
1768.   PIERCE, KARIMAN
1769.   PINA, KARINA
1770.   PINKARD, MERCEDES
1771.   PINKARD, MONICA
1772.   PINKARD, ROBERT
1773.   PLUMMER, TWAVIDA
1774.   POITTER, RICHARD THOMAS
1775.   POLK , BENJAMIN
1776.   POLK, ANNIE VICTORIA
1777.   POLK, MARILYN M
1778.   POLLARD, VERGIL LOUISE
1779.   POPLAR, LATONDRA
1780.   PORCHE, FRANK
1781.   PORCHE, III., FRANK
1782.   PORCHE, IMYE by Kyndra Williams
1783.   PORTER , SHONTIA CORENE
1784.   PORTER, ALKISHA
1785.   PORTER, LEANNA
1786.   PORTER, SID DESHAN
1787.   POTTER, SHAMYJARE
1788.   POWELL, AHJA
1789.   POWELL, BRANDEN
1790.   POWELL, BRIAN
1791.   POWELL, EDWARD
1792.   POWELL, HARELL
1793.   POWELL, JR., JAMES
1794.   POWELL, LAKISHA
1795.   POWELL, NICOLE
1796.   POWELL, PAMELA
1797.   POWELL, SHANTEL
1798.   POWELL, SHAREKA SHARONDA-MARIE
1799.   PRATT, III., HERMAN

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1800. | PRATT, I'JAH |
| 1801. | PRATT, U'JAH |
| 1802. | PRENTICE, D'NAY |
| 1803. | PRENTICE, DNAYA |
| 1804. | PRESSLEY, ERIC |
| 1805. | PRICE, DOSHEA |
| 1806. | PRICE, ROMEAR |
| 1807. | PRIMES, JEROME |
| 1808. | PRIMUS, RUDOLPH LIONEL |
| 1809. | PROFIT, GAYNELL |
| 1810. | PROFIT, JOSEPH |
| 1811. | PROFIT, KATHY D. |
| 1812. | PRYER, KIM ELLEN |
| 1813. | PUCKETT, JANIELLE |
| 1814. | PUGH, SAMARIA by Latashia McFarland |
| 1815. | QUINN, DONTE MIGUEL |
| 1816. | QUINNINE, SHARMAINE |
| 1817. | RAM, EVELYN |
| 1818. | RAM, LEONARD |
| 1819. | RAMIREZ, MIGUEL ANGEL |
| 1820. | RAMIREZ, VIDA |
| 1821. | RANDELL, TONIA |
| 1822. | RANDOLPH, LEILANI VICTORIA |
| 1823. | RANEY, SONYA R. |
| 1824. | RANGE, DESHAWN |
| 1825. | RANKIN, ANTHONY D |
| 1826. | RANKINS, CLAIRE L. |
| 1827. | RANSA, MARQUISJA JENE |
| 1828. | RAO, ALAMELA |
| 1829. | RAO, ALAMELU |
| 1830. | RAO, ALEIMAN |
| 1831. | RAO, SARADHA |
| 1832. | RASOOL, SHAHEED |
| 1833. | RATLER-BAILEY, GLYNIS D. |
| 1834. | RATLIFF, LAKEESHA |
| 1835. | RAY, ANTHONY by Inita Johnson |
| 1836. | RAYFORD, TIMOTHY SEAN |
| 1837. | RECIO, PATRICIA |
| 1838. | RECIO, SR., ALCIDE |
| 1839. | RED, EMEROLD MARIE |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1840. | REDDIC, DALTON |
| 1841. | REDDIC, LaSHONDA |
| 1842. | REDMOND, DIANA |
| 1843. | REDMOND, DONALD |
| 1844. | REDMOND, ELEISHA |
| 1845. | REDMOND, JAEDON SILAS |
| 1846. | REDWOOD, ANTHONY |
| 1847. | REDWOOD-HELTON, THERESA MARIE |
| 1848. | REED, BENJAMIN |
| 1849. | REED, CHARLENE |
| 1850. | REED, EDDIE R. |
| 1851. | REED, ERIC LYNN |
| 1852. | REED, FREDERICK |
| 1853. | REED, LATARA RENEE |
| 1854. | REED, LORETTA |
| 1855. | REED, LOU ELLA |
| 1856. | REED, MALENA |
| 1857. | REEVES, ROMEO |
| 1858. | REID, JR., BENJAMIN |
| 1859. | REID, TIFFANI J. |
| 1860. | REID, TYSON D. |
| 1861. | REYES, GEORGE |
| 1862. | REYNOLDS, ISAIAH by Tina Marie Owens |
| 1863. | REYNOLDS, SEDRIC by Tina Marie Owens |
| 1864. | RHODES, AGYEI |
| 1865. | RHODES, SHARON C. |
| 1866. | RHODES, SHERRON |
| 1867. | RHODES, SR., JULIUS |
| 1868. | RHONE, DONALD EARL |
| 1869. | RICE, DEANNA D. |
| 1870. | RICHARDSON, JIMMIE |
| 1871. | RICHARDSON, JUKARI |
| 1872. | RICHARDSON, MARIJEWEL |
| 1873. | RICHARDSON, VIVIAN J. |
| 1874. | RICKY, ANTHONY |
| 1875. | RIDDLE, WILBERT KEITH |
| 1876. | RILEY, BERNADINE |
| 1877. | RIVERS , TRACY DAWAYNE |
| 1878. | RIVERS, GERALDINE |
| 1879. | RIVERS, PATRICIA |

47

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1880.  RIVERS, TERRI
1881.  RIVERS, WILLIAM R
1882.  ROACH, KRISTINE
1883.  ROAN, LUCIA R.
1884.  ROAN, SHALINDA FELICE
1885.  ROARK, REONA LYNN
1886.  ROBERSON, STEPHANIE FAYE
1887.  ROBERTSON, KEICHANEE
1888.  ROBINIZINE, GLENDA S.
1889.  ROBINSON, BERNARD
1890.  ROBINSON, CHANISCE
1891.  ROBINSON, CHYNA by Patricia Rivers
1892.  ROBINSON, DEREK
1893.  ROBINSON, DONNELL L.
1894.  ROBINSON, EBONIE
1895.  ROBINSON, EMMITT
1896.  ROBINSON, JESSE
1897.  ROBINSON, JR., KENNETH EARL
1898.  ROBINSON, MAURICE L.
1899.  ROBINSON, MICHAEL AMARY
1900.  ROBINSON, PAMELA
1901.  ROBINSON, RONIQUA
1902.  ROBINSON, SIERRA
1903.  ROBINSON, TEDD CHRISTIAN
1904.  ROBINSON, TIANA
1905.  ROBINSON, VELMA
1906.  ROCHE, SEAN PATRICK
1907.  RODNEY, ANDY R.
1908.  RODNEY, ARMANI LEE
1909.  RODNEY, IMAN REGINALD
1910.  RODNEY, REGINA C.
1911.  RODRIGUEZ, ANJENETTE
1912.  RODRIGUEZ, FRANCISCO
1913.  RODRIGUEZ, LEONARDA
1914.  ROGERS, DWANEE' LEE
1915.  ROGERS, ROMAN
1916.  ROGERS, TERRELL
1917.  ROGERS, TIERRA
1918.  ROLLINS, ROSCOE
1919.  ROMERO, JOSE

48

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1920. | ROMERO, ZACHARY AARON |
| 1921. | ROMERO-MEJIA, ANIELKA |
| 1922. | ROOKS, CHAD |
| 1923. | ROSS, DEBRA  ANN WILLIAMS |
| 1924. | ROSS, KINDRED |
| 1925. | ROTH, DENIS DEAN |
| 1926. | ROWEL, CHANEL |
| 1927. | ROWEL, KEVIN MAC |
| 1928. | RUBIN, JOSEPH N. |
| 1929. | RUBIN, VENDELLA |
| 1930. | RUDOLPH, DAISHANIQUA |
| 1931. | RUDOLPH, DENISE RENELL |
| 1932. | RUDOLPH, XZAVIER by Shante Danielle Brown |
| 1933. | RUFFIN, CLAREESE |
| 1934. | RUFFIN, KATHY |
| 1935. | RUPAN, ASHWIN |
| 1936. | RUPAN-TOMPKINS, MIZAN by Raphael Tompkins |
| 1937. | RUPAN-TOMPKINS, NAMAZ by Raphael Tompkins |
| 1938. | RUPAN-TOMPKINS, RONICA |
| 1939. | RUPAN-TOMPKINS, SURAH by Raphael Tompkins |
| 1940. | RUSSELL, ALEXANDRIA |
| 1941. | RUSSELL, ANGELINA |
| 1942. | RUSSELL, GWENDOLYN L. |
| 1943. | RUSSELL, TIFFANY |
| 1944. | SAILORS, ROBERT |
| 1945. | SALEH, MONICA RENEE |
| 1946. | SAMAD, SATI |
| 1947. | SAMPLES, JANICE |
| 1948. | SANCHEZ, EDITH |
| 1949. | SANDERS, COLTYCE T. |
| 1950. | SANDERS, FELICIA |
| 1951. | SANDERS, HENRY |
| 1952. | SANDERS, HENRY LEE |
| 1953. | SANDERS, LAMONT LAMAR |
| 1954. | SANFORD, JOVAUHN |
| 1955. | SARSOUR, LARENT NICOLA |
| 1956. | SARSOUR, MARQUETTA DENYSE |
| 1957. | SATINOVER, DANIELLE |
| 1958. | SATINOVER, MIRIELLE L. |
| 1959. | SATTUI, MARIO |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1960. | SAULNY, TERRY |
| 1961. | SAULNY-GREEN, ANITA |
| 1962. | SCARBROUGH-SICES, BERNADETTE FRANCES |
| 1963. | SCOTT, BARBARA ELAINE |
| 1964. | SCOTT, EBONY DENISE |
| 1965. | SCOTT, JESSE |
| 1966. | SCOTT, JR., STANLEY RICHARD |
| 1967. | SCOTT, KIMONYA |
| 1968. | SCOTT, MILTON |
| 1969. | SCOTT, RONKENIA LEEAN |
| 1970. | SCOTT, UGANDA TRINIKA |
| 1971. | SCRANTON, LASHA |
| 1972. | SEAGRAVE, KATHERINE |
| 1973. | SEASTRUNK, ORLANDO |
| 1974. | SECREASE, KENNETH |
| 1975. | SELBY, LISA M. |
| 1976. | SEPULONA, LESI |
| 1977. | SEPULONA, TUSIGA |
| 1978. | SEYMORE, MAKHI by Kashina Garner |
| 1979. | SHABAZZ, DORIS LINDA |
| 1980. | SHACKLEFORD-COOPER, DEASJMANYHKE by Jasmine Butler |
| 1981. | SHANKAR, A.L. |
| 1982. | SHARELL, NEAL |
| 1983. | SHARP, ARLENE |
| 1984. | SHARP, MARTHA |
| 1985. | SHAW, ARKELIA J. |
| 1986. | SHAW, DAWN |
| 1987. | SHAW, DEBRA H. |
| 1988. | SHELBUA, ANTWAN |
| 1989. | SHEPARD, KEANA |
| 1990. | SHEPARD, LYNDA FAYE |
| 1991. | SHERMAN, JAMES |
| 1992. | SHERMAN, QUINCY by James Sherman |
| 1993. | SHICK, RICHARD |
| 1994. | SHIELDS, ERICKA S. |
| 1995. | SHINE, LILLIAN |
| 1996. | SHINE, TIMOTHY |
| 1997. | SHOWERS, ANJEANNETTE SARAH |
| 1998. | SHOWERS, JERRY L. |
| 1999. | SHOWERS, VIVIAN ANNETTE |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 2000. | SICES, BIANCA |
| 2001. | SICES, KATRINA |
| 2002. | SILAS, NANDI |
| 2003. | SILAS, TANISHA J. |
| 2004. | SIMMS, FAIRY |
| 2005. | SIMMS, JR., ROBERT |
| 2006. | SIMMS, KIM |
| 2007. | SIMMS, KOMET |
| 2008. | SIMMS, REGINALD EDWIN |
| 2009. | SIMMS, ROBERT W |
| 2010. | SIMMS, WALKIRIS |
| 2011. | SIMPSON, DOROTHY |
| 2012. | SIMPSON, RONDA |
| 2013. | SIMS, BILLY GLYN |
| 2014. | SIMS, CHRISTOPHER |
| 2015. | SIMS, IV., ROSE MARIE |
| 2016. | SIMS, JEREMIAH |
| 2017. | SIMS, KENNETH MICHAEL |
| 2018. | SIMS, WESLEY |
| 2019. | SIMS, YISHA |
| 2020. | SINGH JOHNSON, ROSELA |
| 2021. | SINGH, ELISA V. |
| 2022. | SINGH, SHALBEENDRA |
| 2023. | SINGH, SHALVIN by Evelyn Ram |
| 2024. | SINGLETON, ISAAC |
| 2025. | SINGLETON, LACONYA |
| 2026. | SKINNER, JR, COREY |
| 2027. | SKINNER, NAJAH |
| 2028. | SLADE, JR., JAMES IVAN |
| 2029. | SLOAN, AHMAD JEROME |
| 2030. | SMITH , ROSALIND |
| 2031. | SMITH, ANDRE RAYDEL |
| 2032. | SMITH, ANDREA |
| 2033. | SMITH, ANDREW |
| 2034. | SMITH, ANGELA |
| 2035. | SMITH, ARAINA |
| 2036. | SMITH, ASHLEY ELAINE NICOLE |
| 2037. | SMITH, BEVERLY |
| 2038. | SMITH, BRANDY |
| 2039. | SMITH, BRIAN |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 2040. | SMITH, BYNONTAE A. |
| 2041. | SMITH, BYRONAE |
| 2042. | SMITH, CLOIA |
| 2043. | SMITH, DENISE |
| 2044. | SMITH, DIANA LORRAINE |
| 2045. | SMITH, DIANE WESLEY |
| 2046. | SMITH, DORIELL |
| 2047. | SMITH, DOROTHY J. |
| 2048. | SMITH, FREDERICK |
| 2049. | SMITH, GREGORY |
| 2050. | SMITH, HAROLD D. |
| 2051. | SMITH, JAMARR |
| 2052. | SMITH, JANICE MARIE |
| 2053. | SMITH, JOYCE O'CONNER |
| 2054. | SMITH, KEVIN |
| 2055. | SMITH, LASHANDA |
| 2056. | SMITH, LaTONYA |
| 2057. | SMITH, LAVEITTE |
| 2058. | SMITH, MARTI C. |
| 2059. | SMITH, MARY |
| 2060. | SMITH, NEISHA |
| 2061. | SMITH, QUINCY |
| 2062. | SMITH, ROSALAND R. |
| 2063. | SMITH, SR., STEPHEN D. |
| 2064. | SMITH, STEPHEN D. |
| 2065. | SMITH, TAMIR |
| 2066. | SMITH, YVONNE |
| 2067. | SMITH-FRANCIS, SANDRA |
| 2068. | SMOTHERS, ETHEL L. |
| 2069. | SNEED, NEVAEH by Alise Minor |
| 2070. | SNELL, JOSEPH |
| 2071. | SNELL, NICHOLAS |
| 2072. | SOLOMON, EMILY |
| 2073. | SOLORZANO, OCTAVIO GUILLERMO |
| 2074. | SOTO-HERNANDEZ YESSENIA |
| 2075. | SOUN, SAKHAN |
| 2076. | SPAIN, JAHMIL MIKEL |
| 2077. | SPEARS, APRIL |
| 2078. | SPEARS, LATANYA |
| 2079. | SPENCER, JAMES |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 2080. | SPENCER, LAVETTE |
| 2081. | SPENCER, TASHA T. |
| 2082. | SPIKENER, DAVID P. |
| 2083. | SPRINGFIELD, DOMINIQUE |
| 2084. | SPRINGFIELD, SHARNAE |
| 2085. | ST LOUIS, CONSTANCE |
| 2086. | ST LOUIS, LEVOI |
| 2087. | ST. LEON, KAMARI |
| 2088. | STANCIL, JALEEL |
| 2089. | STANCIL, JANELLE |
| 2090. | STANCIL, JEFFREY |
| 2091. | STANCIL, JERREL K. |
| 2092. | STANCIL, MADONNA R. |
| 2093. | STANDIFER, TERIANA |
| 2094. | STATHAM, CLARENCE |
| 2095. | STATHAM, JASMIN ANNE-MARIE |
| 2096. | STATHAM, SALENE |
| 2097. | STERN, ARION |
| 2098. | STEVENSON, DAIMONNAE EMONEI |
| 2099. | STEWART , ANDREA |
| 2100. | STEWART, BETTY M.; |
| 2101. | STEWART, CORETTA ALLENE |
| 2102. | STEWART, HERMAN |
| 2103. | STEWART, RAVEN O |
| 2104. | STEWART, STACY HERMAIN |
| 2105. | STIGER, JANINA |
| 2106. | STIGER, TIFFANIQUE |
| 2107. | STITT, CHARLES |
| 2108. | STOCKS, DEJA |
| 2109. | STONE, AARON |
| 2110. | STONE, EDWARD |
| 2111. | STONEY, SHAKEMA |
| 2112. | STRINGER, VIRGINIA |
| 2113. | STROTHER, BRITTANY TATIANA |
| 2114. | STUART, ANGELA F. |
| 2115. | STUART, LESTER |
| 2116. | STUART, REGINALD E. |
| 2117. | SULLEY, UWAH |
| 2118. | SULLIVAN , MONICA |
| 2119. | SULLIVAN, MAURICE |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 2120. | SULTAN, SHAYNA |
| 2121. | SUNDAY, BEULAH MAE |
| 2122. | SUTTON, VERANIECE |
| 2123. | SUWANDI, SUWANDI |
| 2124. | SWAN, BERTHA |
| 2125. | SWAN-CUMMINGS, TIERRA |
| 2126. | SWANN, CYNTHIA |
| 2127. | SWAYNE, GREGORY C. |
| 2128. | SWEENY-ALLEN, DAVOIR DARLENE |
| 2129. | SYLVE, JANET DENISE |
| 2130. | SYLVE, MARLISSA |
| 2131. | SYRETTA, DANIELLE |
| 2132. | TAAMAI, FLORITA |
| 2133. | TAARNAOR, FLORITA |
| 2134. | TABRON, DUPREE SHYHEEM |
| 2135. | TABRON, JR., ULES |
| 2136. | TAGATA, FAALILIU |
| 2137. | TAGATA, SWEETIE SILVANO |
| 2138. | TALLEY-EVANS, DIANE |
| 2139. | TALOLO, MATTHEW MICHAEL |
| 2140. | TANKSLEY, CAROLYN J. |
| 2141. | TANKSLEY, WENDY |
| 2142. | TANNER, YVONNE |
| 2143. | TAPER, IV., THOMAS ANDREW |
| 2144. | TATUM, KOSHAWN |
| 2145. | TATUM, WAYNE |
| 2146. | TAUMAOE, TAUFETEE |
| 2147. | TAYLOR , ELAINE MARIE |
| 2148. | TAYLOR, BEVERLY ANN |
| 2149. | TAYLOR, CHARLOTTE ELIZABETH |
| 2150. | TAYLOR, DORETHA |
| 2151. | TAYLOR, HAKIM |
| 2152. | TAYLOR, JR., DARRYL by Patsy Candley |
| 2153. | TAYLOR, JR., MACK EDWARD |
| 2154. | TAYLOR, KAMILAH |
| 2155. | TAYLOR, MARYLIN |
| 2156. | TAYLOR, MEOLDY MONIQUE |
| 2157. | TAYLOR, NAEEMAH |
| 2158. | TAYLOR, OMAR |
| 2159. | TAYLOR, ORONDE |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2160.   TAYLOR, PATRICK
2161.   TAYLOR, PAUL RANDALL
2162.   TAYLOR, PEARL
2163.   TAYLOR, PEARL L.
2164.   TAYLOR, RONDOE
2165.   TAYLOR, SHIRLEY
2166.   TAYLOR, WILBERT
2167.   TAYLOR-JONES, TIFFANY A
2168.   TEA, FIALUGA
2169.   TEA, JR., SIONE
2170.   TELFOR, ALBERTA
2171.   TELFOR, ALFRED
2172.   TELFOR, LATASHA·
2173.   TELFOR, MALCOM
2174.   TELFOR, MARGARET
2175.   TENNANT, JULIET
2176.   TERRELL, DREW
2177.   TERRELL, JESSICA
2178.   TERRELL-RHODES, ANTONIKA
2179.   THIBAUEX, LLOYD
2180.   THOMAS, ALTHEA
2181.   THOMAS, ANASTASIA
2182.   THOMAS, BERNARD KEVIN
2183.   THOMAS, CHERRY
2184.   THOMAS, DONALD
2185.   THOMAS, ELIJAH
2186.   THOMAS, ELIZABETH ANN
2187.   THOMAS, ISAIAH
2188.   THOMAS, JOHNNY
2189.   THOMAS, JUAN
2190.   THOMAS, LAFAYETTE
2191.   THOMAS, LaTANYA
2192.   THOMAS, LINDA M.
2193.   THOMAS, LORENZO
2194.   THOMAS, MILDRED DEAN
2195.   THOMAS, PETTRENELIA
2196.   THOMAS, RUBY
2197.   THOMAS, SARAH
2198.   THOMAS, SARAH JUNE
2199.   THOMAS, SHAMIKA

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2200.   THOMAS-MARSHALL, OMARION by Tiffany Russell
2201.   THOMASSON, LEON
2202.   THOMASSON, TRACEY LYNN
2203.   THOMPSON WHITFIELD, COLBY RONNELL
2204.   THOMPSON, BRIAN
2205.   THOMPSON, CLARESSE
2206.   THOMPSON, DANIELLE
2207.   THOMPSON, FRED
2208.   THOMPSON, GERALD LEWIS
2209.   THOMPSON, J LEONTE by Jada Walker
2210.   THOMPSON, JACKIE
2211.   THOMPSON, MARY
2212.   THOMPSON, MIEISHA
2213.   THOMPSON, SHAQUETT
2214.   THOMPSON, TAKIA TELITHA,
2215.   THOMPSON, TANYA RITA,
2216.   THOMPSON, UNIQUE,
2217.   THONG, SAVOEUN
2218.   THORNTON-COLBERT, TANYA JOHNSON
2219.   THROWER, SHARON
2220.   TIMS, LAKEDA
2221.   TINSLEY, KARIMA
2222.   TITUS, LOTTIE J.
2223.   TOBIAS, EDDIE
2224.   TOBIAS, HENRY L.
2225.   TODD, ASHLEY
2226.   TODD, TAKISHA
2227.   TOLBERT, TANTAY ARLEAN
2228.   TOLLIVER, DIANA
2229.   TOLLIVER, PHYLLIS THOMPSON
2230.   TOLLIVER, SHERRIE LYNN
2231.   TOLLIVER, THEODORE
2232.   TOLLIVER, TIFFANY
2233.   TOM, JEREMY
2234.   TOMPKINS, BELEN
2235.   TOMPKINS, BRIANA
2236.   TOMPKINS, DANIEL
2237.   TOMPKINS, DANIELLE
2238.   TOMPKINS, LETITIA
2239.   TOMPKINS, RAPHAEL

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2240. TOMPKINS, RAQUEL
2241. TOMPKINS, RAY
2242. TOMPKINS, TIANA by Daniel Tompkins
2243. TORREY, HAPPY
2244. TOUPS, JAMEELA
2245. TOUPS, JILL A.
2246. TRAMIL, MARY LOUISE
2247. TRAVIS, CHAVARLA
2248. TRAVIS, HASSAN MALIK
2249. TRAVIS, JASON
2250. TRAVIS, JR., ANTHONY B.
2251. TRAVIS, MARY JEAN
2252. TRAVIS, PAMELA
2253. TRAVIS, PAUL
2254. TRAVIS, SR., ANTHONY T.
2255. TROCHEZ COTO, JUAN RAMON
2256. TROTTER, DOROTHY
2257. TROTTER, MICHAEL
2258. TROTTER, MIKETHA
2259. TROUPE, DOMINICK
2260. TROUPE, QUINTASIA
2261. TROUPE, STACEY
2262. TUMBAT, GULNAR
2263. TURNER, MARYLIN
2264. TURNER, ROPESHA
2265. TURNER, SANDRA LYNETTE
2266. TURNER, HERBERT B.
2267. TURNER, LAJANEE
2268. TURNER, LEAMUEL
2269. TURNER, LERONE
2270. TURNER, TERRY
2271. TURNER, VALERIE
2272. TWINE, EDWARD
2273. TWINE, NGHIA
2274. TYLER TUKES,
2275. TYLER, SIRNELL
2276. TYSON, ANGELA NICOLE
2277. TYSON, CATHERINE
2278. TYSON, DARON
2279. TYSON, III., JOE NATHAN

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 2280. | TYSON, JOE KOLBY KEVON |
| 2281. | TYSON, NEFATORA |
| 2282. | UNDERDUE, SUNDRA |
| 2283. | VALENCIA, JEANNETTE L. |
| 2284. | VANDERCOURT, ADRIANNE |
| 2285. | VAUGHN, ANTHONY FREDERICK |
| 2286. | VAUGHN, JOYCE E. |
| 2287. | VAUGHN, MARQUEZ |
| 2288. | VAUGHN, SAMUEL |
| 2289. | VINCENT, KATINA |
| 2290. | VINCENT, VICTORIA |
| 2291. | VINENT, STEPHAN |
| 2292. | VINES, JR., EDWARD P. |
| 2293. | VINES, KIM |
| 2294. | VINES, LYNJAE |
| 2295. | WADE, ROBERT |
| 2296. | WAGNER, BRANDY A. |
| 2297. | WAGNER, CHRISTINA |
| 2298. | WALKER , RENIQUA |
| 2299. | WALKER, ANTHONY RYDELL |
| 2300. | WALKER, CESENA |
| 2301. | WALKER, CRYSTAL |
| 2302. | WALKER, DESIREE L. |
| 2303. | WALKER, DEVANT LONDELL |
| 2304. | WALKER, JACQUELINE YVETTE |
| 2305. | WALKER, JADA |
| 2306. | WALKER, KEVIN DAVON |
| 2307. | WALKER, LEON |
| 2308. | WALKER, LEONA L. |
| 2309. | WALKER, SHAWNAY ARENA |
| 2310. | WALKER, VELVELON |
| 2311. | WALKER, ZYON |
| 2312. | WALLACE, FRANK |
| 2313. | WALLACE, JR., LE'VESTER |
| 2314. | WALLACE, MARGUERITE LOUISE |
| 2315. | WALLER, RENATA |
| 2316. | WALLS , GHAIMAH MAHASIN |
| 2317. | WALLS , LELIA DIANA |
| 2318. | WALLS , RICARDO CORTEZ, |
| 2319. | WALLS, BASHEBA |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 2320. | WALLS, RICHARD V. |
| 2321. | WALTON, DALE |
| 2322. | WARD, JOE |
| 2323. | WARD, LANEITA |
| 2324. | WARD, NADINE |
| 2325. | WARD, TERRELL R. |
| 2326. | WARD, TERRON A. |
| 2327. | WARD, TIERRA L. |
| 2328. | WARE, PATRICIA |
| 2329. | WARREN, ALGARISCE |
| 2330. | WARREN, ANTHONY |
| 2331. | WARREN, DIANNE |
| 2332. | WARREN, LANNY ALBERT |
| 2333. | WARREN, MAURICE |
| 2334. | WARREN, NICHOLE |
| 2335. | WARREN, SIERRA |
| 2336. | WARREN, ULYSSES |
| 2337. | WASHINGTON, ANISA |
| 2338. | WASHINGTON, ANISHA |
| 2339. | WASHINGTON, ARIM |
| 2340. | WASHINGTON, BARBARA ANN |
| 2341. | WASHINGTON, BROOKE |
| 2342. | WASHINGTON, GREGORY ALLAN |
| 2343. | WASHINGTON, III., GREGORY ALLAN |
| 2344. | WASHINGTON, JACQUELINE |
| 2345. | WASHINGTON, JARELL |
| 2346. | WASHINGTON, JIMMIE WAYNE |
| 2347. | WASHINGTON, KEISHA |
| 2348. | WASHINGTON, KIMBERLY J. |
| 2349. | WASHINGTON, KIMBERLY JEMELA |
| 2350. | WASHINGTON, LANEISHA |
| 2351. | WASHINGTON, LEE |
| 2352. | WASHINGTON, LINDA LOUISE |
| 2353. | WASHINGTON, SAHKARI NYEMAH |
| 2354. | WASHINGTON, SANKARI |
| 2355. | WASHINGTON, VIRGINIA |
| 2356. | WASHINGTON, ZYERRE |
| 2357. | WATERS, CHANTIY |
| 2358. | WATKINS, JOYCE |
| 2359. | WATKINS, JOYCE ANN |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2360.   WATKINS, MARQUEESE T.
2361.   WATKINS, PARRISH
2362.   WATKINS, REVOLVDA
2363.   WATKINS, SHANYA
2364.   WATLEY, ONA M.
2365.   WATSON, BARBARA A.
2366.   WATSON, FRANKIE FELICE
2367.   WATSON, JR., ARTHUR
2368.   WATSON, LENCE
2369.   WATSON, ROOSEVELT
2370.   WATSON, SANDRA VARNETTE
2371.   WATSON, SR., ARTHUR
2372.   WATSON, WARDELL R.
2373.   WATSON, YASMEEN
2374.   WATTS, PEPPER
2375.   WATTS, SHARON
2376.   WEATHERSBY, KENNYATTA
2377.   WEBB, CYNTHIA ROSE
2378.   WEBB, DIAMOND by Heidi Deanna Bluford.
2379.   WEBB, DONNA
2380.   WEBB, JAMES DANTE
2381.   WEBB, SR., MAGER
2382.   WEBB, VICTORIA
2383.   WEIGHT, JALENA MARIE
2384.   WELLS, SHENE
2385.   WESLEY, FAHEEM
2386.   WESLEY, SR., KELLY RASHAND
2387.   WHILTENBERG, BILLY
2388.   WHILTENBERG, RONNIE
2389.   WHILTENBERG, SHIELA
2390.   WHILTSHIRE, AREON
2391.   WHISBY, MAYA
2392.   WHITAKER, JAVONE by Cedric Whitaker, Sr.
2393.   WHITAKER, SR, CEDRIC
2394.   WHITAKER, SR., VICTOR
2395.   WHITAKER, VAHN
2396.   WHITAKER, VANCE
2397.   WHITAKER, VINCENA
2398.   WHITE, ANDRE
2399.   WHITE, BARBARA

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

|       |                                  |
|-------|----------------------------------|
| 2400. | WHITE, BRIAN E.                  |
| 2401. | WHITE, CANDACE                   |
| 2402. | WHITE, CRYSTAL LYN               |
| 2403. | WHITE, CYNTHIA                   |
| 2404. | WHITE, ERIC                      |
| 2405. | WHITE, FRANCELLE                 |
| 2406. | WHITE, III., NATHANIEL           |
| 2407. | WHITE, JEROME                    |
| 2408. | WHITE, JOHN                      |
| 2409. | WHITE, KIANA CHEVELLE            |
| 2410. | WHITE, MAURICE                   |
| 2411. | WHITE, MELISSA MAE               |
| 2412. | WHITE, MONIQUE                   |
| 2413. | WHITE, NA'JEE                    |
| 2414. | WHITE, PEARLIE                   |
| 2415. | WHITE, ROBERT                    |
| 2416. | WHITE, SHIERICKEA ADREANA        |
| 2417. | WHITE, SNOW, by Yolanda Marshall |
| 2418. | WHITE, TORRENCE                  |
| 2419. | WHITE, VANESSA                   |
| 2420. | WHITE-HEINZ, STARLA              |
| 2421. | WHITESIDE, DONALD                |
| 2422. | WHITFIELD, ANDREW                |
| 2423. | WHITFIELD, FRANK                 |
| 2424. | WHITFIELD, LASHANNA              |
| 2425. | WHITFIELD, ROSLYN                |
| 2426. | WHITLEY, ANTWON                  |
| 2427. | WHITLEY, DIETRICH D.             |
| 2428. | WHITLEY, RODERICK                |
| 2429. | WHITLEY, SHIRLEY                 |
| 2430. | WHITTENBERG, JAMES               |
| 2431. | WHITTENBERG, JASON               |
| 2432. | WHITTENBERG, RENESHA RENIKA      |
| 2433. | WILKE, JEFFREY                   |
| 2434. | WILLIAMS , MALAE                 |
| 2435. | WILLIAMS, ANGELA                 |
| 2436. | WILLIAMS, BETTY                  |
| 2437. | WILLIAMS, BIESHA                 |
| 2438. | WILLIAMS, BRIAN                  |
| 2439. | WILLIAMS, BRIGETTE               |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2440.   WILLIAMS, CALLIE MAE
2441.   WILLIAMS, CANDICE
2442.   WILLIAMS, CAROLENA
2443.   WILLIAMS, CHANCES
2444.   WILLIAMS, DEMETRIUS
2445.   WILLIAMS, DEMONYA
2446.   WILLIAMS, DENNIS CHARLES
2447.   WILLIAMS, DERRICK
2448.   WILLIAMS, DOMINIQUE D.
2449.   WILLIAMS, DOROTHY M.
2450.   WILLIAMS, FELICIA
2451.   WILLIAMS, GARRY LANE
2452.   WILLIAMS, IMANI
2453.   WILLIAMS, JACQUEZ
2454.   WILLIAMS, JAELUN
2455.   WILLIAMS, JANET
2456.   WILLIAMS, JEFFREY C.
2457.   WILLIAMS, JOSEPH
2458.   WILLIAMS, JUELEAH
2459.   WILLIAMS, KATIE by Sarah Thomas
2460.   WILLIAMS, KENNETH
2461.   WILLIAMS, KYNDRA
2462.   WILLIAMS, LADORIS
2463.   WILLIAMS, LATRICE
2464.   WILLIAMS, LEA JANAY
2465.   WILLIAMS, MARIAN
2466.   WILLIAMS, OTIS
2467.   WILLIAMS, RICKY
2468.   WILLIAMS, RITA A.
2469.   WILLIAMS, ROBERT A.
2470.   WILLIAMS, ROBERT ALONZO
2471.   WILLIAMS, ROMAYN LE'ANDRE
2472.   WILLIAMS, STEVEN
2473.   WILLIAMS, TASHAWN
2474.   WILLIAMS, TIFFANY
2475.   WILLIAMS, TIMONI by Maya Whisby
2476.   WILLIAMS, VERLA
2477.   WILLIAMSON, DOMINIQUE
2478.   WILLIS, ALICIAH
2479.   WILLIS, NILAYAH by Mieisha Thompson

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2480. WILLIS, PARIS by Mieisha Thompson
2481. WILLIS, TINA LOUISE
2482. WILLIS-DE LOS REYES, MIQUESHA
2483. WILLSON, JIMMIE EDWARD
2484. WILSON, DA'RON
2485. WILSON, ERIN
2486. WILSON, GAYNELL
2487. WILSON, JR., ANDRE by Twavida Plummer
2488. WILSON, KHALID AHMAD
2489. WILSON, LATOYA
2490. WILSON, MICHAEL
2491. WILSON, NADIYAH
2492. WILSON, PRISCILLA
2493. WILSON, SHA'MYA
2494. WILSON, STAFUNDA
2495. WILSON, TABRELA
2496. WINCHESTER, RAHSAAN
2497. WINDHAM, ANETH N.
2498. WINDHAM, JEFFERY
2499. WINDOM, ANGELA
2500. WINDOM, TERRELL LODOM
2501. WINDOM, III., TERRELL LADO
2502. WINDOM, TERREL
2503. WINNFIELD, MERCEDES A.
2504. WINTERSTEIN, ELIZABETH CHASTITY
2505. WINTERSTEIN, EVELYN PULETELE
2506. WISE-GASTINELL, KIM A.
2507. WITHERSPOON, JR., EZEKIEL E.
2508. WITHERSPOON, REGINA L.
2509. WITHERSPOON, SR., EZEKIEL E.
2510. WOLDRIDGE-HOWARD, LAVEESE M.
2511. WOLFE, LYRIS DELPHINIA
2512. WOLLEY, LINDA
2513. WOMACK, ANTHONY S.
2514. WONG, NATHAN
2515. WOODS, JACK
2516. WOODS, LISA
2517. WOODS, VICTORIA
2518. WOODWARD, JALIL by Jasmine Butler
2519. WOOTEN, JAKARI

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2520.   WOOYEON, CHO
2521.   WORLEY, CHERRYL M.
2522.   WRIGHT, CAELA ADRIANNA
2523.   WRIGHT, DERRICK
2524.   WRIGHT, DURINA
2525.   WRIGHT, III., CLEVELAND C.
2526.   WRIGHT, JANAE
2527.   WRIGHT, KARLTON
2528.   WRIGHT, MATTHEW
2529.   WRIGHT, MELISSA MAE
2530.   WRIGHT, PATRICIA A.
2531.   WRIGHT, SHAWANA A.
2532.   WRIGHT, SR., DERRICK DIMITRIS
2533.   WYATT, SHANI JAMILA JAHA
2534.   WYNN , ANGEL
2535.   WYNN, INGRID
2536.   WYNN, LISA
2537.   XU, YALI
2538.   YATES, SASHELL
2539.   YORK, ANTOINELLA MARIE
2540.   YORK, SHARINA M.
2541.   YOUNG , DONTAY
2542.   YOUNG, AMANDA
2543.   YOUNG, BEVERLY ANN
2544.   YOUNG, MARGARET E.
2545.   YOUNG, MARVIN SCOTT
2546.   YOUNG, PERRY GLENN
2547.   YOUNG, STEPHANIE FELICIA
2548.   YOUNG, TONI MARIE
2549.   YOUNGS, ARETHA
2550.   YOUNGS, ERIC
2551.   YOUNGS, TYRONE
2552.   YOUNGS-COLVIN, DIANE
2553.   ZAYAS, MEKIELA R.
2554.   ZINN, ANGEL GLORIA
2555.   ZINN, NICOLE JEAN

1 | CHARLES A. BONNER, ESQ. SB# 85413
2 | A. CABRAL BONNER, ESQ. SB# 247528
   | **LAW OFFICES OF CHARLES A. BONNER**
3 | 475 GATE FIVE RD, SUITE 212
   | SAUSALITO, CA 94965
4 | TEL: (415) 331-3070
   | FAX: (415) 331-2738
5 | cbonner799@aol.com
6 | cabral@bonnerlaw.com

7 | ATTORNEYS FOR PLAINTIFFS

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*
**02/05/2019**
Clerk of the Court
BY:JUDITH NUNEZ
Deputy Clerk

8 | **SUPERIOR COURT OF CALIFORNIA**

9 | **COUNTY OF SAN FRANCISCO**

10 | **UNLIMITED JURISDICTION**

11 |

12 | BAYVIEW HUNTERS POINT RESIDENTS, DANIELLE CARPENTER, CATHERINE
13 | MUHAMMAD, *Including All Parties Listed In Exhibit A*; and Doe Plaintiffs 1-40,000, on
14 | behalf of themselves, and all others similarly situated;
15 |
16 |                 Plaintiffs,
   |           vs.
17 |
18 | TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *In his Individual*
19 | *and Official Capacity,* CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of
20 | TETRA TECH; STEVEN M. BURDICK, *In his Individual and Official Capacity,*
21 | EXECUTIVE VICE PRESIDENT, CHIEF FINANCIAL OFFICER OF TETRA
22 | TECH; STEPHEN C. ROLFE, *In his Individual and Official Capacity,*
23 | MANAGING AGENT OF TETRA TECH;
24 | JUSTIN E. HUBBARD, *In his Individual and Official Capacity,* MANAGING AGENT OF
25 | TETRA TECH; LENNAR, INC.; and FIVE POINT HOLDINGS, LLC., and DOES 1-100
26 | Inclusive,
27 |
28 |                 Defendants.

Case No.: CGC-18-566188

**A CLASS ACTION LAWSUIT**

**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

I. **UNFAIR AND FRAUDULENT BUSINESS PRACTICES**
2. **FALSE AND MISLEADING STATEMENTS**
3. **NEGLIGENCE FEAR OF CANCER**
4. **STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES**
5. **VIOLATION OF PROPOSITION 65**
6. **FRAUD**
7. **NEGLIGENCE PER SE-VIOLATION OF CRIMINAL LAW**
8. **BAD FAITH BREACH OF THIRD PARTY CONTRACT**
9. **PUBLIC NUISANCE**
10. **PRIVATE NUISANCE**
11. **INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

SECOND AMENDED CLASS ACTION COMPLAINT - 1

Plaintiffs BAYVIEW HUNTERS POINT RESIDENTS ("BHPR" or "PLAINTIFFS"), individually and on behalf of all others similarly situated, allege the following:

## I. INTRODUCTION

### *"[T]he biggest case of eco-fraud in U.S. history."[1]*

1.     "They told us we were safe! Tetra Tech Lied!" "This is shocking; frightening!" The distressed pleas from the predominantly African American neighborhoods in the Bayview Hunters Point have grown louder and more urgent since the Navy and the Environmental Protection Agency ("EPA") have found that Tetra Tech, after being paid 1.1 Billion Dollars to clean up the Superfund Site, fraudulently falsified soil samples from the 522-acre Hunters Point Naval Shipyard (HPNS"), one of the most highly toxic waste sites in America. As victims of environmental racism, many BHPR believe that because of Tetra Tech's conduct, their suffering from cancers, asthma, debilitating respiratory illnesses and many other diseases caused by the toxic conditions at the Navy's Superfund site has been exceedingly exacerbated. Tetra Tech's conduct has also further elevated their now immeasurably heightened FEAR of contracting cancer and other radiation caused medical illnesses.

2.     In 1995, a Health Department Study found that San Francisco's BAYVIEW HUNTERS POINT District has higher than normal rates of breast and cervical cancers. The study shows that African American women under 50 account for the majority of the higher incidences of breast cancer. Their breast cancer rate is double that of San Francisco as a whole. BAYVIEW HUNTERS POINT RESIDENTS know that the higher incidences of cancer and asthma are caused by the Navy's dumping of toxic materials, including radioactive materials into the land adjacent to their neighborhoods. They know that the toxic materials are still in the ground they walk on, in the air they breathe, and trapped in the very building materials of their homes; they are well aware that they are in fact marinating in radioactive, carcinogenic killer toxins. They are now living in existential, abject FEAR of developing cancer and other radiation related illnesses.

---

[1]   Jeff Ruch, PEER's executive director Public Employees for Environmental Responsibility, an advocacy group based in the Washington, D.C.

3.      Hunters Point Naval Ship Yard housed the Naval Radiological Defense Laboratory ("NRDL") from 1948 to 1969. NRDL activities included radiological decontamination of ships exposed to atomic weapons testing, experimentation and research on radiological decontamination in general, the overall effects of radiation on material substances,[2] and the effect of radiation on humans and other living organisms.

4.      Such activities conducted by the NRDL contaminated the soil, dust, sediments, surface water and groundwater of BAYVIEW HUNTERS POINT with petroleum fuels, pesticides, heavy metals, radiation releases, polychlorinated biphenyls ("PCBs"), volatile organic compounds ("VOCs") and all such radionuclides released from the fusion process of making Nuclear Atomic Bombs. Soil at the site has also been found to contain naturally occurring asbestos and metals.

5.      The U.S. Navy additionally operated the site as a shipyard until 1974, predominantly using it to clean ships exposed radiation from atom bombs, as well as for research on nuclear weapons defense.

6.      In 1989, the heavily contaminated shipyard was designated as an EPA Superfund site, giving it priority as one of the most toxic cleanup sites in the nation. On or about 2002, Tetra Tech, a company specializing in toxic cleanup was hired by the United States Navy to undertake cleanup and removal of the toxic waste laid down by the United States Navy during the approximately 25 years of its residency.

7.      On Jan. 30, 2018, the United States Navy issued a preliminary report, compiled by five outside consultants, which concluded that nearly half of the data Tetra Tech had collected from the Superfund site was flawed. The data includes samples collected mostly between 2006

---

[2]     Historians estimate that 7,000 to 10,000 Native Americans inhabited the San Francisco Bay Region at one point. The Ohlone people likely settled in the Hunters Point area due to the availability of seasonal hunting and fishing. Hunters Point was a private commercial dry dock facility from 1869 until 1939, when the Navy purchased the property. From 1945 until 1974, the Navy used the site mostly as a naval submarine and ship repair facility. The site also housed the Naval Radiological Defense Laboratory (NRDL) from 1948 to 1969. NRDL activities included radiological decontamination of ships exposed to atomic weapons testing as well as research and experiments on radiological decontamination, the effect of radiation on living organisms, and the effects of radiation on materials. https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0902722

1 and 2012 from 300,000 cubic yards of soil, 20 buildings, 30 former building sites and 28 miles of
2 storm drains.

3       8.      In April 2018, an environmental watchdog group released a Dec. 27, 2017 letter
4 written by John Chesnutt, manager of the EPA's local Superfund Division. The letter stated that
5 as much as 97 percent of Tetra Tech's cleanup data from two parcels on the site was found to be
6 suspect and should be retested.[3]

7       9.      The EPA found: "In Parcel B, the Navy recommended resampling in 15% of soil
8 survey units in trenches, fill, and building sites. EPA, Department of Toxic Substances Control
9 ("DTSC"), and California Department of Public Health, (CDPH) found signs of potential
10 falsification, data manipulation, and/or data quality concerns that call into question the reliability
11 of soil data in an additional 76% of survey units, bringing to 90% the total suspect soil survey
12 units in Parcel B. (These do not add exactly due to rounding). In Parcel G, the Navy
13 recommended resampling 49% of survey units, and regulatory agencies recommended 49%
14 more, for a total of 97% of survey units as suspect...." Chesnutt further found that "the data
15 analyzed demonstrates a widespread pattern of practices that appear to show deliberate
16 falsification, failure to perform the work in a manner required to ensure (the EPA's approval)
17 requirements were met, or both."

18      10.     Over the decades, asbestos, PCBs, solvents, lead and radioactive materials all
19 were dumped at the site bordering Bayview Hunters Point.

20      11.     The City of San Francisco first adopted a redevelopment plan for the shipyard in
21 1997. Whistleblowers came forward in 2012 with allegations that their superiors at Tetra Tech
22 had ordered them to fake soil samples in an effort to speed up the $1 billion cleanup.

23      12.     In 2014, the Navy admitted that it had become aware of mishandling of data and
24 fake testing by Tetra Tech employees, triggering an investigation by the Nuclear Regulatory
25 Commission. The revelations led to Tetra Tech shifting blame onto low-level employees and
26 stating they were re-cleaning the sites.

27

---

[3] EPA December 27, 2017, *John Chesnutt, Manager, Pacific Islands and Federal Facilities Section Superfund*
28 *Division.*

13.  Also In 2014, Whistleblowers exposed Navy contractor Tetra Tech's internal report, documenting deliberate and orchestrated fraud in the collection of 2,500 anomalous radioactive soil samples collected at multiple sites on the base. The Nuclear Regulatory Commission fined Tetra Tech $7,000 after confirming the soil samples had been falsified. Recent reviews by both the U.S. Navy and the EPA corroborate allegations made by former Tetra Tech employees, whistleblowers and their advocates over the last six years.

14.  Tetra Tech first admitted to providing false soil samples in 2014, but the Navy permitted the company to continue working after blaming the problem on low-level employees, as well as subjecting other workers to "ethics training." The Navy apparently accepted Tetra Tech's excuses and solutions until recently, when more whistleblowers came forward, again alleging more widespread and systemic fraud—allegations that have now been sustained.

## II. THE PARTIES

15.  Class Plaintiffs are Residents of BAYVIEW HUNTERS POINT, consisting of individuals who have been living in, or had substantial contact with, the Hunters Point Community, with the Postal Zip Code 94124, from 2004 to present. All Plaintiffs in this action are set forth in **Exhibit A**, which is incorporated by this reference as fully set forth herein.

16.  The geographic parameters of the BAYVIEW HUNTERS POINT RESIDENT PLAINTIFFS are limited to the last, 2010, census tract populations and in the Postal Zip Code 94124 as follows:

| Census Tract No. | Population |
|---|---|
| 9809 | 350 |
| 610 | 3,610 |
| 233 | 5,216 |
| 234 | 3,660 |
| 232 | 4,582 |
| 231.03 | 3,725 |
| 230.01 | 5,216 |
| 230.03 | 4,093 |

SECOND AMENDED CLASS ACTION COMPLAINT - 5

| 230.03 | 4,093 |
|---|---|
| 612 | 4,087 |
| **TOTAL POPULATION** | **38,484** |



**DOE PLAINTIFFS**

17.     DOE PLAINTIFFS 1-40,000 are Residents of BAYVIEW HUNTERS POINT, consisting of individuals who have been living in, or had substantial contact with, the Hunters Point Community, with the Postal Zip Code 94124, from 2004 to present but have not to date discovered the elements of their causes of action. This action will be amended to include those

1  DOE PLAINTIFFS 1-40,000 when those PLAINTIFFS have ascertained and discovered each
2  element of each cause of action against each of the named DEFENDANTS herein.

3      18.     DEFENDANTS Tetra Tech, Inc. and Tetra Tech EC, Inc. are California
4  corporations that have contracted with the United States Navy and United States government to
5  perform clean-up and remediation services at the Hunters Point Shipyard in San Francisco. On
6  information and belief it is alleged that the principal business office of Tetra Tech EC, Inc. is
7  located in Pasadena, California.

8      19.     DEFENDANT Lennar, Inc. is headquartered in Miami, Florida and is doing
9  business in California. DEFENDANT Five Point Holdings, LLC is headquartered in Aliso Viejo,
10  California.

11                            **DOE DEFENDANTS**

12      20.     The true names and capacities, whether individual, corporate, associate,
13  subsidiary, officer, director, employee, other representative, or otherwise, of DOE
14  DEFENDANTS 1 through 50 inclusive, are unknown to the PLAINTIFFS, who therefore sue
15  each DEFENDANT by a fictitious name. PLAINTIFFS are informed and believe and thereupon
16  allege that each of these fictitiously named DEFENDANTS are responsible, in some manner, for
17  the damages alleged herein. PLAINTIFFS therefore designate DOE DEFENDANTS 1 through
18  50 by such fictitious names, and when their names have been ascertained, PLAINTIFFS will
19  amend this complaint to allege their true names and capacities.

20                        **III. JURISDICTION AND VENUE**

21      21.     Jurisdiction is pursuant to California Code of Civil Procedure § 382 providing:
22  "When the question is one of a common or general interest, of many persons, or when the parties
23  are numerous, and it is impracticable to bring them all before the court, one or more may sue or
24  defend for the benefit of all." This court also has jurisdiction under California Business &
25  Professions Code §17203. Venue is proper in this judicial district because BAYVIEW
26  HUNTERS POINT RESIDENTS' injuries, damages and harms occurred in this judicial district.
27  Further, one or more of the DEFENDANTS reside, are headquartered and conduct business in

28

this judicial district. DEFENDANTS' wrongful acts and omissions are giving rise to PLAINTIFFS' claims for restitution and equitable relief.

### IV. RESPONDEAT SUPERIOR

22.     All of the described conduct, acts, and failures to act are attributed to agents and employees under the direction and control, and with the permission, consent and authorization of DEFENDANTS. Said acts, conduct and failures to act were within the scope of such agency and/or employment, and each of the DEFENDANTS ratified, endorsed, and agreed to the acts and omissions of each of the other DEFENDANTS. Each of these acts and failures to act is alleged against each DEFENDANT, whether acting individually, jointly, or severally. At all times relevant herein, each DEFENDANT was acting within the course and scope of his or her employment, agreement, and ratification.

### DEFENDANTS' RATIFICATION, ADOPTION AND AUTHORIZATION

23.     DEFENDANTS knew, or should have known, that DEFENDANTS' employees had a propensity, proclivity and obedience to carry out the directives, orders, and mandates of superiors and managers, even when those directives, orders and mandates violated the law, were fraudulent and even criminal.

24.     It is well established that when an employer ratifies the tortious conduct of an employee, he or she becomes "liable for the employee's wrongful conduct as a joint participant." *Fretland v. County of Humboldt* (1999) 69 Cal. App. 4th 1478, 1489-1490. An employer who fails to discipline an employee after being informed of that employee's improper conduct can be deemed to have ratified that conduct. *Hart v. National Mortgage & Land Co.* (1987) 189 Cal. App. 3d 1420, 1430; *Iverson v. Atlas Pacific Engineering* (1983) 143 Cal. App. 3d 219, 228. According to the court in Iverson, if an employer is informed that an employee has committed an intentional tort and nevertheless declines to "censure, criticize, suspend or discharge" that employee, a claim can be made for ratification. Id.

25.     "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him. A purported agent's

1    act may be adopted expressly or it may be adopted by implication based on conduct of the
2    purported principal from which an intention to consent to or adopt the act may be fairly inferred,
3    including conduct which is 'inconsistent with any reasonable intention on his part, other than that
4    he intended approving and adopting it.' *Fretland,* supra 69 Cal. App. 4th 1491

5        26.    At all relevant times alleged herein, DEFENDANTS had actual and constructive
6    knowledge of DEFENDANTS' illegal, unethical, unlawful, criminal behavior. DEFENDANTS
7    endorsed, ratified, authorized, encouraged, and directed the illegal conduct as alleged herein and
8    failed to take any corrective action to protect the BAYVIEW HUNTERS POINT RESIDENTS
9    and the public from the illegal conduct. Hence, DEFENDANTS; and each of them, are liable for
10   all the illegal conduct of their employees.

11                    **V. STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTION**
12                    **Historical Background of Hunters Point Naval Shipyard**

13       27.    Hunters Point Shipyard ("HPS" or the "Site") is a deactivated shipyard located in
14   the southeastern portion of San Francisco, California, adjacent to San Francisco Bay. In 1940,
15   the Navy obtained ownership of the shipyard for ship building, repair and maintenance activities.
16   Hunters Point Naval Shipyard ("HPNS") was the transit departure point for Little Boy, the
17   atomic bomb the U.S. dropped on the civilian population of Hiroshima in August 1945.

18       28.    In addition to using the Site for a Naval Shipyard, The Department of Defense
19   also used these properties to conduct radiological activities on the site, including (1) sandblasting
20   radioactive waste off Navy ships subjected to nuclear testing at the Bikini Atoll, (2) extensive
21   application of fluorescent radium on dials, knobs, and buttons, and (3) operating a radiological
22   defense laboratory on site from 1955 to 1979 in Buildings 364, 815, and 816. Radioactive waste
23   materials generated by the University of California at Berkeley and the Lawrence Livermore
24   Laboratories were shipped to Hunters Point for handling, transport and disposal. Such activities,
25   involving the handling and application of radioactive materials, contaminated the ground,
26   buildings, sewer lines, landfills, and surrounding areas of Hunters Point.

27       29.    The U.S. Navy established the Naval Radiological Defense Laboratory (NRDL)
28   in 1946 at HPS to study the effects of nuclear weapons, as well as to develop counter measures

to such weapons. NRDL operated until 1969 and conducted studies related to ship shielding, radioactive waste for deep-sea disposal, animal research, radiation detection instrumentation development, and other laboratory studies. NRDL also decontaminated and disposed of some of the ships involved in nuclear weapons testing in the Marshall Islands. During operations at HPNS, the shipyard site grew in size to approximately [500 acres] by filling parts of the San Francisco Bay bordering the Hunters Point Shipyard. The site currently consists of approximately 866 acres, 446 of which are under water.

30.     Hunters Point began operating as a Navy shipyard in the early 1940s and soon became the only Navy shipyard in Northern California that could deal with large warships. Although World War II had ended, the U.S. continued its nuclear operations and in July 1946, during *Operation Crossroads*, the U.S. set off two A-bombs at the Bikini Atoll in the Pacific. Nearly 100 "target" and 150 "support ships" sat in surrounding waters.

31.     The Navy was interested in how the ships would do in an atomic blast. The Navy was also interested in learning how animals would endure intense radioactive exposure and placed animals, ranging from goats to rats on some of the ships located close to the blasts.[4]

32.     The majority of the animals died and many, if not all of the ships who didn't sink sustained contamination with radioactive fallout from the blasts. The Navy did what it could to decontaminate the ships, but, as a Navy fact sheet on Operation Crossroads stated, its efforts "revealed conclusively that removal of radioactive contamination of the type encountered on target ships cannot be accomplished successfully. The factsheet concluded that, after Operation Crossroads, "18 target and observation vessels were decontaminated at Hunters Point" and that they performed "the decontamination of ships associated with Pacific atomic and thermonuclear (H Bomb) weapons testing generated radiological material and waste." Id.

33.     Hunters Point was also the home of the Naval Radiological Defense Laboratory until 1969. This facility's "purposes included radiological decontamination of ships exposed to atomic weapons testing," and "conducting research and experiments on decontamination, the

---

[4] http://www.myatomiclife.com/hunters-point-rad-labs.html

effects of radiation on living organisms, and the effects of radiation on materials." It became the "U.S. military's largest facility for nuclear research," and the "shipyard also consolidated radioactive waste from other facilities, including the University of California, Mare Island and McClellan Air Force Base (near Sacramento)." Id.

34.    For 23 years following World War II, Hunters Point Shipyard was the site of the military's largest facility for applied nuclear research - the top-secret Naval Radiological Defense Laboratory ("NDRL"). Over the course of its life, according to declassified government documents, the NRDL handled nearly every kind of radioactive material known to man - including, at one point, enough plutonium to kill 15 million people. The shipyard is also well known as a site where Navy ships were decontaminated after being irradiated during atomic weapons tests. The Navy used the irradiated sand, which turned a shiny black that 'glistened in the sun,' to "pave" side roads and walking paths throughout the Shipyard. Neighborhood children loved to play in it, calling it "black beauty sand." Id.

35.    Evidence illustrating some of the reckless conduct engaged in by scientists at the NRDL includes the following: (1) Conducted human experiments that included requiring people to drink radioactive elements (2) Burned radioactive fuel oil in a boiler, discharging the smoke into the atmosphere. (3) Oversaw the dumping of huge amounts of contaminated sand and acid into the San Francisco Bay after they were used in attempts to clean irradiated ships. (4) Spread radioactive material on- and off-base, as if it were fertilizer, to practice decontamination. (5) Hung a source of cobalt-60, a nuclear isotope that emits high-energy electromagnetic radiation similar to X-rays, in San Francisco Bay for two weeks, apparently just to see what would happen. (6) Experimented with significant amounts of a wide variety of long-lived radiological poisons, including plutonium, cesium, uranium, thorium and radium. (7) Studied and disposed of thousands of irradiated mice, rats, dogs, goats, mules, and pigs, among other animals. Id. Radioisotopes such as radium-226, cesium-137, plutonium and uranium will be around for hundreds of more years, if not millennia. Plutonium-239 has a radioactive life of 240,000 years.

36.    The first use of radioactive materials at Hunters Point Shipyard predated the issuing of licenses by the Atomic Energy Commission ("AEC"). The AEC is the predecessor of

the U.S. Nuclear Regulatory Commission ("NRC"), which was established in 1974. Prior to 1954, AEC issued only authorizations or permits for controlled uses of radioactive material. After 1954, AEC licenses were issued to Hunters Point Shipyard and the NRDL for use of radioactive materials. In the shipyard, multiple AEC licenses were issued for use of radioactive materials. The AEC licenses for NRDL were for a broad array of radioactive materials to be used for research. Radioactive materials specific to nuclear weapon testing used at Hunters Point Shipyard and NRDL are exempted under AEC, or NRC, licensing by the Atomic Energy Act of 1946. For closure of the NRDL in 1969, a license was issued by AEC for decommissioning activities. AEC licenses for the shipyard and NRDL were terminated in the 1970's. Following the termination of licenses, the AEC and NRC ceased exercising regulatory authority at the HPS.[5]

37.     In 1989, the Site was placed on the National Priorities List ("NPL") and in 1991 was selected for closure under the Base Realignment and Closure ("BRAC") program. The lead agency for investigation and cleanup of the Site is the United States Navy ("Navy"). The lead support agency is the United States Environmental Protection Agency, Region IX ("EPA"). State support agencies include the California Environmental Protection Agency, Department of Toxic Substances Control ("DTSC") and the Regional Water Quality Control Board ("RWQCB").[6]

38.     In 1987, contamination was confirmed at a number of Site locations. This finding, combined with the proximity to an off-site drinking water source (the aquifer used by the Albion Springs water bottling company) resulted in the EPA placing the Site on the National Priorities List ("NPL"), in 1989. In 1991, the Department of Defense listed the Site for closure. Id.

39.     In January 1992, the Navy, the EPA, DTSC and RWQCB entered into a Federal Facilities Agreement to better coordinate the environmental investigation and cleanup of the Site. To expedite the investigation and cleanup, the Site was divided into six parcels. Each of the six parcels were assigned a letter, ranging from A to F. Parcel F is an offshore parcel. Fieldwork has

---

[5] https://www.nrc.gov/info-finder/decommissioning/complex/hunters-point-naval-shipyard.html
[6] EXPLANATION OF SIGNIFICANT DIFFERENCES SFUND RECORDS Parcel B, Hunters Point Shipyard Site San Francisco, California August 24, 1998

1  been completed for all six parcels. The fieldwork showed that the soils and groundwater of the
2  Site are contaminated with a variety of hazardous substances including metals, polychlorinated
3  biphenyls ("PCBs"), volatile organic compounds ("VOCs"), semi-volatile organic compounds
4  ("SVOCs"), polyaromatic hydrocarbons ("PAHs"), and pesticides. In addition, total petroleum
5  hydrocarbons (TPH) are present in Parcel B soil and groundwater. Id.

6  **Defendant Tetra Tech Contract To Clean Up The Shipyard**

7      40.     In or about 2004, The United States Navy contracted with Tetra Tech to assist in
8  the cleanup of Hunters Point Naval Shipyard ("the Shipyard" or "HPNS") in San Francisco,
9  California, which the NAVY deemed a National Priorities List Superfund site. Instead of
10  discharging its contractual obligation by remediating HPNS, DEFENDANT TETRA TECH
11  engaged in intentional fraud, greed and disregard for the health and safety of BAYVIEW
12  HUNTERS POINT RESIDENTS, the present and future San Francisco residents as well as the
13  greater Northern California community. Since the 1940's HPNS has disregarded the lives of the
14  largely African American Communities immediately adjacent to the Shipyard. DEFENDANT
15  TETRA TECH "doubled-down". and exacerbated such historical reckless disregard to the health,
16  safety and civil rights of San Francisco's most vulnerable residents who, on account of the
17  Navy's pollution at the HPNS, were already suffering from life threatening illnesses stemming
18  from said pollution.

19      41.     Radiological Data Review Background: In 2012, as a part of its regular review of
20  contractor data, the Navy discovered a discrepancy in radiological sampling by one contractor,
21  Tetra Tech EC ("TTEC"). Despite sampling the data in question and taking initial corrective
22  actions, it was determined that sample data taken by TTEC had been falsified. [7]

23      42.     In 2016, a former TTEC contract worker made additional claims about the
24  fraudulent work done before 2012. Additional allegations were made in 2017. Id.

25

26
[7]  EPA Website. September 2017:This is the second in a series of fact sheets and other ongoing communications
27  about the radiological data review being conducted at Hunters Point Naval Shipyard (HPNS). The previous fact
    sheet (dated February 2017) on the Navy's radiological data review may be found on the HPNS pages of the Navy's
28  website at *www.bracpmo.navy.mil*

43.     In November 2016, the Navy hired an independent team of experts (review team) to further review and evaluate the reliability of the radiological data collected by TTEC. As part of the evaluation, the review team has developed a database of soil data and is analyzing radiological sampling, surveys, and building scan results. **What are the data evaluation objectives?** 1. Evaluate radiological data collected by TTEC 2. Identify data that may have been falsified or improperly collected. Id.

44.     **Extent of Data Review and Analysis:** The data evaluation includes radiological samples taken by TTEC beginning in 2006 from Parcels B, C, D-2, E, G, and the utility corridors (UC-1, UC-2 and UC-3). Id.

45.     **Snapshot of Extensive Analysis:** Radiological Soil Analysis:

- Approximately 300,000 cubic yards of soil
- Over 50,000 soil samples
- More than 900,000 analytical results
- Over 30 former building sites
- Approximately 28 miles of trench lines Radiological Scans
- More than 20 structures (buildings) on approximately 23 acres of land Id.

46.     Based on DEFENDANT Tetra Tech's admitted falsification and "mishandling" of soil samples, none of the Navy or EPA's representations of planned action are reliable, which has greatly elevated the fear, anxiety, and emotional distress among HUNTERS POINT RESIDENTS regarding the now heightened reality of additional life-threatening health problems related to disturbances of toxic releases.

47.     The Navy has divided the site into several subsites to organize and prioritize cleanup activities: *Parcel A:* The EPA's unreliable representation selected "no further action" as the long-term remedy; conditions are protective of human health and the environment. The Navy transferred Parcel A to the San Francisco Redevelopment Agency in 2004.

48.     *Parcel B:* The long-term remedy included excavation and disposal of soils, installation of soil covers, installation of a revetment along the shoreline, a soil vapor extraction system to remove VOCs, groundwater treatment, removal of radiologically contaminated

structures, monitoring and institutional controls to maintain the remedy in the long term and prevent exposure to contaminants. Excavation and disposal of contaminated soil was finished in 2010. Construction of the covers and revetment, operation of the soil vapor extraction system and treatment of contaminated groundwater are ongoing. Access restrictions prevent exposure to contaminants.

49.   *Parcel C:* The long-term remedy included excavation and disposal of soils, installation of soil covers, installation of a revetment along the shoreline, a soil vapor extraction system to remove VOCs, groundwater treatment, removal of radiologically contaminated structures, monitoring and institutional controls to maintain the remedy in the long term and prevent exposure to contaminants. Soil excavation and disposal, groundwater treatment, soil vapor extraction and radiological removal activities are ongoing. The Navy will finish covering contaminated soils after it finishes removing radiologically contaminated soils. Access restrictions prevent exposure to contaminants.

50.   *Parcel D-1:* The long-term remedy included excavation and disposal of soils, installation of soil covers, groundwater treatment, removal of radiologically contaminated structures, monitoring and institutional controls to maintain the remedy in the long term and prevent exposure to contaminants. Groundwater treatment using zero valent iron injection finished in 2008. Excavation and off-site disposal of contaminated soil and removal of soil stockpiles finished in 2010. Radiological removals are ongoing. The Navy will finish removing and covering contaminated soils after it finishes radiological removal activities. Access restrictions prevent exposure to contaminants.

51.   *Parcel D-2:* After removal actions removed contaminated soils and structures at the subsite, EPA selected "no further action" as the final remedy in 2010.

52.   *Parcel G:* The long-term remedy included excavation and disposal of soils, installation of soil covers, groundwater treatment, removal of radiologically contaminated structures, monitoring and institutional controls to maintain the remedy in the long term and prevent exposure to contaminants. Groundwater treatment using zero valent iron injection finished in 2008. Excavation and off-site disposal of contaminated soil and removal of soil

stockpiles finished in 2010. Construction of covers is ongoing. The radiologically related parts of the remedy are complete and unrestricted release of radionuclides is ongoing. Access restrictions prevent exposure to contaminants.

53.     *Parcel UC-1:* The long-term remedy included soil covers, soil gas surveys, removal of radiologically contaminated structures, monitoring and institutional controls to prevent exposure to contaminants. The Navy has lowered contaminant levels in soils and sediments by removing and covering contaminated soils. Soil vapor survey activities are ongoing. The radiologically related parts of the remedy are complete and unrestricted release of radionuclides is ongoing.

54.     *Parcel UC-2:* The long-term remedy included soil covers, removal of radiologically contaminated structures, monitored natural attenuation, soil gas surveys, monitoring and institutional controls to prevent exposure to contaminants. The Navy has lowered contaminant levels in soils and sediments by removing and covering contaminated soils. Monitored natural attenuation, which involves letting naturally occurring processes reduce the contamination in groundwater, will reduce levels of radiological and chemical contaminants at the subsite.

55.     *Parcels E, E-2, F and UC-3:* The Navy has conducted several removal actions at these subsites, including removal and disposal of contaminated soils and debris, construction of a landfill cap and removal of radiological contamination. EPA has selected a long-term remedy for Parcel E-2. It included removal and disposal of contaminated soils, radiological surveys, installation of a soil cover with a protective liner, below-ground barriers to limit groundwater flow between the landfill and the San Francisco Bay, removal and treatment of landfill gas, installation of a revetment along the shoreline, monitoring, and institutional controls to prevent exposure to contaminants. Remedial investigation activities, operation and maintenance activities, and monitoring are ongoing for these subsites. EPA has not conducted five-year reviews for these subsites. Id.

## Whistleblowers' Statements of Tetra Tech Fraud

56.     Several Tetra Tech employees, including Anthony Smith, Robert McLean, Donald Wadsworth and others, have testified under oath to DEFENDANT TETRA TECH'S fraudulent scheme to place profit over the lives of the BAYVIEW HUNTERS POINT RESIDENTS, resulting in the release of radiative materials still in the soil being swept up by the prevailing winds blowing such materials over the homes of BHP Residents. Anthony Smith's Declaration is attached as Exhibit 2 and all facts therein are incorporated as though fully set forth herein.

57.     In 2014, Anthony Smith, a former Tetra Tech Employee, quit his job because he could not live with the fraud his superiors ordered him to commit every day. His Tetra Tech managers ordered him to falsify records, and soil samples. Smith, the former radiation control technician, said his supervisors used to conceal radioactive soil on the Hunters Point 800-acre former Superfund site. [8]

58.     Smith stated that the fraudulent conduct he witnessed being carried out by Tetra Tech means that the Hunters Point Shipyard is still radioactive, contaminated, toxic, dangerous, and a public health hazard to the BHPR. Smith said the company repeatedly cut corners to save money. Smith admitted that Tetra Tech supervisors: (1) Ordered him to replace contaminated soil samples with clean soil samples (2) Instructed him to dump contaminated soil into open trenches across Hunters Point. (3) Forced him to sign falsified documents that were later submitted to the government; and (4) Falsified and tampered with computer data that analyzed radiation levels. Id.

59.     Smith said he decided to speak out "to clear my name, make everything right and let people know what really happened." Id.

---

[8] *www.nbcbayarea.com/investigations/Former-Hunters-Point-Worker-Claims-Supervisors-Ordered-Him-to-Hide-Radiation-371723561.html*

1

## Switching Soil Samples and Dumping Soil into Trenches

2  60.    Smith moved to the Bay Area from his home in Georgia in 2002 and worked on
3  and off at Hunters Point as a radiation control technician until 2012. He collected soil samples,
4  which were surveyed to determine radiation contamination levels. Smith said beginning in 2009,
5  his supervisors began instructing him to get rid of radiation-contaminated soil samples and
6  replace them with clean soil samples. He said the switching of the soil samples often took place
7  out of public view, inside large Conex bins located around the job site. He estimated that
8  hundreds of samples had been switched. "I didn't like it because it wasn't right," Smith said.
9  "That's not the way it was supposed to be done." Smith said multiple locations across Hunters
10 Point are still contaminated with radiation. Id.

11  61.    Smith said he collected soil samples underneath a structure referred to as building
12 351 A, which once housed part of the Navy's radiological laboratory. He recalled a sample tested
13 positive for radium, an element linked to bone cancer. "When I took a sample it came back hot,"
14 he said, "and they made me get rid of it." Id.

15  62.    Smith said the building should have been remediated after he found a hot soil
16 sample, but he questions whether crews subsequently cleaned up the contamination. He said
17 remediating the area would have taken more time and money. He said his supervisors directed
18 him to dump the discarded, contaminated soil into trenches that have since been covered or
19 paved. Smith said there is no way to know what the contamination levels are in the trenches
20 without retesting the soil. He said as far as he can tell, Tetra Tech did not test the trenches after
21 they were backfilled. Id.

22  //
23  //
24  //
25  //
26  //
27  //

28

## Falsified Documents and Data

63.     Smith also said that Tetra Tech fabricated Chain of Custody documents forms, which are supposed to document the location and time of the soil samples taken by Smith and to certify that the samples stayed under his control. He said sometimes his bosses would fill out the forms instead: "I never got to see them until the end of the day when all I done was sign my name and put the date," Smith said. Id.

Tetra Tech Chain of Custody Form



Anthony Smith says his supervisors fabricated documents called Chain of Custody Forms. The forms are supposed to document where and when Smith collected soil samples and certify that the samples stayed under his control. But Smith says sometimes his supervisors filled out the forms and that he couldn't verify the information contained in the documents. He says sometimes he didn't see the forms until the end of the day, when he was asked to sign his name.

64.     Tetra Tech came up with multiple excuses and theories, but never definitively concluded how or why soil samples were switched and data was falsified. In the report, the Tetra Tech admitted the "mishandling of soil samples", but fraudulently blamed the "sample collectors on the chain of custody forms," including Smith. He said the company made him a scapegoat. "They were blaming me for something [they] were telling me to do every day". Smith said the company failed to identify and retest other questionable locations on the site. He worried the health of people who will work, play and live at Hunters Point may be at stake. He said the cleanup can't be trusted. "It's not good and it's not right," Smith said. Id.

1

## DEFENDANT TETRA TECH TYPES OF FRAUD

2        65.        Tetra Tech employees and the radiological subcontractors it directly supervised
3   were involved in at least six types of fraud that are discussed in detail in this supplemental
4   disclosure: (1) fake sampling, in which soil samples – potentially thousands of them – were
5   reported to have been taken at one location when they were actually taken from another; (2)
6   discarding samples and analytical results when they came back radiologically too "hot" (i.e.,
7   above the cleanup standard); (3) altering scanning data to make them appear radiologically
8   acceptable; (4) conducting false building surveys in which certain scan results were fabricated
9   and others were falsified; (5) remediating radioactive material in soil improperly, resulting in
10  potentially radioactively-contaminated soil being shipped offsite as well as being used as backfill
11  for trenches at the Shipyard; and (6) altering Portal Monitor procedures so potentially
12  radioactively-contaminated soil was allowed to be shipped offsite for commercial purposes to
13  places unknown.

14       66.        Fraudulent sampling, scanning, and surveys led to fraudulent remediation; sites
15  that required additional cleanup were not remediated and-remain contaminated because fake
16  samples indicated areas were "clean" when they were not.

17       67.        Evidence shows Tetra Tech's top onsite management, its Project Manager and
18  Construction Superintendent, participated in and directed the fraud. Their employees engaged in
19  sustained widespread misconduct, significantly compromising the cleanup.

20       **1. Fake Soil Sampling: Parcels C, D, E**

21            **a.      Fraudulent Sampling - Stage 1**

22       68.        Fraudulent and fabricated soil samples, purportedly taken from various sites on
23  the Shipyard, including the areas around Building 707 (Parcel E), the 500 Series of buildings
24  (Parcel D), and Parcel C, were in fact collected from elsewhere on the site.

25       69.        Senior Health Physics Technician ("HP") Anthony Smith says fake sampling took
-26  place in two stages. At first, HPs were directed to take samples from the general location
27  intended to be sampled, but to fudge the specific location of the samples.

28

70.     When tasked with soil sampling, proper procedure was to initially scan the soil in order to locate radioactive hot spots. The scanning data was then used by engineers to identify locations of high radioactivity which would then be designated on maps indicating locations of the highest readings and thus, where soil samples should be taken.

71.     HPs followed the correct procedure in the early years at Hunters Point. Proper practice however eroded under the direction of Project Manager William "Bill" Dougherty when efforts for areas to pass inspection and obtain "free release" were difficult to obtain due to remaining radioactive contamination. There is evidence that fraudulent sampling was conducted throughout the 2007-2008 time period, but accelerated in the latter part of 2008 and early 2009. At that time, Tetra Tech was having difficulty obtaining free releases; post-remediation samples came back too "hot."

72.     In response, DEFENDANT TETRA TECH supervisors ordered the HPs not to take samples from the highest radioactive reading spots as designated by the engineers. Rather, the HPs were ordered to make it appear they collected samples from the marked spots, but in actuality gather samples from clean areas close by the radioactive spots. An HP (also known as a Radiation Control Technician, or "RCT,") admitted this form of fraud to the NRC: "the RCT stated that, when sufficiently low contamination levels were not obtained, the RTS [Radiation Task Supervisor] would direct the RCT to move 5 to 10 feet in another direction and obtain a new sample from that location. Meanwhile, the new sample would be represented as having been obtained from the original, specified location."

       b.      **Fraudulent Sampling – Stage 2**

73.     Time and again the fraudulent post-remediation soil samples resulted in laboratory results indicating radioactive contamination above the free release levels. For example, around Building 707, repeated rounds of remediation failed to decontaminate all the soil; successive post-remediation samples came back too "hot." When sample results exceeded the free release levels, Tetra Tech was required to do more clean-up.

74.     Due to the frustration of Tetra Tech's attempts to obtain free release and the desire to cut costs to increase profits, the manner of the fraud changed. No longer did

DEFENDANT TETRA TECH supervisors direct their HPs to obtain false samples in the nearby area of the radioactive sites, but rather in at least three remote locations known from prior sampling to contain "clean" soil. Tetra Tech management pressured its supervisors to have the HPs engage in fraudulent sampling that would guarantee lab results under the free release levels so it could collect payment without incurring the full costs of the cleanup.

75.     Former employees, like Senior HP Anthony Smith, state that he and others took the second-stage type of fraudulent samples from at least three locations known to be low in radiological activity. The specific location was chosen depending on the type of soil they were trying to match.

76.     If HPs needed to match "green serpentine" soil, Smith and others took false samples from one of two locations. Originally, the green serpentine soil used to submit false samples was taken from a sewer trench in front of the Building 500 series of buildings. That site was supplanted by a second one, an area inside the remains of the foundation of an old movie theater in the 500 series area. According to Smith, the theater foundation was preferable to the sewer trench because it afforded greater privacy — employees could take samples there unseen when inside the foundation walls. Smith says he would wait until laborers not involved in the fraud went to lunch or left for the day and he would then fill a 5-gallon bucket with soil from the theater site which he knew to be clean.

77.     If HPs needed to match sandy soil, they would fill five-gallon buckets with soil taken from an area under two palm trees in the vicinity of an old pump house (Building 521) that was also near the old movie theater foundation area.

                c.     **Substituting Clean Soil for Potentially "Hot" Soil**

78.     Senior HP Smith states he would take the five-gallon buckets of either green serpentine  or sandy soil to the Conex (a shipping container that acted as a temporary field office), where HP supervisor Steve Rolfe, his wife HP Tina Rolfe, and HP Rick Zahensky would transfer the soil into sample containers to substitute for real samples. The original, and potentially "hot" samples, would be emptied into another 5-gallon bucket and Smith would dump that soil into open trenches that had been dug for sewer removal. In short, the true soil samples

1    were switched with the soil known to be radiologically clean with the intent to fraudulently

2    "prove" to the Navy, regulators, and the public that all radiological hazards had been removed.

3        79.     Smith estimates this type of false sampling happened "pretty much every day"

4    over at least the last one and a half years he worked at the Shipyard. He says fake soil samples he

5    took from all three sites – the sewer trench, the palm tree site and the theater – resulted in 800 to

6    1,000 false samples. Other HPs on the team under Smith's supervisor, Steve Rolfe, also regularly

7    engaged in taking false soil samples, as did HPs under the supervision of Justin Hubbard.

8        80.     Samples were switched not only from the former site of Building 517, but Smith

9    admits he switched samples taken from the area around Building 707, the "Triangle Area" in

10    Parcel E, and the area of the former 500 series of buildings in Parcel D. Additionally, HPs other

11    than Smith had falsely switched samples in other areas, including North Pier and "shacks" 79

12    and 80 and Parcel C.

13        81.     Former employees declare fraudulent soil samples were taken as early as 2007.

14    They also state that the fraudulent practices escalated in the years after Tetra Tech's contract

15    with the Navy changed from a time-and-materials contract to a firm fixed-price contract. This

16    provided a financial incentive for fraud; the less time and resources Tetra Tech spent on

17    sampling and cleanup, the more profit they would make.

18    **2. Destruction of "Hot" Soil Samples and Their Records**

19        **a.  Building 351A**

20        82.     Building 351A had been used by the Navy's Radiological Defense Laboratory for

21    decades conducting extensive experiments with hazardous radionuclides. It was one of the last

22    buildings in Parcel G that had not been free released. Clearance of building 351A was holding up

23    final payment to Tetra Tech for all of the work the company had done in that parcel, potentially

24    millions of dollars.

25        83.     Direct readings from radiological survey detection instruments indicated the

26    presence of elevated radioactivity in a large amount of soil in a crawl space under Building

27    351A. Remediation attempts within the crawl space were performed in 2008 by a group of

28    laborers who dug up the soil while HPs Anthony Smith and Josh Hooper monitored them. The

1   laborers used pick axes, shovels and trowels to loosen the soil and a large vacuum truck that
2   sucked the soil from under the building through an 8-inch hose. The soil was ultimately placed in
3   bins to be disposed offsite as radioactive waste.

4       84.    At the conclusion of approximately two weeks of remediation, HPs Anthony
5   Smith and Josh Hooper took post-remediation soil samples from the crawl space in an attempt to
6   demonstrate that there was no longer any residual radiological contamination above established
7   free-release levels. However, a post-remediation sample came back too "hot," demonstrating the
8   radioactive cleanup had not been successfully completed. Proper procedure mandated another
9   round of soil removal. This additional round of remediation would once again involve laborers
10  and a vacuum truck, followed by another round of post-remediation sampling. However, Tetra
11  Tech's management directed that proper procedures be ignored.

12      85.    Smith and Hooper were summoned to a meeting that included Tetra Tech's HPNS
13  Project Manager, Bill Dougherty, Tetra Tech's Construction Superintendent Dennis McWade,
14  among other senior Tetra Tech and sub-contractor managers. With respect to costs Tetra Tech
15  was incurring to undertake the cleanup, Dougherty told Hooper and Smith "Do you know how
16  much that machine cost to rent for two weeks? We can't afford to do that again, get rid of that
17  sample," or words to that effect. McWade gave Smith the containerized sample and its Chain of
18  Custody ("COC") document, completely contrary to acceptable procedures, and Smith and
19  Hooper did what they were told. They got rid of the sample and the COC record.

20      86.    Thereafter, they engaged in the first type of soil-sampling fraud described above
21  and took a false sample under Building 351A. Tetra Tech had its engineers mark the areas under
22  the building that were known to be clean so that Smith could be assured he would not obtain
23  another soil sample that came back too "hot."  Smith says he understood, based on what his
24  supervisors told him, that Tetra Tech wanted to get free release of the building despite the
25  remaining contamination so Tetra Tech would get paid the final installment for its work in Parcel
26. G.

27      87.    Tetra Tech submitted false documents to the Navy, claiming that Building 351A
28  had been properly cleared of all radioactive material above release levels, when significantly

1  elevated radioactivity, beyond free release levels, was known to still exist in the crawl space
2  under the building. The radioactive contamination was not remediated over the next three-plus
3  years that Smith continued to work at the Shipyard. To the best of his knowledge it never has
4  been remediated. It is still to this day "Hot".

5      88.    Smith states that the soil sample from under Building 351A was the first instance
6  where he was told to get rid of a sample. As further described below, it was not the last.

7           **b. Parcel A Background Sample**

8      89.    In July or August 2009, Tetra Tech HP Supervisor Justin Hubbard directed Senior
9  HP Anthony Smith to 'ditch' a soil sample from the Shipyard's Parcel A because it was too
10 "hot" radiologically.

11     90.    Tetra Tech was about to start, or had just started, a project to remove sewer lines
12 below Fisher Avenue and Spear Streets. Smith was directed by Hubbard to obtain a background
13 reference sample (i.e., a sample known not to be radioactively contaminated) for the Spear/Fisher
14 sewer projects. Smith had been told that Parcel A was never used for any industrial purpose, that
15 it was deemed by the Navy to be free of contamination and, as a result, had been transferred to
16 the City of San Francisco for development in 2004. Because of its close proximity to the
17 Fisher/Spear project and assuming Parcel A was clean, Smith determined it would be an
18 appropriate place to obtain a background sample.

19     91.    Smith proceeded to a location just north of the intersection of Fisher Avenue and
20 Spear Street. On the north side of the road next to Fisher Avenue and just beyond the sidewalk,
21 there is a concrete wall which descends in height as it extends west and parallel to Fisher
22 Avenue. Beyond the wall is a hill that rises to the top of Parcel A. Just before the stop sign at the
23 intersection of Fisher and Spear (i.e., just northeast of the intersection) and approximately 20 feet
24 from a light pole on the north side of Fisher Avenue, the wall was about waist-high for Smith.
25 Because of how the hill rose behind the wall, Smith was able to reach over the wall and use a
26 trowel to take a sample without bending over. He dug a hole about 6 inches deep in the hillside
27 and took a sample from the bottom of the hole. He gave the sample to Justin Hubbard, who took

28

1  it to the laboratory. In a violation of proper procedure, there was no chain-of-custody document
2  accompanying the sample.

3      92.    The next day, Hubbard approached Smith and had the sample with him. In the
4  presence of HPs Jeff Rolfe, Ray Roberson and Carey Bell, Hubbard told Smith the sample had
5  come back "hot." Hubbard said it contained 2 to 3 picocuries per gram of cesium-137, which
6  Smith knew was much higher than background levels and the cesium-137 cleanup standard of
7  0.113 picocuries per gram – 18 to 26 times higher than the set health and safety ceiling. Hubbard
8  gave the sample to Smith and told him to "get rid of it and not say a word," or words to that
9  effect. Smith took the sample back to the site where he had taken it and put the soil back in the
10  hole he created earlier for taking the sample. He disposed of the plastic sample container by
11  putting it in a bin set aside for radiological waste. That same day, Smith took a different sample,
12  to be used as the background sample, from a distant site on the shipyard he knew to be clean
13  from prior sampling and analysis.

14      93.    To the best of Smith's knowledge, the soil contamination he discovered in Parcel
15  A was never thereafter remediated for cesium-137 or other potential radioactive contaminants.

16  **3. Fraudulent Building Surveys**

17      94.    The contract between the Navy and Tetra Tech required the company to perform
18  static scans and smears of buildings to determine if they were contaminated with radioactivity
19  beyond free release levels. When a building was found to have elevated levels of radioactivity,
20  Tetra Tech was contracted to engage in remediation to remove the radioactive contamination and
21  bring contaminant levels below release levels. After remediation, Tetra Tech was required to
22  again scan and take smears of the building to determine if all radioactive readings were within
23  acceptable levels. Tetra Tech ordered the post-remediation building scans be done fraudulently
24  so as to obtain free release.

25      95.    Tetra Tech supervisors divided building areas into three classes, Class 1, 2 and 3.
26  They classified the floors and lowest two meters (or approximately 6 feet) of the walls to be
27  Class 1. The proper way to conduct a Class 1 survey was to slowly scan the "probable sites" of
28  contamination, such as drains down which radioactive liquids might have been poured, and to

1   scan each surface (i.e., the floor and lower walls) using a Ludlum 2350 scanner (which measures
2   gamma radiation) in a systematic grid. In addition, smear samples were to be taken from area
3   surfaces which the scans identified as highest in radioactivity.

4       96.      For Class 2, HPs were supposed to take static scan and smear samples in a
5   systematic grid from the higher sections of the walls, above 2 meters. Class 3 areas were
6   considered the ceiling and roof. Scans and smears were to be taken of these areas, but without
7   requiring the strict grid patterns of a Class 1 or 2.

8       **4. Proper building survey procedure was not followed.**

9       97.      Anthony Smith was assigned to perform a large number of building surveys.
10  Sometime between the summer of 2010 and early 2011, he was assigned to do building surveys
11  in Building 707, several buildings and building footprints throughout the 500 series and
12  Buildings 351, 351A, 411, 401, 414, 406, 144, 146, 130, 103, 113, and 521. Smith's Tetra Tech
13  HP supervisor, Steve Rolfe, told his survey team, consisting of Jeff Rolfe, Rick Zahensky and
14  Smith, not to worry about doing Class 2 or 3 scans and smears at all. Rather, they were instructed
15  to "just get some numbers and get it done," or "just set your meter down on the ground and let it
16  count," meaning they should allow the scanner to operate in order to obtain data, but that the
17  scanner should be stationary rather than doing a systematic survey of the area as required. Smith
18  and his co-workers followed instructions, did not do proper Class 2 and 3 scans, and reported
19  fraudulent data for the Class 2 and Class 3 scans for nearly all buildings at Hunters Point.

20      98.      When Smith challenged this practice, Tetra Tech HP supervisor Steve Rolfe told
21  him, "That's what Bill Dougherty [Tetra Tech's Project Manager] wants." The false scanning
22  was also done on other buildings by HP Supervisor Justin Hubbard's team, including Buildings
23  103, 114, 145, 130, 439, 366, and 813.

24      **5. Fraudulent Data Reporting**

25      99.      The contract between the Navy and Tetra Tech required the company to do scans
26  for radioactive contaminants of buildings, developed areas, and areas of open soil. Tetra Tech
27  directed that scan data be altered that were too high, which would result in having to do

28

additional expensive remediation, or too low, which would raise questions about the scan integrity and potentially require that the scanning be entirely redone.

100.    Anthony Smith personally witnessed HP Tina Rolfe changing scan results so that they would fall within acceptable limits, i.e., not too high but not too low to raise suspicions. One time when Smith was downloading data from his equipment onto a computer, he came up behind Tina Rolfe and saw her working on a computer changing readouts from a Ludlum 2350.

101.    Smith estimates that the HPs downloaded thousands of scan results per day. He states that changing these scan numbers was a very simple thing to do. He also saw her changing numbers on readings from a Ludlum 2360 (which collects surveillance data for alpha and beta radiation). The fact that Tetra Tech was "changing the numbers" was common knowledge among the HPs. Both HPs Ray Roberson and Joe Cunningham told Smith they were aware that scan results were being altered. Senior HP Donna Watson observed Tetra Tech Supervisor Hubbard changing scan readings taken in the field on a computer as early as 2007 or 2008.

102.    Smith observed that Tina Rolfe was directed to change the numbers by her husband, Steve Rolfe, a Tetra Tech HP supervisor. Several times he heard Steve Rolfe say of one sample or another, "that number's too high, it's way above background," and he directed that it be altered to be lower, to be closer to the background levels. Tetra Tech HP supervisor Justin Hubbard was also aware of the alterations. Smith complained about the scan results being changed, and Hubbard told him that Tetra Tech was doing it everywhere else on the Shipyard.

103.    Smith reports that Senior HP Rick Zahensky told him he also changed scan result numbers for an extended period, involving many months, if not years. On numerous occasions Zahensky took a computer home in order to change scan results overnight. Zahensky told Smith that at times he worked until the early hours of the morning to "get the numbers right." Smith was present on several occasions when Zahensky did not "get the numbers right," and was "chewed out" by Steve Rolfe. Smith also witnessed Tina Rolfe being "chewed out" by her husband Steve, when numbers remained too high or too low. ..

104.    Tetra Tech also violated proper protocol by holding up the delivery of the scan results to the project management office. Proper procedure was that the scan results were to be

1  submitted to the office by the end of each day on thumb drives. However, rather than submit
2  scan results by day's end, the scan results were held up so that employees like Zahensky could
3  manipulate results that were deemed too high or too low. When Zahensky was given the scan
4  results to take home in the evening, the thumb drive was not submitted until the following day or
5  later. The office had no objection to the tardy delivery of the scan results, since their fraudulent
6  manipulation was done at the direction and insistence of Tetra Tech's upper-level onsite project
7  management.

8       105.    Bert Bowers, the former Radiation Safety Officer Representative ("RSOR"), has
9  given a Declaration, each fact in which is incorporated by this reference as though fully set forth
10  herein. (See Exhibit 3). He states that a lab technician, Neil Barrett, and a lab supervisor, Phil
11  Smith, came to him on separate occasions complaining they were being asked by upper level
12  project management to "write away" laboratory analysis results, that is, change the results of
13  sample analyses and scans. Bowers directed the employees to go back to the project
14  management, talk with them, and come back to Bowers if they were not satisfied. At that time,
15  Bowers had not been aware project management had been ordering the falsification of samples
16  and scan results. (Bowers Dec. ¶54)

17  **TETRA TECH'S ADMISSIONS SUBSTITUTING CLEAN SOIL FOR RADIATIVE**
18  **SOIL IN SUPERVISOR JUSTIN E. HUBBARD'S FEDERAL CRIMINAL GUILTY**
    **PLEA**

19       106.    "I, Justin E. Hubbard, and the United States Attorney's Office for the Northern
20  District of California (hereafter "the government") enter into this written Plea Agreement (the
21  "Agreement") pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal
22  Procedure:

23       "The Defendant's Promises

24            (1) I agree to plead guilty to Count One of the captioned Information
                 charging me with destruction, alteration, or falsification of records in
25               federal investigations and bankruptcy, in violation of 18 U.S.C. § 1519.
                 I agree that the elements of the offense are as follows: (1) I knowingly
26               altered, falsified, or made a false entry in a record or document; (2) with
                 the intent to impede, obstruct or influence the investigation or proper
27               administration of any matter or in contemplation of or in relation to any
28

such matter; (3) within the jurisdiction of an agency of the United States.

I agree that the maximum penalties are as follows:

a.  Maximum prison term              20 years
b.  Maximum fine                     $250,000, or twice gain/loss
c.  Maximum supervised release term  3 years
d.  Restitution                      To be determined
e.  Mandatory special assessment     $100
f.  Forfeiture

(2) I agree that I am guilty of the offense to which I am pleading guilty and I agree that the following facts are true:

I have been working in the nuclear industry since approximately 1989, after completing my formal education. During my twenty-five years in the industry, I have conducted decontamination work at nuclear power plants, medical laboratories handling radioactive material, and a "Superfund Site", among other activities. During that same period, I have received training in radiation contamination control, the proper handling of radiological waste, and the assessment of radionuclides in the environment. I have also supervised others in these activities.

In approximately 1994 or 1995, I began performing nuclear remediation work at the former Hunters Point Naval Shipyard ("HPNS"), located in the Bayview District of San Francisco, California. My first employer at HPNS was New World Environment, Inc. ("New World"). After approximately four years with New World, **I was hired by Tetra Tech EC, Inc. ("Tetra Tech"), as a Radiological Task Supervisor at HPNS. As a supervisor at Tetra Tech, I was in charge of a team of radiation control technicians ("RCTs") engaged in radiological remediation of soil at HPNS.** I was aware that Tetra Tech had been hired by the United States Navy ("U.S. Navy") to perform the radiological remediation at HPNS.   My employment with Tetra Tech terminated in December 2013. [Emphasis Added]

While working for Tetra Tech, I reported to a Tetra Tech HPNS Project Manager, and a Tetra Tech HPNS Lead Superintendent, among others. The RCT's I supervised worked for Tetra Tech subcontractor Radiological Survey & Remedial Services, LLC ("RSRS").

I understood that the radiological remediation of HPNS was being conducted by Tetra Tech for the U.S. Navy under established sampling guidelines and protocols. My job at HPNS required me comply with a Task Specific Plan ("TSP") which identified, for a Building Series or Area, the number and type of survey units that were to be sampled at specific locations. In general, I would receive directions on a daily basis, including a survey unit map, identifying the sampling locations for a particular survey unit. Once the

Tetra Tech engineers marked these locations, I would supervise the sampling of them by my RCTs.

The RCTs were expected to take soil from each marked sampling location, bag and label the sample, and then send it to a laboratory for an analysis of, among other data, any radionuclides of concern. Chain of custody ("COC') forms and tags showing the precise location of each soil extraction as identified on the survey map were required for each sample. I was aware that information from the chain of custody forms, including the sample locations, was incorporated into the sampling analysis reports prepared by Tetra Tech and emailed to the U.S. Navy.

**During my work at HPNS, I was aware of U.S. Navy testing protocols which mandated that if a laboratory analysis determined a sample of collected soil to be "hot"--that is, containing a higher-than-allowable level of radionuclides of concern--then additional remediation, including more sampling, of that survey unit was to be undertaken until all new collected samples passed laboratory analysis. [Emphasis Added]**

**During 2012, in direct contravention of the relevant U.S. Navy testing protocols, I obtained "clean" dirt from an area north of Buildings 253 and 211 at HPNS and substituted it for dirt taken from survey units in the North Pier area of HPNS. To effect this illegal switching, I drove my company truck to the area north of Buildings 253 and 211 and filled a five-gallon bucket with "clean" serpentinite soil from an area I knew to be outside the relevant marked survey unit. I then drove the clean dirt back to a "conex box"-style trailer. Once I was inside the conex, I emptied the "legitimate" soil samples previously collected by RCT's from their sampling bags into an empty bucket, and substituted the clean serpentinite soil into each sampling bag. [Emphasis Added]**

I did not alter the markings made earlier on the sampling bags by the RCTs, which included the sample number, time, and date. **I then placed a bar code sticker on an outer bag for each sample. A copy of this bar code sticker was also affixed to a chain of custody ("COC") form for each sample.** The sticker was meant to identify the survey unit location the soil was taken from. **By switching the soil inside the sampling bag, I knew that the data on the COCs, many of which I signed, was false. I also knew that the false data on these COCs was incorporated into maps and reports made by Tetra Tech and submitted to the U.S. Navy for the purpose of demonstrating that the area had been successfully remediated. [Emphasis Added]**

**On or about May 31, 2012, I fraudulently switched soil for four survey units on the North Pier of HPNS: Survey Units 1,8,10, and 11. For Survey Unit I, specifically recall replacing the soil samples with soil I had collected from a clean area. [Emphasis Added]**

(3)    I agree to give up all rights that I would have if I chose to proceed to trial, including the rights to a jury trial with the assistance of an attorney; to confront and cross-examine government witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth Amendment claims; to any

further discovery from the government; and to pursue any affirmative defenses and present evidence.

18.     I confirm that my decision to enter a guilty plea is made knowing the charges that have been brought against me, any possible defense, and the benefits and possible detriments of proceeding to trial. I also confirm that my decision 10 plead guilty is made voluntarily, and no one coerced or threatened me to enter into this Agreement...." (See Exhibit 4)

## TETRA TECH'S ADMISSIONS SUBSTITUTING CLEAN SOIL FOR RADIATIVE SOIL IN SUPERVISOR STEPHEN C. ROLFE'S FEDERAL CRIMINAL GUILTY PLEA

107.     I, Stephen C. Rolfe, and the United States Attorney's Office for the Northern District of California (hereafter "the government") enter into this written Plea Agreement (the "Agreement") pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

"The Defendant's Promises

(1) I agree to plead guilty to Count One of the captioned Information charging me with destruction, alteration, or falsification of records in federal investigations and bankruptcy, in violation of 18 U.S.C. § 1519. I agree that the elements of the offense are as follows: (1) I knowingly altered, falsified, or made a false entry in a record or document; (2) with the intent to impede, obstruct or influence the investigation or proper administration of any matter or in contemplation of or in relation to any such matter; (3) within the jurisdiction of an agency of the United States.

I agree that the maximum penalties are as follows:

| | | |
|---|---|---|
| a. | Maximum prison term | 20 years |
| b. | Maximum fine | $250,000, or twice gain/loss |
| c. | Maximum supervised release term | 3 years |
| d. | Restitution | To be determined |
| e. | Mandatory special assessment | $100 |
| f. | Forfeiture | |

(2)I agree that I am guilty of the offense to which I am pleading guilty and I agree that the following facts are true.

In or about September or October 2007, I was hired by Radiological Survey and Remedial Services, LLC., commonly known as RSRS. Thereafter, **in approximately 2008, I became a supervisor at Tetra Tech EC, Inc**. ("Tetra

Tech"), in charge of a team of radiation control technicians ("RCTs") engaged in the radiological remediation of soil at the former Hunters Point Naval Shipyard ("HPNS") located in the Bayview District of San Francisco, California. I served in that role until approximately August 2014. I was aware that Tetra Tech had been hired by the United States Navy ("U.S. Navy") to perform the radiological remediation at HPNS. [Emphasis Added]

While working for Tetra Tech, I reported to a Tetra Tech HPNS Project Manager, and a Tetra Tech HPNS Lead Field Superintendent, among others. During this time period, RSRS was a sub-contractor of Tetra Tech and I supervised several RSRS RCTs.

I understood that the radiological remediation of HPNS was being conducted by Tetra Tech for the U.S. Navy under established sampling guidelines and protocols. My job at HPNS required me to comply with a Task Specific Plan ("TSP") which identified, for a Building Series or Area, the number and type of survey units that were to be sampled at specific locations. In general, I would receive directions on a daily basis, including a survey unit map, identifying the sampling locations for a particular survey unit. Once the Tetra Tech engineers marked these locations, I would supervise the sampling of them by my RCTs.

Once the engineers had marked the survey unit sampling locations, the RCTs were expected to take soil from each marked sampling location, bag and label the sample, then send it to a laboratory for an analysis of, among other data, any radionuclides of concern. Chain of custody forms and tags showing the precise location of each soil extraction as identified on the survey map were required for each sample. In addition to these chain of custody forms and tags, I was also required to fill out a daily "Building/Site Area Report and Survey Unit Tracking Sheet ('survey unit tracking sheet')," which indicated the number of samples taken each day from a specific survey unit to document my team's daily activities. I was aware that information from the chain of custody forms, including the sample locations, was incorporated into the sampling analysis reports made by Tetra Tech and emailed to the U.S. Navy.

During my work at HPNS, I was aware of U.S. Navy testing protocols which mandated that if a laboratory analysis determined a sample of collected soil to be "hot"-that is, containing a higher than allowable level of radionuclides of concern-then additional remediation, including more sampling, of that survey unit was to be undertaken until all new collected samples passed laboratory analysis.

**During 2012, I told the RCTs on my team to get "clean dirt" from areas known to be clean and taken from outside the marked survey unit areas to use as substitute samples for the dirt from the marked survey unit. did this so that the survey unit would pass the laboratory analysis and not require further remediation.** [Emphasis Added]

I am aware of at least two different sources of dirt for clean samples, "green dirt" from certain locations known to be clean and "brown dirt" from a pile formerly located on H Street, southeast of Building 606 at HPNS. **During**

SECOND AMENDED CLASS ACTION COMPLAINT – 34

this time period, I estimate that I told my RCTs to get clean dirt outside the designated survey units on approximately twenty occasions. On multiple occasions the switching of this dirt was done inside a "conex" trailer on site in my presence. I knew on these occasions that the soil locations reported in the chain of custody forms and the survey unit tracking sheets for these samples were false, that is, that the locations reported on the forms regarding where the soil came from were untrue. I would estimate that there were between ten to twenty occasions when saw a chain of custody from being filled out when I knew the data on the form was inaccurate. I directed the RCTs to switch soil for samples 81-100 for Survey Unit 22, taken on August 23, 2012. On that occasion, I falsified data on the survey unit tracking sheet in that] stated on the form the soil came from within that Survey Unit when I know it did not. I also know that the sampling data from Survey Unit 22 incorporated into the map and analyses sent by Tetra Tech to the U.S. Navy on August 29, 2012 was false. [Emphasis Added]

I did not receive extra compensation for substituting "clean" soil for potentially contaminated soil in a survey unit. **My motivation came from pressure applied by the Tetra Tech supervisors. One told me on multiple occasions to "get the hell out of that area," in reference to a particular survey unit that was not testing clean. Another told me on more than one occasion that we were "not remediating the whole goddam site." An Assistant HPNS Project Manager told me on numerous occasions to "get clean dirt."** I understood these statements as a direction to go outside the appropriate survey unit and get dirt from other areas that was known to be clean, that is not containing excessive levels of radiation. I knew that my conduct would impede the proper investigation and administration of the radiological remediation being undertaken by the U.S. Navy at HPNS. [Emphasis Added]

(3)     I agree to give up all rights that I would have if I chose to proceed to trial, including the rights to a jury trial with the assistance of an attorney; to confront and cross-examine government witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth Amendment claims; to any further discovery from the government; and to pursue any affirmative defenses and present evidence.

18. I confirm that my decision to enter a guilty plea is made knowing the charges that have been brought against me, any possible defense, and the benefits and possible detriments of proceeding to trial. I also confirm that my decision 10 plead guilty is made voluntarily, and no one coerced or threatened me to enter into this Agreement." [Emphasis Added] (See Exhibit 5)

## VI. DAMAGES



*Workers leaving the shipyard, World War II ca. ca 1943*

108.   "Tens of thousands of Black workers were recruited from the South to work in Bay Area shipyards. Here, in a photo taken around 1943, workers at the Hunters Point Naval Shipyard have finished the day's shift and are headed home. Some 10,000 of them lived adjacent to the shipyard in Hunters Point. Many of their descendants still do, and they recall their relatives dying of diseases from exposure to the radioactivity and multiple toxins that were and are ubiquitous there."[9] The BAYVIEW HUNTERS POINT RESIDENTS are still, as we speak, dying from exposure to radioactivity and a toxic stew of deadly poisons in the air they breathe, in the water they drink, in their homes where they spend most of their living time, with their

---

[9]  Showdown! Radiological data fraud at Hunters Point Shipyard 2018
January 29, 2018 by Ahimsa Porter Sumchai. M.D. A former physician specialist with the San Francisco Department of Public Health and former attending physician for the Palo Alto VAH Environmental Registry.

1  children suffering from asthma, mothers sick with breast cancer, fathers struggling with

2  cardiovascular diseases and families suffering with a myriad of other toxic caused illnesses.

3      109.   "[T]he cost of medical monitoring is a compensable item of where the proofs

4  demonstrate, through reliable medical expert testimony, that the need for future monitoring is a

5  reasonably certain consequence of a plaintiff's toxic exposure and that the recommended

6  monitoring is reasonable"[10] *Potter v. Firestone Tire Rubber Co.* (1993) 6 Cal.4th 965, at p.

7  1009).

8      110.   Radioactive Components Identified as Contaminants of Concern on Hunters Point Ship Yard:[11]

| | |
|---|---|
| **Bismuth 214** | Kidney damage |
| **Cesium 137** | Thyroid cancer; Increases risk of cancer; Bone marrow failure; and Reproductive effects. |
| **Cobalt 60** | Associated carcinogen in humans; Sterility. |
| **Plutonium 239** | Cancer of the lungs, liver, bone and bone marrow. |
| **Radium 226** | Bone cancer |
| **Strontium 90** | Human carcinogen; Cancer of the bone, nose, lungs, skin Leukemia; |

[10] There is now sufficient mechanistic and epidemiological evidence to accept that exposure to external ionising radiation at low doses < 100 mSv is a risk factor for dementia." Christopher Busby, *A Risk Coefficient for Radiation-Induced Dementia*, June 14, 2018,  http://www.scirp.org/Journal/PaperInformation.aspx?PaperID=85279

[11] **Wilma Subra** Chemist / Technical Adviser

Mrs. Subra holds degrees in Microbiology/Chemistry from the University of Southwestern Louisiana. She received the MacArthur Fellowship "Genius" Award from the MacArthur Foundation for helping ordinary citizens understand, cope with and combat environmental issues in their communities and was one of three finalist in the Environmental Category of the 2004 Volvo for Life Award. Was selected in 2011 as one of the 'Lifetime Remarkable Woman' and most recently won the 2011 Global Exchange, Human Rights Award for her ongoing work with the BP Oil Spill and the communities affected by it.

| | Cancer due to damage to genetic material in cells. |
|---|---|

The radioactive components have extremely long half lives, and will remain in the environment hundreds to thousands of years. Thus, if the radioactive components are not addressed on the former Hunters Point Ship Yard, they have the potential to migrate off the former Ship Yard site in the form of particulate emissions as well as potential contaminants in ground water and serve as a source of Fear of Cancer to Bay View community members and potential future occupants on the ship yard property.

In the areas where the radioactive components still remain unaddressed on the ship yard property, other toxic chemicals are also known to be present. These toxic chemicals consist of volatile organic compounds, semi-volatile organic compounds, polynuclear aromatic hydrocarbons, PCBs, pesticides, petroleum hydrocarbons and dioxins and furans. These toxic chemicals are also know to cause a variety of cancers and serve as a source of Fear of Cancer to Bay View community members and potential future occupants on the ship yard property.

Applying the methodology of Probability of Causation, and based on my discussions with Bay View Hunters Point Residents' in 2010 and in June 2018, including visiting the HPNS, and having read the guilty pleas of the TTEC supervisors, admitting to taking ""clean" dirt from an area north of Buildings 253 and 211 at HPNS and substituted it for dirt taken from survey units in the North Pier area of HPNS", plus review of the sworn declarations of several whistleblowers confirming the supervisors criminal admissions, it is my opinion to a reasonable reliable scientific probability that the risk of developing cancer in the BHPR has significantly increased by the additional radiation releases from TTEC's admitted actions of leaving radioactive soil in the ground at the ship yard. Further, it is my opinion that TTEC's actions have resulted in significant actual risk of cancer or other toxic related illnesses to the BHPR. These facts support my opinion of the reasonableness of Fear of Cancer to Bay View community members.[12]

111.   Bayview Hunters Point Residents have suffered economic and non-economic damages, including, but not limited to, the following:

### A. ECONOMIC

---

[12] Id.

1      1. MEDICAL BILLS

2      2. MEDICAL MONITORING--NEXT FIVE (5) GENERATIONS

3      3. PROPERTY DAMAGE

4      4. COST OF URGENT SCREENING AND TESTING FOR RADIATION

5          RELATED ILLNESSES

6      5. DIMINUTION IN HOME VALUES DUE TO GROUND WATER

7          CONTAMINATION

8      6. LOST INCOME

9      112.    On information and belief, the NAVY has sent out to Bayview Hunters Point

10   Residents "Deed notification that soil below the groundwater table in remediated areas may be

11   contaminated."

12      **B. NON-ECONOMIC**

13      FEAR

14      ANXIETY

15      LOSS OF ENJOYMENT OF LIFE

16      MENTAL DISTRESS

17      EMOTIONAL DISTRESS

18      PAIN

19      HUMILIATION

20      SUFFERING

21                    **VII. CLASS ACTION ALLEGATIONS**

22      113.    PLAINTIFFS bring this lawsuit as a class action and on behalf of themselves and

23   all others who are similarly situated. The class is composed of all persons who are RESIDENTS

24   OF BAYVIEW HUNTERS POINT, consisting of individuals who have been living, working,

25   attending school or had substantial contact with the community from 2004 to present.

26

27

28

114. The geographic parameter of the BAYVIEW HUNTERS POINT RESIDENTS is limited to the last, 2010, census tract populations as similarly situated.[13]

115. The members of the class are so numerous, approximately 38,484 Residents, that joining them all individually would be impracticable. PLAINTIFFS don't know the exact number of the members of the class at this time, but the number and identity of the class members is easily ascertainable through DEFENDANTS' business records.

116. PLAINTIFFS have the same interest in this matter as all other members of the class.

117. PLAINTIFFS' claims are typical of all the members of the class.

118. A well-defined community of interest in the questions of law and fact involving all members of the class exists.

119. Common questions of law and fact predominate over questions that may affect only individual class members.

120. Questions of law include:

    a. Common The nature and application of DEFENDANTS' statutory and common law duties to avoid unfair and fraudulent business practices;

    b. The nature and application of DEFENDANTS' statutory and common law duties to avoid false and misleading communications about the remediation of radiation and toxins at the HPNS, which is causing harm, fear, mental and emotional distress to all PLAINTIFFS;

    c. The nature and application of the DEFENDANTS' duties with respect to the operation, management and supervision of the soil remediation and clean-up operation of the HPNS;

    d. DEFENDANTS' applicable standard of care with respect to the operation, management and supervision of the soil remediation and clean-up operation of the HPNS.

---

[13] See Exhibit 1, Census Tract Map

121.     Common questions of fact include:

    a.  Did DEFENDANTS breach their statutory and common law duties to avoid unfair and fraudulent business practices?

    b.  Did DEFENDANTS breach their statutory and common law duties to avoid false and misleading communications about the soil remediation and clean-up operation of the HPNS?

    c.  Did DEFENDANTS breach their duties with respect to the operations, management and supervision of the soil remediation and clean-up operation of the HPNS?

    d.  What is the measure of restitution, including medical bills, costs for medical monitoring, and other costs DEFENDANTS owe to PLAINTIFFS and class members resulting from the breach of their duties with respect to operations, management and supervision of the soil remediation and clean-up operation of the HPNS?

122.     PLAINTIFFS' claims are typical of all class member claims because all class members' claims for equitable relief and restitution arise from DEFENDANTS' failure to carry proper and professional soil remediation and clean-up of radiation and toxic carcinogenic materials as DEFENDANTS were contracted to do for the benefit of PLAINTIFFS. Instead, DEFENDANTS engaged in unfair and fraudulent business practices, false and misleading statements, breach of the duty of good faith and fair dealing, and bad faith breach of third party beneficiary contract.

123.     The evidence and the legal issues regarding DEFENDANTS' wrongful conduct are substantially identical for PLAINTIFFS and all of the class members.

124.     DEFENDANTS have acted or failed to act on grounds generally applicable to all class members, making equitable relief—e.g., restitution to each class member—appropriate to the class as a whole.

125.     The court should certify the class because common questions of law and fact predominate over individual questions. Legal issues regarding duty and standard of care are

common to all class members' claims. Factual issues regarding breach and the measure of restitution are common to all class members' claims. For example, the financial detriment suffered by each member of the class may be determined with respect to the difference between the fair market value of the medical treatments, medical monitoring or other costs common to the class as a whole. The financial detriment to all class members is directly caused by DEFENDANTS promising—but not delivering—a remediated clean HPNS consistent with applicable federal and state safety and requirements, and DEFENDANTS' failure to monitor, manage, maintain and best practices to prevent release of radioactive and toxic carcinogenic materials into the air, homes, property and persons of Class Members.

126.    A class action is superior to all other available procedures for the fair and efficient adjudication of these claims. Even if any individual class member could afford individual litigation, it would be unduly burdensome to the courts in which the separate lawsuits would proceed. A single class action is preferable to separate, individual lawsuits because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.

127.    **PLAINTIFFS DANIELLE CARPENTER** and **CATHERINE MUHAMMAD** are educated, articulate, professionals who will fairly and adequately protect the interests of the members of the class. PLAINTIFFS do not have interests that are contrary to or in conflict with those of the members of the class they seek to represent. PLAINTIFFS' undersigned counsel is experienced and capable of managing a class action of this anticipated size and complexity, and will vigorously prosecute the class claims.

128.    The prosecution of separate, individual lawsuits by individual members of the class would create a risk of inconsistent or contradictory findings of fact and law—which could impose incompatible standards of conduct for DEFENDANTS—and would lead to repetitious trials of the numerous common questions of fact and law. PLAINTIFFS know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of these claims.

129.   Class members may be identified and notified of developments in this class action through DEFENDANTS' billing data base, DEFENDANTS' marketing data base, DEFENDANTS' website at *http://www.tetratech.com/*, and through state or nationwide publications.

130.   PLAINTIFFS and class members have suffered financial losses and irreparable harm as a result of DEFENDANTS' wrongful conduct. Without a class action, PLAINTIFFS and members of the class will continue to suffer losses, thereby allowing DEFENDANTS' wrongful conduct to proceed without remedy, and allowing DEFENDANTS to retain the proceeds of their ill-gotten profits, contrary to California law and public policy.

## PRIVATE ATTORNEY GENERAL ALLEGATIONS

131.   PLAINTIFFS bring these claims as private attorneys general on behalf of the class and the general public pursuant to Business & Professions Code §17204. PLAINTIFFS seek to enjoin DEFENDANTS from engaging in the unfair and fraudulent business practices alleged, and to require DEFENDANTS to make restitution of all monies wrongfully obtained through their unfair and fraudulent business practices. A private attorney general/representative action is necessary and appropriate because DEFENDANTS have engaged in the wrongful acts alleged as a general business practice.

### FIRST CAUSE OF ACTION
**UNFAIR AND FRAUDULENT BUSINESS PRACTICES**
**(Against TETRA TECH EC, INC. TETRA TECH, INC., and Does 1 to 50)**

132.   PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

133.   DEFENDANTS' wrongful conduct constitutes unfair and fraudulent business practices that can and have in fact deceived PLAINTIFFS and class members in violation of California Business & Professions Code §17200 et seq. ("UCL"), providing: "unfair competition shall mean and include any unlawful, unfair or **fraudulent business act or practice** and unfair, deceptive, untrue or misleading advertising and any act prohibited by § **17500. Prohibiting False or Misleading statements.**

134.   California Business & Professions Code § 17500 expressly states, in pertinent part: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to perform services, professional or otherwise… or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto…to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate… in any newspaper or other publication, or any advertising device,… or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to [perform] … those services, professional or otherwise, so advertised [or agreed] at the price stated therein….**Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine. [Emphasis Added]**

135.   DEFENDANTS violated California Business & Professions Code §§ 17200-17500 by engaging in the following, but not limited to, unlawful, unfair and **fraudulent business act and practices, and unfair, deceptive, untrue or misleading statements**:

        a.  False and misleading representations about the remediation and clean-up of radiation and toxins at HPNS.

        b.  Failure to carry out the remediation and clean-up of radiation and toxins at HPNS.

        c.  Failure to remove, dispose and remediate, discharge, and clean up radiation and toxins from HPNS.

1           d.  Fraudulently billing tax payers of BAYVIEW HUNTERS POINT

2               RESIDENTS and U.S. taxpayers for services never performed nor provided,

3               creating unjust enrichment to DEFENDANTS.

4      136.   DEFENDANTS' criminal, wrongful, fraudulent conduct is part of an ongoing
5 pattern and practice, a systematic course of conduct which is repeated daily at other locations
6 pursuant to government contracts.

7      137.   DEFENDANTS' wrongful conduct adversely impacts the public interest.
8 DEFENDANTS' wrongful conduct is a factual and legal cause of financial harm to
9 PLAINTIFFS and class members. PLAINTIFFS and class members would have objected to
10 DEFENDANTS' contract with the government if the true facts were disclosed that
11 DEFENDANTS entered into the contract to remediate HPNS with the intent to not perform the
12 contract, but with the fraudulent, deceptive intent to "take the money and run", and the intent to
13 leave the PLAINTIFFS in a worse environmental disaster than before because DEFENDANTS,
14 pretending to remediate, uncovered, turned over and disturbed radioactive soil, releasing
15 radionuclides into the air, which DEFENDANTS knew would be blowing over PLAINTIFFS.

16      138.   DEFENDANTS knew the danger posed to the community of low income people,
17 who are without financial means to properly protect their safety, health, and legal rights.
18 DEFENDANTS showed a conscious disregard to the civil rights granted by the creating energy
19 creating all creation, including the right to Life, Liberty, and the Pursuit of Happiness.
20 DEFENDANTS would not have engaged in such reckless, criminal, life threatening conduct in
21 their own communities, or the communities of the rich, famous and powerful. DEFENDANTS'
22 criminal conduct is not only an intentional disregard of the lives of the BAYVIEW HUNTERS
23 POINT RESIDENTS, but also for their offspring for the next foreseeable five (5) generations
24 since the radionuclides DEFENDANTS deliberately, intentionally, conspiratorially left in the
25 ground have a half-life of thousands of years. Several radioactive isotopes released by
26 DEFENDANTS, such as iodine-131, cesium-134 and cesium-137 and strontium-90, Cesium-137
27 have a half-life of 30 years and remain in the environment for decades. Nuclear waste is loaded

28

with noble gases. The noble gases, such as xenon or krypton, are called noble because they don't react with anything. **All the noble gases are released when radioactive waste is disturbed.**

139.    DEFENDANTS knew they were undertaking to perform a dangerous task on behalf of the BAYVIEW HUNTERS POINT RESIDENTS, and the San Francisco Community. DEFENDANTS knew they were engaging in an ultra-hazardous activity. DEFENDANTS knew they were handling radioactive material like Plutonium-239, which is particularly long-lived and toxic with a half-life of 24,000 years and remains hazardous for tens of thousands of years. DEFENDANTS knew that the isotope iodine-131 is easily absorbed by the thyroid. Persons exposed to releases of I-131 from any source have a higher risk for developing thyroid cancer or thyroid disease, or both. DEFENDANTS knew that Cesium-137 is also a particular threat because it behaves like potassium-40 and is taken up by cells throughout the body. Radioactivity is defined as the spontaneous decay or disintegration of the nucleus of an atom. Radioactive nuclei decompose by releasing nuclear radiation consisting of high-energy particles or photons.[14] DEFENDANTS knew that "the amount of radiation released by a radioactive material depends on its rate of decay. Potassium-40 is considered a very long-lived radioisotope—it takes an extremely long time for decay to occur. "The rate at which a radioisotope decays is most conveniently described by the half-life, which is defined as the time required for one-half of the atoms of a radioisotope to emit radiation and decay to products. For potassium-40, the half-life is $1.28 \times 10/9$ years."[15]

140.    DEFENDANTS, at all relevant times, knew additionally, that Cs-137 has a long, 30-year-half-life and causes acute radiation sickness, and increases the risk for cancer because of exposure to high-energy gamma radiation. Internal exposure to Cs-137, through ingestion or inhalation, allows the radioactive material to be distributed in the soft tissues, especially muscle tissue, exposing these tissues to the beta particles and gamma radiation and increasing cancer risk. Radiation causes mutations in DNA, resulting in birth defects in future generations and offspring.

---

[14] https://www.flinnsci.ca/api/library/Download/f3dfdff2c4854ad99a385f5e2110b2d4
[15] Id.

141.   DEFENDANTS, at all relevant times, knew Strontium-90 behaves like calcium, and tends to deposit in bone and blood-forming tissue (bone marrow). 20–30% of ingested Sr-90 is absorbed and deposited in the bone. Internal exposure to Sr-90 is linked to bone cancer, cancer of the soft tissue near the bone, and leukemia. The risk of cancer increases with increased exposure to Sr-90.[16]

142.   DEFENDANTS, at all relevant times, knew when radiation is released or leaks, it contaminates the environment and poses a serious health threat to humans and other species. The greater the concentration of radiation that escapes, the higher the risk to humans, creating an enhanced threat to human health. Radiation does not readily break down and does not biodegrade in the ground or water or apparatus exposed to it. Research shows that it will persist in the environment for decades, since even a half-life in excess of 77 years is far longer than the life expectancy of humans exposed to it.

143.   Epidemiological studies of ionizing radiation show it causes dementia, specifically the problem of Krypton-85 and its affinity for fatty brain tissue. Studies have shown that Krypton has a 9-fold higher solubility in fats than in water and therefore it would concentrate in the myelin sheathing of nerves and other tissues of the brain which contain large amounts of lipid. Studies show that there is a statistically significant 2-fold excess risk of dementia in people who are experiencing prolonged exposure to radiation.[17]

144.   PLAINTIFFS and class members request that the court enter such orders as may be necessary to restore to PLAINTIFFS and class members all sums which DEFENDANTS wrongfully acquired by means of unfair and fraudulent conduct, as provided in Business & Professions Code §17203, Civil Code §3345, and for other appropriate relief.

145.   Injunction Relief; Court Orders: Business & Professions Code §17203 states: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment

---

[16] http://en.wikipedia.org/wiki/Radiation_effects_from_the_Fukushima_Daiichi_nuclear_disaster
[17] Supplementary Expert Report on Causation in case of Lawson v. General Electric, Christopher Busby PhD

1   by any person of any practice which constitutes unfair competition, as defined in this chapter, or

2   as may be necessary to restore to any person in interest any money or property, real or personal,

3   which may have been acquired by means of such unfair competition. Any person may pursue

4   representative claims or relief on behalf of others only if the claimant meets the standing

5   requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure."

6     146. DEFENDANTS' unlawful and criminal misconduct was deliberate, and

7   undertaken with oppression, fraud or malice within the meaning of *California Civil Code § 3294*,

8   justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter

9   them from such misconduct in the future.

10     WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

11   <div align="center"><b>SECOND CAUSE OF ACTION</b></div>

12   <div align="center"><b>FALSE AND MISLEADING STATEMENTS</b><br><b>(Against TETRA TECH EC, INC. TETRA TECH, INC., and Does 1 to 50)</b></div>

13     147. PLAINTIFFS and class members hereby incorporate allegations contain in the

14   preceding paragraphs, as though fully set forth herein.

15     148. DEFENDANTS' wrongful conduct constitutes unfair and fraudulent business

16   practices that have in fact deceived PLAINTIFFS and class members in violation of California

17   Business & Professions Code § 17500.

18     149. DEFENDANTS made untrue and misleading statements about the

19   implementation, execution, disposition, discharge, clean-up, and remediation of radiation and

20   toxins at HPNS.

21     150. DEFENDANTS failed to carry out the terms and conditions of the 1.1 Billion

22   Dollars Contract with the Navy, entered into for the benefit of the San Francisco Community,

23   including the community of the BAYVIEW HUNTERS POINT RESIDENTS.

24     151. DEFENDANTS' misleading statements are the following:

25      "At Tetra Tech, we seek clear, sustainable solutions that improve quality

26      of life. We take this responsibility seriously because Tetra Tech's work often

27      places us at the center of our clients' environmental, safety, and sustainability

28      challenges.

<div align="center">SECOND AMENDED CLASS ACTION COMPLAINT - 48</div>

1   These challenges often involve the opinions of public, industry, and
2   government stakeholders who seek Tetra Tech's advice on complex issues. We
3   have helped thousands of towns, cities, industries, and governments find
4   sustainable solutions to complex issues concerning resource management and
5   infrastructure.

6   To provide solutions to these challenges, we believe in maintaining our
7   technical objectivity. We have earned our reputation for technical objectivity over
8   more than five decades.

9   We have designed progressive, green buildings in New York City, helped
10  the U.S. Department of Defense with pollution prevention and clean-up, and
11  helped many Fortune 500 companies balance environmental needs with business
12  goals. We are helping Vancouver achieve its goal of becoming the greenest city in
13  the world. Tetra Tech companies hold memberships with the U.S. Green Building
14  Council and the Chicago Climate Exchange.

15  We also encourage our professionals to participate in outreach programs to
16  help improve the communities in which they live and work. Tetra Tech associates
17  and offices around the globe participate in many financial, in-kind, volunteer, and
18  pro bono activities each year."[18]

19  152.    DEFENDANTS' self-serving statements are false, as the evidence proves in this
20  case. The preponderance of evidence proves that DEFENDANTS falsified soil samples; covered
21  over, and covered-up radioactive killer toxins in the trenches; switched "Hot" radioactive soil for
22  clean soil to pass inspection in order to get money; ordered employees to engage in fraudulent
23  alteration and spoliation of chain of custody records; intentionally sending trucks loaded with
24  dirt under the cover of night when the Geiger Counter Monitors were turned off so as to avoid
25  radiation detection or lack thereof. This illegal, criminal misconduct was designed with a scheme
26  of misleading the Navy, the EPA and the BAYVIEW HUNTERS POINTS RESIDENTS. This

27

28  [18]  http://www.tetratech.com/en/social-responsibility

1 | conduct is antithetical to the representations and statements such as "At Tetra Tech, we seek
2 | clear, sustainable solutions that improve quality of life. We take this responsibility seriously
3 | because Tetra Tech's work often places us at the center of our clients' environmental, safety, and
4 | sustainability challenges." This internet statement is a violation of the law.

5 |      153.    DEFENDANTS' statements and representations that they were cleaning, and
6 | removing the radioactive materials from HPNS, coupled with the representations on their
7 | website and their publications that they "...believe in maintaining our technical objectivity. We
8 | have earned our reputation for technical objectivity over more than five decades"--these
9 | representations induced justifiable reliance in the BAYVIEW HUNTERS POINTS RESIDENTS
10 | that they were safe. Now they are afraid. They are gripped with fear of contracting cancer, more
11 | asthma, breast cancer, testicular cancer, thyroid cancer, and the host of others medical conditions
12 | the HPNS has inflicted upon them.

13 |      154.    As a direct result of DEFENDANTS' violation of §17500, DEFENDANTS have
14 | been and will be unjustly enriched at the expense of PLAINTIFFS, class members, and the
15 | general public.

16 |      155.    Pursuant to §17535, PLAINTIFFS and class members seek an order awarding
17 | PLAINTIFFS and class members restitution of all monies wrongfully acquired by the
18 | DEFENDANTS by means of false statements, plus interest and attorneys' fees pursuant to, inter
19 | alia, CCP § 1021.5.[19]

20 |      156.    DEFENDANTS' acts, conduct and behavior proximately caused harm and
21 | damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional
22 | distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their
23 | property and life, the need for periodic examination and treatment, as well as economic losses

24 |
25 |

26 | [19] Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any
action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant
27 | benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b)
the necessity and financial burden of private enforcement, or of enforcement by one public entity against another
28 | public entity, are such as to make the award appropriate....

1 including loss of earnings, stigma damages, the cost of obtaining potential cure, and other
2 needless expenditures of time and money.

3      157.    DEFENDANTS' misconduct was deliberate, and undertaken with oppression,
4 fraud or malice within the meaning of *California Civil Code § 3294*, justifying an award of
5 exemplary damages sufficient to punish DEFENDANTS and to deter them from such
6 misconduct in the future.

7      WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

8                        **THIRD CAUSE OF ACTION**
                        **NEGLIGENCE FEAR OF CANCER**
9      **(Against TETRA TECH EC, INC. TETRA TECH, INC., and Does 1 to 50)**

10     158.    PLAINTIFFS and class members hereby incorporate allegations contain in the
11 preceding paragraphs, as though fully set forth herein.

12     159.    **CALIFORNIA JURY INSTRUCTION:** 1623 Provides: Negligence-Recovery
13 of Damages for Emotional Distress--No Physical Injury-Fear of Cancer, or radiation or toxic
14 caused illness, Malicious, Oppressive, or Fraudulent Conduct-Essential Factual Elements.

15     160.    BAY VIEW HUNTERS POINT RESIDENTS claim that DEFENDANTS
16 TETRA TECH acted with malice or oppression, or fraudulent or intent in exposing to them to
17 carcinogen and toxic substance, and that this conduct caused BAY VIEW HUNTERS POINT
18 RESIDENTS to suffer serious emotional distress. The preponderance of the evidence proves
19 each of the elements to **establish this claim in favor of BAY VIEW HUNTERS POINT**
20 **RESIDENTS who must prove all of the following five (5) Elements:**

21           1.    That BAY VIEW HUNTERS POINT RESIDENTS were exposed to a
22                radiation related injury, a FEAR of cancer or radiation or toxins related illness as
23                a result of DEFENDANTS TETRA TECH'S negligent conduct;

24           2.    That TETRA TECH acted with malice/oppression/fraudulent intent
25                because

26                A.    THAT TETRA TECH intended to cause injury to BAY VIEW
27                      HUNTERS POINT RESIDENTS; **OR**

28

B.    TETRA TECH'S conduct was despicable and was carried out with a willful or conscious disregard of BAY VIEW HUNTERS POINT RESIDENTS' rights or safety; **OR**

C.    TETRA TECH'S conduct was despicable and subjected BAY VIEW HUNTERS POINT RESIDENTS to cruel and unjust hardship in conscious disregard of BAY VIEW HUNTERS POINT RESIDENTS' rights; **OR**

D.    TETRA TECH Intentionally misrepresented or concealed a material fact known to TETRA TECH, intending to cause BAY VIEW HUNTERS POINT RESIDENTS harm;

3.    That BAY VIEW HUNTERS POINT RESIDENTS suffered serious emotional distress from a fear that they will develop cancer, as a result of the exposure;

4.    That reliable medical or scientific opinion confirms that BAY VIEW HUNTERS POINT RESIDENTS' risk of developing cancer was significantly increased by the exposure and has resulted in an actual risk that is significant; and

5.    That TETRA TECH'S conduct was a substantial factor in causing BAY VIEW HUNTERS POINT RESIDENTS serious emotional distress.

Emotional distress includes suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame. Serious emotional distress exists if an ordinary, reasonable person would be unable to cope with it. "Despicable conduct" is conduct that is so mean, vile, base, or contemptible that it would be looked down on and despised by reasonable people.

161.    An estimated 20 schools are located within a one mile radius of the Hunters Point shipyard and in 2006, children playing outdoors on a hillside adjacent to grading activities developed a range of cardiorespiratory symptoms and signs of exposure to dust containing asbestos and particulates in concentrations above that allowed by law. According to Your Neighborhood at a Glance prepared by Harder + company community (research for the San

Francisco Department of Public Health, Health Care Services Master Plan Community Meeting held on March 22, 2012), 65% of Bayview Hunters Point residents perceive their safety during the day to be very unsafe or unsafe compared with a citywide average of 26%. Adding to the enormous burden of cardiopulmonary disease documented among residents of 94124, there is the cumulative psychological trauma introduced by chronic exposure to known toxins from adjacency to a Federal Superfund site undergoing remediation.[20]

162.   PLAINTIFFS' Experts provide "reliable medical or scientific opinion" confirming that BAY VIEW HUNTERS POINT RESIDENTS' risk of developing cancer was significantly increased by the exposure and has resulted in an actual risk that is significant.

163.   PLAINTIFFS' injuries, damages, losses, fear and harm are the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release of the nature and kind that was released at HPNS.

164.   DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

165.   DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of *California Civil Code § 3294*, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

[20] Ahimsa Porter Sumchai, M.D. A former physician specialist with the San Francisco Department of Public Health and former attending physician for the Palo Alto VAH Environmental Registry,

**FOURTH CAUSE OF ACTION**
**STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES**
(Against TETRA TECH EC, INC. TETRA TECH, INC., and Does 1 to 50)

166.   PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

167.   DEFENDANTS, and each of them, engaged in an ultra-hazardous activity that caused harm, damages, losses, injuries, including fear of contracting cancer, birth defects for their children, born and unborn, and economic and non-economic damages.

168.   DEFENDANTS, and each of them, are responsible for that harm, injuries, damages, both economic and noneconomic because DEFENDANTS engaged in remediation of nuclear waste, radioactive materials, an ultra-hazardous activity at HPNS.

169.   PLAINTIFFS' injuries, damages, losses, fear and harm are the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release as the nature and kind that was released at HPNS.

170.   DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. PLAINTIFFS will continue to incur losses and damage in the future. Based on PLAINTIFFS' repeated exposure to ionizing radiation, PLAINTIFFS have a reasonable fear that said exposure more likely than not increases their risk of developing cancer in the future.

171.   DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

172.   DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of *California Civil Code § 3294*, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

### FIFTH CAUSE OF ACTION
### VIOLATION OF PROPOSITION 65
#### (Against TETRA TECH EC, INC. TETRA TECH, INC., and Does 1 to 50)

173.   PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

174.   Proposition 65 California Health and Safety Code sections 25249.5 - 25249.13 imposes: "Prohibition On Contaminating Drinking Water With Chemicals Known to Cause Cancer or Reproductive Toxicity. No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water; notwithstanding any other provision or authorization of law except as provided in Section 25249.9.

175.   Proposition 65 Section 25249.6 states: "Required Warning Before Exposure To Chemicals Known to Cause Cancer Or Reproductive Toxicity. No person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual.... (a) Any person that violates or threatens to violate Section 25249.5 or 25249.6 may be enjoined in any court of competent jurisdiction. (b) (1) Any person who has violated Section 25249.5 or 25249.6 shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) per day for each violation in addition to any other penalty established by law. That civil penalty may be assessed and recovered in a civil action brought in any court of competent jurisdiction.

176.   Since 2006, DEFENDANTS failed to comply with Proposition 65 by failing to notify BAYVIEW HUNTERS POINT RESIDENTS that they were releasing radioactive

materials in the air, and by failing to give warning that DEFENDANTS were leaving, covering over, paving under, and covering up radiative materials on the grounds of HPNS.

177.     DEFENDANTS admitted in 2014 that their soil samples were mishandled, but concealed that their practice and policy was to submit fake, fraudulent soil samples, switching contaminated radiative soil with clean dirt to pass the regulatory inspections.

178.     DEFENDANTS' actions have caused and continued to cause harm, damages, including mental and emotional distress, anxiety, physical and physic injuries, including fear of radiation related injuries to BAYVIEW HUNTERS POINT RESIDENTS.

179.     DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

180.     DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of *California Civil Code § 3294*, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

## SIXTH CAUSE OF ACTION

### FRAUD
**(Against TETRA TECH EC, INC., TETRA TECH, INC., and Does 1 to 50)**

181.  PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

182.  DEFENDANTS represented that they were professionals and were skilled at performing radiation remediation and that they would remove and clean-up the radioactive materials from HPNS for the exchange of Billions of dollars. DEFENDANTS lied. DEFENDANTS acted with full knowledge, plan and scheme to defraud the public, including the BAYVIEW HUNTERS POINT RESIDENTS, and did defraud the public and PLAINTIFFS as the evidence herein proves.

183.   PLAINTIFFS justifiably relied to their detriment on DEFENDANTS' representations that the community was going to be "safe". Based on this reliance, BAYVIEW HUNTERS POINT RESIDENTS did not take any safety precautions such as demanding the replacement of DEFENDANTS with an honest, capable remediation company. PLAINTIFFS relied on DEFENDANTS' representations that DEFENDANTS were taking all safety measures and following the law, best practices and adhering to the standard of care for similar toxic remediation companies.

184.   DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

185.   DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of *California Civil Code § 3294*, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

## SEVENTH CAUSE OF ACTION
### NEGLIGENCE PER SE
### CRIMINAL CONVICTIONS
**(Against TETRA TECH EC, INC., TETRA TECH, INC., and Does 1 to 50)**

186.   PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

187.   DEFENDANTS breached a duty owing the PLAINTIFFS, a duty arising out of the contract with the Navy to remediate HPNS. DEFENDANTS were negligent per se since they violated federal criminal law and the statutory scheme mandated in Proposition 65 expressly for the protection of the class of people in which PLAINTIFFS are members.

188.   DEFENDANTS' negligence per se was a direct and proximate cause of PLAINTIFFS' damages and harm.

189.   DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

190.   DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish Defendants and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

### EIGHTH CAUSE OF ACTION
### BAD FAITH BREACH OF THIRD PARTY CONTRACT
### (Against TETRA TECH EC, INC., TETRA TECH, INC., and Does 1 to 50)

191.   PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

192.   DEFENDANTS entered into a contract with the Navy to remediate the HPNS for the benefit of BAYVIEW HUNTERS POINT RESIDENTS and the San Francisco community. PLAINTIFFS were named in the contract as the beneficiaries to whom the benefit would flow from the discharge of the terms and conditions of the contract.

193.   DEFENDANTS committed fraud, failed to honor and perform their duties under the contract, and created a failure of consideration. DEFENDANTS are liable for all of PLAINTIFFS' damages, including medical expenses and medical monitoring for the next five (5) generations.

WHEREFORE, Plaintiffs pray judgment as hereinafter set forth.

### NINTH CAUSE OF ACTION
### PUBLIC NUISANCE
### (Against TETRA TECH EC, INC., TETRA TECH, INC., and Does 1 to 50)

194.    PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

195.    California Civil Code section 3479: "Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance."

196.    California Civil Code section 3480 provides: "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

197.    "[M]ere apprehension of injury from a dangerous condition may constitute a nuisance where it interferes with the comfortable enjoyment of property (46 C.J. § 50, p. 680), and that the injured party need not seek an abatement of the nuisance but may sue for damages. McIvor v. Mercer-Fraser Co. (1946) 76 Cal.App.2d 247, 254 [172 P.2d 758].  The public misance-doctrine is aimed at the protection and redress of community interests and, at least in theory, embodies a kind of collective ideal of civil life which the courts have vindicated by equitable remedies since the beginning of the 16th century." People ex rel. Gallo v. Acuna (1997) 14 Cal.4th 1090, 1103 [60 Cal.Rptr.2d 277, 929 P.2d 596]. "[N]ot every interference with collective social interests constitutes a public nuisance. To qualify . . . the interference must be both substantial and unreasonable." People ex rel. Gallo, supra, 14 Cal.4th at p. 1105. "The elements 'of a cause of action for public nuisance include the existence of a duty and causation.' Public nuisance liability 'does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the nuisance.' " Melton v. Boustred (2010) 183 Cal.App.4th 521, 542 [107 Cal.Rptr.3d 481].

198.    DEFENDANTS, and each of them, engaged in negligent, reckless, intentional, and criminal conduct by deliberately and premeditatedly leaving and placing radioactive soil in the HPNS, fully aware that dust, debris, and radionuclides would blow with the prevailing winds

over the BAYVIEW HUNTERS POINT RESIDENTS and cause life threatening permanent injuries and death.

199.   BAYVIEW   HUNTERS   POINT   RESIDENTS   suffered   harm   because DEFENDANTS created a nuisance. DEFENDANTS, by leaving radioactive materials and other toxins at the HPNS created conditions that were harmful and injurious to health and life; were offensive to the senses; were an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life and property; unlawfully obstructed the free passage or use, in the customary   manner;   and   created   other   dangerous   conditions   to   BHPR'S   property   by contaminating ground water, soil for vegetation, lawns, and the quality of the air that the BAYVIEW HUNTERS POINT RESIDENTS have to breathe.

200.   DEFENDANTS' intentional, illegal and criminal conduct produced dangerous conditions that affected approximately forty thousand (40,000) people at the same time.

201.   Ordinary people would be reasonably annoyed, disturbed and offended by DEFENDANT'S conduct in admitting that they left radioactive soil in the densely populated residential community. DEFENDANT TETRA TECH'S criminal admission in their guilty pleas to federal crimes proves there was no social utility to DEFENDANTS' conduct. The serious deadly consequences of BAYVIEW HUNTERS POINT RESIDENTS being exposed to radioactive materials, outweigh DEFENDANTS' conduct. BAYVIEW HUNTERS POINT RESIDENTS did not consent to DEFENDANT TETRA TECH'S conduct.

202.   BAYVIEW HUNTERS POINT RESIDENTS suffered injuries, losses and harms, including, but not limited to, cancer, asthma, respiratory failure, heart attack, stroke and fear of contracting other life-long injuries as well as injuries to their offspring for the next five (5) generations. The harm suffered by the BAYVIEW HUNTERS POINT RESIDENTS was different than any potential harm to the general San Francisco communities.

203.   DEFENDANT TETRA TECH'S conduct was a substantial factor in causing BAYVIEW HUNTERS POINT RESIDENTS injuries, losses and harms, including, but not limited to, cancer, asthma, respiratory failure, heart attack, stroke and fear of contracting other life-long injuries as well as injuries to their offspring for the next five (5) generations.

204.   DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their

1   property and life, the need for periodic examination and treatment, as well as economic losses
2   including loss of earnings, stigma damages, the cost of obtaining potential cure, and other
    needless expenditures of time and money.
3
4        205.    DEFENDANTS' misconduct was deliberate, and undertaken with oppression,
    fraud or malice within the meaning of California Civil Code § 3294, justifying an award of
5   exemplary damages sufficient to punish DEFENDANTS and to deter them from such
6   misconduct in the future.

7        WHEREFORE, Plaintiffs pray judgment as hereinafter set forth.

8                               **TENTH CAUSE OF ACTION**
9                                   **PRIVATE NUISANCE**
              **(Against TETRA TECH EC, INC., TETRA TECH, INC., and Does 1 to 50**
10
11       206.    PLAINTIFFS and class members hereby incorporate allegations contain in the
    preceding paragraphs, as though fully set forth herein.
12
13       207.    DEFENDANT TETRA TECH interfered with BAYVIEW HUNTERS POINT
14   RESIDENTS' use and enjoyment of their land. BAYVIEW HUNTERS POINT RESIDENTS
     owned, leased, occupied, and controlled their property;  DEFENDANT TETRA TECH, by
15   acting or failing to act as hereinabove described, by leaving radioactive materials and other
16   toxins at the HPNS created conditions that were harmful and injurious to health and life; were
17   offensive to the senses; were an obstruction to the free use of property, so as to interfere with the
18   comfortable enjoyment of life and property; unlawfully obstructed the free passage or use, in the
19   customary manner;  and created other dangerous conditions to BHPR'S property by
     contaminating ground water, soil for vegetation, lawns, and the quality of the air that the
20   BAYVIEW HUNTERS POINT RESIDENTS have to breathe.
21
22       208.    DEFENDANTS' intentional, illegal and criminal conduct produced dangerous
     conditions that affected approximately forty thousand (40,000) people at the same time.
23   Ordinary people would be reasonably annoyed, disturbed and offended by DEFENDANT'S
24   conduct in admitting that they left radioactive soil in the densely populated residential
25   community. DEFENDANT TETRA TECH'S criminal admission in their guilty pleas to federal
26   crimes proves there was no social utility to DEFENDANTS conduct. The serious deadly
27   consequences of BAYVIEW HUNTERS POINT RESIDENTS being exposed to radioactive
28

materials outweigh DEFENDANTS conduct. BAYVIEW HUNTERS POINT RESIDENTS did not consent to DEFENDANT TETRA TECH'S conduct.

209.    BAYVIEW HUNTERS POINT RESIDENTS suffered injuries, losses and harms, including, but not limited to, cancer, asthma, respiratory failure, heart attack, stroke and fear of contracting other life-long injuries as well as injuries to their offspring for the next five (5) generations. The harm suffered by the BAYVIEW HUNTERS POINT RESIDENTS was different than any potential harm to the general San Francisco communities.

210.    DEFENDANT TETRA TECH'S conduct was a substantial factor in causing BAYVIEW HUNTERS POINT RESIDENTS injuries, losses and harms, including, but not limited to, cancer, asthma, respiratory failure, heart attack, stroke and fear of contracting other life-long injuries as well as injuries to their offspring for the next five (5) generations.

211.    DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

212.    DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

## ELEVENTH CAUSE OF ACTION
### For INJUNCTIVE RELIEF
(Against LENNAR, INC., FIVE POINT HOLDINGS, LLC and ALL DEFENDANTS and Does 1 to 50)

213.    PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

214.    PLAINTIFFS conferred upon DEFENDANTS an economic benefit, in the nature of "Superfund" public funds granted for the cleanup of Bayview Hunter's Point. (UNJUST ENRICHMENT)

215.   DEFENDANTS, and each of them, wrongfully and unlawfully falsified soil samples, failed to contain toxic dust, denied allegations, and endangered the local community.

216.   PLAINTIFFS have repeatedly demanded that DEFENDANTS stop the development until thorough, complete, and verified test results prove that all the toxins and radioactive materials have been removed, but DEFENDANTS have ignored PLAINTIFFS' demands.

217.   PLAINTIFFS have suffered and will continue to suffer irreparable injury unless and until this Court enjoins DEFENDANTS from continuing their wrongful conduct. When asked at a Hunters Point Community Meeting, on April 27, 2018, 70% of residents responded they knew someone in the area who suffers Cancer and 93% of residents responded they knew someone in the area who suffers from Asthma. DEFENDANTS' wrongful conduct is ongoing and threatens to be continued in the future.

218.   PLAINTIFFS have no adequate remedy at law for the injuries suffered as an award of monetary damages would not provide an adequate remedy as because money damages cannot replace safety, health and lives lost from exposure to radiation and other toxins confirmed now at the HPNS. An INJUNCTION is the only remedy available to PLAINTIFFS to protect themselves, their children and families from the life threatening toxic SUPERFUND HPNS.

WHEREFORE, PLAINTIFFS pray judgment against DEFENDANTS as follows:

## PRAYER FOR RELIEF

1.   For an order requiring DEFENDANTS to show cause, if any they have, why they should not be enjoined as set forth in this complaint, during the pendency of this action;

2.   For a preliminary injunction, enjoining DEFENDANTS, and each of them, and their agents, servants, and employees, and all persons acting under, in concert with, or for them to:

   a.   Take "anticipatory action" to prevent harm and through exploration of current toxicity and careful analysis of courses of action in order to present the least threat to residents in Hunters Point. and;

1       b.   Conduct an immediate Health and Safety assessment for residents,

2         workers and students within Hunters Point in cooperation with the school

3         districts, relevant community organizations and city task forces like SF

4         Asthma Task Force.

5       c.   **DEFENDANTS, and each of them, must be ordered to STOP ALL**

6         **DEVELOPMENT, CONSTRUCTION, BUILDING, DIGGING,**

7         **ERECTING, DISTURBING THE SOIL, DIRT, EARTH,**

8         **BUILDINGS, STRUCTURES, PIPES,  AND ALL ACTIVITY AT**

9         **HPNS UNTIL INDEPENDENT VERIFIED REPORTS CAN BE**

10        **OBTAINED SHOWING COMPLETE AND TOTAL**

11        **REMEDIATION OF ALL TOXIC SUBSTANCES, INCLUDING**

12        **ALL RADIOACTIVE MATERIALS FROM HPNS. ;**

13   3.   Monetary damages in the amount of $1 Billion dollars, wrongfully stolen from the

14    taxpayers for Unjust Enrichment, the health problems suffered by previous and

15    current residents, and the waste of public funds received to complete the cleanup

16    of Hunters Point.

17   4.   For costs of suit incurred in this action; and

18   5.   For such other and further relief as the Court deems proper.

19   184.   WHEREFORE, further PLAINTIFFS and members of the Class request that the

20 Court enter an order or judgment against DEFENDANTS, and each of them as named in the

21 future, as follows:

22   1.   For an order certifying the Class, appointing PLAINTIFFS and their

23    counsel to represent  the Class, and notice to the Class to be paid by

24    DEFENDANTS;

25   2.   For an injunction ordering DEFENDANTS to cease and desist from

26    seeking to engage in any additional remediation at HPNS.

27   3.   For an order requiring DEFENDANTS to immediately pay for medical

28    screenings for early detection of any radiation related medical conditions.

4.    For an order requiring DEFENDANTS to pay for medical monitoring for the next five (5) generations of each PLAINTIFF.

5.    For a comprehensive remediation of HPNS, with three (3) independent confirmations from non-government entities and by companies selected with PLAINTIFFS' input and agreement.

6.    For payment to PLAINTIFFS' class compensation damages as and for restorative justice in the amount of $27 Billion Dollars for the past and future harm, damages PLAINTIFFS will suffer and for Punitive Damages to punish DEFENDANTS for the blatant, conscious, callous disregard of BAYVIEW HUNTERS POINT RESIDENTS' lives, born and unborn, for the next five (5) generations.

7.    For PLAINTIFFS' costs of the proceedings herein and pre-judgment interest ;

8.    For reasonable attorneys' fees as allowed by statute;

9.    For an order prohibiting DEFENDANTS' unfair and fraudulent business practices and false and misleading statements.

10.   For any and all such other and further relief that this Court may deem just and proper.

Dated: JANUARY 31, 2019

LAW OFFICES OF BONNER & BONNER

Charles A. Bonner
Attorney for Plaintiffs

SECOND AMENDED CLASS ACTION COMPLAINT – 65

# EXHIBIT A

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1.  ABERCROMBIE, MICHAEL JAMES
2.  ABERNATHY, JOANNE
3.  ABNEY, HASSAN SALIN
4.  ABNEY, RENEE
5.  ABRAM, RASHAAN
6.  ABRAM, TRINITY
7.  ADAMS, BERRY L.
8.  ADAMS, BHANICA
9.  ADAMS, CHRISTOPHER
10. ADAMS, DINA LEE
11. ADAMS, JESCINA
12. ADAMS, WARNETTA
13. ADAMS-MOORE, JERELL
14. ADAMS-SIMS, TALENA
15. ADDISON, CURTIS AURTHER
16. ADDISON, CYNTHIA
17. ADDISON, SHANNON C.
18. AFALAVA, LUSA
19. AGREDANO, JR., DANIEL by Mayra Bermudez
20. AGREDANO, MARIANNA by Mayra Bermudez
21. AGUALLO, FRANCISCO
22. AHMED, JHONYELLE OLIVIA
23. AKIL, RASHAAD
24. AKINSON, CHARLES
25. ALBERT, JR., RAYMOND
26. ALE, CECILIA
27. ALEXANDER, KENISHA
28. ALEXANDER, MARQUEZ L.
29. ALEXANDER, RHONDA
30. ALFAFARA, ARIC LEE
31. ALFAFARA, JOSEPH PRINCE
32. ALHARK, JANASHA
33. ALLAH, ALASIA Z.
34. ALLEN, DEANNA
35. ALLEN, TAMARA
36. ALLEN, TARA
37. ALLEN, TIFFANY ANGEL
38. ALLEN, YVONNE
39. ALTMAYER, OLANDA JAVAE MARIE

1

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

40. AMEPEROSA, ANTHONY
41. AMEPEROSA, ANTHONY JACKSON F.
42. AMEPEROSA, SHARON
43. AMERSON, VICTOR
44. ANDERSON, ANDREA
45. ANDERSON, ELIZABETH
46. ANDERSON, JAMIE
47. ANDERSON, LAMONT
48. ANDERSON, LANNA
49. ANDERSON, LARON RAYMOND
50. ANDERSON, LATEISHA
51. ANDERSON, NICOLE LATRICE
52. ANDERSON, RAVON ERIC
53. ANDERSON, RONALD RAY
54. ANDERSON, SAMYAH by Jacquettia Banks
55. ANDERSON, TRAVON EDWARD
56. ANDERSON, WILLIAM
57. ANDREWS, JALIEL
58. ANG, SHEILA B.
59. ANGEL, DELOREAN DELBERT
60. ANGEL, SERENA
61. ANGEL, VERENA L.
62. ANGEL-SHORT, MOANEE NARIAH
63. ANTHONY, CALISTE
64. ANTHONY, PATRICIA A.
65. ANTIONE, LINDA
66. ANTOINE, HEIDI
67. APPLETON, ANDRE
68. APPLETON, RAMEIA
69. APPLON, CARL
70. ARD, MONIQUE
71. ARDOIN, JOHNATHAN
72. ARMSTRONG, CHARLENE
73. ARMSTRONG, LAWANDA J.
74. ARMSTRONG, RONNIE
75. ARMSTRONG, TAMELIA
76. ARMSTRONG, TIFFANY
77. ARNESSA HODGES
78. ASEGED, ESKENDER
79. ASH, MONIQUE YVONNE

2

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

80. ATKINSON, CHARLES
81. ATKINSON, LUCILLE
82. ATKINSON, WILLIAM
83. AUGUST, NICOLE
84. AUMOEUALOGO, LOLITA,
85. AUMOEUALOGO, TAIEPISI
86. AUSTIA, JR II, ROBERT ARTURO
87. AUZENNE, MARTIN
88. AUZENNE, SHEILA
89. AYATCH, MAKHAI by Tiesha Tonshay Hendricks
90. BABERS, JOHNNYE B
91. BABERS, LINDA FAYE
92. BAGBY, MAMIE
93. BAGBY, TEIARY
94. BAILEY, ASA,
95. BAILEY, ALLEGRA VIOLA LOUISE
96. BAILEY, GISELLE
97. BAILEY, JEMAL
98. BAILEY, MARSHAWN
99. BAILEY, MAXINE
100. BAILEY, REGINALD
101. BAILEY, RICHARD M.
102. BAILEY, TAYLOR by Felicia Sanders
103. BALINTON, DARIO J.
104. BALLARD, ASHLEY
105. BALLARD, TONY L.
106. BANK, LEE ANN
107. BANKS MUHAMMAD, MARK
108. BANKS, DE'ANDRA
109. BANKS, JACQUETTIA
110. BANKS, JAZZ
111. BANKS, LAMAR
112. BANKS, MARCEL
113. BANKS, MARKEL
114. BANKS, NICOLE
115. BANKS, PAMELA
116. BANKS, QUEEN-VANESSA
117. BANKS, RHONDA N.
118. BANKSTON, EUGENE
119. BARNES JOHNSON, MRESHELLE DENISE

3

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 120. | BARNES, BILL |
| 121. | BARNES, BOBBY TRAMMEL |
| 122. | BARNES, BRENTON |
| 123. | BARNES, BRIANA |
| 124. | BARNES, CHRISTIAN MILESTONE |
| 125. | BARNES, CLARISSA ANN |
| 126. | BARNES, JACKIE |
| 127. | BARNES, JACQUELINE M. |
| 128. | BARNES, LATASHA JOHNSON |
| 129. | BARNES, MIWANDA |
| 130. | BARNETT, LESTER |
| 131. | BARRETT, JEWEL |
| 132. | BARRNES, JR., BOBBY TRAMMEL |
| 133. | BARRON, SR., ANDRES L. |
| 134. | BARTOK, KRISTEN ANN |
| 135. | BASPED, JESSIE VICTORIA |
| 136. | BASS, KARCHE KRYSTLE |
| 137. | BASSETTI, CAROL LYNN |
| 138. | BATTLE, FE S. |
| 139. | BATTLEY, BELINDA |
| 140. | BAXTER, JERRY |
| 141. | BEAN, ELVIS R. |
| 142. | BEASLEY, ERNESTINE |
| 143. | BEASLEY, JEREMY ULYSSES-THADDEUS |
| 144. | BEASLEY, MARK |
| 145. | BEASLEY, WILLIE RAY |
| 146. | BEE, TERRY |
| 147. | BEHERA, SAMBIT |
| 148. | BELL, AUDREY |
| 149. | BELL, DAMONE |
| 150. | BELL, DORA |
| 151. | BELL, FALETEINE L. |
| 152. | BELL, JUDY |
| 153. | BELL, KRISTEN E JASON |
| 154. | BELL, LARENZO |
| 155. | BELL, SR., KILAMANJARO |
| 156. | BELL, VICENT KEITH |
| 157. | BELLOT, SHEVONNA |
| 158. | BELTCHER, ISAIAH ZACKERY |
| 159. | BENDER, SUSIE M. |

4

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 160. | BENDER, TRUEMAN |
| 161. | BENJAMIN, AARON NEAL |
| 162. | BENNETT, DIANE |
| 163. | BENNETT, UVONNE |
| 164. | BENSON, MYESHA |
| 165. | BENTON, DAVID ANTHONY |
| 166. | BENTON, DERRICK JEROME |
| 167. | BENTON, JR., DAVID J. |
| 168. | BENTON, TONYA |
| 169. | BERGANS II, MARVIN AUSTIN |
| 170. | BERMUDEZ, MAYRA |
| 171. | BERMUDEZ, MAYRA ALEJANDRA |
| 172. | BERRY, BELLA · |
| 173. | BERRY, DEVANCE |
| 174. | BERRY, DOLLIE IVORY |
| 175. | BERRY, ERVIN |
| 176. | BERRY, GLORIA |
| 177. | BERRY, JAMMIE |
| 178. | BERRY, LARRY |
| 179. | BERRY, MYQUITA by Verna Jean Berry |
| 180. | BERRY, NATALIE |
| 181. | BERRY, TANIA |
| 182. | BERRY, VERNA JEAN |
| 183. | BERTRON, BRUNO |
| 184. | BIBBS, ERICKEA N. |
| 185. | BIGGINS, BETTY |
| 186. | BISHOP, ANDREA |
| 187. | BISHOP, CHELICE |
| 188. | BISHOP, JACQUELINE |
| 189. | BISHOP, SHALANDA |
| 190. | BISHOP-HOLMES, SHA'LIYAH |
| 191. | BLACK, OMAR ASAD M. |
| 192. | BLACK, SHARON ROCHELLE |
| 193. | BLACK, SR., TRAVIS TERRELL |
| 194. | BLACKBURN, EBONY by Antoinette Fort |
| 195. | BLACKWELL, ANITRA |
| 196. | BLAKELY, DARNELL |
| 197. | BLAKLEY, SOPHRONIA |
| 198. | BLANCHARD, FRANCES |
| 199. | BLANKENSHIP, LEROY |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 200. | BLANKENSHIP, SHERRITA |
| 201. | BLATCHER, ANTHONY |
| 202. | BLATCHER, DEREK |
| 203. | BLUE, LYEISHIA |
| 204. | BLUFORD, BONNIE |
| 205. | BLUFORD, HEIDI DEANNA |
| 206. | BLUFORD, JANNETTE |
| 207. | BLUFORD, MARKIDA |
| 208. | BLUFORD, NICHOLAS GEORGE |
| 209. | BLUFORD, TATIANA R. |
| 210. | BLUFORD, TRAVIS T. |
| 211. | BLUFORD, VALENTINA ROSHAWN |
| 212. | BLUFORD, VALERIE K. |
| 213. | BODDIE, JAVEONA |
| 214. | BODDIE, JAVON |
| 215. | BOISSIERE, SHEIBA |
| 216. | BOLDS, DARIENE |
| 217. | BOLMER, ARMANI |
| 218. | BOLMER, VICTORIA DONNA ARMOND |
| 219. | BOLTON, LONNIE RAY |
| 220. | BOND, JAMES L. |
| 221. | BOONE , AUKAYLA B SMITH |
| 222. | BOOTH, KAREN D |
| 223. | BORELA, SHANTE |
| 224. | BORELA, TIFFANY |
| 225. | BOUDREAUX-MATTHEWS, MICHELLE |
| 226. | BOUIE IV, GEORGE |
| 227. | BOYD, JODIE |
| 228. | BOYD, RAYMOND C. |
| 229. | BOYDEN, KAMARAH by Kashina Garner |
| 230. | BOYLAND, RHONDA RENEE |
| 231. | BRADFORD, AMELA |
| 232. | BRADFORD, DENISE MARIE |
| 233. | BRADFORD, LACHELE A |
| 234. | BRADFORD, LORETHA |
| 235. | BRADLEY, MARGARET M. L. |
| 236. | BRADLEY, SAMUEL HENRY |
| 237. | BRANCH, MALORIE JAMELIA |
| 238. | BRANCH, SR., ANDRE |
| 239. | BRANNER, JEFFREY |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | | |
|---|---|---|
| 240. | BRANNER, MARVVIN L. |
| 241. | BRANNER, SHAMIKA TENE |
| 242. | BRANNER, SR., JEFFREY |
| 243. | BRANNER, TAMIKA |
| 244. | BRAUD, DAVONTE |
| 245. | BRAUD, DIMITRA |
| 246. | BRAY, GLENN D. |
| 247. | BREAUX, DARYL |
| 248. | BREAUX, GUSSIE M |
| 249. | BREAUX, PAMELA MARIE |
| 250. | BREAUX, STEVEN J. |
| 251. | BREED, COMELIA |
| 252. | BREED, HATTIE |
| 253. | BREED, PAUL |
| 254. | BREED, PRISILLA ANN |
| 255. | BREWER, SHARON |
| 256. | BREWSTER, ALICIA |
| 257. | BREWSTER, ANTHONY |
| 258. | BREWSTER, ANTHONY R. |
| 259. | BREWSTER, ESAU |
| 260. | BREWSTER, EVANGELA |
| 261. | BREWSTER, JANITA |
| 262. | BREWSTER, JOEANNE |
| 263. | BREWSTER, LINDA S. |
| 264. | BREWSTER, MALONE |
| 265. | BREWSTER, MICHAEL |
| 266. | BREWSTER, OTIS |
| 267. | BREWSTER, SONIA |
| 268. | BREWSTER, TALERIA |
| 269. | BREWSTER, VIOLA |
| 270. | BREWSTER, VIOLET |
| 271. | BRIDGES, GWENDOLYN M. |
| 272. | BRITT, BRIAN |
| 273. | BRITT, GILMA M. |
| 274. | BRITT, WILLIE L. |
| 275. | BROOK, ETHAN |
| 276. | BROOKS, CHARLES |
| 277. | BROOKS, EARL EUGENE |
| 278. | BROOKS, JUSTIN |
| 279. | BROOKS, KELVIN DWAYNE |

7

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 280. | BROOKS, RONALD |
| 281. | BROOM, ALICE |
| 282. | BROOM, MICHAEL |
| 283. | BROUSSARD, ALEXIS ALANDRA |
| 284. | BROUSSARD, CAMILLE |
| 285. | BROUSSARD, CASIMIR N |
| 286. | BROUSSARD, ERIC |
| 287. | BROWDER, CESENA MICHELE |
| 288. | BROWN , DARRELL |
| 289. | BROWN, ALEXIS |
| 290. | BROWN, BARBARA |
| 291. | BROWN, CONSTANCE |
| 292. | BROWN, CYNTHIA |
| 293. | BROWN, DEBORAH |
| 294. | BROWN, DENISE L. |
| 295. | BROWN, DEONTE O. |
| 296. | BROWN, DEWEY |
| 297. | BROWN, DUANE M. |
| 298. | BROWN, DWIGHT M. |
| 299. | BROWN, E'LAYA by Denise L. Brown |
| 300. | BROWN, EMIL |
| 301. | BROWN, EUNICE K |
| 302. | BROWN, GEARY L. |
| 303. | BROWN, JANET |
| 304. | BROWN, JOHNNY |
| 305. | BROWN, KELLE J. |
| 306. | BROWN, KENNETH |
| 307. | BROWN, LAMONT |
| 308. | BROWN, LATRELLE |
| 309. | BROWN, MARQUEZ |
| 310. | BROWN, NEVAEH by Ronnie Mack Brown |
| 311. | BROWN, PAMELA |
| 312. | BROWN, ROBERT |
| 313. | BROWN, ROGER LEE |
| 314. | BROWN, RONNIE MACK |
| 315. | BROWN, SHARAE LATRICE |
| 316. | BROWN, SHARON |
| 317. | BROWN, SHAWNTE DANIELLE |
| 318. | BROWN, SHEREE ETHEL |
| 319. | BROWN, SHIRLEY A. |

8

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 320. | BROWN, TAMMY M. |
| 321. | BROWN, VANESSA |
| 322. | BROWN, WYWNOKA |
| 323. | BRUCE, AMELIA BONITA |
| 324. | BRUNO, BERTRON |
| 325. | BRYANT, ANNETTE |
| 326. | BRYANT, DEANDRA |
| 327. | BRYANT, DINA MARIE |
| 328. | BRYANT, DINO R |
| 329. | BRYANT, GREGORY |
| 330. | BRYANT, MYRONE LEE |
| 331. | BRYANT, NEFARTARI |
| 332. | BRYANT, RASHEIDA |
| 333. | BRYANT, TIZEYAH |
| 334. | BUCHANAN, ZHARIA U. |
| 335. | BUCKLEY, MARY |
| 336. | BUCKLEY-CHUNG, SAMANTHA |
| 337. | BUCKLEY-CHUNG, SYLISIA |
| 338. | BULLARD, TOSCA IRENE |
| 339. | BULLOCK, CIARA |
| 340. | BULLOCK, LISA |
| 341. | BULLOCK, PAUL |
| 342. | BURLESEN, JR., ALBERTO JAMES |
| 343. | BURNLEY, GWENDOLYN OTIS |
| 344. | BURRELL, ANTONIO |
| 345. | BURROUGHS, JAVANEA |
| 346. | BUSBY, ADRIENNE M. |
| 347. | BUSBY, ANITRA |
| 348. | BUSBY, ANITRA |
| 349. | BUSBY, ANTRONN |
| 350. | BUSBY, DOSHON |
| 351. | BUSBY, KERRINE FATIMA |
| 352. | BUSBY, SR., ANTRONN |
| 353. | BUTLER, EARL MONEE |
| 354. | BUTLER, EULA CEIL |
| 355. | BUTLER, JAMAL X. |
| 356. | BUTLER, JASMINE |
| 357. | BUTLER, JOHN HARVEY |
| 358. | BUTLER, TIFFANY |
| 359. | BYRD, JUMA |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 360. | BYRD, LINDA |
| 361. | BYRD, ROBERT |
| 362. | CADE, LARENDA LYNETTE |
| 363. | CAEL, HARRY |
| 364. | CAEL, PATRICIA D. |
| 365. | CAEL, TANEASHA |
| 366. | CAEL, TERESA |
| 367. | CAGE, ANGEL |
| 368. | CAIN, KASHUNDA |
| 369. | CAIN, SAMONE |
| 370. | CALDWELL, FAIDA |
| 371. | CALDWELL, KISHIRA |
| 372. | CALDWELL, RHONDA |
| 373. | CALHOUN, TRACI |
| 374. | CALLIER, FAY C. |
| 375. | CALLIER-JOHNSON, MONA L. |
| 376. | CALLOWAY, ALICE |
| 377. | CALLOWAY, JAMISI |
| 378. | CALLOWAY, JR., MATTHEW |
| 379. | CALLOWAY, KIM ROCHELLE |
| 380. | CAMPBELL, DENISE |
| 381. | CANADA, PAMELA DENISE |
| 382. | CANALES, ROLANDO JOSE |
| 383. | CANCUN, MARCUS |
| 384. | CANDLEY, PATSY |
| 385. | CANNEDY, KIYANNA MONET |
| 386. | CANNON, CHASITY M |
| 387. | CANNON, TRE'ZHAN |
| 388. | CANSINO, KRYSTLE |
| 389. | CARMICHAEL, JAZMYNE LANIECE |
| 390. | CARMON, MARCUS |
| 391. | CARPENTER, DANIELLE |
| 392. | CARPENTER, KISSI KENYA |
| 393. | CARPENTER, TE-ONZAY L. |
| 394. | CARR, GINA M. |
| 395. | CARRILLO, ANTONIO G. |
| 396. | CARROL, MICHAEL JAMES |
| 397. | CARSON, ANIYAH |
| 398. | CARSON, JANNA |
| 399. | CARSON, SHAELA |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 400. | CARTER, BELINDA FRANCINE |
| 401. | CARTER, BRIAN |
| 402. | CARTER, BRIDGET |
| 403. | CARTER, GREGORY L. |
| 404. | CARTER, JOYCE MARIE |
| 405. | CARTER, LA'SHAWNA |
| 406. | CARTER, LYNELL |
| 407. | CARTER, NICHELLE NICOLE |
| 408. | CARTER, RICKY |
| 409. | CARTER, SHARON G. RICHARDSON |
| 410. | CARTER, TASHANA D. |
| 411. | CARTWRIGHT, ANTHONY LEE |
| 412. | CASEY, KATHLEEN |
| 413. | CATO, AISHA |
| 414. | CATO, ALISHA |
| 415. | CATO, TIERANEE |
| 416. | CELESTINE, PARIS |
| 417. | CENTENO, LUISA AMALIA |
| 418. | CHAMBERS, DENNIS |
| 419. | CHAMBERS, GREGORY |
| 420. | CHAMBERS, JONATHAN C. |
| 421. | CHANTHA, SARETH |
| 422. | CHAPMAN, ALIZE |
| 423. | CHARLES, DWAYNE J. |
| 424. | CHEATUM, LANEICE |
| 425. | CHEATUM, LANIYA |
| 426. | CHEERES, BYRON |
| 427. | CHERRY, JASON ERIC |
| 428. | CHHITH, DORA |
| 429. | CHKINEF, MO |
| 430. | CHRISTIAN, MAURICE SIMEON |
| 431. | CHRISTIE, DIAHANNA |
| 432. | CHRISTIE, GLORIA |
| 433. | CLARK, LESTER |
| 434. | CLARY-BROWN, CAROLYN |
| 435. | CLAYBORN, BRIDGETTE |
| 436. | CLAYBORN, JANESSE |
| 437. | CLAYBRON, SR., GREGORY |
| 438. | CLAYTON, PLADEE |
| 439. | CLAYTON, PLADEE TOMMY |

11

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

440.   CLAYTON, TIA
441.   CLAYTON, TOMANI by Shamika Thomas
442.   CLAYTON, TOMARI by Shamika Thomas
443.   CLAYTON, TYCE by Shamika Thomas
444.   COATS, ROBERT LEE
445.   COATS, ROCHELL L.
446.   COBB, MARIE
447.   COGMAN, SERENE
448.   COHN, WANDA
449.   COLE , JON
450.   COLE, LOIS ANN
451.   COLE, SHA-RITA L.
452.   COLEMAN, CESENA
453.   COLEMAN, NORRIS
454.   COLEMAN, THERESA LYNN
455.   COLEMAN-ROACH, DEBORAH
456.   COLEMON, KIMBERLY
457.   COLLIER, AKILI
458.   COLLIER, KIASI
459.   COLLIER, MELODY DANIEL
460.   COLLIER, WILLIAM H.
461.   COLLINS, DELACEY JERMAINE
462.   COLLINS, DUKE
463.   COLLINS, GWENISHA
464.   COLLINS, JASMINE
465.   COLLINS, JERROYN KEIARE
466.   COLLINS, KEVIN
467.   COLLINS, LARRY
468.   COLLINS, LaSHAWNDA
469.   COLLINS, LATRINA DENISE
470.   COLLINS, LAURIE
471.   COLLINS, RAHSHEDIA
472.   COLLINS, TOMMIE
473.   COLVIN, AC
474.   COLVIN, DARLENA M.
475.   COLVIN, LEONARD
476.   COLVIN, MAURICE
477.   COLVIN, RENEE
478.   COLVIN, RENEE
479.   COMBS, JA'SHAWN

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 480. | CONLEY, ANTHONY M. |
| 481. | CONLEY, LISA E. |
| 482. | CONLEY-BRILEY, PAUL DAVE D. |
| 483. | CONNER, ANDY |
| 484. | CONNER, SHARON MARTIN |
| 485. | COOK, IESHA NECOLE |
| 486. | COOK, ROBERT L. |
| 487. | COOPER, BARBARA CAROLYN |
| 488. | COOPER, BETTY |
| 489. | COOPER, LEMARLIN |
| 490. | COOPER, LOIS |
| 491. | COOPER, PRECIOUS J. |
| 492. | CORLEY, DARNELL |
| 493. | CORLEY, LYNNELL |
| 494. | CORLEY, MONIQUE |
| 495. | CORLEY, MYLANI |
| 496. | CORLEY, QUIANJN |
| 497. | COSY, RONALD |
| 498. | COULAH, TRAMAINE |
| 499. | COURSEY, BELINDA |
| 500. | COUSSINAT, JASMINE MARLA ANDREA |
| 501. | COVINGTON, LEWIS JAMES |
| 502. | CRANER, EDDIEMAC |
| 503. | CRANER, JIMMY LEE |
| 504. | CRATER, SHIRLEY |
| 505. | CRAWFORD, EBONEE |
| 506. | CRAWFORD-LEWIS, SHIRLEY |
| 507. | CRENSHAW, MARY |
| 508. | CRISWELL, BETTY |
| 509. | CRISWELL, CATRINA |
| 510. | CRITTLE, RITA L. |
| 511. | CROSBY, THELMA |
| 512. | CROSLEY, ASHLEY |
| 513. | CROSLEY, NATASHA |
| 514. | CROWDER, JAYANN |
| 515. | CRUSE, DALE J. |
| 516. | CUMMINGS, CHRISTIN DEAN |
| 517. | CUMMINGS, HAKEEM |
| 518. | CUNNINGHAM, ANGELA C. |
| 519. | CUNNINGHAM, ANITA |

13

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

520.     CUNNINGHAM, LEE
521.     CUNNINGHAM-LOWERY, NIKCOLE
522.     CURRY, GERALD
523.     CURRY, RENITA
524.     DANCY, KIMBERLY ANN
525.     DANIEL, MICHAEL
526.     DANIEL, MICHELLE
527.     DANIEL, RUBY
528.     DANIEL, WILLIAM ALBERT
529.     DANIELS, BRYAN L.
530.     DANIELS, CLEVELAND J.
531.     DANIELS, HEZZACK
532.     DANIELS, JAYSHA RENIA L
533.     DANIELS, LARRY H.
534.     DANIELS, NAJUAWANDA
535.     D'ASCENZO, MARK ANTHONY
536.     DAVID-JACOBS, CHAUNCY FELICIA
537.     DAVID-JACOBS, SILVIA
538.     DAVIS, ANGEL
539.     DAVIS, ANTHONY by LaShunda Hollis
540.     DAVIS, BENJAMIN D.
541.     DAVIS, DE'JAH
542.     DAVIS, JANET KAYE
543.     DAVIS, KEANTAY
544.     DAVIS, LEANDER S
545.     DAVIS, LISA CHENNETTE
546.     DAVIS, SHAWNETTA
547.     DAVIS, SHELA TENE'
548.     DAVIS, SOBRINA S.
549.     DAVIS, STEPHEN MICHAEL
550.     DAVIS, TIA MICHELLE
551.     DAWES, LAQUAN
552.     DAWSON, MARILYN LOUISE
553.     DEAN, ANGELA M.
554.     DEANDA, JORGE M.
555.     DEAN-RIVERS, DEBORAH E.
556.     DeCOY, REBECCA
557.     DEL CHIARO, JASMINE
558.     DEMINGS, EVETTE
559.     DEMUS, LASHANDA

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 560. | DEMUS, LOIS MICHELLE |
| 561. | DESCLAMPS, HL ALEXANDER |
| 562. | DESCLAMPS, JESSIE |
| 563. | DEVORE, BARRY K. |
| 564. | DIALS, ENNA M. |
| 565. | DIAS, AALIYAH by Angela Smith |
| 566. | DIAS, AMIR by Angela Smith |
| 567. | DIAS, ANDRE |
| 568. | DIAS, ASHANTI by Angela Smith |
| 569. | DIAS, JR., ANDRE by Angela Smith |
| 570. | DIKON, A. |
| 571. | DILLARD, ANTHONY |
| 572. | DILLON, ERIC WARREN |
| 573. | DILLON, YVONNE MARIE |
| 574. | DISMUKES, CHRISTOPHER JEROME |
| 575. | DIXON, AIREL ARTRESE |
| 576. | DLE CHIARO, JASMINE |
| 577. | DOATY, MARIE |
| 578. | DOMINIQUE, DOORTHY |
| 579. | DOMINIQUE, KAREN |
| 580. | DOMINIQUE, LEE ANDREW |
| 581. | DOMINIQUE, SADE |
| 582. | DONAHUE, MICHELLE |
| 583. | DONAHUE, VIVIAN |
| 584. | DONEHUE-STIGER, NINA L. |
| 585. | DORN, SR, YUL D |
| 586. | DOSS, CORNELL |
| 587. | DOUGLAS, WHITLEY |
| 588. | DRAPER, TONI R |
| 589. | DUDLEY, DONALD |
| 590. | DUDLEY, JOSEPH R |
| 591. | DUKES, TYRONE |
| 592. | DUNCAN, CAMILLE |
| 593. | DUNCAN, JR, CANDISS |
| 594. | DUNCAN, ROBERT |
| 595. | DUNCAN, SR, ROBERT |
| 596. | DUNN, KELVIN SEYMOURN |
| 597. | DUNN, RITA |
| 598. | DUNSON, MEGAN L. |
| 599. | DURAN, DAVID STEPHEN |

15

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 600. | DURDEN, JOHNTA DELION |
| 601. | DUTY, LAURA |
| 602. | DYSON, KARWANNA |
| 603. | EALY, ROSIE M. |
| 604. | EARBY, PERCY |
| 605. | EARBY, ZAIRE |
| 606. | EARLE, CHRISTOPHER |
| 607. | EAST, JAI |
| 608. | EDMUNDS, RAVEN by LaTasha Telfor |
| 609. | EDWARD, GUINN |
| 610. | EDWARDS, APRIL DELAINE |
| 611. | EDWARDS, GIONE |
| 612. | EDWARDS, KEOSHA LEONA |
| 613. | ELDER, AARONISHA |
| 614. | ELDER, ALANNA |
| 615. | ELDER, JR., MARCELLUS AARON |
| 616. | ELLINGTON, EULA |
| 617. | ELLIS , KIMIANTE |
| 618. | ELLIS, DEVIN |
| 619. | ELLIS, GRETA |
| 620. | ELLIS, JR., HENRY DEWAYNE |
| 621. | ELLISON, ESTHER |
| 622. | ELLISON, ETHEL |
| 623. | ELLISON, RONALD |
| 624. | ELLIS-SMITH, JAMELA |
| 625. | ELMORE, CHRISTOPHER |
| 626. | EMERSON, JR., FREDERICK JAMES |
| 627. | ENNIS , MARTY |
| 628. | ENNIS, ANITRA |
| 629. | ENNIS, BILLY |
| 630. | ENNIS, IVORY |
| 631. | ENNIS, SABRINA |
| 632. | ENNIS, SR, BILLY |
| 633. | ENNON, LORETTA |
| 634. | ENNON, LORRAINE |
| 635. | ENNON, WALTER |
| 636. | ESCOBAR, CARLA |
| 637. | ESCOBAR, DORA L. |
| 638. | ESCOBAR, JAIRO |
| 639. | ESPINOZA, JUAN MACIEL |

16

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 640. | ESPREE, CHARLESVESTER |
| 641. | ESPREE, QUINDELLA MARQUES |
| 642. | EUBANKS, ROYALE |
| 643. | EVANS, CAROLYN L. |
| 644. | EVANS, GARY M. |
| 645. | EVANS, MAURICE |
| 646. | EVANS, RUBY |
| 647. | EVERETT, ARIANA by Raquel Tompkins |
| 648. | EVERETT, MALACHI by Raquel Tompkins |
| 649. | EVERETT, RONALD |
| 650. | EVERETT, SKYLAR by Raquel Tompkins |
| 651. | FAAFITI, EASTER SAKA |
| 652. | FAAFITI, MAFAUFAUGA |
| 653. | FAATAUI, ADELE |
| 654. | FAATAUI, CENTURY DAVID |
| 655. | FAATAUI, DONNA |
| 656. | FAATAUI, ELIZABETH |
| 657. | FAATAUI, FELICIA REBECCA |
| 658. | FAATAUI, KRYSTAL |
| 659. | FAATAUI, PAUL VAOSEA |
| 660. | FAATAUI, PELENISE |
| 661. | FAATAUI, VEVESI RUBEN |
| 662. | FAILS, BEVERLY A. |
| 663. | FAILS, LENETTE |
| 664. | FAIRLEY, KENNETH |
| 665. | FALESOGA, DAVID |
| 666. | FARLEY, JOURNEY LABRE |
| 667. | FARR, DANIEL |
| 668. | FELICIANA, STEPHAN M. |
| 669. | FERGUSON, LAMONTE ELLIOTT |
| 670. | FERGUSON, LOIS MARIE |
| 671. | FERRANDO, JASON |
| 672. | FIELDS, JR., DUWAN |
| 673. | FIELDS, NIKO |
| 674. | FIELDS, RICO |
| 675. | FIELDS, ROBERT |
| 676. | FIELDS, SR., DUWAN |
| 677. | FIELDS, TAMNICA D. |
| 678. | FIGUEROA, NATHALIE F. |
| 679. | FINAMORE, CARL |

17

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

680.    FISHER, EVELYN
681.    FISHER, KATHLEEN
682.    FISHER, VINCENT
683.    FLEETON, LINILA
684.    FLEMING, DARLENE
685.    FLORES, CLEMENTE
686.    FLORES, DILCIA
687.    FLORES, NELSON
688.    FLOWER, DORIS
689.    FLOWERS, ELLIOTT
690.    FONTENOT, JABARI
691.    FONTENOT, RICKY
692.    · FOOTS, LOUISE
693.    FORBES, ANGELIQUE N.
694.    FORBES, ANTOINIQUE
695.    FORBES, SHEILA
696.    FORT, ANTOINETTE
697.    FORTE, ALMETA JENKINS
698.    FORTE, BURNETTE
699.    FORTE, XZARAMIYA by Burnette Forte
700.    FORTENBERRY, LARONDA L.
701.    FOSTER, DEREK
702.    FOSTER, IJINANYA
703.    FOSTER, NINA
704.    FOSTER, ORLAND KEITH
705.    FOWLS, JAMELA
706.    FRANCIS, JANISA RANIQUE
707.    FRANK, BRIANNA
708.    FRANK, FRANDIS
709.    FRANK, JERALDINE
710.    FRANKLIN, ARETHA
711.    FRANKLIN, BERNADINE A.
712.    FRANKLIN, BONNIE M.
713.    FRANKLIN, EARLINE
714.    FRANKLIN, GEORGE
715.    FRANKLIN, LEON
716.    FRANKLIN, PATRICIA
717.    FRANKLIN, PATTY JO
718.    FRANKLIN, TRACY
719.    FRANKS, JEANAE

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

720. FRANKS, JEANNAE
721. FRANKS, RAFIQUE
722. FRAZIER, MYRON D.
723. FREEMAN, PHYLLIS
724. FRELOT, DA'SHUAN
725. FREYMAN, YEVGENIY
726. FRIEDMAN, BONNIE
727. FRYE, MALIK ZAIRE
728. FUNG, GRACE
729. FURLOUGH, LOYCE MARIE
730. GAFFNEY, REGINA M.
731. GAGE, YVONNE L.
732. · GAGE, YVONNE L.
733. GAINES, ALEX
734. GAINES, ALEXIS
735. GAINES, DERRICK
736. GAINES, DWAYNE H.
737. GAINES, DWAYNE H.
738. GAINES, FREDERICK
739. GAINES, JEANETTE ALICIA
740. GAINES, JENNIFER.
741. GAINES; JOUDERE AREMEL
742. GAINES, MYRA
743. GAINES, RASHALANDA
744. GAINES, SHANTANICE
745. GAINES, YOLANDA
746. GAINO, MILDRED H.
747. GAINS, CHRISTOPHER
748. GANS, ROBERT L.
749. GANS, SHARON L.
750. GANTT, BRIAN
751. GARBYS, NICOLE
752. GARCIA, ALFONSO ALVIN
753. GARCIA, NAKISHA JOSIE
754. GARCIA, SINGIN T.
755. GARDNER, CHARLES by Andrea Smith
756. GARDNER, JR., CHARLES
757. GARDNER, LARENDA RENE
758. GARDNER, McCALE LATEEF
759. GARDNER, SHANTEL TRISHA FAYE

19

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

760. GARNER, DYESHA
761. GARNER, EURMA
762. GARNER, KASHINA
763. GARNER, KASHINA L.
764. GARNER, REGINA
765. GARNER, TARIAN L.
766. GARRETT, LADIAMOND CORDELLIA
767. GARRETT, MARY CHRIS'TI'ROANAN
768. GARRETT, NONA
769. GARRITT, JAZMANIKA
770. GARVIN, JR., CARLOS
771. GASPARD, LASHONA
772. GASTINELL, KEVIN L.
773. GASTINELL, KYMBER
774. GASTINELL, LORENZO
775. GASTINELL, VARLANDER S.
776. GENOCHIO, RACHEL
777. GEORGE, JEFFERY W.
778. GETER, DISHON IRVING
779. GIBSON, MARK
780. GIBSON, MARKETTA LUVINA
781. GIBSON, TAMMIE LAVETTE
782. GILBERT, MELVIN CORY
783. GILBERT, ROSETTA MAE
784. GILBERT, SCHARLENE
785. GILLIAM, SHY'LAH by Twavida Plummer
786. GILLIS, CHARLES J.
787. GLASPIE, EMIL
788. GLASPIE, GLENDON B
789. GLASPIE, LASHUNDRA
790. GODALL, HARRY
791. GOINS, EMMANNUEL
792. GOLSON, GELETTI
793. GOODALL, SABRINA M.
794. GOODWIN, JASON
795. GORDON, JEREMIAH
796. GORDON, QUNNICE AGUSTUS
797. GOULD, SHARON RENEE
798. GRADY, SANDRA
799. GRANT, LORRAINE

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 800. | GRANT, NICOLE V. |
| 801. | GRAY, ARBEE |
| 802. | GRAY, GIOVANNI |
| 803. | GRAY, III, PHILIP |
| 804. | GRAY, JEREMIAH |
| 805. | GRAY, SHARON D. |
| 806. | GRAY-JONES, DAWN |
| 807. | GRAY-ROY, DEBRAH ANN |
| 808. | GRAYS, BETTY |
| 809. | GRAYS, DARIUS |
| 810. | GRAYS, EARL |
| 811. | GRAYS, EARLVONTE |
| 812. | GRAYSON, FREDERICK C. |
| 813. | GRAYSON, KYLA LOURIAL |
| 814. | GREEN- BISSIG, VICTORIA YVETTE |
| 815. | GREEN, ASANEKO YAKEYLEE |
| 816. | GREEN, BRITTANY |
| 817. | GREEN, CALLIE |
| 818. | GREEN, DANIELLE |
| 819. | GREEN, DEANNA L. |
| 820. | GREEN, DEBORAH |
| 821. | GREEN, DENAE |
| 822. | GREEN, MAURICE ALEXANDER |
| 823. | GREEN, PRINCESS |
| 824. | GREEN, RICHARD MARTIN |
| 825. | GREEN, ROBERT |
| 826. | GREEN, ROSALYN Y. |
| 827. | GREEN, SR., RODNEY MAURICE |
| 828. | GREEN, YVONNE |
| 829. | GREENWOOD, DAVID |
| 830. | GREENWOOD, DAVIOUS A. |
| 831. | GREENWOOD, NEFATERIA |
| 832. | GREGORY, ELSTON |
| 833. | GRENOCHIO, RACHEL |
| 834. | GRICE, MISTEE U. |
| 835. | GRICE-ROBINSON, MYESHIA |
| 836. | GRIER, SHEILA |
| 837. | GRIFFIN, DEBORAH ANN |
| 838. | GRIFFIN, JACQUELINE |
| 839. | GRIFFIN, KARLEEN L. |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

840. GRIFFIN, OZEL
841. GRIFFIN, TRACY
842. GRIFFIN, XANDRINE S.
843. GRIFFIN, XZERIC X.
844. GRIFFIN-JOHNSON, LaRHONDA
845. GROSS, NADIA
846. GUBSON, ANTHONY
847. GUBSON, CASSANDRA
848. GUBSON, CHARLES
849. GUBSON, JARVIS
850. GUBSON, TERRISHE
851. GUBSON, TROY
852. GUERRERO, MARICELLA
853. GUEVARA, DOLORES O.
854. GUIDRY, ORLANDO
855. GUIDRY, WINNIE DELORES
856. GUINN, EDWARD
857. GUNTER, JAMES
858. GUNTER, JERMAINE
859. GUTU, TAIEPISI
860. HAINES, BRIDGET MARIE
861. HALL, BERTHA LEE
862. HALL, DONALD WAYNE
863. HALL, LARITA
864. HALL, MARUIN
865. HALL, SHIRLEY JEAN
866. HALL, TERRANCE
867. HALL, TERRENCE DEAN
868. HALL, WILLIAM C.
869. HAMILTON, HANIYAH by Francelle White
870. HAMILTON, REGAN
871. HAMILTON, REGINA L.
872. HAMILTON, THOMAS W.
873. HAMPTON, CEDRICA
874. HAMPTON, DeSHANE
875. HAMPTON, MICHAEL
876. HAND, III., ROBERT
877. HANDY, KIM
878. HANDY, KIM
879. HANKERSON, SHEMETA

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

880. HANNA, CYRIL
881. HARDEN, DONTRELL LEE
882. HARDY, JAMES OLIVER
883. HARGRAVES, SR., JERMAINE
884. HARPER, EMOND LEON
885. HARPER, HA'KEEM OMAR G.
886. HARPER, RAMONDO L.
887. HARPER, SR., TOMMY EARL
888. HARRELL, DONNISHA
889. HARRELL, FELICIA
890. HARRELL, HENDERSON B.
891. HARRELL, LINDA C.
892. HARRELL, MARYLE C.
893. HARRELL, SEFO S.
894. HARRIS, ARIANNA
895. HARRIS, CONSTANCE
896. HARRIS, LATESHA
897. HARRIS, MYISHEA
898. HARRIS, PARIS MAURICE
899. HARRIS, RACINE
900. HARRIS, RACINE LYNNETTE
901. HARRIS, TAZIA
902. HARRIS, TOMMY LEE
903. HARRISON, ADELYA
904. HARRISON, AJA
905. HARRISON, AKIDA
906. HARRISON, AKIDE
907. HARRISON, AMIL
908. HARRISON, AMILI
909. HARRISON, ARIAHN
910. HARRISON, JESSICA ELYSSE
911. HARRISON, LARRY D.
912. HARRISON, ROMAN
913. HARRIS-WELCH, D'NIQUE CHRISTOPHER
914. HARRIS-YOUNG, SHEILA V.
915. HART, GAYLE
916. HART, MOTAIGUS
917. HARVEY, DIA KENYATTE
918. HARVEY, JR., DIA Q.
919. HARVEY, MONICA

23

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 920. | HAVARD, JEROME CARL |
| 921. | HAVARD, SHARON LOUISE |
| 922. | HAWKINS, DAVID L. |
| 923. | HAWKINS, DEVON FREDRICK |
| 924. | HAWKINS, ERICK |
| 925. | HAWKINS, JASMINE V. |
| 926. | HAWKINS, NARSHON |
| 927. | HAWKINS, VERLAINE |
| 928. | HAWKINS, ZAIRE |
| 929. | HAYDEN, LAHROL AHMAD |
| 930. | HAYES, ALAN A. |
| 931. | HAYES, CHASITY A. |
| 932. | HAYES, KAREN |
| 933. | HAYES, TASHIA |
| 934. | HAYS, RAMONA ALFREDA |
| 935. | HAZAARD-HAWKINS, ERICK ANTHONY |
| 936. | HAZARD , LAVONNE |
| 937. | HAZARD, ADRIAN JAMES |
| 938. | HAZARD, EDNA MARIA |
| 939. | HAZARD, KAREEM |
| 940. | HEARD, JANAE |
| 941. | HEARNE, LEILANI |
| 942. | HEBERT, EMIL DRAYVONN |
| 943. | HECKARD, ROSE MARY |
| 944. | HECTOR, MICHELLE PEPPARS |
| 945. | HELM, WILLIAM L. |
| 946. | HELTON, JEFFREY |
| 947. | HENDERSON, CONSTANCE R. |
| 948. | HENDERSON, DELANA |
| 949. | HENDERSON, I, TROY |
| 950. | HENDERSON, JOHN MARK |
| 951. | HENDERSON, JR., TROY |
| 952. | HENDERSON-HOSKINS, PATRICIA |
| 953. | HENDRICKS, MICHAEL ROBERT |
| 954. | HENDRICKS, TIESHA TONSHAY |
| 955. | HENRY, DENEITRA |
| 956. | HENRY, JERALENE |
| 957. | HENRY, MICHAEL D. |
| 958. | HENRY, MIESHAEL |
| 959. | HENRY, SHEILA LOUISE |

24

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 960. | HENTREL, MARTHA RENEE |
| 961. | HEPBURN, EMANUEL |
| 962. | HERBERT, BARBARA S. |
| 963. | HERBERT, DIAMOND |
| 964. | HERNANDEZ -RAMIREZ, ANGEL ALONZO |
| 965. | HERNANDEZ, MARIA ALLEGRA |
| 966. | HERNANDEZ, SEQUIOA |
| 967. | HERNANDEZ-HERNANDEZ, JOSE ALEXIS |
| 968. | HESLIP, BARBARA ANN |
| 969. | HESLIP, WOODROW |
| 970. | HESTER, PATRICIA |
| 971. | HICKERSON, CHARLES A. |
| 972. | HICKERSON, JR., ROBERT M. |
| 973. | HICKERSON, TYRIQ |
| 974. | HICKS, HELEN L. |
| 975. | HIGGINS, BETTY J |
| 976. | HIGGINS, JERRY |
| 977. | HIGGINS, SONJA |
| 978. | HIGGINS, TRISTAN |
| 979. | HIGGS, JOVANDA NICOLE |
| 980. | HIGH, E'NIYA by Denise L. Brown |
| 981. | HILL, AREYANA |
| 982. | HILL, DAISY LEE |
| 983. | HILL, KENNETH LEE A. |
| 984. | HILL, RALEIGH WILLIE |
| 985. | HILL, RAPHAEL |
| 986. | HILL, SEMETHA |
| 987. | HILL, SHERMAN |
| 988. | HILL, TINY MARIE |
| 989. | HILL, TONYA |
| 990. | HILLIS, RAYNARD H. |
| 991. | HILL-SCOTT, ANNETTE |
| 992. | HINES, KAIA by Kim Handy |
| 993. | HINES, STETSON JOVAN |
| 994. | HINES, STETSON JUAN |
| 995. | HOCKETT, COWYA LAMOND |
| 996. | HOFFMANN, CATIUSSI |
| 997. | HOFFMANN, JEREMY |
| 998. | HOGAN, II., JAMES EUGENE |
| 999. | HOGG, CADMUS |

25

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1000. | HOGG, CUNTIS |
| 1001. | HOGG, DENNIS |
| 1002. | HOLCOMB, MERCEDES |
| 1003. | HOLCOMB, MICHELLE |
| 1004. | HOLLIDAY, JR., LAWRENCE D. |
| 1005. | HOLLIER, MARKIEDA |
| 1006. | HOLLINGWORTH, LEONARD |
| 1007. | HOLLINS, KEION |
| 1008. | HOLLINS, KERRY |
| 1009. | HOLLINS, TACORA |
| 1010. | HOLLIS, BRANDON by LaShunda Hollis |
| 1011. | HOLLIS, LASHUNDA M. |
| 1012. | HOLLOWAY, DONALD RAMON |
| 1013. | HOLLOWAY, TRISH |
| 1014. | HOLMES, AARON |
| 1015. | HOLMES, DAMON |
| 1016. | HOLMES, DAVID |
| 1017. | HOLMES, FATINA |
| 1018. | HOLMES, MARGIE |
| 1019. | HOPKINS, CATINA |
| 1020. | HORNER, KIMBERLY D. |
| 1021. | HOSKINS, BRITTANY |
| 1022. | HOSKINS, CHANEL |
| 1023. | HOWARD, CUSANDA LYNN |
| 1024. | HOWARD, JASMINE JAHWANA |
| 1025. | HOWARD, JERIMOND |
| 1026. | HOWARD, JR., LONELL by Lonell Howard, Sr. |
| 1027. | HOWARD, LEONARD DOUGLAS |
| 1028. | HOWARD, LEONARD RASHAD |
| 1029. | HOWARD, LISA MONIQUE |
| 1030. | HOWARD, SAMANTHA |
| 1031. | HOWARD, SR., LONELL |
| 1032. | HOWARD, THERESA |
| 1033. | HOWARD, VERNA L. |
| 1034. | HUBARD, LINDA FAYE |
| 1035. | HUBBARD, TAMMIA M. |
| 1036. | HUBBARD, TE'ANDRE |
| 1037. | HUBBART, JENNIFER D. |
| 1038. | HUDNALL, EVELYN |
| 1039. | HUDNALL, JAMES HENRY |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1040. | HUDSON, ALAYIA by Queen-Vanessa Banks |
| 1041. | HUDSON, ALI MUSTAFA |
| 1042. | HUDSON, JR., ORLANDO NIMROD |
| 1043. | HUDSON, ROBERT |
| 1044. | HUDSON, SR., ORLANDO NIMROD |
| 1045. | HUESO, ADELA ANDREA |
| 1046. | HUESO, MARIO |
| 1047. | HUFF, MAE |
| 1048. | HUGHES, DARRELL |
| 1049. | HUGHES, JR., PERRY |
| 1050. | HUGHES, KRISTY |
| 1051. | HUGHES, KRYSTLE |
| 1052. | HUGHES, PERRY |
| 1053. | HUGHES, SHADE T. |
| 1054. | HUGHES, STEPHANIE L. |
| 1055. | HUMBLE, HEATHER A. |
| 1056. | HUMPHREY, MICHAEL |
| 1057. | HUMTER, GLORIA J. |
| 1058. | HUNTER, JR., ROOSEVELT |
| 1059. | HUNTER, RUTHA |
| 1060. | HUNTER, VINCENT |
| 1061. | HUNTLEY, ASIA by Corinne Huntley |
| 1062. | HUNTLEY, CATHERINE |
| 1063. | HUNTLEY, CORINNE |
| 1064. | HUNTLEY, CRYSTAL by Corinne Huntley |
| 1065. | HUNTLEY, KEVIN |
| 1066. | HURD, RAY ANTWOINE |
| 1067. | HURST, HOPE |
| 1068. | INGRAM, DALONNA |
| 1069. | INYANG, SR., LEMUEL |
| 1070. | IRVING, ANGELIQUE |
| 1071. | IRVING, TERNELL |
| 1072. | IVY, ROBERT |
| 1073. | JACK, FRANCIS N. |
| 1074. | JACK, JOHN FITZGERALD |
| 1075. | JACK, VANCE |
| 1076. | JACKSON HAYDEN, EMMA |
| 1077. | JACKSON, BRENDA D. |
| 1078. | JACKSON, DARRELL EUGENE |
| 1079. | JACKSON, DELRICCO J. |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1080. | JACKSON, DEWAYNE |
| 1081. | JACKSON, FREDERICK |
| 1082. | JACKSON, GERALD ALONZO |
| 1083. | JACKSON, GREGORY A. |
| 1084. | JACKSON, ISAIAH by LaShunda Hollis |
| 1085. | JACKSON, JUANITA |
| 1086. | JACKSON, KATINA |
| 1087. | JACKSON, RAICHELE |
| 1088. | JACKSON, SR., DOMINICK |
| 1089. | JACKSON, SR., JERMAINE |
| 1090. | JACKSON, TAMMIE MARIE |
| 1091. | JACKSON, TANESHA |
| 1092. | JACKSON, THOMAS W. |
| 1093. | JACKSON, TOMMY LEE |
| 1094. | JACKSON, TONI |
| 1095. | JACKSON, VERA L. |
| 1096. | JACKSON-FRAZIER, THERESA |
| 1097. | JAGDISH, SANJAY by Aisha Malone |
| 1098. | JAMES, LIBBIE ANN |
| 1099. | JAMES, LORNA P. |
| 1100. | JAMES, THOMAS |
| 1101. | JASPER, DARAE MARLENE |
| 1102. | JEFFERSON, DEJA |
| 1103. | JEFFERSON, JAMES C. |
| 1104. | JEFFERSON, JNAI |
| 1105. | JEFFRIES, TIFFANY |
| 1106. | JENKINS, CARMEN PIA |
| 1107. | JENKINS, CHERLENA |
| 1108. | JENKINS, DEBORAH R. |
| 1109. | JENKINS, GERALDINE |
| 1110. | JENKINS, JACQUIA LA'RUTH |
| 1111. | JENKINS, MICHAEL OTIS |
| 1112. | JENKINS, NICOLE SHARRON |
| 1113. | JENKINS, TIMOTHY |
| 1114. | JENNINGS, KALEN |
| 1115. | JENNINGS, RACHELLE |
| 1116. | JETT, JUNETTA |
| 1117. | JIANG, HUANG WEN |
| 1118. | JIANG, SHAO LAN |
| 1119. | JIANG, XIUQI |

28

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1120.   JIANG, ZHENG ZHANG
1121.   JINKS, LYNORK
1122.   JOHNS, ERAINA
1123.   JOHNS, HAROLD B.
1124.   JOHNSON, ALBERT
1125.   JOHNSON, ALVIN LEE
1126.   JOHNSON, ANDREA
1127.   JOHNSON, ANGELA
1128.   JOHNSON, ANIRELL
1129.   JOHNSON, ANTONIO
1130.   JOHNSON, ANTONIO J.
1131.   JOHNSON, ANTONIO JULIUS
1132.   JOHNSON, AUDRIANA MARIE
1133.   JOHNSON, BERNICE
1134.   JOHNSON, CHERISE LYNETTE
1135.   JOHNSON, CORA
1136.   JOHNSON, CORNELL MACKEY
1137.   JOHNSON, DAMAR
1138.   JOHNSON, DAVID CORNELL
1139.   JOHNSON, DEANNA
1140.   JOHNSON, DEMARCUS
1141.   JOHNSON, DENISHIA
1142.   JOHNSON, DERWAYNE
1143.   JOHNSON, DOROTHY
1144.   JOHNSON, ELMIRA
1145.   JOHNSON, ERIC
1146.   JOHNSON, ERINNE
1147.   JOHNSON, GERALD
1148.   JOHNSON, HORACE
1149.   JOHNSON, INITA
1150.   JOHNSON, JERAY
1151.   JOHNSON, JR, VINSON
1152.   JOHNSON, JR., ANTHONY
1153.   JOHNSON, JULIA L
1154.   JOHNSON, KANYCE
1155.   JOHNSON, KYMOREA
1156.   JOHNSON, LESSIE L.
1157.   JOHNSON, LOUIS
1158.   JOHNSON, MALIK by Tianna Elaine Johnson
1159.   JOHNSON, MARCUS

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1160.   JOHNSON, MAURIYAN
1161.   JOHNSON, MOESHE
1162.   JOHNSON, NEEDRA
1163.   JOHNSON, NIKKO ISIAH
1164.   JOHNSON, QUANISHA
1165.   JOHNSON, ROSELA
1166.   JOHNSON, SHAKISHA
1167.   JOHNSON, SIDNEY
1168.   JOHNSON, SR, ANTONIO
1169.   JOHNSON, SR, VINSON
1170.   JOHNSON, SR., ANTHONY
1171.   JOHNSON, SR., DARNELL
1172.   JOHNSON, TASHA
1173.   JOHNSON, TASHEANNA CHRISTY
1174.   JOHNSON, TIANNA
1175.   JOHNSON, TIANNA ELAINE
1176.   JOHNSON, TRACIE
1177.   JOHNSON, TRAVELLE DEMARCO
1178.   JOHNSON, VERONICA
1179.   JOHNSON, VERONIQUE M.
1180.   JOHNSON-MARCHALL, CHANARAE B.
1181.   JOHNSON-MCKEEVER, CHANDRA R.
1182.   JOLIVETTE, MELISSA
1183.   JONES , RHAJONE
1184.   JONES, ANTWON
1185.   JONES, ARMANI
1186.   JONES, ASHFORD
1187.   JONES, BANAY NICOLE
1188.   JONES, BREANNA by LaTasha Telfor
1189.   JONES, CHARLES LYNN
1190.   JONES, CONNER
1191.   JONES, DAMARCO
1192.   JONES, DANIELLE MONIQUE
1193.   JONES, DAVIE
1194.   JONES, DEBRA LOLITA
1195.   JONES, DEMARION
1196.   JONES, DONAE
1197.   JONES, DONALD R.
1198.   JONES, DONNELL
1199.   JONES, EDWARD EARL

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1200. | JONES, ELOIS |
| 1201. | JONES, ERIC B. |
| 1202. | JONES, IESHA |
| 1203. | JONES, JAMES C. |
| 1204. | JONES, JAMES D. |
| 1205. | JONES, JAMES MARIO CLAYTON |
| 1206. | JONES, JARHONDA |
| 1207. | JONES, JONEL L. |
| 1208. | JONES, JR., CHARLES LEE |
| 1209. | JONES, JR., FLETCHER |
| 1210. | JONES, KEISHA |
| 1211. | JONES, KYRA AVINA |
| 1212. | JONES, MARLO |
| 1213. | JONES, MARSHA LEE |
| 1214. | JONES, MAXINE P. |
| 1215. | JONES, MELISSA |
| 1216. | JONES, PAMELA |
| 1217. | JONES, QUEEN ESTER |
| 1218. | JONES, RAMON |
| 1219. | JONES, SADRIENA |
| 1220. | JONES, SHIRLEY |
| 1221. | JONES, SONJA DENISE |
| 1222. | JONES, SYEEDA |
| 1223. | JONES, THEASTER |
| 1224. | JONES, TINA M. |
| 1225. | JONES, TOMEKA M. |
| 1226. | JONES, VIRGINIA RAE |
| 1227. | JONES-BEASLEY, SONYA |
| 1228. | JORDAN, SAMUEL by Deandra Bryant |
| 1229. | JORDAN, SHANTE SADE |
| 1230. | JORDON, EARLASHA CANDY |
| 1231. | JOSEPH, ABDALLAH |
| 1232. | JOSEPH, ALICE |
| 1233. | JOSEPH, ASAD |
| 1234. | JOSEPH, GLADYS |
| 1235. | JOSEPH, LA'NESHA |
| 1236. | JOSEPH, LA'SHONDA |
| 1237. | JOSEPH, MAHER |
| 1238. | JOSEPH, RAYLINA RAYCHELLE |
| 1239. | JOSEPH, RAYMOND E. |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | | |
|---|---|---|
| | 1240. | JOSEPH, TAMY |
| | 1241. | JOSEPH, TANYA |
| | 1242. | JOSHUA, ENYESE |
| | 1243. | JUAREZ, BRIANA MONIQUE |
| | 1244. | JUAREZ, ESTHER |
| | 1245. | JUAREZ, JOSE ANGEL |
| | 1246. | JUAREZ, XAVIER JAMES |
| | 1247. | JUSTIN, KIM L. |
| | 1248. | JUSTIN, LATRICE |
| | 1249. | KALIFA, ISA M. |
| | 1250. | KARAN, AMANDA |
| | 1251. | KEARNEY, CYNTHIA |
| | 1252. | KEASLEY, KEVIN |
| | 1253. | KELLEY, BRITTNEY |
| | 1254. | KELLEY, BRUCE |
| | 1255. | KELLEY, BRYAN |
| | 1256. | KELLEY, DOROTHY YVETTE |
| | 1257. | KELLEY, KIMBERLY |
| | 1258. | KELLEY, MICHELLE |
| | 1259. | KELLEY, MYRON |
| | 1260. | KELLEY, SHEILA |
| | 1261. | KELLOM, MUHAMMAD |
| | 1262. | KELLY, ARTEMESE FELICIA |
| | 1263. | KELLY, BRITTENNE RENEE |
| | 1264. | KELLY, CLARA B. |
| | 1265. | KENDRICK, DIANA G. |
| | 1266. | KENDRICK, DOMINIQUE |
| | 1267. | KENDRICK, NATASHA |
| | 1268. | KENNY, CARLA D. |
| | 1269. | KERAN, AMANDA |
| | 1270. | KESS, ROXANE CIARA |
| | 1271. | KIDD, LAWANDA |
| | 1272. | KINCAID, AIMEE |
| | 1273. | KINCAID, DEONTE |
| | 1274. | KING, DANYEL |
| | 1275. | KING, DEBORAH |
| | 1276. | KING, DURAN ORLANDO |
| | 1277. | KING, FRANZO W. |
| | 1278. | KING, MARINA |
| | 1279. | KING, MELVIN CALDWELL |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1280.   KING, MILDRED
1281.   KING, SHARDAE
1282.   KING, SUSIE MAE
1283.   KITTLES, DEANDRA
1284.   KITTLES, JR., DARIUS RAI
1285.   KITTLES, PO
1286.   KITTLES, SIMONE
1287.   KNIGHT, ANTHONY
1288.   KNIGHT, NACHE
1289.   KNIGHT, SANDIATA
1290.   KNIGHTEN, CYNTHIA MARIE
1291.   KUKA, MALAMA SARAH
1292.   KUKA, PRINCESS
1293.   KYER, TERRIE
1294.   LaCROSSE, SARA NICOLE
1295.   LAGERHAUSEN, BRIAN SCOTT
1296.   LAKE, IV., JOSEPH
1297.   LAKE, JOSEPH EL MALIK
1298.   LALLIEIRSOC, MURRAY T.
1299.   LAMPKINS, ARNOLD
1300.   LAMPKINS, AYJAE by Lesi Sepulona
1301.   LAMPKINS, III., ARNOLD LEON
1302.   LAMPKINS, SELINA by Lesi Sepulona
1303.   LANDRY, DANIEL B
1304.   LANDRY, MARCUS B
1305.   LANDRY, TAVIS TERRELL
1306.   LANE, RONNIE
1307.   LANE, TONETTE
1308.   LANUZA, ELIAS
1309.   LANUZA, ISAIAH by Magdalena Lanuza
1310.   LANUZA, ISRAEL by Magdalena Lanuza
1311.   LANUZA, JR., ELIAS by Magdalena Lanuza
1312.   LANUZA, MAGDALENA
1313.   LANUZA, MAGDALENA
1314.   LARK, HATTIE
1315.   LARK, RITA P
1316.   LARRY, JAMES J.
1317.   LATHAN, MAURICE
1318.   LATIMER, FAITH EILEEN
1319.   LATIMORE, BEAUVLEN LOUISE

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1320.    LATIMORE, KHALIQ A. R.
1321.    LAURY, TYRONE
1322.    LEAE, CHRISTENSEN
1323.    LEAE, ELISHA
1324.    LEAEA, MARLENA
1325.    LeBLANC, SHEREE D.
1326.    LE'BRANE, THERECE MARIE
1327.    LEDBETTER, CARMEN
1328.    LEDBETTER, DIANNE
1329.    LEDBETTER, JANICE MARIE
1330.    LEDBETTER, JR., ELIJAH
1331.    LEDBETTER, MICHELLE MARTIN
1332.    LEE, CHARLIE
1333.    LEE, CURTIS DWAYNE
1334.    LEE, JACQUELINE KAY
1335.    LEE, JASON DWAYNE
1336.    LEE, NYISHEA
1337.    LEE, PAULINE
1338.    LEE, ROBBIE C.
1339.    LEE, SR., JUSTIN M.
1340.    LEE, TAUREAN DOROTAE
1341.    LEE, TOMMY
1342.    LEGGETT, ROSEMARY
1343.    LELAIND, ANTIA MARIE
1344.    LEMMONS, DEBRA ANN
1345.    LEONARDI, JOSEPH
1346.    LEREMIS, SELOTIA A. by Cecilia Ale
1347.    LESTEER, VERNON
1348.    LESTER, HASINA
1349.    LESTER, JAMES VERNON
1350.    LESTER, TAHIRA
1351.    LEWIS, BRITTANY
1352.    LEWIS, CHARISE
1353.    LEWIS, CHERYL RENEE
1354.    LEWIS, DELFONSE
1355.    LEWIS, FONDA NICOLE
1356.    LEWIS, JAMESZELL
1357.    LEWIS, LONZEL
1358.    LEWIS, REGINA
1359.    LEWIS, STARLENA

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1360. | LEWIS, TATIANA |
| 1361. | LEWIS, THERESA RENEE |
| 1362. | LEWIS, TYRONE S. |
| 1363. | LEWIS, YOLANDA FAY |
| 1364. | LIANG, CHAO JUN |
| 1365. | LIANG, IAN H |
| 1366. | LIANG, RUI HUA |
| 1367. | LIGE, DAMIANA |
| 1368. | LITTLETON, CHAD ZAIRE |
| 1369. | LIU, DEION |
| 1370. | LIU, HECTOR JIA |
| 1371. | LIU, JEFFREY P. |
| 1372. | LIU, LILLIAN |
| 1373. | LIU, MICHAEL |
| 1374. | LIU, NINI |
| 1375. | LIU, PETER |
| 1376. | LIUM, JAYLINA |
| 1377. | LIUM, LAYLINE |
| 1378. | LIVINGSTON, VELMA |
| 1379. | LOCKETT, JR., DENNIS K. |
| 1380. | LOCKETT, JUNIOUS |
| 1381. | LOCKETT, LAVERNE |
| 1382. | LOCKETT, MICHAEL |
| 1383. | LOCKHART, HOWARD |
| 1384. | LOFTON, DEVONTA |
| 1385. | LOFTON, MALCOLM |
| 1386. | LOFTON, MARNITHA |
| 1387. | LOGAN, VANESSA TEVIS |
| 1388. | LOGAN, VENITTA |
| 1389. | LOGGINS, ATOLYA |
| 1390. | LOGGINS, JULIUS |
| 1391. | LOMAX, BRENDA |
| 1392. | LOMAX, BRIANA |
| 1393. | LOMAX, CHRISTOPHER |
| 1394. | LOMAX, TIMOTHY D. |
| 1395. | LOPEZ, JESSICA |
| 1396. | LOPEZ, OLIVIA ELIZABETH |
| 1397. | LOPEZ, OYUKI |
| 1398. | LOUIE, JENNIFER |
| 1399. | LOVE, JAYDA by Antoinette Fort |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1400. | LOVE, THERESE NATASHA |
| 1401. | LOVE, VICTOR R. |
| 1402. | LOWERY, DEZARAY |
| 1403. | LOYD, AZIZI |
| 1404. | LOYD, HANNE MUNK |
| 1405. | LUCAS, JR., MARVELLUS ANTHONY |
| 1406. | LUCAS, JUANITA J. |
| 1407. | LUCKETT, DIANE DENISE |
| 1408. | LUM, KEALA |
| 1409. | LUMSEY, DENNIS R. |
| 1410. | LUO, XIAO WEN |
| 1411. | LYNCH, ABREEON |
| 1412. | LYNCH, JESSE |
| 1413. | LYNELL, JOYCE |
| 1414. | LYONS, TANICA |
| 1415. | MABRAY, CHANTELLE |
| 1416. | MABRAY, JOSIE |
| 1417. | MABRAY, TIFFANY |
| 1418. | MACK, ANN |
| 1419. | MACK, JOHNIESHA JADA |
| 1420. | MACK, JOHNNY JAVON |
| 1421. | MACKEY, LATANIA DIONNE |
| 1422. | MACKEY, LELAND |
| 1423. | MACKEY, RENA |
| 1424. | MACKEY, TERRY |
| 1425. | MADKINS, TATINIESHA |
| 1426. | MAGEE, KELLISHA ELIZABETH |
| 1427. | MAHASIN, AMIR |
| 1428. | MAHASIN, JIHAD WALEED |
| 1429. | MAHASIN, OMAR QAWI |
| 1430. | MAHASIN, SALAHUDIN |
| 1431. | MAHASIN-WALLS, ANTAR RASHEED |
| 1432. | MAJOR, CHARLENE |
| 1433. | MALIK, HANEEFA |
| 1434. | MALIK, ISMAIL ABDUL |
| 1435. | MALONE, AISHA |
| 1436. | MALONE, BETTY |
| 1437. | MALONE, DRUMON LAWRENCE |
| 1438. | MALONE, JUWAN ELIJAH |
| 1439. | MALONE, SICARD |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1440. | MALONEY, MAURICE J. |
| 1441. | MANIGO, JIMMIE LEE |
| 1442. | MANIGO, JIMMIE LYNCH |
| 1443. | MANIGO, JOE LEE |
| 1444. | MANNING, AMANI CHAZ |
| 1445. | MANSFIELD, LASONIA PATRICE |
| 1446. | MANUEL, JABARI M. |
| 1447. | MANUEL, JAIDA T. |
| 1448. | MANUEL, LATRICE MONIQUE |
| 1449. | MANUELS, EBONY A. |
| 1450. | MARCHALL, CHANARAE |
| 1451. | MARKHAM, PHOEBE |
| 1452. | MARMAN, DEVON |
| 1453. | MARMAN, SR., DEVON |
| 1454. | MARSHALL, CATHALENE |
| 1455. | MARSHALL, DAVON R. |
| 1456. | MARSHALL, JEAN |
| 1457. | MARSHALL, KING ROYALTY by Yolanda Marshall |
| 1458. | MARSHALL, MIRACLE |
| 1459. | MARSHALL, SAMUEL |
| 1460. | MARSHALL, TOMEICKA |
| 1461. | MARSHALL, YOLANDA |
| 1462. | MARTIN, CYNTHIA MARIE |
| 1463. | MARTIN, ELAINE |
| 1464. | MARTIN, JALISCO MARRELL |
| 1465. | MARTIN, JA'RAYA |
| 1466. | MARTIN, MICHELLE |
| 1467. | MARTIN, ROBERT JAMES |
| 1468. | MARTINEZ, DIVINA M. |
| 1469. | MARVEL, JABARI RICHARD |
| 1470. | MASINA, NEIMA |
| 1471. | MASINA, SOPHIA |
| 1472. | MASON, LISHANIQUE J. |
| 1473. | MATHEWS, I'EASHA L, |
| 1474. | MATHEWS, LAKEISHA |
| 1475. | MATLOCK, MICHAEL |
| 1476. | MATOS, PRISCILLA |
| 1477. | MATTHEWS, AMINA |
| 1478. | MATTHEWS, ERICA |
| 1479. | MATTHEWS, JENNEFERE LEE |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1480.   MAXEY, II., JANET
1481.   MAYBON, ROBERT
1482.   MAYES, CLIFFORD DARNELL
1483.   MAYFIELD, MIKAYLA by Zulaika Mayfield
1484.   MAYFIELD, ZULAIKA
1485.   MAYS, DUNTE by Alise Minor
1486.   MAYS, PARIS
1487.   MCALISTER, KENNETH
1488.   MCBRIDE, ANTOINETTE
1489.   MCCALL, ELONDA D.
1490.   MCCLENDON, AHMONDRA
1491.   MCCLINTON, HELEN
1492.   MCCOY, AIYANA LEE
1493.   McCREE, DARIUS LEAEA
1494.   MCDANIEL, CHARLES LAMAR
1495.   MCDANIEL, CLARA E.
1496.   MCDANIEL, CLARISSA L.
1497.   MCDANIELS, TIMOTHY
1498.   McDONALD, GERALD J.
1499.   MCDONALD, STEVEN
1500.   McDOWELL, ISAIAH
1501.   MCDOWELL, JOHNTE
1502.   MCFARLAND, KIMONESHA LASHA
1503.   MCFARLAND, LATASHIA
1504.   MCGEE, KELLY
1505.   MCGHEE, III, ORASE by Pamela Marie Breaux
1506.   MCGHEE, JORDAN by Pamela Marie Breaux
1507.   MCGHEE, ORASE
1508.   McGHEE, SHAQUETT
1509.   MCGILBERY, SHERREL A.
1510.   MCGINNIS, KATRICE
1511.   MCGINNIS, LEON
1512.   McGINNIS, LEVON
1513.   McGINNIS, VIVIENNE
1514.   MCGINNIS, VONTRICE
1515.   McGLOTHIN, BRICE
1516.   McGLOTHIN, CURTIS
1517.   MCGLOTHIN, GIRTHA
1518.   MCGLOTHIN, RUMEKA
1519.   McGLOTHIN, ZACHARIAH

38

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1520.   MCGOWAN, JOSEPH D.
1521.   MCGOWAN, MAURISHA
1522.   MCGUIRE, ANGELIQUE
1523.   MCGUIRE, ZION by Angelique McGuire
1524.   MCKEEVER, EBONY
1525.   MCKEEVER, JAMES
1526.   MCKEEVER, SEMA J AREVON
1527.   MCKINNON, LEILANI by Stacy Hermain Stewart
1528.   MCLEMORE, ASHLEY NICOLE
1529.   MCNAIR, JONATHON C.
1530.   MCNAMARA, GREGORY
1531.   MCNAMARA, JOHN
1532.   McNEIL, MARK ANTHONY
1533.   McPETERS, MONIQUE NICOLE
1534.   MCPHEETERS, MARY
1535.   McWHORTER, JOHN
1536.   MEAN, JOHNNY
1537.   MEAN, SAROEUN
1538.   MELTON, ANTHONY E.
1539.   MENDEZ, ALBERT RICARDO
1540.   MERCER, BERTHINA
1541.   MEREDITH, ISHMAEL
1542.   MEREDITH, LANAESHA
1543.   MEREDITH, NICOLE
1544.   MEREDITH, RAYMOND
1545.   MERRIHEW, ANITA MIGNON
1546.   MERRIHEW, MORGAN WILEY
1547.   MERRITT, RANDY
1548.   MICHAELS, ANITA C.
1549.   MICKELS, JUSTICE
1550.   MILBURN-WEBB, URSULA M.
1551.   MILLER, ERIC EUGENE
1552.   MILLER, LAGENA G.
1553.   MILLER, MONIQUE
1554.   MILLER, RAQUEL
1555.   MILLER, REGGIE
1556.   MILLER, TANESHIA
1557.   MILLER, TRENELL DAESHAWN
1558.   MILLIGAN, ARMISSA
1559.   MIMS, DELIAH

39

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1560. | MIMS, LAMONT |
| 1561. | MIMS, LILIAN |
| 1562. | MINER, SHEILA |
| 1563. | MINKINS, MARYANN |
| 1564. | MINOR, AARON MONTRELL |
| 1565. | MINOR, ALISE |
| 1566. | MINOR, JR., SAMUEL |
| 1567. | MINOR, SAMUEL |
| 1568. | MINOV, ANDRE |
| 1569. | MITCHELL, ANTHONY |
| 1570. | MITCHELL, AUBRA |
| 1571. | MITCHELL, BREYANNA |
| 1572. | MITCHELL, JR., MAURICE ANTONIO |
| 1573. | MITCHELL, KIARI ANTONESE NATASHA |
| 1574. | MITCHELL, MAXINE COLETTE |
| 1575. | MITCHELL, NIKOH GLEN |
| 1576. | MITCHELL, TOMASA LUCILLE |
| 1577. | MIXON , JARIEL |
| 1578. | MIXON, CATHERINE |
| 1579. | MIXON, KATIRIA |
| 1580. | MIXON, LADASHA |
| 1581. | MOBLEY, ANTOINETTE |
| 1582. | MOFFETT, AJEENAH |
| 1583. | MOLEX, LEELA VIRGINIA |
| 1584. | MONCADA, LUCIA G. |
| 1585. | MONDY, MONICA |
| 1586. | MONROE, CARMELITA |
| 1587. | MONTEZA, FIORELLA |
| 1588. | MONTFORD, G'ECHELE |
| 1589. | MONTFORD, GREGORY |
| 1590. | MONTFORD, KEITH |
| 1591. | MONTGOMERY, LINDA ANN |
| 1592. | MOOR, RAYMOND |
| 1593. | MOORE, AYANNA |
| 1594. | MOORE, DIANE M. |
| 1595. | MOORE, LEE E. |
| 1596. | MOORE, LEROY |
| 1597. | MOORE, NATALIE |
| 1598. | MOORE, RICKEY D. |
| 1599. | MOORE, ROBYN L |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 1600. | MOORE, VELMA |
| 1601. | MOORE, WILLIAM L. |
| 1602. | MORGAN, ANGELA |
| 1603. | MORGAN, DELVON |
| 1604. | MORRIS, JAMES |
| 1605. | MORRIS, SR., TAVARIS JOVAN |
| 1606. | MORRIS, TAVARIS JOVAN |
| 1607. | MORRIS, VERLA |
| 1608. | MORRISON, ANDREA |
| 1609. | MORTON, ALAHJAWON |
| 1610. | MORTON, IVORYONNE by Yvonne Lanette Gage |
| 1611. | MOSS, JOAN |
| 1612. | MOSS, MILLARD FILLMORE |
| 1613. | MOSS, PIA |
| 1614. | MOSS, PIERRE by Yolanda Marshall |
| 1615. | MOZEKE, JA'NI by Patsy Candley |
| 1616. | MOZEKE, TRE'MAYNE by Patsy Candley |
| 1617. | MUHAMMAD, AISHA by Lejeannia Richardson |
| 1618. | MUHAMMAD, ALBERT |
| 1619. | MUHAMMAD, ALESHA by Catherine Muhammad |
| 1620. | MUHAMMAD, ALITASH |
| 1621. | MUHAMMAD, ANTHONY MARQUIS |
| 1622. | MUHAMMAD, ARSHAD ZAHIR |
| 1623. | MUHAMMAD, ARYSSA ZARIA by Catherine Muhammad |
| 1624. | MUHAMMAD, AZRAA |
| 1625. | MUHAMMAD, CATHERINE |
| 1626. | MUHAMMAD, CHRISTOPHER |
| 1627. | MUHAMMAD, COLLEEN |
| 1628. | MUHAMMAD, CYRIL |
| 1629. | MUHAMMAD, ELYASAN by Tynetta S. Muhammad |
| 1630. | MUHAMMAD, ERICA |
| 1631. | MUHAMMAD, FATIMA SUCI |
| 1632. | MUHAMMAD, FATIMAH by Sati Samad |
| 1633. | MUHAMMAD, HALIMAH S. |
| 1634. | MUHAMMAD, MARTHA K. |
| 1635. | MUHAMMAD, MARYAM |
| 1636. | MUHAMMAD, MILES |
| 1637. | MUHAMMAD, RAHIMA |
| 1638. | MUHAMMAD, SAADIQ by Erica Muhammad |
| 1639. | MUHAMMAD, SALAMAN |

41

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1640. MUHAMMAD, SHARIEFF by Lcjcannia Richardson
1641. MUHAMMAD, TORAH CLARA by Linda Muhammad-Baxter
1642. MUHAMMAD, TYNETTA S.
1643. MUHAMMAD, Y'HOSHUA by Erica Muhammad
1644. MUHAMMAD, YOLANDE COLE
1645. MUHAMMAD-BAXTER, LINDA
1646. MULLINS, FRANCES
1647. MUNK, LEE
1648. MURPHY, DONALD
1649. MURPHY, LARRY L.
1650. MURRAY, MARKETTA
1651. MYLES, PATRICIA ANN
1652. NALLS, II., RONALD DOUGLAS
1653. NARCISSE, A. RENE
1654. NED, DEANDRE
1655. NEELY, MAIJOR I. by Tarian L. Garner
1656. NELSON, ANDREYA by Latashia McFarland
1657. NELSON, PARIS by Andrea Smith
1658. NELSON, TELRON
1659. NELSON, TERESSA by Catina Hopkins
1660. NEWT, NICOLE NASHAE
1661. NGUYEN, ANH XUAN
1662. NGUYEN, THUONG
1663. NIKO, JERICHO SULE
1664. NISBY, DERYL
1665. NORMAN, DENNIS K.
1666. NORMAN, GENETE
1667. NORMAN, MICHAEL
1668. NORTH, BESSIE
1669. NUQUI, SR., ALLAN M.
1670. NZEREM, CHIDOLE
1671. NZEREM, IFEYINWA
1672. NZEREM, UZOAMAKA
1673. OBERES, GIRLIE FERAREN
1674. OBRIEN, JR., DAVID
1675. OGANS, JR, CRAIG ALLEN
1676. O'GILIVIE, WAYNE
1677. OLDS, LENORA
1678. OLIVER, DIANE
1679. OLIVER, FRANK L.

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1680. OLIVER, GEORGIE
1681. OLIVER, JONATHON DAVID
1682. OLIVER, MAURICE
1683. OLIVER, REGINALD LEON
1684. OLIVER, TERRY
1685. OLIVER, TRACEY LAURICE
1686. O'NEAL, AALIYAH J. M.
1687. O'NEAL, MANDON ISAIAH
1688. O'NEIL, JUDY
1689. ONYEADOR, OBINNA
1690. OREGANA, ALCUIN
1691. ORNELAS, MARIO JOSE
1692. ORTEZ, STEPHANIE
1693. ORTEZ-TOUSSAND, IASIAH by Stephanie Ortez
1694. ORTUA, JR., ZACARIAS R.
1695. ORTUA, LOLITA
1696. OSBORNE, JEANETTE
1697. OSBORNE, LAMAR S.
1698. OTIS, LUMONT M.
1699. OW, MATTHEW
1700. OWENS, BRADLEY
1701. OWENS, DOUGLAS
1702. OWENS, GLORIA
1703. OWENS, LESSIE M.
1704. OWENS, LYNETTE
1705. OWENS, MARY
1706. OWENS, SHEILA
1707. OWENS, TINA MARIE
1708. PAGE-BOND, PATRICIA L.
1709. PALMER, JANICE LYNN
1710. PAOPAO, ESETA
1711. PAOPAO, FOTOLE
1712. PAOPAO, FOTU FOTU
1713. PARISH, BRENDA K.
1714. PARISH, CHRIS
1715. PARISH, OSCAR J.
1716. PARKER, KIMBERLY N.
1717. PARKER, MARSHAI
1718. PARKER, MIZELLE
1719. PARKER, RODNEY

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1720.  PARKER, SHEILA
1721.  PARKER, VEOTIS LEE
1722.  PARRA-MCGLOTHIN, PALOMA
1723.  PATTERSON, ANTHONY EARL
1724.  PATTERSON, GLORIA
1725.  PATTERSON, KEYS
1726.  PATTERSON, TIAJHANNA
1727.  PATTON, DOROTHY
1728.  PATTON, IV., EVERETT
1729.  PATTON, JORDAN
1730.  PATTON, JR., EVERETT E.
1731.  PATTON, MILDRED L
1732.  PATTON, VATIMA
1733.  PAYNE, DEBBIE
1734.  PAYNE, REMI
1735.  PEACOCK, NAKEISHA
1736.  PEANG, NATALIE N.
1737.  PEARSON, GLORIA
1738.  PELESAUMA, TAMAITAIOLEAO TAI
1739.  PELESEUMA, EMELIANO ANI
1740.  PEPPARS, LINDA
1741.  PERCY, LAKITYA
1742.  PERKINS, JR., SYLVESTER MICHAEL
1743.  PERKINS, ROSEMARIE LINTZ
1744.  PERKINS, SYLVESTER
1745.  PERRY, SHERRA ROSNER
1746.  PERRY-SMITH, CYNTHIA FRANCES
1747.  PERSONS, LATRICE M.
1748.  PETE, JESSICA J.
1749.  PETERS, HENDERSON·
1750.  PETERSON, DOROTHY MAE
1751.  PETERSON, LYNELL
1752.  PHILLIPS, AMIR
1753.  PHILLIPS, CHLOE M.T. by Tarian L. Garner
1754.  PHILLIPS, ERIC D.
1755.  PHILLIPS, ERICA DEANNA
1756.  PHILLIPS, JR., ERIC DWAYNE
1757.  PHILLIPS, KHAMAL
1758.  PHILLIPS, RAINE GAYNELL by Tarian L. Garner
1759.  'PHILLIPS, RITA H.

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1760. PHILLIPS, RITA RENEE
1761. PHILLIPS, TRACIE
1762. PHILLIPS, ZOE B.O. by Tarian L. Garner
1763. PHIPPS, JOSEPH NATHANIEL
1764. PICKETT, CAROLE ELAINE
1765. PICOT, ANGELIQUE
1766. PIEERCE, ROBERT
1767. PIERCE, ERICA
1768. PIERCE, KARIMAN
1769. PINA, KARINA
1770. PINKARD, MERCEDES
1771. PINKARD, MONICA
1772. PINKARD, ROBERT
1773. PLUMMER, TWAVIDA
1774. POITTER, RICHARD THOMAS
1775. POLK , BENJAMIN
1776. POLK, ANNIE VICTORIA
1777. POLK, MARILYN M
1778. POLLARD, VERGIL LOUISE
1779. POPLAR, LATONDRA
1780. PORCHE, FRANK
1781. PORCHE, III., FRANK
1782. PORCHE, IMYE by Kyndra Williams
1783. PORTER , SHONTIA CORENE
1784. PORTER, ALKISHA
1785. PORTER, LEANNA
1786. PORTER, SID DESHAN
1787. POTTER, SHAMYJARE
1788. POWELL, AHJA
1789. POWELL, BRANDEN
1790. POWELL, BRIAN
1791. POWELL, EDWARD
1792. POWELL, HARELL
1793. POWELL, JR., JAMES
1794. POWELL, LAKISHA
1795. POWELL, NICOLE
1796. POWELL, PAMELA
1797. POWELL, SHANTEL
1798. POWELL, SHAREKA SHARONDA-MARIE
1799. PRATT, III., HERMAN

45

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1800. PRATT, I'JAH
1801. PRATT, U'JAH
1802. PRENTICE, D'NAY
1803. PRENTICE, DNAYA
1804. PRESSLEY, ERIC
1805. PRICE, DOSHEA
1806. PRICE, ROMEAR
1807. PRIMES, JEROME
1808. PRIMUS, RUDOLPH LIONEL
1809. PROFIT, GAYNELL
1810. PROFIT, JOSEPH
1811. PROFIT, KATHY D.
1812. PRYER, KIM ELLEN
1813. PUCKETT, JANIELLE
1814. PUGH, SAMARIA by Latashia McFarland
1815. QUINN, DONTE MIGUEL
1816. QUINNINE, SHARMAINE
1817. RAM, EVELYN
1818. RAM, LEONARD
1819. RAMIREZ, MIGUEL ANGEL
1820. RAMIREZ, VIDA
1821. RANDELL, TONIA
1822. RANDOLPH, LEILANI VICTORIA
1823. RANEY, SONYA R.
1824. RANGE, DESHAWN
1825. RANKIN, ANTHONY D
1826. RANKINS, CLAIRE L.
1827. RANSA, MARQUISJA JENE
1828. RAO, ALAMELA
1829. RAO, ALAMELU
1830. RAO, ALEIMAN
1831. RAO, SARADHA
1832. RASOOL, SHAHEED
1833. RATLER-BAILEY, GLYNIS D.
1834. RATLIFF, LAKEESHA
1835. RAY, ANTHONY by Inita Johnson
1836. RAYFORD, TIMOTHY SEAN
1837. RECIO, PATRICIA
1838. RECIO, SR., ALCIDE
1839. RED, EMEROLD MARIE

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1840.   REDDIC, DALTON
1841.   REDDIC, LaSHONDA
1842.   REDMOND, DIANA
1843.   REDMOND, DONALD
1844.   REDMOND, ELEISHA
1845.   REDMOND, JAEDON SILAS
1846.   REDWOOD, ANTHONY
1847.   REDWOOD-HELTON, THERESA MARIE
1848.   REED, BENJAMIN
1849.   REED, CHARLENE
1850.   REED, EDDIE R.
1851.   REED, ERIC LYNN
1852.   REED, FREDERICK
1853.   REED, LATARA RENEE
1854.   REED, LORETTA
1855.   REED, LOU ELLA
1856.   REED, MALENA
1857.   REEVES, ROMEO
1858.   REID, JR., BENJAMIN
1859.   REID, TIFFANI J.
1860.   REID, TYSON D.
1861.   REYES, GEORGE
1862.   REYNOLDS, ISAIAH by Tina Marie Owens
1863.   REYNOLDS, SEDRIC by Tina Marie Owens
1864.   RHODES, AGYEI
1865.   RHODES, SHARON C.
1866.   RHODES, SHERRON
1867.   RHODES, SR., JULIUS
1868.   RHONE, DONALD EARL
1869.   RICE, DEANNA D.
1870.   RICHARDSON, JIMMIE
1871.   RICHARDSON, JUKARI
1872.   RICHARDSON, MARIJEWEL
1873.   RICHARDSON, VIVIAN J.
1874.   RICKY, ANTHONY
1875.   RIDDLE, WILBERT KEITH
1876.   RILEY, BERNADINE
1877.   RIVERS , TRACY DAWAYNE
1878.   RIVERS, GERALDINE
1879.   RIVERS, PATRICIA

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1880. RIVERS, TERRI
1881. RIVERS, WILLIAM R
1882. ROACH, KRISTINE
1883. ROAN, LUCIA R.
1884. ROAN, SHALINDA FELICE
1885. ROARK, REONA LYNN
1886. ROBERSON, STEPHANIE FAYE
1887. ROBERTSON, KEICHANEE
1888. ROBINIZINE, GLENDA S.
1889. ROBINSON, BERNARD
1890. ROBINSON, CHANISCE
1891. ROBINSON, CHYNA by Patricia Rivers
1892. ROBINSON, DEREK
1893. ROBINSON, DONNELL L.
1894. ROBINSON, EBONIE
1895. ROBINSON, EMMITT
1896. ROBINSON, JESSE
1897. ROBINSON, JR., KENNETH EARL
1898. ROBINSON, MAURICE L.
1899. ROBINSON, MICHAEL AMARY
1900. ROBINSON, PAMELA
1901. ROBINSON, RONIQUA
1902. ROBINSON, SIERRA
1903. ROBINSON, TEDD CHRISTIAN
1904. ROBINSON, TIANA
1905. ROBINSON, VELMA
1906. ROCHE, SEAN PATRICK
1907. RODNEY, ANDY R.
1908. RODNEY, ARMANI LEE
1909. RODNEY, IMAN REGINALD
1910. RODNEY, REGINA C.
1911. RODRIGUEZ, ANJENETTE
1912. RODRIGUEZ, FRANCISCO
1913. RODRIGUEZ, LEONARDA
1914. ROGERS, DWANEE' LEE
1915. ROGERS, ROMAN
1916. ROGERS, TERRELL
1917. ROGERS, TIERRA
1918. ROLLINS, ROSCOE
1919. ROMERO, JOSE

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1920. ROMERO, ZACHARY AARON
1921. ROMERO-MEJIA, ANIELKA
1922. ROOKS, CHAD
1923. ROSS, DEBRA  ANN WILLIAMS
1924. ROSS, KINDRED
1925. ROTH, DENIS DEAN
1926. ROWEL, CHANEL
1927. ROWEL, KEVIN MAC
1928. RUBIN, JOSEPH N.
1929. RUBIN, VENDELLA
1930. RUDOLPH, DAISHANIQUA
1931. RUDOLPH, DENISE RENELL
1932. RUDOLPH, XZAVIER by Shante Danielle Brown
1933. RUFFIN, CLAREESE
1934. RUFFIN, KATHY
1935. RUPAN, ASHWIN
1936. RUPAN-TOMPKINS, MIZAN by Raphael Tompkins
1937. RUPAN-TOMPKINS, NAMAZ by Raphael Tompkins
1938. RUPAN-TOMPKINS, RONICA
1939. RUPAN-TOMPKINS, SURAH by Raphael Tompkins
1940. RUSSELL, ALEXANDRIA
1941. RUSSELL, ANGELINA
1942. RUSSELL, GWENDOLYN L.
1943. RUSSELL, TIFFANY
1944. SAILORS, ROBERT
1945. SALEH, MONICA RENEE
1946. SAMAD, SATI
1947. SAMPLES, JANICE
1948. SANCHEZ, EDITH
1949. SANDERS, COLTYCE T.
1950. SANDERS, FELICIA
1951. SANDERS, HENRY
1952. SANDERS, HENRY LEE
1953. SANDERS, LAMONT LAMAR
1954. SANFORD, JOVAUHN
1955. SARSOUR, LARENT NICOLA
1956. SARSOUR, MARQUETTA DENYSE
1957. SATINOVER, DANIELLE
1958. SATINOVER, MIRIELLE L.
1959. SATTUI, MARIO

49

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

1960. SAULNY, TERRY
1961. SAULNY-GREEN, ANITA
1962. SCARBROUGH-SICES, BERNADETTE FRANCES
1963. SCOTT, BARBARA ELAINE
1964. SCOTT, EBONY DENISE
1965. SCOTT, JESSE
1966. SCOTT, JR., STANLEY RICHARD
1967. SCOTT, KIMONYA
1968. SCOTT, MILTON
1969. SCOTT, RONKENIA LEEAN
1970. SCOTT, UGANDA TRINIKA
1971. SCRANTON, LASHA
1972. SEAGRAVE, KATHERINE
1973. SEASTRUNK, ORLANDO
1974. SECREASE, KENNETH
1975. SELBY, LISA M.
1976. SEPULONA, LESI
1977. SEPULONA, TUSIGA
1978. SEYMORE, MAKHI by Kashina Garner
1979. SHABAZZ, DORIS LINDA
1980. SHACKLEFORD-COOPER, DEASJMANYHKE by Jasmine Butler
1981. SHANKAR, A.L.
1982. SHARELL, NEAL
1983. SHARP, ARLENE
1984. SHARP, MARTHA
1985. SHAW, ARKELIA J.
1986. SHAW, DAWN
1987. SHAW, DEBRA H.
1988. SHELBUA, ANTWAN
1989. SHEPARD, KEANA
1990. SHEPARD, LYNDA FAYE
1991. SHERMAN, JAMES
1992. SHERMAN, QUINCY by James Sherman
1993. SHICK, RICHARD
1994. SHIELDS, ERICKA S.
1995. SHINE, LILLIAN
1996. SHINE, TIMOTHY
1997. SHOWERS, ANJEANNETTE SARAH
1998. SHOWERS, JERRY L.
1999. SHOWERS, VIVIAN ANNETTE

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 2000. | SICES, BIANCA |
| 2001. | SICES, KATRINA |
| 2002. | SILAS, NANDI |
| 2003. | SILAS, TANISHA J. |
| 2004. | SIMMS, FAIRY |
| 2005. | SIMMS, JR., ROBERT |
| 2006. | SIMMS, KIM |
| 2007. | SIMMS, KOMET |
| 2008. | SIMMS, REGINALD EDWIN |
| 2009. | SIMMS, ROBERT W |
| 2010. | SIMMS, WALKIRIS |
| 2011. | SIMPSON, DOROTHY |
| 2012. | SIMPSON, RONDA |
| 2013. | SIMS, BILLY GLYN |
| 2014. | SIMS, CHRISTOPHER |
| 2015. | SIMS, IV., ROSE MARIE |
| 2016. | SIMS, JEREMIAH |
| 2017. | SIMS, KENNETH MICHAEL |
| 2018. | SIMS, WESLEY |
| 2019. | SIMS, YISHA |
| 2020. | SINGH JOHNSON, ROSELA |
| 2021. | SINGH, ELISA V. |
| 2022. | SINGH, SHALBEENDRA |
| 2023. | SINGH, SHALVIN by Evelyn Ram |
| 2024. | SINGLETON, ISAAC |
| 2025. | SINGLETON, LACONYA |
| 2026. | SKINNER, JR, COREY |
| 2027. | SKINNER, NAJAH |
| 2028. | SLADE, JR., JAMES IVAN |
| 2029. | SLOAN, AHMAD JEROME |
| 2030. | SMITH , ROSALIND |
| 2031. | SMITH, ANDRE RAYDEL |
| 2032. | SMITH, ANDREA |
| 2033. | SMITH, ANDREW |
| 2034. | SMITH, ANGELA |
| 2035. | SMITH, ARAINA |
| 2036. | SMITH, ASHLEY ELAINE NICOLE |
| 2037. | SMITH, BEVERLY |
| 2038. | SMITH, BRANDY |
| 2039. | SMITH, BRIAN |

51

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2040. SMITH, BYNONTAE A.
2041. SMITH, BYRONAE
2042. SMITH, CLOIA
2043. SMITH, DENISE
2044. SMITH, DIANA LORRAINE
2045. SMITH, DIANE WESLEY
2046. SMITH, DORIELL
2047. SMITH, DOROTHY J.
2048. SMITH, FREDERICK
2049. SMITH, GREGORY
2050. SMITH, HAROLD D.
2051. SMITH, JAMARR
2052. SMITH, JANICE MARIE
2053. SMITH, JOYCE O'CONNER
2054. SMITH, KEVIN
2055. SMITH, LASHANDA
2056. SMITH, LaTONYA
2057. SMITH, LAVEITTE
2058. SMITH, MARTI C.
2059. SMITH, MARY
2060. SMITH, NEISHA
2061. SMITH, QUINCY
2062. SMITH, ROSALAND R.
2063. SMITH, SR., STEPHEN D.
2064. SMITH, STEPHEN D.
2065. SMITH, TAMIR
2066. SMITH, YVONNE
2067. SMITH-FRANCIS, SANDRA
2068. SMOTHERS, ETHEL L.
2069. SNEED, NEVAEH by Alise Minor
2070. SNELL, JOSEPH
2071. SNELL, NICHOLAS
2072. SOLOMON, EMILY
2073. SOLORZANO, OCTAVIO GUILLERMO
2074. SOTO-HERNANDEZ YESSENIA
2075. SOUN, SAKHAN
2076. SPAIN, JAHMIL MIKEL
2077. SPEARS, APRIL
2078. SPEARS, LATANYA
2079. SPENCER, JAMES

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 2080. | SPENCER, LAVETTE |
| 2081. | SPENCER, TASHA T. |
| 2082. | SPIKENER, DAVID P. |
| 2083. | SPRINGFIELD, DOMINIQUE |
| 2084. | SPRINGFIELD, SHARNAE |
| 2085. | ST LOUIS, CONSTANCE |
| 2086. | ST LOUIS, LEVOI |
| 2087. | ST. LEON, KAMARI |
| 2088. | STANCIL, JALEEL |
| 2089. | STANCIL, JANELLE |
| 2090. | STANCIL, JEFFREY |
| 2091. | STANCIL, JERREL K. |
| 2092. | STANCIL, MADONNA R. |
| 2093. | STANDIFER, TERIANA |
| 2094. | STATHAM, CLARENCE |
| 2095. | STATHAM, JASMIN ANNE-MARIE |
| 2096. | STATHAM, SALENE |
| 2097. | STERN, ARION |
| 2098. | STEVENSON, DAIMONNAE EMONEI |
| 2099. | STEWART , ANDREA |
| 2100. | STEWART, BETTY.M. |
| 2101. | STEWART, CORETTA ALLENE |
| 2102. | STEWART, HERMAN |
| 2103. | STEWART, RAVEN O |
| 2104. | STEWART, STACY HERMAIN |
| 2105. | STIGER, JANINA |
| 2106. | STIGER, TIFFANIQUE |
| 2107. | STITT, CHARLES |
| 2108. | STOCKS, DEJA |
| 2109. | STONE, AARON |
| 2110. | STONE, EDWARD |
| 2111. | STONEY, SHAKEMA |
| 2112. | STRINGER, VIRGINIA |
| 2113. | STROTHER, BRITTANY TATIANA |
| 2114. | STUART, ANGELA F. |
| 2115. | STUART, LESTER |
| 2116. | STUART, REGINALD E. |
| 2117. | SULLEY, UWAH |
| 2118. | SULLIVAN , MONICA |
| 2119. | SULLIVAN, MAURICE |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 2120. | SULTAN, SHAYNA |
| 2121. | SUNDAY, BEULAH MAE |
| 2122. | SUTTON, VERANIECE |
| 2123. | SUWANDI, SUWANDI |
| 2124. | SWAN, BERTHA |
| 2125. | SWAN-CUMMINGS, TIERRA |
| 2126. | SWANN, CYNTHIA |
| 2127. | SWAYNE, GREGORY C. |
| 2128. | SWEENY-ALLEN, DAVOIR DARLENE |
| 2129. | SYLVE, JANET DENISE |
| 2130. | SYLVE, MARLISSA |
| 2131. | SYRETTA, DANIELLE |
| 2132. | TAAMAI, FLORITA |
| 2133. | TAARNAOR, FLORITA |
| 2134. | TABRON, DUPREE SHYHEEM |
| 2135. | TABRON, JR., ULES |
| 2136. | TAGATA, FAALILIU |
| 2137. | TAGATA, SWEETIE SILVANO |
| 2138. | TALLEY-EVANS, DIANE |
| 2139. | TALOLO, MATTHEW MICHAEL |
| 2140. | TANKSLEY, CAROLYN J. |
| 2141. | TANKSLEY, WENDY |
| 2142. | TANNER, YVONNE |
| 2143. | TAPER, IV., THOMAS ANDREW |
| 2144. | TATUM, KOSHAWN |
| 2145. | TATUM, WAYNE |
| 2146. | TAUMAOE, TAUFETEE |
| 2147. | TAYLOR , ELAINE MARIE |
| 2148. | TAYLOR, BEVERLY ANN |
| 2149. | TAYLOR, CHARLOTTE ELIZABETH |
| 2150. | TAYLOR, DORETHA |
| 2151. | TAYLOR, HAKIM |
| 2152. | TAYLOR, JR., DARRYL by Patsy Candley |
| 2153. | TAYLOR, JR., MACK EDWARD |
| 2154. | TAYLOR, KAMILAH |
| 2155. | TAYLOR, MARYLIN |
| 2156. | TAYLOR, MEOLDY MONIQUE |
| 2157. | TAYLOR, NAEEMAH |
| 2158. | TAYLOR, OMAR |
| 2159. | TAYLOR, ORONDE |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2160.  TAYLOR, PATRICK
2161.  TAYLOR, PAUL RANDALL
2162.  TAYLOR, PEARL
2163.  TAYLOR, PEARL L.
2164.  TAYLOR, RONDOE
2165.  TAYLOR, SHIRLEY
2166.  TAYLOR, WILBERT
2167.  TAYLOR-JONES, TIFFANY A
2168.  TEA, FIALUGA
2169.  TEA, JR., SIONE
2170.  TELFOR, ALBERTA
2171.  TELFOR, ALFRED
2172.  TELFOR, LATASHA
2173.  TELFOR, MALCOM
2174.  TELFOR, MARGARET
2175.  TENNANT, JULIET
2176.  TERRELL, DREW
2177.  TERRELL, JESSICA
2178.  TERRELL-RHODES, ANTONIKA
2179.  THIBAUEX, LLOYD
2180.  THOMAS, ALTHEA
2181.  THOMAS, ANASTASIA
2182.  THOMAS, BERNARD KEVIN
2183.  THOMAS, CHERRY
2184.  THOMAS, DONALD
2185.  THOMAS, ELIJAH
2186.  THOMAS, ELIZABETH ANN
2187.  THOMAS, ISAIAH
2188.  THOMAS, JOHNNY
2189.  THOMAS, JUAN
2190.  THOMAS, LAFAYETTE
2191.  THOMAS, LaTANYA
2192.  THOMAS, LINDA M.
2193.  THOMAS, LORENZO
2194.  THOMAS, MILDRED DEAN
2195.  THOMAS, PETTRENELIA
2196.  THOMAS, RUBY
2197.  THOMAS, SARAH
2198.  THOMAS, SARAH JUNE
2199.  THOMAS, SHAMIKA

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2200.   THOMAS-MARSHALL, OMARION by Tiffany Russell
2201.   THOMASSON, LEON
2202.   THOMASSON, TRACEY LYNN
2203.   THOMPSON WHITFIELD, COLBY RONNELL
2204.   THOMPSON, BRIAN
2205.   THOMPSON, CLARESSE
2206.   THOMPSON, DANIELLE
2207.   THOMPSON, FRED
2208.   THOMPSON, GERALD LEWIS
2209.   THOMPSON, J LEONTE by Jada Walker
2210.   THOMPSON, JACKIE
2211.   THOMPSON, MARY
2212.   THOMPSON, MIEISHA
2213.   THOMPSON, SHAQUETT
2214.   THOMPSON, TAKIA TELITHA,
2215.   THOMPSON, TANYA RITA,
2216.   THOMPSON, UNIQUE,
2217.   THONG, SAVOEUN
2218.   THORNTON-COLBERT, TANYA JOHNSON
2219.   THROWER, SHARON
2220.   TIMS, LAKEDA
2221.   TINSLEY, KARIMA
2222.   TITUS, LOTTIE J.
2223.   TOBIAS, EDDIE
2224.   TOBIAS, HENRY L.
2225.   TODD, ASHLEY
2226.   TODD, TAKISHA
2227.   TOLBERT, TANTAY ARLEAN
2228.   TOLLIVER, DIANA
2229.   TOLLIVER, PHYLLIS THOMPSON
2230.   TOLLIVER, SHERRIE LYNN
2231.   TOLLIVER, THEODORE
2232.   TOLLIVER, TIFFANY
2233.   TOM, JEREMY
2234.   TOMPKINS, BELEN
2235.   TOMPKINS, BRIANA
2236.   TOMPKINS, DANIEL
2237.   TOMPKINS, DANIELLE
2238.   TOMPKINS, LETITIA
2239.   TOMPKINS, RAPHAEL

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2240.   TOMPKINS, RAQUEL
2241.   TOMPKINS, RAY
2242.   TOMPKINS, TIANA by Daniel Tompkins
2243.   TORREY, HAPPY
2244.   TOUPS, JAMEELA
2245.   TOUPS, JILL A.
2246.   TRAMIL, MARY LOUISE
2247.   TRAVIS, CHAVARLA
2248.   TRAVIS, HASSAN MALIK
2249.   TRAVIS, JASON
2250.   TRAVIS, JR., ANTHONY B.
2251.   TRAVIS, MARY JEAN
2252.   TRAVIS, PAMELA
2253.   TRAVIS, PAUL
2254.   TRAVIS, SR., ANTHONY T.
2255.   TROCHEZ COTO, JUAN RAMON
2256.   TROTTER, DOROTHY
2257.   TROTTER, MICHAEL
2258.   TROTTER, MIKETHA
2259.   TROUPE, DOMINICK
2260.   TROUPE, QUINTASIA
2261.   TROUPE, STACEY
2262.   TUMBAT, GULNAR
2263.   TURNER , MARYLIN
2264.   TURNER , ROPESHA
2265.   TURNER , SANDRA LYNETTE
2266.   TURNER, HERBERT B.
2267.   TURNER, LAJANEE
2268.   TURNER, LEAMUEL
2269.   TURNER, LERONE
2270.   TURNER, TERRY
2271.   TURNER, VALERIE
2272.   TWINE, EDWARD
2273.   TWINE, NGHIA
2274.   TYLER TUKES,
2275.   TYLER, SIRNELL
2276.   TYSON, ANGELA NICOLE
2277.   TYSON, CATHERINE
2278.   TYSON, DARON
2279.   TYSON, III., JOE NATHAN

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2280.   TYSON, JOE KOLBY KEVON
2281.   TYSON, NEFATORA
2282.   UNDERDUE, SUNDRA
2283.   VALENCIA, JEANNETTE L.
2284.   VANDERCOURT, ADRIANNE
2285.   VAUGHN, ANTHONY FREDERICK
2286.   VAUGHN, JOYCE E.
2287.   VAUGHN, MARQUEZ
2288.   VAUGHN, SAMUEL
2289.   VINCENT, KATINA
2290.   VINCENT, VICTORIA
2291.   VINENT, STEPHAN
2292.   VINES, JR., EDWARD P.
2293.   VINES, KIM
2294.   VINES, LYNJAE
2295.   WADE, ROBERT
2296.   WAGNER, BRANDY A.
2297.   WAGNER, CHRISTINA
2298.   WALKER , RENIQUA
2299.   WALKER, ANTHONY RYDELL
2300.   WALKER, CESENA
2301.   WALKER, CRYSTAL
2302.   WALKER, DESIREE L.
2303.   WALKER, DEVANT LONDELL
2304.   WALKER, JACQUELINE YVETTE
2305.   WALKER, JADA
2306.   WALKER, KEVIN DAVON
2307.   WALKER, LEON
2308.   WALKER, LEONA L.
2309.   WALKER, SHAWNAY ARENA
2310.   WALKER, VELVELON
2311.   WALKER, ZYON
2312.   WALLACE, FRANK
2313.   WALLACE, JR., LE'VESTER
2314.   WALLACE, MARGUERITE LOUISE
2315.   WALLER, RENATA
2316.   WALLS , GHAIMAH MAHASIN
2317.   WALLS , LELIA DIANA
2318.   WALLS , RICARDO CORTEZ,
2319.   WALLS, BASHEBA

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 2320. | WALLS, RICHARD V. |
| 2321. | WALTON, DALE |
| 2322. | WARD, JOE |
| 2323. | WARD, LANEITA |
| 2324. | WARD, NADINE |
| 2325. | WARD, TERRELL R. |
| 2326. | WARD, TERRON A. |
| 2327. | WARD, TIERRA L. |
| 2328. | WARE, PATRICIA |
| 2329. | WARREN, ALGARISCE |
| 2330. | WARREN, ANTHONY |
| 2331. | WARREN, DIANNE |
| 2332. | WARREN, LANNY ALBERT |
| 2333. | WARREN, MAURICE |
| 2334. | WARREN, NICHOLE |
| 2335. | WARREN, SIERRA |
| 2336. | WARREN, ULYSSES |
| 2337. | WASHINGTON, ANISA |
| 2338. | WASHINGTON, ANISHA |
| 2339. | WASHINGTON, ARIM |
| 2340. | WASHINGTON, BARBARA ANN |
| 2341. | WASHINGTON, BROOKE |
| 2342. | WASHINGTON, GREGORY ALLAN |
| 2343. | WASHINGTON, III., GREGORY ALLAN |
| 2344. | WASHINGTON, JACQUELINE |
| 2345. | WASHINGTON, JARELL |
| 2346. | WASHINGTON, JIMMIE WAYNE |
| 2347. | WASHINGTON, KEISHA |
| 2348. | WASHINGTON, KIMBERLY J. |
| 2349. | WASHINGTON, KIMBERLY JEMELA |
| 2350. | WASHINGTON, LANEISHA |
| 2351. | WASHINGTON, LEE |
| 2352. | WASHINGTON, LINDA LOUISE |
| 2353. | WASHINGTON, SAHKARI NYEMAH |
| 2354. | WASHINGTON, SANKARI |
| 2355. | WASHINGTON, VIRGINIA |
| 2356. | WASHINGTON, ZYERRE |
| 2357. | WATERS, CHANTIY |
| 2358. | WATKINS, JOYCE |
| 2359. | WATKINS, JOYCE ANN |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2360.    WATKINS, MARQUEESE T.
2361.    WATKINS, PARRISH
2362.    WATKINS, REVOLVDA
2363.    WATKINS, SHANYA
2364.    WATLEY, ONA M.
2365.    WATSON, BARBARA A.
2366.    WATSON, FRANKIE FELICE
2367.    WATSON, JR., ARTHUR
2368.    WATSON, LENCE
2369.    WATSON, ROOSEVELT
2370.    WATSON, SANDRA VARNETTE
2371.    WATSON, SR., ARTHUR
2372.    WATSON, WARDELL R.
2373.    WATSON, YASMEEN
2374.    WATTS, PEPPER
2375.    WATTS, SHARON
2376.    WEATHERSBY, KENNYATTA
2377.    WEBB, CYNTHIA ROSE
2378.    WEBB, DIAMOND by Heidi Deanna Bluford
2379.    WEBB, DONNA
2380.    WEBB, JAMES DANTE
2381.    WEBB, SR., MAGER
2382.    WEBB, VICTORIA
2383.    WEIGHT, JALENA MARIE
2384.    WELLS, SHENE
2385.    WESLEY, FAHEEM
2386.    WESLEY, SR., KELLY RASHAND
2387.    WHILTENBERG, BILLY
2388.    WHILTENBERG, RONNIE
2389.    WHILTENBERG, SHIELA
2390.    WHILTSHIRE, AREON
2391.    WHISBY, MAYA
2392.    WHITAKER, JAVONE by Cedric Whitaker, Sr.
2393.    WHITAKER, SR, CEDRIC
2394.    WHITAKER, SR., VICTOR
2395.    WHITAKER, VAHN
2396.    WHITAKER, VANCE
2397.    WHITAKER, VINCENA
2398.    WHITE, ANDRE
2399.    WHITE, BARBARA

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 2400. | WHITE, BRIAN E. |
| 2401. | WHITE, CANDACE |
| 2402. | WHITE, CRYSTAL LYN |
| 2403. | WHITE, CYNTHIA |
| 2404. | WHITE, ERIC |
| 2405. | WHITE, FRANCELLE |
| 2406. | WHITE, III., NATHANIEL |
| 2407. | WHITE, JEROME |
| 2408. | WHITE, JOHN |
| 2409. | WHITE, KIANA CHEVELLE |
| 2410. | WHITE, MAURICE |
| 2411. | WHITE, MELISSA MAE |
| 2412. | WHITE, MONIQUE |
| 2413. | WHITE, NA'JEE |
| 2414. | WHITE, PEARLIE |
| 2415. | WHITE, ROBERT |
| 2416. | WHITE, SHIERICKEA ADREANA |
| 2417. | WHITE, SNOW, by Yolanda Marshall |
| 2418. | WHITE, TORRENCE |
| 2419. | WHITE, VANESSA |
| 2420. | WHITE-HEINZ, STARLA |
| 2421. | WHITESIDE, DONALD |
| 2422. | WHITFIELD, ANDREW |
| 2423. | WHITFIELD, FRANK |
| 2424. | WHITFIELD, LASHANNA |
| 2425. | WHITFIELD, ROSLYN |
| 2426. | WHITLEY, ANTWON |
| 2427. | WHITLEY, DIETRICH D. |
| 2428. | WHITLEY, RODERICK |
| 2429. | WHITLEY, SHIRLEY |
| 2430. | WHITTENBERG, JAMES |
| 2431. | WHITTENBERG, JASON |
| 2432. | WHITTENBERG, RENESHA RENIKA |
| 2433. | WILKE, JEFFREY |
| 2434. | WILLIAMS , MALAE |
| 2435. | WILLIAMS, ANGELA |
| 2436. | WILLIAMS, BETTY |
| 2437. | WILLIAMS, BIESHA |
| 2438. | WILLIAMS, BRIAN |
| 2439. | WILLIAMS, BRIGETTE |

61

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 2440. | WILLIAMS, CALLIE MAE |
| 2441. | WILLIAMS, CANDICE |
| 2442. | WILLIAMS, CAROLENA |
| 2443. | WILLIAMS, CHANCES |
| 2444. | WILLIAMS, DEMETRIUS |
| 2445. | WILLIAMS, DEMONYA |
| 2446. | WILLIAMS, DENNIS CHARLES |
| 2447. | WILLIAMS, DERRICK |
| 2448. | WILLIAMS, DOMINIQUE D. |
| 2449. | WILLIAMS, DOROTHY M. |
| 2450. | WILLIAMS, FELICIA |
| 2451. | WILLIAMS, GARRY LANE |
| 2452. | WILLIAMS, IMANI |
| 2453. | WILLIAMS, JACQUEZ |
| 2454. | WILLIAMS, JAELUN |
| 2455. | WILLIAMS, JANET |
| 2456. | WILLIAMS, JEFFREY C. |
| 2457. | WILLIAMS, JOSEPH |
| 2458. | WILLIAMS, JUELEAH |
| 2459. | WILLIAMS, KATIE by Sarah Thomas |
| 2460. | WILLIAMS, KENNETH. |
| 2461. | WILLIAMS, KYNDRA |
| 2462. | WILLIAMS, LADORIS |
| 2463. | WILLIAMS, LATRICE |
| 2464. | WILLIAMS, LEA JANAY |
| 2465. | WILLIAMS, MARIAN |
| 2466. | WILLIAMS, OTIS |
| 2467. | WILLIAMS, RICKY |
| 2468. | WILLIAMS, RITA A. |
| 2469. | WILLIAMS, ROBERT A. |
| 2470. | WILLIAMS, ROBERT ALONZO |
| 2471. | WILLIAMS, ROMAYN LE'ANDRE |
| 2472. | WILLIAMS, STEVEN |
| 2473. | WILLIAMS, TASHAWN |
| 2474. | WILLIAMS, TIFFANY |
| 2475. | WILLIAMS, TIMONI by Maya Whisby |
| 2476. | WILLIAMS, VERLA |
| 2477. | WILLIAMSON, DOMINIQUE |
| 2478. | WILLIS, ALICIAH |
| 2479. | WILLIS, NILAYAH by Mieisha Thompson |

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

2480.   WILLIS, PARIS by Micisha Thompson
2481.   WILLIS, TINA LOUISE
2482.   WILLIS-DE LOS REYES, MIQUESHA
2483.   WILLSON, JIMMIE EDWARD
2484.   WILSON, DA'RON
2485.   WILSON, ERIN
2486.   WILSON, GAYNELL
2487.   WILSON, JR., ANDRE by Twavida Plummer
2488.   WILSON, KHALID AHMAD
2489.   WILSON, LATOYA
2490.   WILSON, MICHAEL
2491.   WILSON, NADIYAH
2492.   WILSON, PRISCILLA
2493.   WILSON, SHA'MYA
2494.   WILSON, STAFUNDA
2495.   WILSON, TABRELA
2496.   WINCHESTER, RAHSAAN
2497.   WINDHAM, ANETH N.
2498.   WINDHAM, JEFFERY
2499.   WINDOM, ANGELA
2500.   WINDOM, LERREEZLODOM
2501.   WINDOM, TILI, TERRELL LADO
2502.   WINDOM, TERREL
2503.   WINNFIELD, MERCEDES A.
2504.   WINTERSTEIN, ELIZABETH CHASTITY
2505.   WINTERSTEIN, EVELYN PULETELE
2506.   WISE-GASTINELL, KIM A.
2507.   WITHERSPOON, JR., EZEKIEL E.
2508.   WITHERSPOON, REGINA L.
2509.   WITHERSPOON, SR., EZEKIEL E.
2510.   WOLDRIDGE-HOWARD, LAVEESE M.
2511.   WOLFE, LYRIS DELPHINIA
2512.   WOLLEY, LINDA
2513.   WOMACK, ANTHONY S.
2514.   WONG, NATHAN
2515.   WOODS, JACK
2516.   WOODS, LISA
2517.   WOODS, VICTORIA
2518.   WOODWARD, JALIL by Jasmine Butler
2519.   WOOTEN, JAKARI

SECOND AMENDED COMPLAINT- AMENDED PLAINTIFFS' LIST OF NAMES-

| | |
|---|---|
| 2520. | WOOYEON, CHO |
| 2521. | WORLEY, CHERRYL M. |
| 2522. | WRIGHT, CAELA ADRIANNA |
| 2523. | WRIGHT, DERRICK |
| 2524. | WRIGHT, DURINA |
| 2525. | WRIGHT, III., CLEVELAND C. |
| 2526. | WRIGHT, JANAE |
| 2527. | WRIGHT, KARLTON |
| 2528. | WRIGHT, MATTHEW |
| 2529. | WRIGHT, MELISSA MAE |
| 2530. | WRIGHT, PATRICIA A. |
| 2531. | WRIGHT, SHAWANA A. |
| 2532. | WRIGHT, SR., DERRICK DIMITRIS |
| 2533. | WYATT, SHANI JAMILA JAHA |
| 2534. | WYNN , ANGEL |
| 2535. | WYNN, INGRID |
| 2536. | WYNN, LISA |
| 2537. | XU, YALI |
| 2538. | YATES, SASHELL |
| 2539. | YORK, ANTOINELLA MARIE |
| 2540. | YORK, SHARINA M. |
| 2541. | YOUNG , DONTAY |
| 2542. | YOUNG, AMANDA |
| 2543. | YOUNG, BEVERLY ANN |
| 2544. | YOUNG, MARGARET E. |
| 2545. | YOUNG, MARVIN SCOTT |
| 2546. | YOUNG, PERRY GLENN |
| 2547. | YOUNG, STEPHANIE FELICIA |
| 2548. | YOUNG, TONI MARIE |
| 2549. | YOUNGS, ARETHA |
| 2550. | YOUNGS, ERIC |
| 2551. | YOUNGS, TYRONE |
| 2552. | YOUNGS-COLVIN, DIANE |
| 2553. | ZAYAS, MEKIELA R. |
| 2554. | ZINN, ANGEL GLORIA |
| 2555. | ZINN, NICOLE JEAN |

# EXHIBIT 1



# EXHIBIT 2

1  Steve Castleman, (CA Bar No. 95764)
   Collin McCarthy, (CA. Bar No. 305489)
2  Jordan Davis, CA PTLS Cert. No. 41751
   Chloe Yaw, CA PTLS Cert. No. 41764
3  Environmental Law and Justice Clinic
   Golden Gate University School of Law
4  536 Mission Street
   San Francisco, California 94105-2968
5  Telephone: (415) 369-5351
6  Facsimile: (415) 896-2450

7  David C. Anton , (CA Bar No. 95852)
   Law Office of David Anton
8  1717 Redwood Lane
   Davis, CA 95616
9  Telephone: (530) 220-4435
10 Email: davidantonlaw@gmail.com

11
   Attorneys for Petitioners
12 GREENACTION FOR HEALTH AND ENVIROMENTAL JUSTICE

13
                   NUCLEAR REGULATORY COMMISSION
14

15

16 IN RE: TETRA TECH EC, INC.          ) **DECLARATION OF ANTHONY SMITH**
                                       ) **IN SUPPORT OF PETITION TO**
17                                     ) **REVOKE THE LICENSE OF TETRA**
                                       ) **TECH EC, INC.**
18                                     )
                                       )
19                                     )
                                       )
20                                     )
                                       )
21                                     )
                                       )
22                                     )
                                       )
23                                     )
                                       )
24                                     )
                                       )
25                                     )
                                       )
26                                     )

27

28
                                          A. S.
                              ANTHONY SMITH DECLARATION

I, Anthony Smith, declare:

## Radiological Work History & Training

1.     In total, I have seven years of experience working in the nuclear industry.

2.     I started my career as a radiation worker in 2002, when I was hired as a "deconner" (i.e. a decontamination technician) to do decontamination work for New World Environmental ("NWE"), a radiological-staffing company. My first radiological jobs were short term assignments at military facilities in Maryland, Virginia, and Alabama. Later that year, I took a job at Hunters Point Naval Shipyard ("HPNS"), where I assisted with characterization surveys to identify radiologically impacted areas in anticipation of future remediation. My first job at Hunters Point lasted about one year, until I was laid off in 2003.

3.     After my first job at Hunters Point Shipyard, I took and passed the Department of Energy's (DOE) Radiological Control Technician (RCT) CORE Exam. I was previously told I would need to pass the CORE Exam to work at HPNS as a Health Physics Specialist ("HP") when remediation work picked up. I passed the exam in 2003. The DOE CORE Exam covers fundamental radiation concepts and functions performed by HPs (also known as radiation control technicians, or "RCTs"), including mathematics and physical science, sources of radiation, sampling methods, survey instrumentation, dosimetry, and worker safety, among other topics. Passing the CORE exam qualified me to work as an RCT/HP at Hunters Point as well as most other nuclear or radiological sites in the country.

4.     In addition to passing the DOE CORE Exam, I completed annual testing to maintain proficiency in radiological remediation practices. I also completed various onsite radiation and safety trainings throughout my career. When I worked at HPNS the second time, rad workers were often assigned readings on radiation-related topics to study on their own time, and

1

*A. S.*

ANTHONY SMITH DECLARATION

HPs were quizzed in a limited way by supervisors at our daily morning meeting. Together these trainings, along with expected prior experience and training, were intended to ensure HPs on the site were informed of proper radiological procedures as well as the health and safety risks associated with rad work. I observed that a number of the HPs did not appear to be knowledgeable or studying on their own as I was when at Hunters Point.

<u>Experience at Hunters Point Shipyard</u>

5.      In 2006, I returned to work at Hunters Point Shipyard as a Junior HP for New World Environmental and I was promoted to a Senior HP by NWE. Around the end of 2009, I was forced to switched employers to Radiological Survey & Remediation Services, LLC ("RSRS") or be terminated because NWE was losing the sub-contract. RSRS made me a Junior HP for a number of months, and after about eight months promoted me to Senior HP, but my duties remained largely the same throughout my second stint at Hunters Point.

6.      Over the course of my later six years at Hunters Point I performed a variety of HP roles across the base. The majority of my time was spent performing building surveys. I also performed soil sampling in the field and within Radiological Screening Yards ("RSYs"), oversaw laborers and provided access control for buildings and Radiologically Controlled Areas ("RCAs"), and worked the Portal Monitor screening vehicles entering and exiting the site.

7.      Beginning in mid-2008, I noticed improper rad practices taking place at HPNS, including false soil sampling, incomplete building surveys, falsification of chain-of-custody ("COC") documentation, and data manipulation. In my view, the emergence of Tetra Tech as the primary radiological contractor coincided with the negative shift in culture and bad practices at the site. It is my understanding that while prior to 2008 NWE was the holder of the Nuclear Regulatory Commission ("NRC") radioactive materials license that governed the radiological work performed. Tetra Tech became the NRC license holder about that time that improper rad

2

ANTHONY SMITH DECLARATION

1   practices became a regular event and as a result Tetra Tech gained more control over the rad work

2   performed by subcontractors like NWE and Aleut World Solutions.

3

4                                    Building 351A

5       8.      My first experience with improper or fraudulent sampling occurred in the late fall

6   of 2008, when I was assigned to oversee a soil-remediation project in the crawl space under

7
    Building 351A. Building 351A was the last building to undergo remediation on Parcel G and was
8
9   therefore the only work preventing Parcel G from free release by regulators. Building 351A was

10  previously used by the Navy's Radiological Defense Laboratory and was confirmed during our

11  characterization surveys as containing radioactive contaminants exceeding release levels. Areas of

12  the building and the soil areas under the building that could be accessed in a crawl space were

13  identified as containing radioactive materials above release levels that were required to be

14  removed in the remediation process.  As part of the Building 351A remediation of the crawl area,

15  there were roughly a dozen laborers in protective gear (rubber boots and respirators) tasked with
16
17  digging up the soil using shovels and trowels. Tetra Tech also rented a special soil vacuum truck

18  with a long, eight inch hose to suck up the contaminated dirt that the laborers had loosened. The

19  vacuum system deposited the soil in a container designated for low level radioactive waste, which

20  was later shipped off site.

21      9.      During the Building 351A project,  fellow HP Josh Hooper and I were responsible
22
    for manning the opening to the crawl space  and frisking (i.e., scanning the people and equipment
23
24  for radioactive contamination prior to leaving the Building 351A work area) to ensure they were

25  clean. Once the laborers completed the remediation work under the building, Josh and I were also

26  responsible for post-remediation sampling of the area so that the building could be cleared for

27  release. I asked that Josh and I be provided with respirators because of the large amount of air

28                                       3          A.S.
                                         ANTHONY SMITH DECLARATION

borne dust under the building in the crawl area, as well as other standard personal protective equipment. Chuck Taylor, Tetra Tech' RSO representative and field supervisor, refused the request for the PPE respirator. Josh and I took a number of soil samples throughout the crawl area under building 351A and placed in containers for the samples to be tested by the laboratory at Hunters Point. Documents of the samples were done to show where the sample was taken, at what time, by who, and related information and kept with the samples. All together, the remediation process took several weeks to complete.

10.    A day or two after Hooper and I finished post-remediation sampling and delivered the samples to the on-site laboratory, we were approached by HP Supervisor Steve Rolfe and asked to attend a meeting with management at Tetra Tech's HPNS office that was close to the end of the day. Approximately a dozen senior managers were present at the meeting, including RSRS Vice Presidents Daryl DeLong, Brian Henderson, Tetra Tech's Project Manager Bill Dougherty, and Construction Superintendent Dennis McWade. Mr. Bert Bowers, the NWE RSOR was not in the meeting, and that was a puzzle to me as the meeting progressed. During the meeting Dougherty explained to us the cost and effort that went into the Building 351A remediation, asking us with words to the effect "Do you know how much it costs us to rent that machine for two weeks?" Dougherty also told us that the test results of the post remediation soil samples showed some of the highest radioactive readings ever seen on the Hunters Point site. After discussing the cost of the delay having these elevated soil samples would cause, namely that the laborers would have to return to do more digging with the vacuum truck and we would need to take more post-remediation samples, Dougherty instructed us to destroy the existing highly contaminated radioactive soil samples from Building 351A and any related documentation, and directed us to take new samples from areas in the crawl space known to be clean.

4

ANTHONY SMITH DECLARATION

1       11.    Hooper and I returned to Building 351A to take new samples as we were told. We

2  took the samples from areas that had been marked with flags, which were placed by engineers that

3  had been directed to put flags in areas that were previously identified through surveys as

4  consistent with natural background radiation levels that would get lab clearance. The new samples

5  were then used to clear Building 351A and secure free release of Parcel G. In other words, the new

6  samples did come from Building 351A, but were done to intentionally avoid the areas that had

7  been shown to still have high radioactive contamination under the building. The re-sampling was

8
9  taken selectively so that additional remediation would not be required, although the rules and

10  procedures did require additional remediation due to the true soil sample lab results. To my

11  knowledge, the contamination in Building 351A was never remediated.

12  <center>Parcel A Cesium-137</center>

13       12.    The fraudulent sampling at Building 351A was not an isolated incident; in fact, it

14  was just the first of many. For example, less than a year later, around July or August of 2009, I

15
16  was assigned to HP Supervisor Justin Hubbard's crew and tasked with performing surveys and

17  sampling as part of a project remediating sewer lines along Fisher Avenue and Spear Street. At the

18  beginning of the project, Justin Hubbard directed me to take a background sample from

19  somewhere in a nearby adjoining area that did not have radioactive contamination in order to

20  establish naturally occurring levels of radiation for the sewer line work. I chose to take a sample

21  along the border of Parcel A – an area we were told had never been used for radiological purposes

22
23  and was already transferred to the City of San Francisco for development because it was believed

24  to be free of any radioactive contamination above free release levels. Bordering Fisher Avenue

25  there was a retaining wall that descended in height as it ran east to west parallel to the street, and

26  behind the wall was a hill that went up towards the Parcel A development site. The retaining wall

27  was about waist-high near the stop sign at the intersection of Fisher and Spear, about 20 feet from

28

<center>5</center>

1  the light pole. I reached over the wall and dug a hole to take the sample. I used my trowel to dig

2  about 6 inches into the ground, and then removed some soil from the bottom of the hole, and

3  placed the soil from the bottom of the hole in a plastic sample jar. I then walked back to our

4  meeting point and gave the jar to Justin Hubbard, who then took the sample to the on-site lab. In a

5  breach of proper procedure, no chain-of-custody (COC) form accompanied the sample.

6       13.    The next morning or so, Justin Hubbard brought the soil sample out to our meeting

7
8  spot and told me the sample tested "hot" for radiation at a level of two to three picocuries of

9  cesium. Other members of the project crew at the meeting point that morning included HPs Ray

10  Roberson, Carey Bell, and Jeff Rolfe. Hubbard stated to all of us in regards to the soil sample from

11  Parcel A - "get rid of it and not say a word," or words to that effect. I took the sample back to the

12  same area above the wall and dumped the soil back into the hole I originally took it from. I then

13  disposed of the plastic sample jar in a bin for contaminated radiological waste. In the end, we used

14  the established background area near building 505 for the background sample for the Fisher Ave.
15
16  and Spear St. projects, although the building 505 area was quite some distance from the street

17  project. I am aware that the Navy and EPA established release criteria levels, so that soil had to be

18  remediated due to health and safety concerns if it tested above those levels. Different radioactive

19  levels were set for each specific type of radioactive material we encountered at Hunters Point.

20  The release level for cesium-137 was 0.113 picocuries. The cesium-137 results from the sample I

21  took near Parcel A as reported as 2 to 3 picocuries was approximately 18 to 26 times more
22
23  hazardous than the safety level set by the Navy and the state and federal regulators that oversaw

24  the Hunters Point project.

25       14.    As far as I am aware, I was the first and only person to take a sample of the soil at

26  Parcel A. To my knowledge the radioactive contamination I found in Parcel A was not further

27  investigated or remediated.

28
                        6                  A. S.

ANTHONY SMITH DECLARATION

## Fake Soil Sampling

15.     After the Building 351A and Parcel A cover ups, fraudulent sampling became a regular occurrence for me and the teams I worked with at Hunters Point. From time to time I was assigned to work with a team of HPs under the direction of Tetra Tech supervisor Steven Rolfe. When we were doing soil sampling, and that soil sampling was to check on whether the remediation work that had been done was effective, with increasing regularity I and the team working for Mr. Rolfe were directed by Mr. Rolfe to take fake soil samples. In this early period of 2009 to early 2010, when post-remediation sampling was to be done, more and more Mr. Rolfe told me and the other HPs to cheat and take false soil samples. To do the post-remediation soil samples properly, engineers were to mark on the ground where we were to take soil samples because those spots were supposed to have the highest radiological readings. By taking the samples from the high reading areas it was presumed that if those areas were tested and came in under the Navy's and regulators' "release criteria" standards, then the entire area should be within the release criteria standards. When Mr. Rolfe told us to cheat by taking false samples, he instructed us to look like we were taking the samples from the marked spots, but to actually put soil into the sample containers that would go to the lab from nearby soil that was not marked by the engineers as the hot spots for rad contamination.

16.     After a number of months of taking fake soil samples that were close to the marked areas, Mr. Rolfe told us that Tetra Tech bosses were not happy because the fake soil samples were being tested by the lab and still coming back with lab results that were too high and above release criteria, so remediation would have to be re-done. Mr. Rolfe explained that Tetra Tech EC did not want to have to re-do the remediation because of the lab failures, and we were to get fake soil samples from areas from now on that we knew would be clean of elevated radioactive contamination.

<div align="center">7</div>

17.     Beginning around 2010, I was doing soil sampling, called "dirt work" – in what we called "the triangle area" near Building 707 and later around the 500 series of buildings. Due to the directions of Mr. Rolfe, I was instructed that I was to get soil that was known to be clean and pretend that soil came from the Building 707 area and later the 500 building series we were assigned to sample. I had learned that soil in certain parts of the shipyard was clean and could easily be swapped with other samples in order to quickly obtain lab and regulatory clearance due to the fake samples of clean soil we submitted.

18.     More specifically, I knew that the soil in a sewer trench in front of an area of the 500 series of buildings as well as the soil underlying the foundation of the old Hunters Point movie theater was clean serpentine or "green" dirt, and that the soil underneath the two palm trees near the old pump house (Building 521) also near the old theater was clean sandy soil. At the direction of HP Supervisor Steve Rolfe, other HPs and I would wait until lunch time or after work hours, when there was no one else around, and would go down to the clean sewer trench or later to the theater or palm trees depending on the type of soil needed. There, we would fill up a 5-gallon bucket with clean soil and bring it back to the Conex (a shipping container which served as a makeshift office) where Steve Rolfe, Tina Rolfe (Steve's wife), and Rick Zahensky worked with the samples. Inside the Conex the Rolfes and Zahensky would empty the true soil samples taken from the areas the samples were supposed to be taken from into another 5-gallon bucket and replace the sample with the clean soil from one of the three areas we got the clean soil from. Other HPs and I would then dump the soil from the real samples in open sewer trenches around the site before they were backfilled.

19.     The practice of swapping clean dirt for samples really picked up in frequency while working in the Building 707 triangle area. Remediation in that area had been going on for about two years, and after three or four rounds of remediation and post-remediation sampling it still

8

ANTHONY SMITH DECLARATION

1   wasn't clean of radioactive contamination above release levels. Frustrated by the cost and delay,

2   Steve Rolfe directed me to "just go get some clean dirt." I followed Rolfe's direction and obtained

3   some sandy soil from underneath the two palm trees near building 521. I then brought the soil

4   from the palm trees to Rolfe who used the soil to submit fake soil samples for the 707 triangle area

5   to the laboratory for testing to secure release of the area.

6
7       20.     At the time of the Building 707 triangle area remediation and throughout the 500

8   series of buildings falsifying soil samples through the use of replacement clean soil was almost an

9   everyday occurrence. The switching of real samples with the fake clean soil happened pretty much

10  every day during my last year and a half or more at the shipyard. I was released from Hunters

11  Point in September of 2012. I would estimate that I and my team switched real samples with fake

12  clean dirt for the samples between 800 and 1000 times. I understand from my work at Hunters

13  Point, after hours interaction with others, and my review of records, that Justin Hubbard's team

14  also engaged in similar fake soil sample submissions to the lab for years.

15
16
17                          Chain of Custody Forms (COC)

18      21.     In addition to replacing suspected radioactive soil samples with soil from other

19  areas that was known to be clean to obtain fraudulent laboratory testing results, the COC

20  documents filled out for soil samples were regularly falsified. Proper procedure requires that you

21  have a COC document for each sample taken. Proper procedure also requires that the rad tech that

22  does the sampling not only fills in the COC but is also the one who maintains continuous custody

23  of the COC along with the samples until custody is transferred to someone else and signed off as

24  taking custody. It was expected from the COC that each HP would retain the samples and take the

25
26  samples to the lab, never releasing the sample and COC from possession until the COC and

27  sample was turned into the lab. The COC form is supposed to accurately reflect the time and place

28                              9              A. S.

1   the sample was taken and to remain in continuous possession of the sampler until samples are

2   turned over to the lab. The practice became at Hunters Point for the Rolfe team that Tina Rolfe

3   would fill out COCs in the office or conex while we worked in the field taking samples and then

4   have the rad techs sign off on the COC as if they themselves had filled in the information. Tina

5   Rolfe would simply cycle through the names of the HPs on my sampling crew – Rick Zahensky,

6   Jeff Rolfe and I – when filling out COC forms, regardless of who actually took the sample. On

7   some occasions Tina Rolfe listed herself as the sampler despite the fact she almost never worked

8   in the field, and had not taken those samples. I rarely filled out COC forms during my time at

9   Hunters Point, and almost never delivered my own samples to the lab, perhaps once a month.

10

11  Because the trip to the lab was considered leisure time, Steve, Tina, or Jeff Rolfe or Rick

12  Zahensky almost always delivered the samples. I also suspect that Steve Rolfe may not have

13  trusted that I would not say anything to the lab workers about the COC being wrong, or the false

14  soil samples, so that may have contributed to why I seldom made the sample delivery. When I did

15  make sample deliveries to the lab most of the time Steve Rolfe came with me, again maybe to

16  make sure I did not say anything.

17

18      22.      Looking at the COC forms from Hunters Point displays that the forms are falsified.

19  First, many soil sample COCs indicate samples were taken exactly every five minutes apart. In

20  reality, sampling often takes longer than five minutes because some surfaces are difficult to

21  penetrate, the sample must be properly bagged and labeled, and then sampling equipment must be

22  decontaminated by being double-washed and air dried. In my experience, it is impossible to take

23  soil samples every five minutes if you follow proper procedures. Second, the difference in

24  handwriting between the sample times and the sampler information shows that the form was filled

25  out by two different people. I can easily identify the difference in the forms containing only my

26  handwriting and those containing Tina's handwriting and my name. Lastly, I remember occasions

27

28                          10

ANTHONY SMITH DECLARATION

1   when Tina Rolfe would fill out a COC as if I was sampling in one location, when I was actually

2   working in an entirely different area that day.  For example, I recall one occasion when I took

3   samples near Building 707, but the COCs said I was sampling in the  Building 500 series.

4        23.      Having someone pre-fill  the COC makes it impossible to determine where and

5   when a particular sample was taken and seriously compromises the integrity of the sampling

6   results for Hunters Point. From my time at Hunters Point, I understand that the other teams, such

7   as Justin Hubbard's, also used fake COC documents for samples.

8

9                           <u>Sham Building Surveys</u>

10       24.      During my time at Hunters Point, a large part of my time was spent conducting

11  building surveys. Building surveys generally entailed using a Ludlum 2360 with a detector to

12  identify and confirm impacted areas in need of remediation. At HPNS, proper building surveys

13  were conducted in up to three phases: Class 1, which required scanning 100% of the survey areas

14  in a space known to have rad contamination or a high likelihood of rad contamination, using a grid

15  system, comprising the floor and lower walls of the building; Class 2, which my supervisors

16  described as the upper wall areas of the building, and Class 3, the areas the supervisors stated were

17  the ceiling and roof areas of buildings.  I understand that policies defined Class 1, 2, and 3 on

18  other criteria, but the way we used it in the field was based on the floor, walls, or ceiling and roof.

19  In my time at Hunters Point I conducted building surveys in almost all parts of the base, including

20  Parcels C, E, and G.

21

22       25.      Due to the amount of time required to perform a proper building survey, the

23  practice at Hunters Point was to scan the high probability areas and fake the rest. Although we

24  mostly performed Class 1 surveys, the Class 2 and 3  surveys were falsified by holding our

25  instrument in place, or stationary, so as to generate the required amount of data, but having

26  nothing to do with real scanning that was required. On numerous occasions my crew and I were

27

28                              11        $A\,I\,S\,I$

                                    ANTHONY SMITH DECLARATION

1  instructed by HP Supervisor Steve Rolfe to "just get numbers," which we would do by simply

2  holding the 2360 detector in the same spot, or setting it down in one spot for up to 30 minutes

3  while readings were recorded. I specifically recall "just getting numbers" at Building 707,

4  throughout the 500 series of buildings and foundation footprints, buildings 351, 351A, 411, 401,

5  414, 406, 144, 146, 130, 103, 113, 521, and possibly building 203, although I am not sure on

6  building 203. I know we followed similar flawed procedures at numerous buildings that the

7  Navy's studies had designated as rad-impacted.

8

9                                   Data Manipulation

10       26.     To the extent that building surveys were properly performed, and even when they

11  were not done properly, the data collected was often changed to reflect results close to background

12  radiation levels. I know this because I saw it being done. In approximately 2010, when I was in

13  the trailer uploading my instrument I noticed Tina Rolfe on the computer manually changing data

14  uploaded from previous scans. I eventually discussed the issue with other HP's and learned that

15

16  Tina Rolfe and Rick Zahinsky were told to change numbers up or down in order to have readings

17  within normal levels of radiation. I also heard Steve Rolfe chew out Zahensky and Tina Rolfe for

18  not changing the numbers sufficiently. Rick told me that at times he would take the data

19  information on a thumb drive and a work computer home and work until the early hours of the

20  morning changing thousands of numbers, all to misrepresent the data to falsely show that

21  conditions were normal at the site and avoid additional radiological remediation work.

22       27.     After learning that data was frequently changed, I raised my concerns with the

23  practice to my then supervisor Justin Hubbard. Hubbard told me that they were doing it

24  everywhere else on the site and that was what management wanted. I also talked to Ray Roberson,

25  Joey Cunningham, and Rick Zahensky about the issue and they all had a similar response: Tetra

26

27

28                                   12            A. S.

1   Tech supervisors knew about the number tampering and directed that it take place; the quicker the

2   area was deemed releasable, the faster Tetra Tech could get paid for completion of the project.

3

4                           Radioactive Soil Shipped Off Hunters Point

5       28.      When I returned to work at Hunters Point in 2006, a system was being used to scan

6   for radioactive contamination at Hunters Point excavated soil.  The system that was used was a

7
    large conveyor belt had a level of about 6 inches of soil spread on the belt.  The belt would move
8
9   under a group of radioactivity sensors that were set to alarm if radioactive contamination was

10  detected above a certain set level.  If soil triggered the radiation detector alarms the soil on either

11  side of the sensors for a certain number of feet was to be removed from the belt and put in low-

12  level radioactive containers for shipment to federally approved disposal sites.  If the soil cleared

13  the sensors, the soil was piled up in an area designated for soil to be shipped off Hunters Point to

14  facilities that received soil that did not contain radioactive contamination.

15
        29.      I was aware of the conveyor belt system and its set up, but I did not work that
16
17  operation.  Sometime in 2006, I learned that it was discovered that Joe Lavell, a Tetra Tech

18  construction superintendent a supervisor over the conveyor belt system, had increased the speed of

19  the conveyor belt system far faster than had been approved. I also learned that Gary Wilson, a rad

20  supervisor over the conveyor belt system, and Jane Taylor (an assigned Junior Rad Tech) silenced

21  the rad detector alarms.  I was informed that the conveyor belt system had been operated at 6 to 9

22
    times the approved conveyor belt speed, and with no radiation detector alarms operating.
23
24      30.      Based on my knowledge of how the radiation detectors worked, the sensors are

25  much less able to detect radioactivity at higher speeds.  I was informed by others at Hunters Point

26  that Joe Lavell and Gary Wilson explained that they set the conveyor belt (Joe Lavell) to run at the

27  higher speeds because the alarms kept going off at the approved speed and virtually none of the

28                                           13              _A. S._
                                                    ANTHONY SMITH DECLARATION

soil was able to be cleared as free of radioactive contamination within approved levels.  Gary
Wilson explained that he changed the radiation detector alarm settings so the alarms did not
sound.

31.    The soil that was improperly scanned through the conveyor belt system at too fast a
speed and with no functioning alarm was improperly allowed to be shipped off Hunters Point and
was shipped off Hunters Point as non-radioactive material.  After it was discovered that the
conveyor belt system had been run far too fast, some thousand plus cubic yards of soil still
remained in piles that had been improperly cleared by the conveyor belt system.  I and other HPs
were assigned to help scan the soil that remained in the piles.  HPs such as myself scanned soil
picked up by front-loaders, however the soil was two to three feet in thickness so our sensor were
ineffective in sensing radiological contamination much below six inches.  If our sensor, which
were not fully effective due to the multiple feet of thickness to the soil, did not detect high
radioactive readings the soil was deemed "cleared" and sent in trucks to go off site.  The soil then
regularly failed the Portal Monitor screening.  However, HPs were restricted to scanning the truck
trailers of soil through the bed and side of the truck, which our instruments were not effective to
effectively detect the radiological contamination beyond about six inches.

32.    At no time was I informed that any effort was made by Tetra Tech, the Navy, or
others to alert the towns, counties, landfills, and others that received the large amount of soil that
was most likely radioactive but labeled as cleared of radioactive contamination over the months
before it was discovered that the conveyor belt system had been improperly run.

## Work Culture at Hunters Point

33.    During the second half of my time at Hunters Point there was a noticeable negative
shift in culture which can be best described as fraudulently cutting corners wherever possible.
Production – that is, getting the work done as quickly as possible and with as little cost as

14

ANTHONY SMITH DECLARATION

1  possible– was the sole concern at HPNS, and it came at the expense of proper radiological

2  procedures. Fraud was committed on a daily basis. It even reached a point where field workers

3  participating in fraudulent activities established a warning system on the radios to alert one

4  another when Bert Bowers, the Radiological Safety Officer on site, was coming out in the field.

5      34.     The fact that these improper procedures and fraudulent practices were occurring on

6  a regular basis was not lost on me. However, on the occasions that I did raise concerns about the

7  way work was being performed, the response was always the same: "That is what they (Tetra Tech

8  management or the Navy) want – get it done and get it done fast". We were told that "if you don't

9  like it you can go home." I regularly heard of other employees being laid off from HPNS, and

10 knew that if I refused to follow the direction of supervisors, no matter how improper or unethical I

11 believed that direction to be, I too would be let go. The generous pay and tax free per diem were

12 strong incentives to keep my head down and go along with what management wanted, and I know

13 many others felt the same.

14

15     35.     I was ultimately laid off in September 2012. By the end of my employment at

16 Hunters Point I could hardly stand the mental burden and stress due to the cheating that came with

17 the job. I experienced high blood pressure for the first time in my life. My experience at HPNS

18 and the anguish I felt for what occurred due to the frauds there has caused me to give up on the rad

19 industry and I have not worked in that business since.

20

21     I declare under penalty of perjury that the foregoing is true and correct to the best of my

22 personal knowledge.

23

24     Executed on June 3, 2017 in Young Harris, Georgia.

25

26                                          Anthony Smith

27                                          (6-3-17)

28                          15

# EXHIBIT 3

1    Steve Castleman (CA Bar No. 95764)
     Collin McCarthy (CA Bar No. 305489)
2    Environmental Law and Justice Clinic
3    Golden Gate University School of Law
     536 Mission Street
4    San Francisco, California 94105-2968
     Telephone: (415) 442-6675
5    Facsimile: (415) 896-2450

6
     David C. Anton (CA Bar No. 95852)
7    Law Office of David Anton
     1717 Redwood Lane
8    Davis, CA 95616
9    Telephone: (530) 220-4435
     Email: davidantonlaw@gmail.com
10
11   Attorneys for Petitioners
     GREEN ACTION FOR HEALTH FOR ENVIRONMENTAL JUSTICE
12

13                    NUCLEAR REGULATORY COMMISSION
14

15

16

17

18   IN RE: TETRA TECH, EC, INC.          )  DECLARATION OF ELBERT BOWERS IN
                                          )  SUPPORT OF PETITION TO REVOKE
19                                        )  THE LICENSE OF TETRA TECH EC,
                                          )  INC.
20                                        )
                                          )
21                                        )
                                          )
22                                        )
                                          )
23   ─────────────────────────────────────)

24

25

26

27

28

                                    1

                              Declaration of Elbert Bowers

I, ELBERT BOWERS, declare:

**Background and Work History**

1.      I have been involved in the occupational radiation-safety industry since 1978. My experience within the industry has been diverse and I have been assigned to many worksites, including Department of Energy facilities, commercial nuclear power plants, and regulated environmental remediation and reclamation projects. I started at the Oconee Nuclear Power Station as a trainee. I completed Health Physics trainee "entry level" screening. This consisted of Health Physics fundamentals and classwork that lasted approximately six months. It was followed by in-depth Health Physics theory addressing, in part, ionizing radiation – its detection, sources and corresponding effects involving exposure to the living cell (i.e., biological risk). This training was supplemented with hands-on "in-field" exercises and additional follow-up classes within regular six-month intervals.

2.      I worked my way up to becoming a Health Physics Specialist ("HP"), a process that took approximately four years. During that time, I also became ANSI 3.1-qualified. In April 1988, I gained instructor certification through the Institute of Nuclear Power Operations (INPO) to implement all aspects of Occupational Radiation Safety training programs. I gained similar certification to implement like programs at U.S. Department of Energy facilities in November 1995, while assigned to the Rocky Flats Environmental Technology Site (RFETS).

3.      In addition to the aforementioned places I have worked, other tenures involving radiological work included assignments at: the Indian Point Nuclear power plant in Buchanan, New York; the Babcock & Wilcox nuclear fuel production facility in Lynchburg, Virginia;

2

1  Hartley & Hartley Landfill, Kawkawlin, Michigan; Grissom Air Force Base, Indianapolis,

2  Indiana; Shapack Landfill, Attleboro Massachusetts; and Warren Peak Air Force Weather Station

3  in Sundance Wyoming. Subsequently I worked at several places for New World Technology

4
5  ("NWT"), a radiological safety staffing firm. (At that time, New World Environmental ["NWE"]

6  was doing business under its corporate name, "New World Technology.") I worked for NWT in

7  radiological roles at: Pickatinny Arsenal in New Jersey; China Lake Naval Air Station in

8  Ridgecrest, California; and at Hunter Point Naval Shipyard ("HPNS") in San Francisco,

9  California. After leaving NWT, I was employed by Tetra Tech EC at HPNS and finished that
10
11  employment in a radiological role while assigned at Naval Air Station Alameda in Alameda,

12  California.

13  4.      I started working for NWT at HPNS in January 2001 and became the company's

14  Radiation Safety Officer Representative ("RSOR") in January 2004. I worked in that capacity for
15
16  approximately three and one-third years. Then, on March 30, 2009, after Tetra Tech EC invoked

17  first time use of its own NRC materials license and ceased the conduct of operations under

18  NWT's license, I "rolled over" - with endorsement by Navy Radiological Affairs Support Office

19  ("RASO") Lead Environmental Program Manager, Laurie Lowman - from working for NWT to
20
21  working for Tetra Tech EC directly as RSOR (with technical accountability to Mr. Clifford

22  Stephan, Tetra Tech EC's License Radiation Safety Officer).

23  5.      During my first week with Tetra Tech EC as the RSOR at HPNS, Mr. Stephan left the

24  company after which I assumed the dual role of Tetra Tech EC License RSO (with technical

25  accountability to Mr. Philip Bartley, Tetra Tech EC Vice President, Environmental Safety and
26
27  Quality Services). In accordance with Nuclear Regulatory Commission (NRC) mandated

28  approval protocol, my assignment as Tetra Tech EC License RSO was reflected on the

3

Declaration of Elbert Bowers

company's amended NRC license dated July 27, 2009 (designation as the company License RSO remained in effect through December 2009, the same approximate time Mr. Bartley's Tetra Tech EC tenure ended). I held the Tetra Tech EC RSOR position at HPNS for approximately eighteen months. I had prior experience as an RSOR at the high profile Superfund site of Shapack Landfill, Attleboro Massachusetts, and the Hartley and Hartley Landfill, Kawkawlin Township, Michigan. My responsibilities as RSOR at these sites included the accommodation of announced and unannounced NRC inspections as well as overseeing radiological activities at the projects to ensure uninterrupted licensee compliance with NRC mandated regulations, thus ensuring work was performed in a way that validated safe operations and ensuring the health and safety of the project staff, the general public and the environment.

6.      During the time I worked at Hunters Point Shipyard I had multiple concerns pertinent to radiological safety. They included safety oriented concerns centered around: Tetra Tech EC's ever worsening "production over safety" work culture; willful use and retention of unqualified and/or under-qualified workers; improper use of the Portal Monitor; and numerous incidents where I became aware that NRC license compliance was, at the very least, compromised and potentially violated. I have since learned to my dismay that the concerns I had were but the "tip of the iceberg" for I was not aware of the rampant radiological frauds that were being directed by the Tetra Tech EC management and supervisors with whom I worked.

Tetra Tech EC's Work Culture

7.      My most serious concern that I had while working at Hunters Point with RAD work practices involved the work culture of key construction oriented Tetra Tech EC "decision makers" – persons in upper level project management roles at HPNS. In order to comply with

4

1   NRC Form 3 and Materials License mandates, I found myself routinely obligated in ever

2   increasing frequency to bring concerns about RAD safety shortcomings to Tetra Tech EC's top

3
    on-site managers, William "Bill" Dougherty, the Construction Project Manager, and Dennis
4
5   McWade, the Construction Project Superintendent. However, over the course of my

6   employment tenure under Tetra Tech EC, both Dougherty and McWade demonstrated a "profit

7   driven production first" mentality adversely impacting, with increasing frequency, almost every

8   radiologically-oriented project operation at the expense of basic radiological safety. I initially
9
    thought that these Tetra Tech managers simply displayed radiological incompetence which firm
10
11  and assertive corrective actions on my part would easily correct. Instead, over the course of my

12  last months as a Tetra Tech EC Hunters Point employee, I became more and more convinced that

13  the underlying "envisioned" production needs of the Construction Department overrode proper

14  radiological practices. The Construction Department for Tetra Tech EC viewed NRC regulated
15
16  requirements and the HPs who enforced them as impediments to production at Hunters Point.

17  Dougherty and McWade didn't respect the HPs professional responsibilities or authority. I

18  observed that the example of Dougherty and McWade created an unhealthy "trickle down" effect

19  as to how other Construction Department staff treated HPs in the field. I was aware that HP's
20
21  were instructed to speed up work in order to meet production schedules or otherwise be viewed

22  as willfully contributing to project cost overruns and subject to threat of termination.

23  8.      Tetra Tech EC's poor safety culture was further enabled by dictating the preferential hire

24  of unqualified HPs, as further detailed below, who were pliable and willing to be coerced into

25  doing – right or wrong - what the Construction Department dictated as opposed to standing up to
26
27  them and insisting that all rad work be done compliantly and in accordance with Tetra Tech EC's

28

5

Declaration of Elbert Bowers

1    NRC issued license and supporting project RAD safety procedures, despite any potential delays

2    in production.

3    9.      Also as a result of Dougherty and McWade's attitude was a gradually implemented

4    culture of deception. I didn't know it at the time, but I have since been informed by former HPs

5

6    at Hunters Point that the Tetra Tech EC HP supervisors had an "early warning system," under

7    which they were alerted when I would leave my office and go out to the field. Thus alerted, the

8    supervisors, in particular Justin Hubbard and Stephen Rolfe, insured non-compliance and

9    obvious cheating on rad practices ceased, at least until I went back to my office."

10

11   10.     In addition to the early warning system, I discovered during the last few months of my

12   Hunters Point tenure that the Construction Department kept me "out of the loop" of some of the

13   places and times RAD work was being done. This was occurring despite the fact that, to ensure

14   the safe and compliant conduct of all RAD work performed under Tetra Tech EC's NRC license,

15   communication to me or my designee of such planned work was first required. As further

16   described below, I only discovered such work was taking place by conducting RAD-safety

17

18   integrity checks throughout the shipyard at various times of the day, including after-hours. I

19   suspect that despite my efforts RAD work was conducted that I was never informed of, or

20   discovered.

21

22   11.     Looking back, I realize that safety culture expectations suffered when the nature of Tetra

23   Tech EC's contract with the Navy changed. The contract transitioned from a time-and-materials

24   contract to one with a firm fixed-price in 2009. See, Attachment 1, as an example of the firm

25   fixed-price contract formats that were used from 2009 on, a June 24, 2011 Scope of Work

26   Contract issued by the Navy. Under the time-and-materials contract, there was no financial

27

28   incentive to cut corners as Tetra Tech EC was paid for its actual costs plus a percentage for

6

Declaration of Elbert Bowers

profit. However, under the firm fixed-price contract, there was an incentive to cut corners; profit was maximized by cutting costs, speeding up production, and finishing up as far ahead of schedule as possible. So, for example, costs were cut by laying off HPs. In fact, after the firm fixed-price contract model was instituted, 2 of the 3 HP slots that were designated to report to me for miscellaneous "Basewide" support purposes (i.e. NRC license compliance oriented confirmatory surveys of all Radiologically Controlled Areas not actively worked, incoming/outgoing Portal Monitor surveys, etc.) were eliminated beginning in January 2011.

12. Costs could also have been more substantially cut by cheating on various RAD remediation processes. I was not aware of the RAD fraud at the time. I have learned from the *Investigation Conclusion Anomalous Soil Samples at Hunters Point Naval Shipyard* report, as well as the admissions by Anthony Smith and others, that widespread fraudulent cheating on soil samples, scanning, and remediation was done. This scheme of RAD fraud dramatically reduced costs to Tetra Tech, increased the profits to Tetra Tech, and potentially allowed RAD contamination above release criteria to remain on Hunters Point and to be shipped off Hunters Point as non-rad soils, threatening the health and safety of untold numbers of people for eons to come.

13. After the contract changed, I noticed more frequent RAD-oriented discrepancies, going at first from one incident every 6 weeks or so that I discovered, to one every 2 weeks, to upwards of one or more a week. I have since learned after my removal from Hunters Point that dramatic and systematic RAD frauds were engaged in that were kept secret from me by Tetra Tech EC management and others.

14. The incentives that accompanied initiation of the firm fixed-price contracting model explain, in large degree, the deterioration of Tetra Tech EC's safety culture and the

1  accompanying RAD fraud. Based on my experience, following proper radiological procedures

2  often results in production delays (e.g., a series of excavation steps that typically take 15 minutes

3  for a heavy equipment operator to complete may, instead, take upwards of 45 minutes for the

4

5  same steps if subject to radiological controls due to the plethora of monitoring intervals expected

6  of HP safety personnel).

7  15.      Eventually, after months of escalating "cooperative teamwork" difficulties with Tetra

8  Tech EC's on-site construction management, I felt overarching pressure by Bill Dougherty, the

9  Tetra Tech EC Construction Project Manager to "look the other way" – even though ever more

10

11  bizarre RAD safety irregularities persisted. The situation reached its peak for me on the morning

12  of January 13, 2011 when Dougherty angrily threatened to have my name "removed" from the

13  license, then - in what remains the one and only such scenario of its kind encountered in my 30

14  plus year professional career - followed up with shouted demands that I immediately remove

15

16  myself from the project along with my personal belongings. This was the treatment I endured

17  while adhering to the federally protected obligations and mandates of NRC Form 3. I was trying

18  to apprise Dougherty of the most recently-discovered compliance concerns of adverse impact to

19  Tetra Tech EC's NRC license.

20

21

22  **Tetra Tech Did Not Correct RAD Fraud That Resulted In Release Of RAD Contaminated Soil To The Public**

23  16.      When I began working at Hunters Point in 2001, and for some years thereafter, a major

24

25  focus of Navy radiological cleanup protocol and the work of Tetra Tech – referred to as

26  "characterization" or "investigative" assessments - was to survey buildings and areas of Hunters

27  Point to try and determine whether an area or building was "impacted" (meaning elevated

28

8

readings of the building or area confirmed the probable presence of radiological contamination above release criteria levels established by the Navy and regulators). Because buildings and structures were the primary focus of Navy contract awards in the early years, there was not yet a significant priority at that time placed on extracting contaminated soils from Hunters Point and remediating that soil (e.g., pursuing efforts to remove the radiological contamination from the soil so that the soil left behind no longer posed a health hazard to workers, the public, and the surrounding environment.)

17.    In the mid-2000's, the Navy began to release contract awards for work to assess potentially RAD contaminated soil impacted areas of the shipyard, and remediate any radiologically contaminated soil where confirmed to exist. One process used for the purpose of soil remediation at Hunters Point in 2006 involved the staging and use of conveyor belt hardware. Working under two separate Navy awards, extracted soils originating from the Hunters Point Installation Removal – 02 (aka: "IR-02") and the PCB Hot Spot areas of Parcel E were staged to go through conveyor belt systems. Strategically positioned directly above each conveyor belt was a set of twelve radiation detectors that were connected to a computer system. Each computer was equipped with software featuring real-time RAD count rate detection displays and corresponding alarm indicators to alert system operators of RAD-elevated anomalies and RAD contamination when present. The soil to be processed was to be verified as non-saturated (from rain, etc.) and placed on the conveyor belt at a thickness of no more than 6 inches. The soil was then to be moved at a slow, established monitoring rate, under the radiation detectors. If the detectors sensed RAD-elevated anomalies, i.e. radiological contamination, above a naturally occurring "background" radiation intensity level, the sensors triggered an alarm. Once the alarm was sounded the conveyor belt was to stop. A manual survey of the soil

9

Declaration of Elbert Bowers

1   was to then be performed and the contaminated soil was to be removed from the belt and placed

2   in low level radioactive waste containers. Containers in which rejected soils were placed would

3   then be securely staged until arrangements were in place for a low level radioactive waste

4

5   shipment from Hunters Point to one of the four federally approved low level radioactive waste

6   disposal sites in the United States.

7   18.     The soil from Parcel E that was being processed by the conveyor belt systems at that time

8   also had other forms of contamination, such as oils and PCBs. Because of the parallel existence

9   of non-RAD oriented contaminants, waste soil that was cleared of RAD concerns was to be

10  shipped off Hunters Point to third parties that receive such chemically impacted soils. Although

11  NWT and Tetra Tech were not the shippers of that soil, I understand that the final disposition of

12

13  waste soil designated as non-RAD that was shipped off Hunters Point generally involved

14  disposal nearby in Northern California.

15

16  19.     Tetra Tech, as the construction company, had control over the conveyor belt system for it

17  was considered construction based equipment. NWE RAD HPs were not permitted to change,

18  adjust, or handle the conveyor belt processes. In particular, NWE RAD HPs were not permitted

19  to adjust the conveyor belt speed. The conveyor belt speed was controlled by Tetra Tech EC

20  management. There was no standard operating procedure of set frequency to check the belt

21

22  speed, or any directives to check the belt speed at all. NWE HPs did have authority over the

23  radiation detectors and the alarm used in the conveyor belt system for those sensors and the

24  alarm specifically related to remediation of the RAD waste.

25  20.     For months in 2005 and 2006 the conveyor belt systems ran processing thousands of

26  cubic yards of soil, but early in the process a substantial amount of the soil was pulled as having

27

28  excessively high radioactive content, and was segregated and disposed of as low level

10

Declaration of Elbert Bowers

1   radioactive waste. Due to the employee time and costs related to the identification and removal

2   of the radioactive contaminated soil through the conveyor belt system, I contacted Ulrika

3   Messer, a Tetra Tech EC manager in San Diego who was responsible for the conveyor belt

4   processing and this specific contract for Tetra Tech EC under Tetra Tech EC Vice President Neil

5

6   Hart. I called Ulrika Messer and stated that NWE had incurred costs that equaled about 80% of

7   the total contract allotment because of the labor time and associated expenses due to the large

8   amount of radioactive waste that was identified and removed through the conveyor belts systems.

9   Ms. Messer screamed at me over the phone that these costs were a very serious problem for Tetra

10   Tech EC, and that she would have to get on her hands and knees and "crawl to (Tetra Tech VP)

11   Neil Hart begging for more money", or words to that effect.

12

13   21.    I have learned through discussions with HPs, including Anthony Smith, that after I

14   informed Ms. Messer that the soil processing through the PCB Hot Spot conveyor belt system

15   was exhausting the funds budgeted for her project, that efforts were taken to cheat so as to

16   increase production and decrease identification and remediation of radiological contamination in

17   the soil. Mr. Smith informed me that Joe Levell, a Tetra Tech supervisor, substantially increased

18

19   the speeds of the conveyor belts, which, in turn, compromised the previously established

20   monitoring accuracy of the corresponding RAD detector sensors. I know that Joe Levell was a

21   Tetra Tech EC employee who reported directly to Ms. Messer as her field lead at Hunters Point.

22

23   Manipulating conveyor belt controls – including that for belt speed, was something that only a

24   Tetra Tech EC manager was permitted to authorize, and NWE was barred from making such

25   adjustments - including the belt speeds.

26

27   22.    In approximately July of 2006, HPs, who I think were Billy van Vo, Jack Schelebo,

28   Emmitt Brown, Ray Roberson, and possibly others who worked in that operation, reported to

11

Declaration of Elbert Bowers

1   New World management that the conveyor belt systems were not being operated properly.

2   During my tenure at the shipyard in July and August of 2006, I saw memos from Tetra Tech EC

3   managers that stated that the belts had been run at twice the approved speeds. (See attachment 2,

4
5   the August 23, 2006 email from Ulrika Messer of Tetra Tech EC to Mike Wilson, the CEO of

6   New World, aka NWE.) In later discussions with some of the employees who worked in the field

7   who knew how the belts operated, I was informed that the belt speeds were increased between a

8   factor of six to nine times the approved speed.  In my training and experience involving these

9
10  types of radiation detectors, it is common knowledge that the detectors become much less

11  effective when the scan speeds are increased.  Based on my experience and knowledge, I would

12  estimate that the radiation detection sensors would be nearly worthless to detect all but extreme

13  radiation emissions at such high speed scan rates.  The radiation detectors at these speeds would

14  not be able to detect and alarm for radioactive contamination at the health and radiation safety

15
16  criteria that the Navy and regulators had set for Hunters Point.

17  23.      In the time I worked at Hunters Point I learned in and around July and August of 2006

18  that individuals, including Senior HP Gary Wilson (who had recently been promoted into a

19  supervisory role), were also involved in actions to intentionally cripple the conveyor belt

20
21  system's ability to detect radiation.  I was informed by New World project manager Dan

22  Spicuzza that Gary Wilson, who is the brother of NWT CEO Mike Wilson, had silenced the

23  radiation detector alarm on the PCB Hot Spot conveyor belt system.  Mr. Spicuzza told me that

24  Gary Wilson had stated when questioned, that Wilson had silenced the alarms because the alarms

25  were going off so much that all the soil was being treated as radiologically "crapped up" and

26
27  there was way too much down time (or words to that effect).  Having a large amount of the

28  processed soil deemed radiologically contaminated slowed the process down, and dramatically

12

Declaration of Elbert Bowers

1  increased the costs due to the steps necessary to segregate, containerize, and prepare for

2  shipment the soil deemed low level radioactive waste. I understood from the discussions that

3  Gary Wilson had felt pressure from Tetra Tech management to reduce the amount of soil that

4
5  was removed as radioactive contamination in order to reduce costs and increase the clearance of

6  soil as "clean" soil, and Wilson silenced the alarms as a result of that pressure from Tetra Tech. I

7  now can only wonder if Ulrika Messer of Tetra Tech (again, the person who became so

8  uncontrollably enraged when I advised her that the PCB Hot Spot budget had dwindled to a 20%

9
10  reserve) vented as well to NWE CEO Mike Wilson (the brother of PCB Hot Spot RAD

11  supervisor Gary Wilson), and intimidated CEO Wilson into persuading his brother Gary to

12  increase PCB Hot Spot production using whatever means necessary. I am aware that Gary

13  Wilson was subjected to some form of discipline for his actions in August of 2006, but he was

14  not fired for that cheating. Months later Gary Wilson was let go because he had serious

15
16  attendance and related problems. I am not aware that Joe Levell was disciplined by Tetra Tech

17  EC at all for his deceptive act of drastically increasing the PCB Hot Spot conveyor belt speed.

18  24.      In August of 2006, I was informed and received emails that showed Tetra Tech VP Neil

19  Hart was overseeing the response to the disclosure that Joe Levell and Gary Wilson had taken

20  actions that made the conveyor belt system a fraud and ineffective in properly screening soil for

21  radioactive contamination. Ms. Messer advised through e-mails and related communications that

22
23  the VP Neil Hart was checking on the processes that were taken to screen the thousands of cubic

24  yards of soil that had had been falsely screened by the conveyor belt system. I was aware that

25  Justin Hubbard was put in charge of supervising the processing of the soil that had been

26
27  fraudulently processed through the conveyor belt system. See, Attachment 2. I have learned

28  over time after my Hunters Point tenure that Justin Hubbard was actively involved in a pattern of

13

Declaration of Elbert Bowers

cheating during the radiological remediation of soil and buildings that ensued. I know of no steps taken by VP Neil Hart to have the third parties warned that the thousands of cubic yards of soil they received had been falsely screened by the conveyor belt system and were potentially contaminated with hazardous levels of radiological contamination. If Tetra Tech had wanted to give such warnings I would have to have been involved and informed due to the radiological nature of the problem. I believe Tetra Tech top management determined not to inform third parties and the government bodies to avoid having to redress the potential major health hazard the company had created by the release of radiologically contaminated soil into the public. In the five years following the discovery of the false conveyor belt scanning in July of 2006 while I worked at Hunters Point, I never learned of any information that Tetra Tech EC management changed its decision to hide the improper shipment of radioactive contaminated soil into the public. I am not aware of any information to date that Tetra Tech EC, the Navy, or any of the regulators have alerted the third parties, which may include towns, cities, and counties that received this soil, of the radiological health and safety hazard of that soil.

**Unqualified workers/willful submittal of fraudulent qualifications by staff**

25.     Another of my concerns centered on conformance with expected worker qualification as required by the Navy in order to work at Hunters Point as an HP. One stark example of someone in conflict with the Navy's expectation was Jane Taylor.

26.     When a resume was submitted on behalf of someone interested in filling a vacant HP slot at Hunters Point, he or she was required to meet a minimum standard of qualification as contractually detailed in the agreement with the Navy. For the agreement between the Navy and Tetra Tech, for one to be considered for a junior HP role, a candidate had to have a minimum of

14

Declaration of Elbert Bowers

1   one year's experience in radiological remediation and safety prior to arriving at Hunters Point,

2   while a senior HP candidate must have had a minimum of 3 years' experience. As for both junior

3   and senior HPs, the Navy required that minimum experience levels had to comply with ANSI

4

5   Standard 3.1. The ANSI 3.1 standard is based primarily on desired "skill set" driven experience

6   that would involve extensive work experience in the radiological remediation and safety field.

7   27.     In addition to the contract requirements, I expected from my prior industry experience

8   that some form of RAD "fundamentals specific" screening examination would be required to

9
    assess and document the baseline knowledge and skill sets of junior and senior HP candidates
10

11  prior to hiring. However, I found that this was not the expectation for new hires at Hunters Point

12  that were to work on behalf of Tetra Tech EC.

13  28.     Over the course of my professional career as both a RAD supervisor and Radiation Safety

14  Officer Representative, I participated in reviewing the qualifications of potential new hires, but

15
    at Hunters Point my review of qualifications and influence in the hiring decisions were at times
16

17  limited. Normally, I reviewed resumes at Hunters Point in conjunction with Mr. Bill Haney, my

18  NWT direct supervisor, and NWT's Program Manager for Hunters Point, but that wasn't always

19  the case.

20
    29.     In February 2006, I received a copy of a resume for Jane Taylor from the NWT Human
21

22  Resources Director, Kari Guidry. Upon reviewing it, I had serious doubts as to the veracity of the

23  resume. Listed as Jane Taylor's only radiologically oriented tenure was prior experience as a

24  senior HP with a company named "Taylor Made Construction." Taylor did not list any

25  employment as a junior HP. Nor did her resume indicate that she was ANSI 3.1 qualified. From

26  my prior job searches and my experience in the industry reviewing resumes and confirming

27  qualification credentials, I was very familiar with the relatively limited number of companies that

28

15

Declaration of Elbert Bowers

1   specialized in RAD safety support services that would use HPs. I had never heard of Taylor

2   Made Construction in the field, which raised an immediate red flag in my mind. I promptly

3   shared my doubts on the authenticity of the resume by phone with Ms. Guidry. She abruptly said:
4
5   "I'm H.R., you're project management. I'll do my job and you do yours – if I need your help I'll

6   ask for it", or words to that effect. Despite my doubts about Jane Taylor's qualifications, which I

7   attempted to address, Guidry told me that she still intended to hire Jane Taylor. I told Bill Haney

8   about this conversation by phone and he told me "Put her somewhere with a senior where she
9
10  can't hurt us, and keep an eye on her," or words to that effect. I tried to follow this direction and

11  my own belief that Taylor was not qualified. However, in the later years due to Taylor's personal

12  relationship with Tetra Tech EC Construction Superintendent Dennis McWade, I could no longer

13  control the assignments of Taylor and she received special treatment by Tetra Tech management

14  outside of my control.
15

16  30.      Jane Taylor was hired by New World Environmental on March 1, 2006 as a junior HP

17  despite the doubts about her resume and her apparent lack of any legitimate prior RAD-oriented

18  qualification - ANSI 3.1 or otherwise. In May 2006, less than three months into Taylor's initial

19  Hunters Point tenure, Ms. Guidry informed me to my surprise that she was promoting Taylor
20
21  into a vacant senior HP position which had opened at Hunters Point.

22  31.      On May 19, 2006, within a week of Taylor's promotion to the senior HP classification

23  (and subsequent to being announced to the project staff), senior HP Richard Stoney stopped by

24  my office and – obviously upset - tendered his immediate resignation. Upon attempting to

25  identify the bases of what appeared an abrupt, emotionally driven decision, Stoney explained
26
27  with words to the effect that "in good conscience", he could not "work alongside Jane Taylor"

28  now that she was being placed "in a senior HP role" because he knew she didn't have "junior or

16

Declaration of Elbert Bowers

1   senior HP qualifications" and that "the resume she submitted to New World was faked by

2   Samantha" (Samantha Taylor, Jane Taylor's daughter). I asked Mr. Stoney if, instead of

3
    resigning, would he be willing to discuss what he knew with Guidry. Still intent on immediately
4
5   resigning, Stoney indicated that he couldn't imagine "anything productive that could come from

6   that," or words to that effect. I then asked Stoney if he understood I had an obligation to convey

7   to corporate Human Resources what he had conveyed to me, after which Stoney acknowledged

8   that he was. Stoney permanently left the project that same day, and I relayed what had happened
9
    by phone to both Guidry and Haney. I wondered why Taylor had been promoted and so quickly
10
11  for she did not have the background, training, and experience - and nothing she did while

12  employed contradicted that she was a fraud. I heard from others over time that Ms. Taylor was

13  involved in sexual relations with superiors at Hunters Point that might explain the favored

14  treatment she received.

15
16  32.    As her presence at Hunters Point proceeded, I heard from another senior HP, Arthur Jahr,

17  in the presence of New World HR Director Kari Guidry, that it did not appear Taylor knew what

18  she was doing. For example, we were told she did not know how to use RAD scanning

19  equipment properly, a skill any HP would be expected to have.

20
21  33.    On October 10, 2008, Taylor left Hunter Point Shipyard. She sought to return to work at

22  Hunters Point in January of 2009. My understanding was that she left Hunters Point to seek

23  work at the U.S. Department of Energy's Oak Ridge Nuclear Facility (where RAD training

24  department screening examinations are administered), but was unable to get a job there. As when

25  Taylor first arrived at Hunters Point, I did not feel she should be re-hired because she was a
26
27  fraud. However, on January 15, 2009, I received a directive from Dennis McWade, Tetra Tech

28  EC's Construction Superintendent, who told me that Taylor was going to be returning to work at

17

Declaration of Elbert Bowers

Hunters Point and ordered me to have Taylor re-hired into a senior HP slot effective the following Monday. Tetra Tech was the general contractor that retained NWT, the company I worked for at the time. I stated to McWade that I would pass along his direction to New World HR to re-hire Taylor. Despite my personal thoughts about Taylor, her fraudulent resume, and the reports she did not know the job, I knew a precedent had already been set during her initial hire -- the precedent was confirmed when I informed my supervisor Bill Haney, who again advised to "place her where she can't hurt us", or words to that effect. I was told that McWade previously had an ongoing sexual relationship with Taylor and personally witnessed that they appeared to be romantically attached. I suspected the sexual relationship was the primary reason he wanted Taylor rehired. I told McWade that there weren't any senior slots available but McWade told me again to call my supervisor and "that HR lady" and to make sure Taylor was re-hired effective the following Monday and he would make sure there would be a senior slot opened for Taylor by that time. Despite my personal and professional reservations about Taylor's rehire, I passed along McWade's directive to my supervisor Bill Haney and New World's HR Director, Kari Guidry. Taylor and McWade later got married during, per Taylor, a weekend "getaway" to Las Vegas.

34.    The obvious favoritism shown Taylor through her hiring, promotion, and re-hire became a source of growing conflict among the HPs and Tetra Tech employees, and grew as Construction Superintendent McWade made the favoritism more obvious, such as when McWade arranged for delivery of a personal desk for Taylor next to McWade's in the Construction Superintendent office.

35.    Upon Jane Taylor's re-hire in 2009, as the year went on I had less and less ability to have influence over where Taylor or anyone else on staff was assigned to work at Hunters Point.

18

Declaration of Elbert Bowers

1  Specific to Taylor, all reporting HP supervisors – who likewise were aware of her fraudulent

2  qualifications – as well as her romantic connection to McWade, were asked to closely monitor

3  Taylor's activities and performance skills while in the field and, as was passed on by my

4

5  supervisor Bill Haney, continue to use her in roles "where she can't hurt us".

6  36.      In 2009 after I had rolled over from New World to Tetra Tech EC employment, my lead

7  HP field supervisor, Adam Berry, informed me that Tetra Tech EC management, primarily

8  Dennis McWade, saw to it that Taylor was assigned to work overseeing all Radiological

9

10  Screening Yard (RSY) activities. McWade did not first seek my concurrence before the

11  assignment of Taylor, and as in previous instances involving Taylor's retention for rad safety

12  work at Hunters Point, I was not in favor of this assignment and informed my - now Tetra Tech

13  EC direct report, License RSO Eric Abkemeier of Taylor's history and the current situation

14  involving McWade's action. I shared with Abkemeier the prior reports from the New World era

15  that Taylor did not know how to read a Ludlum RAD survey meter and that having difficulty

16  with this fundamental task could present serious consequences, as such skill sets are a central

17

18  prerequisite in the conduct of RSY work. Abkemeier advised that he would monitor and assess

19  the situation. I later learned from senior HPs Archie Jackson and Susan Andrews that during

20  this time Tetra Tech management no longer required HPs to collect soil samples at the RSY yard

21

22  that would be submitted to the lab, but instead, would rely heavily on unskilled laborers under

23  Taylor's oversight to perform this role - an act concealed from me that was occurring without my

24  knowledge or concurrence.

25  37.      My concerns regarding whether the RSY soil pad work was properly being performed

26  was increased due to the hiring of another individual that I believe was unqualified for the

27  position, and hired for non-qualification reasons. In 2009, Tetra Tech EC hired Thorpe Q.

28

19

Declaration of Elbert Bowers

1 Miller. I learned that I was to be the direct supervisor of Mr. Miller, but I had no involvement in
2 his hire, contrary to Tetra Tech EC procedures. Mr. Miller was hired and installed in the position
3 of Radiological Data Analyst that oversaw the data system for the RSY soil pad processing.
4
5 Miller's role included detailed work with extensive and sophisticated volumes of rad survey data,
6 and the development of maps from such data to, in part, identify specific towed array rad scan
7 locations for sample collection from soil pads presenting the highest probability of exhibiting
8 radioactive contaminants. From the knowledge I gained regarding Mr. Miller and the limited
9 skill sets he possessed, I concluded that he did not have the education, training, or experience for
10
11 the position he was hired into, nor for nearly any position at Hunters Point dealing with
12 radiological remediation and safety.

13 38.    I learned that Thorpe Miller was the son of Laurie Lowman, the Navy Radiological
14 Affairs Support Office, aka: "RASO," Lead Environmental Program Manager out of Yorktown,
15 VA - the person responsible for oversight of the RAD work at Hunters Point. I was informed
16 that Miller had been fired from his last job and possibly criminally charged for his conduct with
17 his prior retail store employer, which I heard was Target Stores. I concluded from the lack of
18 education, experience, and training of Miller, and that he was the son of the key Navy
19
20 representative overseeing the RAD related work of Tetra Tech at Hunters Point, that Miller was
21 hired by Tetra Tech to curry favor with Navy RASO Lowman.
22

23 39.    Throughout the time I remained at Hunters Point, I believed that Tetra Tech took active
24 steps to continue to curry favor with RASO Lowman. For example, at the end of 2009 I was to
25 do the performance evaluation of Thorpe Miller. I received clear pressure from General
26 Manager Bill Dougherty to give Miller a positive evaluation. Dougherty gave me a detailed
27 language template stating the performance achievements I was to use for the annual review. Due
28

20

Declaration of Elbert Bowers

1  to the pressure from Dougherty I gave Miller performance ratings what I considered to be more

2  than the most positive evaluation that his performance could have warranted, and I used the

3  template language that Dougherty had directed.  When I submitted the evaluation of Thorpe

4  Miller to Dougherty for approval Dougherty did not approve the evaluation but required upward

5  adjustments throughout the rating so that Miller would receive a pay raise above what his

6  performance warranted.  I did not take steps to block the upward adjustment that Dougherty

7  directed to Miller's appraisal as the process was transferred from me to my direct report, Eric

8  Abkemeier.

9

10

11  40.    A few months after the performance appraisal was done, Tetra Tech Vice President Andy

12  Bolt let me and other managers of Tetra Tech know that management of other companies

13  working at Hunters Point or seeking work at Hunters Point raised objections to the Navy and to

14  Laurie Lowman of RASO that the hiring of Thorpe Miller created a conflict of interest and as a

15  result Lowman, RASO and the Navy favored Tetra Tech due to the employment of Lowman's

16  son by Tetra Tech.  VP Bolt, along with Dougherty and the owners of IO Environmental

17  collaborated to have Miller formally "resign" from Tetra Tech, be "hired" and paid through IO

18  Environmental as an "employee" but perform the same work for Tetra Tech, at the same Tetra

19  Tech work desk and office at Hunters Point, to hide the conflict of interest.  The resignation from

20  Tetra Tech and immediate hire of Miller by IO Environmental was all orchestrated by VP Bolt to

21  continue to curry favor with RASO Lowman, but hide the obvious conflict of interest.  VP Bolt

22  wrote in an e-mail of April 23, 2010 that "Thorpe's resignation removes that appearance of

23  conflict.  Thorpe will be taking a job with another company, but will most likely be working as a

24  subcontractor for us.  This should provide enough layers that the appearance of a conflict is

25

26

27

28

21

Declaration of Elbert Bowers

removed, and will help out Laurie Lowman and us, both." I have attached a chain of emails related to the "resignation" that was orchestrated by Tetra Tech's VP Andy Bolt as Attachment 3.

41.     Tetra Tech continued efforts to curry favor with RASO Lowman in how it treated her son. RASO Lowman knew of the health and safety risks to the workers in RAD areas at Hunters Point, knew her son did not have training or experience with radiological hazards, and she did not want to have her son, Thorpe Miller, allowed to go onto Radiologically Controlled Areas. Miller was never issued a dosimeter badge that was required of anyone entering a RCA at Hunters Point. Nearly everyone working at Hunters Point other than secretarial staff were issued dosimeters for one reason or another as part of the job. Tetra Tech increased the efforts to curry favor with RASO Lowman by directing IO Environmental to not only hire Thorpe Miller, but to also hire the wife of Miller, the daughter-in-law of RASO Lowman, as a full-time archeologist to work at Hunters Point despite the fact that Hunters Point was virtually demolished and rebuilt during and post-World War II and as a result had little to no archeological importance. It was much more a standard practice for such projects with little obvious archeological importance for a company to contract with an archeologist to come on site if something was discovered during the project, and not to hire a full time archeologist.

42.     I was concerned that the combination of having Jane Taylor, whose rad background was a fraud, in charge of the RSY pad surveys and processing, and Thorpe Miller, who had no relevant experience or training, put over the data from the towed array and maps used in the RSY pad work to obtain samples, would result in defective RSY remediation of radiological contamination. However, due to the clear direction from Tetra Tech management that these two people were to do these important tasks, I, nor my direct report Eric Abkemeier, were able to block the assignments. It was reported to me over the following months in 2010 and 2011 that

Declaration of Elbert Bowers

1   soil that had been cleared of radiological contamination from the RSY pads were failing the

2   portal monitor screening at increasing rates.

3   43.     Soil that had some contamination other than radiological contaminants, such as oils,

4

5   PCBs, or asbestos, once processed on the RSY pads and cleared, went through a portal monitor

6   and was shipped off Hunters Point to third-parties that would receive soil that did not have

7   radiological contamination. Soil that did not have these other forms of contamination, once

8   processed through the RSY pad and the samples approved by the lab, were returned to Hunters

9   Point and used as backfill for the trenches on site. It was much less expensive for Tetra Tech to

10  have the soil falsely cleared for use as backfill, than to have the soil repeatedly subjected to

11

12  remediation of radiological contamination, and the associated time and expense of separating the

13  non-impacted soil from portions with elevated radioactive contaminants that would have to be

14  shipped to a low level rad waste landfill.

15

16  44.     After Jane Taylor and Thorpe Miller were in positions of responsibility over the RSY pad

17  processing, very, very high percentages of the soil removed from Hunters Point were deemed

18  "cleared" and used as backfill into the Hunters Point trenches. For example, attachments 4 and 5

19  to my declaration are e-mails of January 6, 2011 from Thorpe Miller. These e-mails show that a

20

21  total of 1,023 cubic yards of soil were processed on the RSY pads from units 190 and 187 from

22  Parcel UC3. The oversight of Taylor and Miller for the RSY pad processing resulted in only 10

23  remediated cubic yards of RAD contaminated soil, or less than .01% of the soil. Having such a

24  low level of soil remediated was a substantial cost savings to Tetra Tech under the firm fixed

25  price contracts with the Navy.

26

27  45.     I have had concerns regarding the qualifications of Jane Taylor and Thorpe Miller to

28  perform their roles regarding the RSY soil pad processing. I am concerned that due to a lack of

23

Declaration of Elbert Bowers

1   training, experience, skill, and commitment by these individuals that significant amounts of the
2   soil that was used as backfill at Hunters Point was not properly screened, sampled, and
3
    remediated. I am concerned that there may be large amounts of soil used as back-fill at Hunters
4
5   Point that did not meet the release criteria established by the Navy and regulators, and continues
6   to have radiological contamination that poses a health hazard.

7   46.      My concerns that soils processed on the RSY pads after Tetra Tech had Jane Taylor, who
8   the company knew was a fraud and incompetent, and Thorpe Miller, who the company knew as
9
    unqualified and hired to compromise Navy oversight of the work, and unskilled laborers
10
11  performing the soil sampling on the RSY pad, would result in hazardous radiological
12  contamination remaining in the soil that was backfilled at Hunters Point was not an academic
13  concern. I learned that highly radioactive contamination did remain in soil processed on the
14  RSY pad system that Tetra Tech "cleared" as free of radioactive contamination. For example,
15  Billy van Vo had worked with NWE and had moved his employment over to Shaw
16  Environmental, a company also performing some radiological remediation work at Hunters
17
18  Point. I learned the following from Mr. Vo, and from others who learned of this situation but
19  kept it quiet. Mr. Vo was with a Shaw junior HP on Hunters Point. The junior HP asked Mr. Vo
20  to show him how to work a radiological scanner in the field, which Mr. Vo had and was
21
22  experienced to use. Mr. Vo showed the junior HP some of the basics in the use of a Ludlum
23  radiological detection field instrument and let the junior HP give it a try in the field. Mr. Vo and
24  the junior HP were in an area of Hunters Point that had been trenched, and remediated by Shaw
25  Environmental. The soil that had been used to fill the trench was largely backfill that came from
26
27  the Tetra Tech managed RSY pads that Jane Taylor, Thorpe Miller, and the unskilled laborers
28  had processed. This soil, once "cleared" by the RSY processed lab samples simply goes back

                                          24

                                  Declaration of Elbert Bowers

into the Hunters Point ground as backfill without any further check or scanning. The junior HP, while conducting a walk-over scan of the freshly placed trench backfill, observed that radiation readings on his instrument had suddenly jumped off scale (aka "pegged out") due to the area radiation levels being so high. When further investigating the source of the high radioactivity, Mr. Vo and the junior HP discovered what proved to be an "old generation button" of the kind used by the military decades earlier throughout Hunters Point. Radiation emissions coming from the button were so excessively high (in the milli-Rem per hour, aka mR/hr, range), that the Ludlum sensor being used was inappropriate for accurate measurement. A better, more specialized monitoring device had to be secured so precise assessment of the highly elevated readings could be gained. Radium 226 was the radioactive contaminant associated with the improperly discarded button from years past that the RSY processing failed to remove as highly elevated radioactive waste. The NRC and EPA have long recognized that radium 226 has historically existed in soils and materials throughout the shipyard at Hunters Point due to actions by the Navy, and is the most common radioactive contaminant still being discovered during clean of Hunters Point. Radium 226 is also recognized by the International Commission on Radiological Protection (ICRP headquartered in Ottowa, Canada) and the National Council on Radiation Protection and Measurements (NCRP based in Bethesda, MD) as being of the "Very High Radiotoxicity" classification. The NRC and others specializing in this field know full well there is a distinct likelihood people can die of cancer from uncontrolled exposure to radium 226, as well as many of the other thirty-three radionuclide contaminants confirmed or expected by the Navy to be present throughout Hunters Point. Blood and bone cancers lead the way as at least two of the distinct health hazards from exposure to radium 226. Young children, old people, and persons saddled with generally poor health are particularly susceptible to increased medical

25

Declaration of Elbert Bowers

issues, complications, and even death due to exposure to radium 226. Human sensitivity factors relate proportionally to radionuclide toxicity. Detrimental health effects can result if Hunters Point radionuclides of concern are absorbed through the skin, inhaled, ingested, or introduced uncontrolled into the body by like means. Radium buttons of the type Mr. Vo unexpectedly discovered, and other residual radium contaminants still present throughout the shipyard (e.g., radium that has leached from devices and / or flaked off from old, improperly discarded, disintegrating buttons / deck markers as tiny but highly radioactive particles commingled in the Hunters Point soils) can very easily and unknowingly be absorbed, inhaled, ingested, etc if unknowingly gotten on ones hands, lips, nose, or mouth. I believe that Mr. Vo did not report this radium button incident to Shaw, the Navy or the NRC because he - like his co-workers - worried that exposing the fraudulent remediation at Hunters Point would result in loss of employment.

47.     I had concerns with other workers' qualifications as well. Bryan White, for example, originally was a New World Technology employee that Human Resources Director Kari Guidry retained based on his stated willingness to fill a junior HP position although, according to Guidry, White possessed Senior HP skills. Once provided the opportunity to review White's resume, in concert with my direct report, Bill Haney, no verifiable place of prior employment could be confirmed through which White's claimed RAD experience was gained. Despite my doubts about his work history, White was hired as a junior HP on May 27, 2008. As was the case with Jane Taylor's fast ascension from the junior to senior HP category, White was promoted to a senior HP position less than 12 weeks later, on August 11, 2008.

48.     Just before my Tetra Tech employment in March 2009 – and without my involvement or input, White resigned his New World position on February 20, 2009 to immediately "roll-over" as a Tetra Tech EC hire. (White would later be assigned to my staff as a Tetra Tech EC

Declaration of Elbert Bowers

1  employee with direction later given to me by Bill Dougherty that White would be the lead RAD

2  HP supervisor). Bill Dougherty, Tetra Tech EC's Construction Project Manager made the

3  decision to hire White and, contrary to license protocol, I was not consulted. As the designated

4
5  Project RSO (and NRC license RSO at the time), I should have been consulted to check that his

6  qualifications complied with Tetra Tech EC's minimum position-oriented requirements as well

7  as those listed in the Navy contract. As the potential direct supervisor of White, company

8  procedures provided that I was to be involved in the hiring decision. Taking into consideration

9
10 details from White's resume and prior experience, still not verifiable, I believed White was not

11 qualified to adequately perform the level of RAD supervisory work expected of him, and I would

12 not have given my approval to the hire and promotion of White to a RAD supervisor position for

13 Tetra Tech at Hunters Point.

14
   49.     During the following months, the performance of Bryan White evidenced deficits in his
15
16 skill, knowledge and abilities as a RAD supervisor. When annual performance reviews were to

17 be done at the end of the year I was tasked with developing the performance review for the RAD

18 supervisors, including White. When Bill Dougherty reviewed the draft performance evaluation I

19 did for White, Dougherty went to my computer and he personally changed the performance

20 evaluation and ratings to significantly increase and improve the ratings for White. Bill
21
22 Dougherty's changes to the performance appraisal were done to falsely depict the performance of

23 White and to promote White upwards 2 full pay scales to the level experienced RAD supervisors

24 were receiving at Tetra Tech EC. I did not agree with the conduct of Dougherty or the changes

25 he made to the performance evaluation of White. I discussed the circumstances with my Tetra
26
27 Tech EC direct report, Eric Abkemeier, who finished White's appraisal process in coordination

28 with Dougherty (retaining the excessive performance ratings for White). Dougherty conveyed his

27

Declaration of Elbert Bowers

expectation as well that White be designated as acting project RSO representative when I was away from Hunters Point - which I felt was contrary to White's lack of experience and competence (an event during which Abkemeier's involvement also became necessary).

50.     I also had questions about the qualifications of Tina Rolfe, who was hired as a senior HP. She was married to Steve Rolfe, a senior HP and he was later a RAD-safety field supervisor for New World Environmental, then as a Tetra Tech EC employee (RAD safety field supervisor). I believe Tina Rolfe was hired based on favouritism and her relationship with her husband, as well as the fact that her brother-in-law Jeff Rolfe and his wife were also employed to work at Hunters Point.

**Portal Monitor**

51.     The Navy required Tetra Tech EC to use a radiation-detection sensing Portal Monitor to screen vehicles designated for load carrying purposes (e.g., dump trucks, etc.) entering and leaving the shipyard to insure they were not carrying radioactive contaminants onto, or off the facility. The Portal Monitor was equipped with an alarm that activated if the sensors detected radiation at a level above the "natural background radiation" clearance standard. The procedure when a truck set off the alarm was to have the truck go through the Monitor again. If it failed two out of three passes, the truck's load was required to remain on the shipyard for further investigation of the source of the radioactive contamination alarm.

52.     A troubling event involving the Portal Monitor took place in early April 2009, the first week after I transitioned from employment as New World Environmental's RSO representative to becoming a Tetra Tech EC employee in the same RSO representative capacity. At the end of the day, management staff gathered in the project conference room - including Tetra Tech EC's

28

Declaration of Elbert Bowers

503

HP supervisors (Adam Berry, Bryan White, Justin Hubbard, and Steve Rolfe) to conduct a debrief specific to the day's activities. After one of the daily debriefs, Adam Berry came to my office looking very frustrated and worried. He told me that Dennis McWade, Tetra Tech EC's Construction Superintendent, directed a truck to leave the shipyard despite having set off the Portal Monitor alarm. Berry said that McWade told the responding HPs to stop surveying the truck and directed the driver to go ahead and leave the site, telling the HPs that it was the end of the shift and he needed the driver to "get off the clock."

53.     Berry and I went to confront McWade. He was in Tetra Tech EC Construction Project Manager Bill Dougherty's office. McWade acknowledged that he'd allowed the truck to leave the shipyard. This was but one example of many instances in which I learned and observed that McWade took steps to have things done quickly and with less expense, with disregard for radiological requirements and radiological safety. This was just one example of the Construction Department overriding proper radiological procedure in favor of a "production first" attitude.

**Changing Analytical Results**

54.     A lab technician, Neil Berrett, and a lab supervisor, Phil Smith, came to me on separate occasions with both complaining they were being asked by upper level project management consultants to "write away" laboratory analysis results by changing the results of sample analyses. In both instances, I asked if, before coming to me, they had attempted to resolve the issue directly with the consultant in question and each said they had not. I advised them that there were two options to achieve resolution. They could either pursue the matter directly with the consultant or all involved could meet with me to address the situation. Both chose not to have a meeting with all involved and myself. In later casual conversation I asked about the situation

29

1 and understood that the matter was resolved. I did not learn the specifics of what lab analysis or

2 data were written away or changes as they indicated. Since my termination from Tetra Tech,

3 however, I have learned of numerous instances in which lab results were ordered destroyed, and

4
5 other improper lab related conduct. Incredibly, and on a personal level, I have also come to

6 realize that employees who reported and resisted improper practices, including myself, were

7 fired. I now wonder if these two individuals chose not to pursue correction of the lab issues they

8 raised in order to remain employed at Hunters Point.

9
10
11 **Concerns Raised During Field Safety Checks**

12 55.      Part of my work as the Hunters Point project RSO representative (and, on occasion,

13 Tetra Tech EC's License RSO) was to do a daily field check to see if there was anything going

14 on contrary to license compliance and to make sure all Radiologically Controlled Areas, or

15
16 RCA's, were secure at the end of the day. During those field checks I noticed many times that

17 license requirements were not respected – so much so in the months prior to me being removed

18 from the project at Hunters Point, that I found myself constantly pondering why someone at my

19 level was discovering such obvious deficiencies that should have been caught/corrected well in

20 advance of identification by me.

21
22 56.      Some of the conditions I noted were dangerous. Building 217 was used to store

23 radioactive waste commodities (subject to NRC license controls) prior to being transported off

24 the shipyard. On or about March 17, 2010 after the field crews had left for the day and I was

25 doing my "end-of-day" RAD integrity field check, I discovered that RCA posted Building 217

26
27 had been left unsecured. We had a recurring problem with trespassers at the shipyard and they or

28 anyone else could have gained unimpeded access to the radiologically controlled interior

30

1  portions of the building and come in contact with radioactive material stored inside and subject

2  to controls dictated by Tetra Tech EC's NRC materials license.

3  57.    On two other occasions, I discovered similar problems at Building 217. On or about

4
5  March 23, 2010 I found the building unsecured; a padlock on the latch used to secure the front

6  sliding door was left open. On April 23, 2010, I again found the building unsecured; a window

7  was propped open and a table was underneath it outside of the building, an open invitation for

8  unauthorized people – in particular trespassers referred to as "Copper Miners" - to go inside.

9
10 58.    Unsecured areas were not only a problem at Building 217. On December 20, 2010, for

11 example, I noticed that the lock was not secured at Radiation Screening Yard 4, or "RSY-4" in

12 Parcel E; nor was the lock secured at the Utility Corridor work area gate.

13 59.    Twice, on or about November 18, 2010 and again on January 18, 2011, I discovered

14 operative employee drinking water stations improperly staged inside a conspicuously posted

15
16 Radiologically Controlled Area ("RCA"), in violation of the clearly posted prohibition of eating

17 or drinking within an RCA. The first time, I noted that the corresponding RAD posting sign had

18 also been tampered with. On both occasions, the ropes delineating the RCA had been improperly

19 repositioned - and without authorization. The second time, I was accompanied by Eric

20 Abkemeier, Tetra Tech's license Radiation Safety Officer ("RSO"), my direct technical report.

21
22 60.    On several occasions I discovered work going on that, as project RSO representative, I

23 should have been informed about before its initiation, but wasn't. For example, sometime in

24 2009, within what was called the "700 Triangle Area," I pointed out to Bill Dougherty and

25 Dennis McWade some sections within the area that had highly elevated RAD-soil contaminants,

26
27 which I knew of from prior work experience associated with the "open field" area - work

28 suspended by RASO immediately after the contaminated area was discovered. Despite the fact I

31

Declaration of Elbert Bowers


informed them of the RAD contaminants present, I noticed some days later there was intrusive soil movement activity going on in this location – again something I had "stumbled upon" – and likewise, without prior notification that such an activity was about to begin.

61.      On March 18, 2010 while doing my "end-of-day" RAD integrity field check, I found indications of intrusive activity having occurred earlier that day (in radiological terms, "intrusive activity" refers - in this instance, to "impacted area" earth movement during construction of an alternate access road throughway). The work was taking place in a Parcel E area posted for radiological controls. The objective was to construct a temporary access throughway to be used - by the University of California, San Francisco, which had (and still maintains) a facility on the shipyard. A temporary throughway was necessary because the existing entrance was going to be dug up and become impassable during upcoming sub-surface "utility corridor" RAD characterization and remediation work Tetra Tech EC was doing for the Navy. This was a new work area activity and during the afternoon debrief that same day, McWade, when asked if he had anything to share, said nothing while shaking his head from side to side to indicate he had no new information to add. No one else in attendance at the debrief indicated new work was occurring in that area. I had not been informed by McWade, any of the RAD supervisors reporting to me, or anyone else that work involving the breach of a Hunters Point property boundary barricade had begun.

62.      Prior to starting the new work, the outermost boundary of the radiologically impacted work area extended up to portions of Hunters Point property boundary fencing – a double fence barricade separating public properties from Hunters Point Shipyard. As part of "right-to-know" communication, yellow and magenta RAD signs were posted on the inside portion of the

32

1   outermost property boundary fence – facing away from Hunters Point toward the general public

2   side to alert that the shipyard side of the barricade was a Radiologically Controlled Area (RCA).

3
4   63.    The site previously had a permanently installed high integrity inner and outer fence

5   representative of clearly established boundary barricades conspicuously posted to warn of RAD-

6   oriented hazards within. On March 18, 2010, however, contrary to the definition of a secured

7   boundary, significant portions of both the inner and outer fence had been extracted and signs of

8   initial "heavy equipment" earth movement were evident. Flimsy overlapping fence panels, some

9
10  held together with low grade hand-twisted wire and some not wired together at all, were staged

11  in place of the outermost barricade. Nothing was erected in place of the permanent inner fence

12  portion now missing as well.   The original RAD postings from the removed permanent fencing

13  sections appeared to have been forcibly ripped away, with one posting now on the ground in

14  some nearby overgrowth, and the other "dangling" from the edge of a permanent inner fence

15  section left intact.

16
17  64.    Within the next day or so, Anthony Smith was assigned to the area and found sources of

18  radioactive material located between the inner and outer property boundary fence being worked.

19  The source was fire brick that had not been detected before Smith did his survey that day.

20  65.    I was alarmed by the severity of NRC license compromise that was obviously and

21  knowingly left un-remedied by Tetra Tech EC RAD supervisor Justin Hubbard (and each RAD-

22  trained project employee working alongside him, and McWade). If I had not "stumbled across it"

23  and corrected the deficiencies, I have no doubt whatsoever that had the NRC encountered exactly

24  what I did that same day and time, serious implications would have resulted for Tetra Tech EC

25  and its NRC license.

26
27
28

33

66.     Similarly, on or about June 25, 2010, I discovered after-hours work involving unimpeded access to "RAD-impacted" areas of the project site. Work was being performed by a non-project utility provider. Allowed to access the shipyard as "visitors," the service team was not under the direct escort and supervision of a RAD-safety designated Tetra Tech EC representative. The incident was occurring along Parcel E's "Utility Corridor Roadway." Unattended Pacific Gas and Electric personnel were in lift-buckets extending around and above conspicuously posted RCA work areas created by Tetra Tech EC. The Pacific Gas and Electric crews were working on overhead wiring in multiple locations. I was not advised of plans for this after-hours work to occur and, as in earlier incidents, happened to "stumble" upon what was happening. As project RSOR, once again I should have been informed so I could assess the planned activity and ensure adequate HP support had been arranged to accompany the "visitor designated" Pacific Gas and Electric crews.

67.     During the portion of my Hunters Point tenure while I was a Tetra-Tech-EC employee, increasingly disturbing discoveries of what were, simply put, purely avoidable non-compliance issues escalated, reflecting "attention to detail" lapses of the type not expected of "ANSI 3.1-designated" professionals. What I found during "in field" inspections involved, in part, the improper posting of RAD-controlled areas, most often those being actively worked.

68.     Recurring posting compromises, typically discovered during days' end "RAD integrity" field checks, were both surprising and unacceptable. Prior to leaving for the day, corresponding RAD-safety supervisors, as well as their assigned HP's, and fellow RAD-trained work crews, were personally and repeatedly reminded during morning safety tailgates to secure work areas and verify intact RAD postings at shift's end. Nevertheless, it was me, the project RSO, who was

34

Declaration of Elbert Bowers

1  way too often "happening upon" these compromising conditions which -- if left uncorrected,

2  would represent a violation of Tetra Tech EC's NRC license.

3  69.  For example, on or about September 16, 2009, I noticed that the RAD posting at an area

4

5  referred to as "Installation Removal 7," or "IR-07" in the Parcel B portion of the shipyard did not

6  compliantly reflect "right-to-know" postings warning of RAD safety hazards (for project cleanup

7  purposes, the Hunters Point Shipyard was divided into Parcels A-G). I documented and corrected

8  the right-to-know" compromise. In another example, I likewise discovered and had to personally

9

10  correct a non-compliant RAD posting scenario on or about April 7, 2010 at  Radiation Screening

11  Yard 4, or "RSY-4", in Parcel D.

12  70.  There were also instances where RAD posting "discrepancies," and active work activities

13  involving NRC licensees Tetra Tech EC and Shaw Environmental (a Tetra Tech EC competitor),

14  came to be in conflict. One example occurred on December 1, 2010, when I observed heavy

15

16  equipment (Shaw Environmental rentals), being used to transfer imported fill sand, entering and

17  exiting a posted RAD "Contaminated Area" in Parcel E. More often referred to as the Installation

18  Removal 2, or IR-02, portion of the shipyard, the activity, which was occurring without the

19  presence of Shaw Environmental RAD-safety oversight, allowed for multiple large-capacity

20

21  dump trucks to deliver "clean" import sand (originating from an offsite source) directly into the

22  muddy, rain saturated Shaw Environmental RCA. Then the trucks exited the same

23  "Contaminated Area" location without first being RAD-monitored for contamination of the

24  transport tires and "foot traffic" shoe soles. Tetra Tech EC had work occurring alongside the

25  observed Shaw Environmental IR-02 activity, inside a location referred to as the Parcel E

26

27  "Triangle Area." The "Triangle Area" was also posted as a RCA subject to radiological controls,

28  but survey monitoring did not indicate elevated contaminants warranting "Contaminated Area"

35

designation. Intersecting the Shaw Environmental and Tetra Tech EC work area RCA's was a "non-impacted" roadway (constructed with placement of a high durability liner covered with clean import sand and gravel). A critical purpose of the "non-impacted" roadway was to allow for vehicle movement (e.g., those associated with project staff transport, security patrols, management inspections, VIP "windshield" tours, RAD integrity checks, rental equipment delivery and pick up, etc.) throughout "high contaminant probability" shipyard locations with reduced risk of source contaminant transfer to vehicle tires (e.g., metal slivers in tire treads originating from rusty, deteriorated deck markers, dials, and like items haphazardly disposed of over the decades, although associated with very highly radiotoxic Ra-226 contaminants, etc.). As is industry standard, project personnel and equipment associated with "intrusive activities" inside RAD "impacted areas" at Hunters Point always required RAD clearance monitoring before crossing back into a "non-RAD impacted" area. In this situation, which was clearly incompatible with general RAD safety practices and expected NRC licensee protocol, the referenced Shaw Environmental activity compromised established and recognized industry standards designed to reliably prevent uncontrolled RAD contaminant migration.

71.     There was also another example adversely impacting the same Shaw Environmental "IR-02" and Tetra Tech EC "Triangle Area" locations. In December 2010, there was a series of unusually strong winter storms bringing heavy downpours of rainwater. Beginning on December 17, 2010 and continuing through about December 21st, I witnessed storm water that had accumulated in Shaw Environmental's RAD "Contaminated Area" overflowing from IR-02 onto the "non-impacted" roadway. In concert with each subsequent downpour, the storm water was "ponding" so much so that, at its peak, its mass engulfed not only large portions within the Shaw Environmental RAD "Contaminated Area" and the "non-impacted" roadway, but also consumed

36

Declaration of Elbert Bowers

adjoining surfaces extending into the Tetra Tech EC "Triangle Area" (still under RAD controls, but not with "Contaminated Area" designation). This example was clearly incompatible with general RAD-safety practices and expected NRC licensee protocol. The disintegrating conditions that resulted due to Shaw Environmental's work strategy compromised established and recognized industry standards designed to reliably prevent uncontrolled RAD contaminant migration.

**Removal from the Shipyard**

72.    On January 12, 2011, another event occurred near "the triangle area" when I was doing my end-of-day field check. I saw two Tetra Tech trucks driving through an area with radiological concerns in Parcel E. As RSOR, I should have been aware of any activity taking place at that location, but I was not and the HP in charge of the area, Justin Hubbard, was not there to monitor the activity. The next morning I attended the regular supervisors meeting and questioned Hubbard about the finding I had made the night before. He just "blew up," verbally attacking me saying that there were not any radiological concerns at this place because this area has been downgraded. This wasn't the case. It was the culmination of increasing problems I had been finding. Bill Dougherty, the Project Manager, heard the commotion and came into the room. He sided with Hubbard and told me, "You seem to have concerns about all of this because it's your name that's on the license. I can arrange to have it removed," or words to that effect. I took this as a threat to my job.

73.    Later, I went to Bill Dougherty's office and told him that if we didn't get this issue resolved, as RSOR I'd be obligated to call the NRC to notify them of the license non-compliance. Dougherty replied with words to the effect, "Call the NRC, call anyone you want,

37

Declaration of Elbert Bowers

1    but while you're at it, pack your shit and get the hell off my project." I was removed from my

2    post as Tetra Tech's RSOR at HPNS and transferred to its project at Alameda Naval Air Station,

3    where I worked for a time before getting laid off entirely.

4

5

6    **5-Minute Intervals Between Taking Soil Samples**

7    74.    I was not aware of this at the time, but after I left Tetra Tech EC I learned that numerous

8    chain-of-custody, or "COC," documents for soil samples claimed they were taken every 5

9    minutes precisely. COCs stated, for example, that certain soil samples were taken at 10:00 am,

10   then at 10:05, 10:10, 10:15 and every 5 minutes thereafter. Based on my training, experience and

11   familiarity with the sampling procedures specified in the site's "Basewide Radiological Work

12   Plan," I believe it was impossible to take soil samples every 5 minutes. Decontamination

13   between sample-taking alone was likely to take far beyond 5 minutes if done properly.

14   Decontamination under the Work Plan was a 5-step process: 1) sampling equipment was scanned

15   using a hand-held meter; 2) the equipment would then be washed with a solution of non-

16   phosphate detergent and water; 3) it would be rinsed with potable water; 4) it would be rinsed a

17   second time with potable water; and 5) it would be set aside on a clean plastic covered surface

18   and be allowed to air dry. In my experience, air drying alone could take 5 – 10 minutes,

19   depending on the weather conditions. Had I known that COCs claimed soil samples were

20   purportedly taken exactly 5 minutes apart, it would have raised immediate red flags that either

21   the COCs were filled out in error, which would violate proper COC procedures, or that sampling

22   was done fraudulently.

23

24

25

26

27

28

<center>38</center>

<center>Declaration of Elbert Bowers</center>



Fraudulent Class 1, 2 and 3 Building Scans

75.      Among the projects Tetra Tech undertook at Hunters Point was one involving building surveys to be done in three stages: Class 1, Class 2 and Class 3.

76.      The contract between the Navy and Tetra Tech defined Classes 1, 2, and 3 differently from the way supervisors in the field may have used the terms. Under the contract, Classes 1, 2, and 3 were defined in large part based on information as to whether the area was known to be contaminated with radioactivity, suspected to be contaminated, or not believed to have contamination above free release levels, respectively. However, in practice, HP supervisors appear to have considered investigation of the floor and walls up to 2 meters high (or about six feet) to be Class 1, the upper walls to be class 2 and the ceiling and roof to be Class 3.

77.      I was not aware of it at the time, but since I left Hunters Point I have learned that project HPs conducted fraudulent building surveys. Senior HP Anthony Smith informed me that his supervisor, Steve Rolfe, told Smith and his survey team to forgo doing Class 2 and 3. Rather, Smith and his team were instructed to "just get some numbers and get it done." They did what they were told and reported fraudulent numbers for those surveys of record. Smith informed me that among the buildings for which he was told to "just get some numbers," I recall included buildings in the 500 series and their footprints, 351, 351A, 411, 401, 414, 406, 144, 146, 130, 113, 103, 146, 521 and possibly building 203, though he's said he was not certain about that site. Anthony Smith has told me that when Smith challenged this practice, he said Tetra Tech EC RAD Safety Supervisor Steve Rolfe told him, "That's what Bill Dougherty 9Tetra Tech EC's Construction Project Manager) wants."

78.      Smith also told me that HP Rick Zahensky told him that he, Zahensky, also reported false data for RAD surveillance associated with Building 707. On yet another occasion, Rolfe told

Declaration of Elbert Bowers

1   Zahensky and Smith "just set your meter down on the ground and let it count," or words to that

2   effect. Zahensky and Smith did so and reported the fraudulent data that resulted.  I was not aware

3   of this fraud, and not aware that the supervisors under me were following the directions of

4
5   construction management, namely Dougherty and McWade.  I am saddened to conclude that the

6   HP supervisors with whom I worked effectively lied to and misled me by not informing me of

7   these improper practices of fraudulent sampling and scanning that they were directing to be

8   done.

9

10

11  **Unqualified Laborers Doing Sampling**

12  79.     After I left HPNS, I also became aware that Tetra Tech EC used untrained laborers to

13  take soil samples. This was a violation of proper procedure, as only HPs were qualified to do

14  sampling.

15

16

17  **Complaint to the NRC**

18  80.     As both a License RSO and Project RSO representative while at Hunters Point, I felt I

19  shouldered some degree of responsibility and accountability for any violations of the NRC

20  license and felt obligated to report it according to regulatory protocol detailed in NRC form 3. I

21  tried to share my concerns with the NRC, which conducted a Tetra Tech EC requested

22
23  "inspection" (not to be confused with investigation, and requested by Tetra Tech to trick the

24  NRC into finding fault with me, and ignore the frauds of the company) from March 29 through

25  March 31, 2011. After this inspection, NRC inspectors Bailey and Nicholson came to talk to me

26  in Alameda, CA after normal work hours. They asked me about the concern I had about Tetra

27  Tech EC's radiation safety program but they limited the meeting to about 90 minutes. This only

28

Declaration of Elbert Bowers

1  face-to-face meeting with NRC representatives - who appeared technically astute in rad-safety

2  matters and proper remediation procedures, did not remotely provide a sufficient platform

3  needed to fully capture the magnitude and depth of licensee oriented RAD-safety concerns which

4  in my opinion continue to pose very likely, long-term, detrimental health threats to all having

5

6  had a physical presence at the shipyard while fraud was committed (as well as consequential

7  threats impacting the surrounding environment and the general public nearby).  The Special

8  Agent, whom I met with in subsequent face-to-face meetings on behalf of the NRC admitted he

9

10  possessed no RAD-oriented background whatsoever. I never had the opportunity to fully share

11  all my concerns. I tried to reach NRC officials, leaving numerous messages, but an

12  overwhelming majority of my efforts went unanswered.  I don't think the NRC took my

13  complaints about Tetra Tech seriously, nor do I think that a real or thorough enough

14  investigation was conducted by the NRC at that time and for the years thereafter, to the present.

15  I understand that in June of 2016, Anthony Smith met with the NRC and explained in great detail

16  a number of these radiological frauds addressed throughout these declarations, but the NRC has

17

18  not subsequently contacted me or followed up with Susan Andrews (who I know also reported to

19  the NRC in 2011 her concerns of similar wrongful RAD practices at Hunters Point by Tetra

20  Tech).

21         I declare under penalty of perjury that the foregoing is true and correct. Executed on

22

23

24  _June 19, 2017_ in _Six Mile, SC_

25  Date                  City and State

26

27                                        _Elbert Bowers_

28

41

Declaration of Elbert Bowers

# EXHIBIT 4

1   BRIAN J. STRETCH (CABN 163973)
    United States Attorney
2
    BARBARA J. VALLIERE (DCBN 439353)
3   Chief, Criminal Division

4   PHILIP J. KEARNEY (CABN 114978)
    MATTHEW L. MCCARTHY (CABN 217871)
5   Assistant United States Attorneys

6       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
7       Telephone: (415) 436-7023
        FAX: (415) 436-7234
8       Philip.kearney@usdoj.gov

9   Attorneys for United States of America

**FILED**

MAY 18 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

10                  UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14
    UNITED STATES OF AMERICA,                    )  NO. CR 17-0278 JD
15                                               )
        Plaintiff,                               )  PLEA AGREEMENT
16                                               )
        v.                                       )
17                                               )
    JUSTIN E. HUBBARD,                           )
18                                               )
        Defendant.                               )
19                                               )

20
        I, Justin E. Hubbard, and the United States Attorney's Office for the Northern District of

21  California (hereafter "the government") enter into this written Plea Agreement (the "Agreement")

22  pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

23  The Defendant's Promises

24      1.      I agree to plead guilty to Count One of the captioned Information charging me with me

25  with destruction, alteration, or falsification of records in federal investigations and bankruptcy, in

26  violation of 18 U.S.C. § 1519. I agree that the elements of the offense are as follows: (1) I knowingly

27  altered, falsified, or made a false entry in a record or document; (2) with the intent to impede, obstruct,

28
    PLEA AGREEMENT
    CR 17-0278 JD                              1

1 | or influence the investigation or proper administration of any matter or in contemplation of or in relation

2 | to any such matter; (3) within the jurisdiction of an agency of the United States.

3 |     I agree that the maximum penalties are as follows:

4 |         a.    Maximum prison term           20 years

5 |         b.    Maximum fine                $250,000, or twice gain/loss

6 |         c.    Maximum supervised release term    3 years

7 |         d.    Restitution.                  To be determined

8 |         e.    Mandatory special assessment      $100

9 |         f.    Forfeiture

10 |     2.    I agree that I am guilty of the offense to which I am pleading guilty, and I agree that the

11 | following facts are true:

12 |     I have been working in the nuclear industry since approximately 1989, after completing my

13 | formal education. During my twenty-five years in the industry, I have conducted decontamination work

14 | at nuclear power plants, medical laboratories handling radioactive material, and a 'Superfund Site,"

15 | among other activities. During that same period, I have received training in radiation contamination

16 | control, the proper handling of radiological waste, and the assessment of radionuclides in the

17 | environment.. I have also supervised others in these activities.

18 |     In approximately 1994 or 1995, I began performing nuclear remediation work at the former

19 | Hunter's Point Naval Shipyard ("HPNS"), located in the Bayview District of San Francisco, California.

20 | My first employer at HPNS was New World Environmental, Inc. ("New World"). After approximately

21 | four years with New World, I was hired by Tetra Tech EC, Inc. ("Tetra Tech"), as a Radiological Task

22 | Supervisor at HPNS. As a supervisor at Tetra Tech, I was in charge of a team of radiation control

23 | technicians ("RCTs") engaged in the radiological remediation of soil at HPNS. I was aware that Tetra

24 | Tech had been hired by the United States Navy ("U.S. Navy") to perform the radiological remediation at

25 | HPNS. My employment with Tetra Tech terminated in December 2013.

26 |     While working for Tetra Tech, I reported to a Tetra Tech HPNS Project Manager, and a Tetra

27 | Tech HPNS Lead Field Superintendent, among others. The RCTs I supervised worked for Tetra Tech

28 | subcontractor Radiological Survey & Remedial Services, LLC ("RSRS").

1    I understood that the radiological remediation of HPNS was being conducted by Tetra Tech for

2    the U.S. Navy under established sampling guidelines and protocols. My job at HPNS required me to

3    comply with a Task Specific Plan ("TSP") which identified, for a Building Series or Area, the number

4    and type of survey units that were to be sampled at specific locations. In general, I would receive

5    directions on a daily basis, including a survey unit map, identifying the sampling locations for a

6    particular survey unit. Once the Tetra Tech engineers marked these locations, I would supervise the

7    sampling of them by my RCTs.

8    The RCTs were expected to take soil from each marked sampling location, bag and label the

9    sample, and then send it to a laboratory for an analysis of, among other data, any radionuclides of

10   concern. Chain of custody ("COC") forms and tags showing the precise location of each soil extraction

11   as identified on the survey map were required for each sample. I was aware that information from the

12   chain of custody forms, including the sample locations, was incorporated into the sampling analysis

13   reports prepared by Tetra Tech and emailed to the U.S. Navy.

14   During my work at HPNS, I was aware of U.S. Navy testing protocols which mandated that if a

15   laboratory analysis determined a sample of collected soil to be "hot"—that is, containing a higher-than-

16   allowable level of radionuclides of concern—then additional remediation, including more sampling, of

17   that survey unit was to be undertaken until all new collected samples passed laboratory analysis.

18   During 2012, in direct contravention of the relevant U.S. Navy testing protocols, I obtained

19   "clean" dirt from an area north of Buildings 253 and 211 at HPNS and substituted it for dirt taken from

20   survey units in the North Pier area of HPNS. To effect this illegal switching, I drove my company truck

21   to the area north of Buildings 253 and 211 and filled a five-gallon bucket with "clean" serpentinite soil

22   from an area I knew to be outside the relevant marked survey unit. I then drove the clean dirt back to a

23   "conex box"-style trailer. Once I was inside the conex, I emptied the "legitimate" soil samples

24   previously collected by RCTs from their sampling bags into an empty bucket, and substituted the clean

25   serpentinite soil into each sampling bag.

26   I did not alter the markings made earlier on the sampling bags by the RCTs, which included the

27   sample number, time, and date. I then placed a bar code sticker on an outer bag for each sample. A

28   copy of this bar code sticker was also affixed to a chain of custody ("COC") form for each sample. The

PLEA AGREEMENT
CR 17-0278 JD                                    3

1  sticker was meant to identify the survey unit location the soil was taken from. By switching the soil

2  inside the sampling bag, I knew that the data on the COCs, many of which I signed, was false. I also

3  knew that the false data on these COCs was incorporated into maps and reports made by Tetra Tech and

4  submitted to the U.S. Navy for the purpose of demonstrating that the area had been successfully

5  remediated.

6      On or about May 31, 2012, I fraudulently switched soil for four survey units on the North Pier of

7  HPNS: Survey Units 1, 8, 10, and 11. For Survey Unit 1, I specifically recall replacing the soil samples

8  28-47 with soil I had collected from a clean area.

9      3.    I agree to give up all rights that I would have if I chose to proceed to trial, including the

10 rights to a jury trial with the assistance of an attorney; to confront and cross-examine government

11 witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth

12 Amendment claims; to any further discovery from the government; and to pursue any affirmative

13 defenses and present evidence.

14     4.    I agree to give up my right to appeal my conviction, the judgment, and orders of the

15 Court, as well as any aspect of my sentence, including any orders relating to forfeiture and/or restitution,

16 except that I reserve my right to claim that my counsel was ineffective.

17     5.    I agree not to file any collateral attack on my conviction or sentence, including a petition

18 under 28 U.S.C. § 2255 or 28 U.S.C. § 2241, except that I reserve my right to claim that my counsel was

19 ineffective. I also agree not to seek relief under 18 U.S.C. § 3582.

20     6.    I agree not to ask the Court to withdraw my guilty plea at any time after it is entered. I

21 understand that by entering into this Agreement: (a) I agree that the facts set forth in Paragraph 2 of this

22 Agreement shall be admissible against me under Fed. R. Evid. 801(d)(2)(A) in any subsequent

23 proceeding, including at trial, in the event I violate any of the terms of this Agreement, and (b) I

24 expressly waive any and all rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 with regard to the

25 facts set forth in Paragraph 2 of this Agreement in such subsequent proceeding. I understand that the

26 government will not preserve any physical evidence obtained in this case.

27     7.    I understand that the Court must consult the United States Sentencing Guidelines and

28 take them into account when sentencing, together with the factors set forth in 18 U.S.C. § 3553(a). I

PLEA AGREEMENT
CR 17-0278 JD                    4

1    also understand that the Court is not bound by the Guidelines calculations below; the Court may

2    conclude that a higher Guidelines range applies to me, and, if it does, I will not be entitled, nor will I ask

3    to withdraw my guilty plea. I further agree that regardless of the sentence that the Court imposes on me,

4    I will not be entitled, nor will I ask, to withdraw my guilty plea. I will not request a downward departure

5    under the Sentencing Guidelines from the total offense level computed by the Court, although I reserve

6    the right to seek a downward variance based on the factors set forth in 18 U.S.C. § 3553(a). I

7    understand that the government is free to oppose any such request.

8         The following describes the parties' agreements regarding the applicable Sentencing Guidelines

9    calculations. As described further below, the parties have reached no agreement regarding whether the

10   two-level upward adjustment for abuse of a position of trust or use of a special skill under U.S.S.G. §

11   3B1.3 applies, and the parties will submit arguments to the Court regarding the application of this

12   adjustment. Accordingly, this possible Guidelines adjustment is bracketed below. I agree that my

13   adjusted offense level may be as low as 13 and as high as 15.

14        The parties have reached no agreement regarding my Criminal History Category.

15        a.    Base Offense Level, U.S.S.G. § 2J1.2(a):                              14

16        b.    Fabrication of substantial number of records, U.S.S.G. § 2J1.2(b)(3)          2

17        c.    Adjustments under U.S.S.G. Ch. 3 (e.g. role in the offense)

18                   -3B1.3: Abuse of Position of Trust or Use of Special Skill          [2]

19        d.    Acceptance of Responsibility:                                        -3

20              If I meet the requirements of U.S.S.G. § 3E1.1, I may be entitled to a three
              level reduction for acceptance of responsibility, provided that I forthrightly
21            admit my guilt, cooperate with the Court and the Probation Office in any
              presentence investigation ordered by the Court, and continue to manifest an
22            acceptance of responsibility through and including the time of sentencing.

23        e.    Adjusted Offense Level:                                          [13 / 15]

24        8.    I agree that regardless of any other provision of this Agreement, the government may and

25   will provide the Court and the Probation Office with all information relevant to the charged offense and

26   the sentencing decision, including any victim impact statements and letters from the victims, and/or their

27   friends and family.

28

PLEA AGREEMENT
CR 17-0278 JD                          5

1      9.    I agree that I will make a good-faith effort to pay any fine, forfeiture, or restitution I am

2  ordered to pay.  I agree to pay the special assessment at the time of sentencing.

3      10.    I agree not to commit or attempt to commit any crimes before sentence is imposed or

4  before I surrender to serve my sentence.  I also agree not to violate the terms of my pretrial release; not

5  to intentionally provide false information to the Court, the Probation Office, Pretrial Services, or the

6  government; and not to fail to comply with any of the other promises I have made in this Agreement.. I

7  agree that if I fail to comply with any promises I have made in this Agreement, then the government will

8  be released from all of its promises in this Agreement, including those set forth in the Government's

9  Promises Section below, but I will not be released from my guilty plea.

10      11.    I agree that this Agreement contains all of the promises and agreements between the

11  government and me, and I will not claim otherwise in the future.  No modification of this Agreement

12  shall be effective unless it is in writing and signed by all parties.

13      12.    I agree that the Agreement binds the U.S. Attorney's Office for the Northern District of

14  California only, and does not bind any other federal, state, or local agency.

15  The Government's Promises

16      13.    The government agrees not to file any additional charges against the defendant that could

17  be filed as a result of the investigation that led to the captioned Information:

18      14.    The government agrees to recommend a sentence within the range associated with the

19  Guideline calculations set out in paragraph 7 above, unless the defendant violates the terms of the

20  Agreement above or fails to accept responsibility.

21  The Defendant's Affirmations

22      15.    I agree that my participation in the District Court's Conviction Alternative Program is not

23  appropriate and that I will not request to be considered for and will not participate in that program as a

24  result of my convictions for these offenses.

25      16.    I confirm that I have had adequate time to discuss this case, the evidence, and the

26  Agreement with my attorney and that my attorney has provided me with all the legal advice that I

27  requested.

28      17.    I confirm that while I considered signing this Agreement, and at the time I signed it, I

PLEA AGREEMENT
CR 17-0278 JD              6

1   was not under the influence of any alcohol, drug, or medicine that would impair my ability to understand

2   the Agreement.

3       18.   I confirm that my decision to enter a guilty plea is made knowing the charges that have

4   been brought against me, any possible defense, and the benefits and possible detriments of proceeding to

5   trial. I also confirm that my decision to plead guilty is made voluntarily, and no one coerced or

6   threatened me to enter into this Agreement.

7

8   Dated: 5-18-2017

             JUSTIN E. HUBBARD
             Defendant

9

10

11                BRIAN J. STRETCH
             United States Attorney

12

13   Dated: 5/18/17

             PHILIP J. KEARNEY
             MATTHEW L. MCCARTHY
             Assistant United States Attorneys

14

15       19.   I have fully explained to my client all the rights that a criminal defendant has and all the

16   terms of this Agreement. In my opinion, my client understands all the terms of this Agreement and all

17   the rights my client is giving up by pleading guilty, and, based on the information now known to me, my

18   client's decision to plead guilty is knowing and voluntary.

19

20   Dated: 5-18-2017

             By
             for KENNETH LONG
             Attorney for Defendant

21

22

23

24

25

26

27

28

PLEA AGREEMENT
CR 17-0278 JD           7

# EXHIBIT 5

1  BRIAN J. STRETCH (CABN 163973)
   United States Attorney
2
   BARBARA J. VALLIERE (DCBN 439353)
3  Chief, Criminal Division

4  PHILIP J. KEARNEY (CABN 114978)
   Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-7023
7       Fax: (415) 436-7234
        philip.kearney@usdoj.gov
8
   Attorneys for the United States
9

                    **FILED**

                  MAR 15 2017

                 SUSAN Y. SOONG
              CLERK, U.S. DISTRIC  COURT
          NORTHERN DISTRICT OF CALIFORNIA

10               UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

14  UNITED STATES OF AMERICA,              )  NO. CR 17-0123 CRB JD
15                                         )
         Plaintiff,                        )  PLEA AGREEMENT
16                                         )
         v.                                )
17                                         )
    STEPHEN C. ROLFE,                      )
18                                         )
         Defendant.                        )
19  _____    )

20      I, Stephen C. Rolfe, and the United States Attorney's Office for the Northern District of

21  California ("the government") enter into this written plea agreement (the "Agreement") pursuant to

22  Rules 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

23  The Defendant's Promises

24      1.      I agree to plead guilty to Count One of the captioned Information charging me with

25  destruction, alteration, or falsification of records in federal investigations and bankruptcy, in violation of

26  18 U.S.C. § 1519. I agree that the elements of the offense are as follows: (1) I knowingly altered,

27  falsified, or made a false entry in a record or document; (2) with the intent to impede, obstruct, or

28  influence the investigation or proper administration of any matter or in contemplation of or in relation to

    PLEA AGREEMENT
    CR

1 | any such matter; (3) within the jurisdiction of an agency of the United States.

2 |       I agree that the maximum penalties are as follows:

| | | |
|---|---|---|
| 3 | a. | Maximum prison term | 20 years |
| 4 | b. | Maximum fine | $250,000, or twice gain/loss |
| 5 | c. | Maximum supervised release term | 3 years |
| 6 | d. | Restitution | To be determined |
| 7 | e. | Mandatory special assessment | $100 |
| 8 | f. | Forfeiture | |

9 |    2.    I agree that I am guilty of the offense to which I am pleading guilty, and I agree that the

10 | following facts are true:

11 |       In or about September or October 2007, I was hired by Radiological Survey and Remedial

12 | Services, LLC., commonly known as RSRS. Thereafter, in approximately 2008, I became a supervisor

13 | at Tetra Tech EC, Inc. ("Tetra Tech"), in charge of a team of radiation control technicians ("RCTs")

14 | engaged in the radiological remediation of soil at the former Hunters Point Naval Shipyard ("HPNS")

15 | located in the Bayview District of San Francisco, California. I served in that role until approximately

16 | August 2014. I was aware that Tetra Tech had been hired by the United States Navy ("U.S. Navy") to

17 | perform the radiological remediation at HPNS.

18 |       While working for Tetra Tech, I reported to a Tetra Tech HPNS Project Manager, and a Tetra

19 | Tech HPNS Lead Field Superintendent, among others. During this time period, RSRS was a sub-

20 | contractor of Tetra Tech and I supervised several RSRS RCTs.

21 |       I understood that the radiological remediation of HPNS was being conducted by Tetra Tech for

22 | the U.S. Navy under established sampling guidelines and protocols. My job at HPNS required me to

23 | comply with a Task Specific Plan ("TSP") which identified, for a Building Series or Area, the number

24 | and type of survey units that were to be sampled at specific locations. In general, I would receive

25 | directions on a daily basis, including a survey unit map, identifying the sampling locations for a

26 | particular survey unit. Once the Tetra Tech engineers marked these locations, I would supervise the

27 | sampling of them by my RCTs.

28 |       Once the engineers had marked the survey unit sampling locations, the RCTs were expected to

PLEA AGREEMENT
CR

1   take soil from each marked sampling location, bag and label the sample, then send it to a laboratory for

2   an analysis of, among other data, any radionuclides of concern. Chain of custody forms and tags

3   showing the precise location of each soil extraction as identified on the survey map were required for

4   each sample. In addition to these chain of custody forms and tags, I was also required to fill out a daily

5   "Building/Site Area Report and Survey Unit Tracking Sheet ('survey unit tracking sheet')," which

6   indicated the number of samples taken each day from a specific survey unit to document my team's

7   daily activities. I was aware that information from the chain of custody forms, including the sample

8   locations, was incorporated into the sampling analysis reports made by Tetra Tech and emailed to the

9   U.S. Navy.

10        During my work at HPNS, I was aware of U.S. Navy testing protocols which mandated that if a

11   laboratory analysis determined a sample of collected soil to be "hot"—that is, containing a higher than

12   allowable level of radionuclides of concern—then additional remediation, including more sampling, of

13   that survey unit was to be undertaken until all new collected samples passed laboratory analysis.

14        During 2012, I told the RCTs on my team to get "clean dirt" from areas known to be clean and

15   taken from outside the marked survey-unit areas to use as substitute samples for the dirt from the marked

16   survey unit. I did this so that the survey unit would pass the laboratory analysis and not require further

17   remediation.

18        I am aware of at least two different sources of dirt for clean samples, "green dirt" from certain

19   locations known to be clean and "brown dirt" from a pile formerly located on H Street, southeast of

20   Building 606 at HPNS. During this time period, I estimate that I told my RCTs to get clean dirt outside

21   the designated survey units on approximately twenty occasions. On multiple occasions the switching of

22   this dirt was done inside a "conex" trailer on site in my presence. I knew on these occasions that the soil

23   locations reported in the chain of custody forms and the survey unit tracking sheets for these samples

24   were false, that is, that the locations reported on the forms regarding where the soil came from were

25   untrue. I would estimate that there were between ten to twenty occasions when I saw a chain of custody

26   form being filled out when I knew the data on the form was inaccurate. I directed the RCTs to switch

27   soil for samples 81-100 for Survey Unit 22, taken on August 23, 2012. On that occasion, I falsified data

28   on the survey unit tracking sheet in that I stated on the form the soil came from within that Survey Unit

PLEA AGREEMENT
CR
                                   3

1   when I know it did not. I also know that the sampling data from Survey Unit 22 incorporated into the

2   map and analyses sent by Tetra Tech to the U.S. Navy on August 29, 2012 was false.

3        I did not receive extra compensation for substituting "clean" soil for potentially contaminated

4   soil in a survey unit. My motivation came from pressure applied by the Tetra Tech supervisors. One

5   told me on multiple occasions to "get the hell out of that area," in reference to a particular survey unit

6   that was not testing clean. Another told me on more than one occasion that we were "not remediating

7   the whole goddam site." An Assistant HPNS Project Manager told me on numerous occasions to "get

8   clean dirt." I understood these statements as a direction to go outside the appropriate survey unit and get

9   dirt from other areas that was known to be clean, that is not containing excessive levels of radiation.

10        I knew that my conduct would impede the proper investigation and administration of the

11   radiological remediation being undertaken by the U.S. Navy at HPNS.

12       3.    I agree to give up all rights that I would have if I chose to proceed to trial, including the

13   rights to a jury trial with the assistance of an attorney; to confront and cross-examine government

14   witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth

15   Amendment claims; to any further discovery from the government; and to pursue any affirmative

16   defenses and present evidence.

17       4.    I agree to give up my right to appeal my conviction, the judgment, and orders of the

18   Court, as well as any aspect of my sentence, including any orders relating to forfeiture and/or restitution,

19   except that I reserve my right to claim that my counsel was ineffective.

20       5.    I agree not to file any collateral attack on my conviction or sentence, including a petition

21   under 28 U.S.C. § 2255 or 28 U.S.C. § 2241, except that I reserve my right to claim that my counsel was

22   ineffective. I also agree not to seek relief under 18 U.S.C. §3582.

23       6.    I agree not to ask the Court to withdraw my guilty plea at any time after it is entered. I

24   understand that by entering into this Agreement: (a) I agree that the facts set forth in Paragraph 2 of this

25   Agreement shall be admissible against me under Fed. R. Evid. 801(d)(2)(A) in any subsequent

26   proceeding, including at trial, in the event I violate any of the terms of this Agreement, and (b) I

27   expressly waive any and all rights under Fed. R. Crim. 11(f) and Fed. R. Evid. 410 with regard to the

28   facts set forth in Paragraph 2 of this Agreement in any such subsequent proceeding. I understand that

PLEA AGREEMENT
CR

1    the government will not preserve any physical evidence obtained in this case.

2        7.    I understand that the Court must consult the United States Sentencing Guidelines and

3    take them into account when sentencing, together with the factors set forth in 18 U.S.C. § 3553(a). I

4    also understand that the Court is not bound by the Guidelines calculations below; the Court may

5    conclude that a higher Guidelines range applies to me, and, if it does, I will not be entitled, nor will I ask

6    to withdraw my guilty plea. I further agree that regardless of the sentence that the Court imposes on me,

7    I will not be entitled, nor will I ask, to withdraw my guilty plea. I agree that the Sentencing Guidelines

8    offense level should be calculated as set forth below, and that other than joining in a possible

9    government downward departure pursuant to U.S.S.G. § 5K1.1 and/or 18 U.S.C. § 3553(e), I will not

10    ask for any other adjustment to or reduction in the offense level or for a downward departure or variance

11    from the Guidelines range as determined by the Court. The parties have reached no agreement

12    regarding my Criminal History Category.

13        a.    Base Offense Level, U.S.S.G. § 2J1.2(a):    14

14        b.    Fabrication of substantial number of records, U.S.S.G. § 2J1.2(b)(3)    2

15        b.    Acceptance of Responsibility: If I meet the requirements of U.S.S.G. §    -3

16                3E1.1, through sentencing I may be entitled to a three level

17                reduction.

18        e.    Adjusted Offense Level:    13

19        I understand that regardless of the sentence that the Court imposes on me, I will not be entitled,

20    nor will I ask, to withdraw my guilty plea.

21        8.    I agree that regardless of any other provision of this Agreement, the government may and

22    will provide the Court and the Probation Office with all information relevant to the charged offense and

23    the sentencing decision, including any victim impact statements and letters from the victims, and/or their

24    friends and family.

25        9.    I agree that I will make a good-faith effort to pay any fine, forfeiture, or restitution I am

26    ordered to pay. I agree to pay the special assessment at the time of sentencing.

27        10.    I agree to cooperate with the U.S. Attorney's Office before and after I am sentenced. My

28

PLEA AGREEMENT
CR

cooperation will include, but will not be limited to, the following:

    a.      I will meet with the government when requested;

    b.      I will respond truthfully and completely to any and all questions put to me, whether in interviews, before a grand jury, or at any trial or other proceeding;

    c.      I will provide all documents and other material asked for by the government;

    d.      I will testify truthfully at any grand jury, court, or other proceeding as requested by the government;

    e.      I surrender any and all assets acquired or obtained directly or indirectly as a result of my illegal conduct;

    f.      I will request continuances of my sentencing date, as necessary, until my cooperation is completed.

    11.    I agree that the government's decision whether to file a motion pursuant to U.S.S.G. § 5K1.1, as described in the government promises section below, is based on its sole and exclusive decision of whether I have provided substantial assistance and that decision will be binding on me. I understand that the government's decision whether to file such a motion, or the extent of the departure recommended by any motion, will not depend on whether convictions are obtained in any case. I also understand that the Court will not be bound by any recommendation made by the government.

    12.    I agree not to commit or attempt to commit any crimes before sentence is imposed or before I surrender to serve my sentence. I also agree not to violate the terms of my pretrial release; not to intentionally provide false information to the Court, the Probation Office, Pretrial Services, or the government; and not to fail to comply with any of the other promises I have made in this Agreement. I agree that if I fail to comply with any promises I have made in this Agreement, then the government will be released from all of its promises in this Agreement, including those set forth in the Government's Promises Section below, but I will not be released from my guilty plea. I agree to abide by all of the terms of my pre-trial release pending sentencing. However, I agree to be remanded to the custody of the United States Marshal at any time prior to my sentencing if requested by Pre-Trial Services, Probation or the government as ordered by the Court.

    13.    If I am prosecuted after failing to comply with any promises I made in this Agreement,

PLEA AGREEMENT
CR

1   then (a) I agree that any statements I made to any law enforcement or other government agency or in

2   Court, whether or not made pursuant to the cooperation provisions of this Agreement, may be used in

3   any way; (b) I waive any and all claims under the United States Constitution, Rule 11(f) of the Federal

4   Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal statute or

5   rule, to suppress or restrict the use of my statements, or any leads derived from those statements; and (c)

6   I waive any defense to any prosecution that it is barred by a statute of limitations, if the limitations

7   period has run between the date of this Agreement and the date I am indicted.

8          14.    I agree that this Agreement contains all of the promises and agreements between the

9   government and me, that this Agreement supersedes all previous agreements that I had with the

10  government (including any "proffer" agreement), and I will not claim otherwise in the future.  No

11  modification of this Agreement shall be effective unless it is in writing and signed by all parties.

12         15.    I agree that the Agreement binds the U.S. Attorney's Office for the Northern District of

13  California only, and does not bind any other federal, state, or local agency.

14         <u>The Government's Promises</u>

15         16.    The government agrees not to file any additional charges against the defendant that could

16  be filed as a result of the investigation that led to the captioned Information, so long as the defendant has

17  fully disclosed such conduct to the government and otherwise complied fully with this Agreement.

18         17.    The government agrees to recommend a sentence no higher than the range associated

19  with the Guideline calculations set out in paragraph 7 above, unless the defendant fails to comply with

20  any promises in this Agreement or fails to accept responsibility.  As noted in paragraph 8, the

21  government will provide the Court with any victim impact statements as well as letters from the

22  victim(s) and/or their friends and family and any sentencing requests that they make to the court are not

23  subject to any restrictions.

24         18.    The government agrees not to use any statements made by the defendant pursuant to this

25  Agreement against him, unless the defendant fails to comply with any promises in this Agreement.

26         19.    If, in its sole and exclusive judgment, the government decides that the defendant has

27  cooperated fully and truthfully, provided substantial assistance to law enforcement authorities within the

28  meaning of U.S.S.G. § 5K1.1, and otherwise complied fully with this Agreement, it will file with the

PLEA AGREEMENT
CR                                          7

1   Court a motion under § 5K1.1 and/or 18 U.S.C. § 3553 that explains the nature and extent of the

2   defendant's cooperation and recommends a downward departure.

3   The Defendant's Affirmations

4          20.     I agree that my participation in the District Court's Conviction Alternative Program is not

5   appropriate and that I will not request to be considered for and will not participate in that program as a

6   result of my convictions for this offense.

7          21.     I confirm that I have had adequate time to discuss this case, the evidence, and the

8   Agreement with my attorney and that my attorney has provided me with all the legal advice that I

9   requested.

10         22.     I confirm that while I considered signing this Agreement, and at the time I signed it, I

11  was not under the influence of any alcohol, drug, or medicine that would impair my ability to understand

12  the Agreement.

13         23.     I confirm that my decision to enter a guilty plea is made knowing the charges that have

14  been brought against me, any possible defenses, and the benefits and possible detriments of proceeding

15  to trial. I also confirm that my decision to plead guilty is made voluntarily, and no one coerced or

16  threatened me to enter into this Agreement.

17

18  Dated: _____3-14-17_____                          _____Stephen C. Rolfe_____
                                                      STEPHEN C. ROLFE
19                                                    Defendant

20

21                                                    BRIAN J. STRETCH
                                                      United States Attorney
22

23  Dated: _____3/14/17_____                          _____

24                                                    PHILIP J. KEARNEY
                                                      Assistant United States Attorney
25

26         24.     I have fully explained to my client all the rights that a criminal defendant has and all the

27  terms of this Agreement. In my opinion, my client understands all the terms of this Agreement and all

28  the rights my client is giving up by pleading guilty, and, based on the information now known to me, my

PLEA AGREEMENT
CR                                          8

1  client's decision to plead guilty is knowing and voluntary.

2

3  Dated: 3-14-1?

4  CHRISTOPHER MORALES
   Attorney for Defendant

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEA AGREEMENT
CR                                    9