CHARLES A. BONNER, ESQ.  SB# 85413
A. CABRAL BONNER, ESQ. SB# 247528
**LAW OFFICES OF CHARLES A. BONNER**
475 GATE FIVE RD, SUITE 212
SAUSALITO, CA 94965
TEL: (415) 331-3070
FAX: (415) 331-2738
cbonner799@aol.com
cabral@bonnerlaw.com

ATTORNEYS FOR PLAINTIFFS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BAYVIEW HUNTERS POINT RESIDENTS, DANIELLE CARPENTER, CATHERINE MUHAMMAD, ***Including All Parties Listed In Exhibit A***; and Doe Plaintiffs 1-40,000, on behalf of themselves, and all others similarly situated,<br>　　　Plaintiffs,<br>　　　vs.<br><br>TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *In his Individual and Official Capacity*, CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH; STEVEN M. BURDICK, *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT, CHIEF FINANCIAL OFFICER OF TETRA TECH; STEPHEN C. ROLFE, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH; JUSTIN E. HUBBARD, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH;  LENNAR, INC.; and FIVE POINT HOLDINGS, LLC., and DOES 1-100 Inclusive,<br>　　　Defendants. | **Case No.: 3:19-cv-01417-JD**<br><br>**<u>A CLASS ACTION LAWSUIT</u>**<br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>1. **UNFAIR AND FRAUDULENT BUSINESS PRACTICES**<br>2. **FALSE AND MISLEADING STATEMENTS**<br>3. **NEGLIGENCE FEAR OF CANCER**<br>4. **STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES**<br>5. **VIOLATION OF PROPOSITION 65**<br>6. **FRAUD**<br>7. **NEGLIGENCE PER SE- VIOLATION OF CRIMINAL LAW**<br>8. **BAD FAITH BREACH OF THIRD PARTY CONTRACT**<br>9. **PUBLIC NUISANCE**<br>10. **PRIVATE NUISANCE**<br>11. **INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs BAYVIEW HUNTERS POINT RESIDENTS ("BHPR" or "PLAINTIFFS"), individually and on behalf of all others similarly situated, allege the following:

## I. INTRODUCTION

### *"[T]he biggest case of eco-fraud in U.S. history."[1]*

1. "They told us we were safe! Tetra Tech Lied!" "This is shocking; frightening!" The distressed pleas from the predominantly African American neighborhoods in the Bayview Hunters Point have grown louder and more urgent since the Navy and the Environmental Protection Agency ("EPA") have found that Tetra Tech, after being paid 1.1 Billion Dollars to clean up the Superfund Site, fraudulently falsified soil samples from the 522-acre Hunters Point Naval Shipyard (HPNS"), one of the most highly toxic waste sites in America. As victims of environmental racism, many BHPR believe that because of Tetra Tech's conduct, their suffering from cancers, asthma, debilitating respiratory illnesses and many other diseases caused by the toxic conditions at the Navy's Superfund site has been exceedingly exacerbated. Tetra Tech's conduct has also further elevated their now immeasurably heightened FEAR of contracting cancer and other radiation caused medical illnesses.

2. In 1995, a Health Department Study found that San Francisco's BAYVIEW HUNTERS POINT District has higher than normal rates of breast and cervical cancers. The study shows that African American women under 50 account for the majority of the higher incidences of breast cancer. Their breast cancer rate is double that of San Francisco as a whole. BAYVIEW HUNTERS POINT RESIDENTS know that the higher incidences of cancer and asthma are caused by the Navy's dumping of toxic materials, including radioactive materials into the land adjacent to their neighborhoods. They know that the toxic materials are still in the ground they walk on, in the air they breathe, and trapped in the very building materials of their homes; they are well aware that they are in fact marinating in radioactive, carcinogenic killer toxins. They are now living in existential, abject FEAR of developing cancer and other radiation related illnesses.

---

[1] Jeff Ruch, PEER's executive director Public Employees for Environmental Responsibility, an advocacy group based in the Washington, D.C.

3.       Hunters Point Naval Ship Yard housed the Naval Radiological Defense Laboratory ("NRDL") from 1948 to 1969. NRDL activities included radiological decontamination of ships exposed to atomic weapons testing, experimentation and research on radiological decontamination in general, the overall effects of radiation on material substances,[2] and the effect of radiation on humans and other living organisms.

4.       Such activities conducted by the NRDL contaminated the soil, dust, sediments, surface water and groundwater of BAYVIEW HUNTERS POINT with petroleum fuels, pesticides, heavy metals, radiation releases, polychlorinated biphenyls ("PCBs"), volatile organic compounds ("VOCs") and all such radionuclides released from the fusion process of making Nuclear Atomic Bombs. Soil at the site has also been found to contain naturally occurring asbestos and metals.

5.       The U.S. Navy additionally operated the site as a shipyard until 1974, predominantly using it to clean ships exposed radiation from atom bombs, as well as for research on nuclear weapons defense.

6.       In 1989, the heavily contaminated shipyard was designated as an EPA Superfund site, giving it priority as one of the most toxic cleanup sites in the nation. On or about 2002, Tetra Tech, a company specializing in toxic cleanup was hired by the United States Navy to undertake cleanup and removal of the toxic waste laid down by the United States Navy during the approximately 25 years of its residency.

7.       On Jan. 30, 2018, the United States Navy issued a preliminary report, compiled by five outside consultants, which concluded that nearly half of the data Tetra Tech had collected from the Superfund site was flawed. The data includes samples collected mostly between 2006

---

[2]       Historians estimate that 7,000 to 10,000 Native Americans inhabited the San Francisco Bay Region at one point. The Ohlone people likely settled in the Hunters Point area due to the availability of seasonal hunting and fishing. Hunters Point was a private commercial dry dock facility from 1869 until 1939, when the Navy purchased the property. From 1945 until 1974, the Navy used the site mostly as a naval submarine and ship repair facility. The site also housed the Naval Radiological Defense Laboratory (NRDL) from 1948 to 1969. NRDL activities included radiological decontamination of ships exposed to atomic weapons testing as well as research and experiments on radiological decontamination, the effect of radiation on living organisms, and the effects of radiation on materials. **https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0902722**

and 2012 from 300,000 cubic yards of soil, 20 buildings, 30 former building sites and 28 miles of storm drains.

8.     In April 2018, an environmental watchdog group released a Dec. 27, 2017 letter written by John Chesnutt, manager of the EPA's local Superfund Division. The letter stated that as much as 97 percent of Tetra Tech's cleanup data from two parcels on the site was found to be suspect and should be retested.[3]

9.     The EPA found: "In Parcel B, the Navy recommended resampling in 15% of soil survey units in trenches, fill, and building sites. EPA, Department of Toxic Substances Control ("DTSC"), and California Department of Public Health, (CDPH) found signs of potential falsification, data manipulation, and/or data quality concerns that call into question the reliability of soil data in an additional 76% of survey units, bringing to 90% the total suspect soil survey units in Parcel B. (These do not add exactly due to rounding). In Parcel G, the Navy recommended resampling 49% of survey units, and regulatory agencies recommended 49% more, for a total of 97% of survey units as suspect…." Chesnutt further found that "the data analyzed demonstrates a widespread pattern of practices that appear to show deliberate falsification, failure to perform the work in a manner required to ensure (the EPA's approval) requirements were met, or both."

10.     Over the decades, asbestos, PCBs, solvents, lead and radioactive materials all were dumped at the site bordering Bayview Hunters Point.

11.     The City of San Francisco first adopted a redevelopment plan for the shipyard in 1997. Whistleblowers came forward in 2012 with allegations that their superiors at Tetra Tech had ordered them to fake soil samples in an effort to speed up the $1 billion cleanup.

12.     In 2014, the Navy admitted that it had become aware of mishandling of data and fake testing by Tetra Tech employees, triggering an investigation by the Nuclear Regulatory Commission. The revelations led to Tetra Tech shifting blame onto low-level employees and stating they were re-cleaning the sites.

---

[3] EPA December 27, 2017, *John Chesnutt, Manager, Pacific Islands and Federal Facilities Section Superfund Division.*

13.     Also In 2014, Whistleblowers exposed Navy contractor Tetra Tech's internal report, documenting deliberate and orchestrated fraud in the collection of 2,500 anomalous radioactive soil samples collected at multiple sites on the base. The Nuclear Regulatory Commission fined Tetra Tech $7,000 after confirming the soil samples had been falsified. Recent reviews by both the U.S. Navy and the EPA corroborate allegations made by former Tetra Tech employees, whistleblowers and their advocates over the last six years.

14.     Tetra Tech first admitted to providing false soil samples in 2014, but the Navy permitted the company to continue working after blaming the problem on low-level employees, as well as subjecting other workers to "ethics training." The Navy apparently accepted Tetra Tech's excuses and solutions until recently, when more whistleblowers came forward, again alleging more widespread and systemic fraud—allegations that have now been sustained.

## II. THE PARTIES

15.     Class Plaintiffs are Residents of BAYVIEW HUNTERS POINT, consisting of individuals who have been living in, or had substantial contact with, the Hunters Point Community, with the Postal Zip Code 94124, from 2004 to present.  All Plaintiffs in this action are set forth in **Exhibit A** , which is incorporated by this reference as fully set forth herein.

16.     The geographic parameters of the BAYVIEW HUNTERS POINT RESIDENT PLAINTIFFS are limited to the last, 2010, census tract populations and in the Postal Zip Code 94124 as follows:

| Census Tract No. | Population |
|---|---|
| 9809 | 350 |
| 610 | 3,610 |
| 233 | 5,216 |
| 234 | 3,660 |
| 232 | 4,582 |
| 231.03 | 3,725 |
| 230.01 | 5,216 |
| 230.03 | 4,093 |

| | |
|---|---|
| 230.03 | 4,093 |
| 612 | 4,087 |
| **TOTAL POPULATION** | **38,484** |

**DOE PLAINTIFFS**

17.     DOE PLAINTIFFS 1-40,000 are Residents of BAYVIEW HUNTERS POINT, consisting of individuals who have been living in, or had substantial contact with, the Hunters Point Community, with the Postal Zip Code 94124, from 2004 to present but have not to date discovered the elements of their causes of action. This action will be amended to include those

DOE PLAINTIFFS 1-40,000 when those PLAINTIFFS have ascertained and discovered each element of each cause of action against each of the named DEFENDANTS herein.

18.    DEFENDANTS Tetra Tech, Inc. and Tetra Tech EC, Inc. are California corporations that have contracted with the United States Navy and United States government to perform clean-up and remediation services at the Hunters Point Shipyard in San Francisco. On information and belief it is alleged that the principal business office of Tetra Tech EC, Inc. is located in Pasadena, California.

19.    DEFENDANT Lennar, Inc. is headquartered in Miami, Florida and is doing business in California. DEFENDANT Five Point Holdings, LLC is headquartered in Aliso Viejo, California.

## DOE DEFENDANTS

20.    The true names and capacities, whether individual, corporate, associate, subsidiary, officer, director, employee, other representative, or otherwise, of DOE DEFENDANTS 1 through 50 inclusive, are unknown to the PLAINTIFFS, who therefore sue each DEFENDANT by a fictitious name. PLAINTIFFS are informed and believe and thereupon allege that each of these fictitiously named DEFENDANTS are responsible, in some manner, for the damages alleged herein. PLAINTIFFS therefore designate DOE DEFENDANTS 1 through 50 by such fictitious names, and when their names have been ascertained, PLAINTIFFS will amend this complaint to allege their true names and capacities.

## III. JURISDICTION AND VENUE

21.    Jurisdiction is pursuant to California Code of Civil Procedure § 382 providing: "When the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." This court also has jurisdiction under California Business & Professions Code §17203. Venue is proper in this judicial district because BAYVIEW HUNTERS POINT RESIDENTS' injuries, damages and harms occurred in this judicial district. Further, one or more of the DEFENDANTS reside, are headquartered and conduct business in

this judicial district. DEFENDANTS' wrongful acts and omissions are giving rise to PLAINTIFFS' claims for restitution and equitable relief.

## IV. RESPONDEAT SUPERIOR

22.     All of the described conduct, acts, and failures to act are attributed to agents and employees under the direction and control, and with the permission, consent and authorization of DEFENDANTS. Said acts, conduct and failures to act were within the scope of such agency and/or employment, and each of the DEFENDANTS ratified, endorsed, and agreed to the acts and omissions of each of the other DEFENDANTS. Each of these acts and failures to act is alleged against each DEFENDANT, whether acting individually, jointly, or severally. At all times relevant herein, each DEFENDANT was acting within the course and scope of his or her employment, agreement, and ratification.

## DEFENDANTS' RATIFICATION, ADOPTION AND AUTHORIZATION

23.     DEFENDANTS knew, or should have known, that DEFENDANTS' employees had a propensity, proclivity and obedience to carry out the directives, orders, and mandates of superiors and managers, even when those directives, orders and mandates violated the law, were fraudulent and even criminal.

24.     It is well established that when an employer ratifies the tortious conduct of an employee, he or she becomes "liable for the employee's wrongful conduct as a joint participant." *Fretland v. County of Humboldt* (1999) 69 Cal. App. 4th 1478, 1489-1490. An employer who fails to discipline an employee after being informed of that employee's improper conduct can be deemed to have ratified that conduct. *Hart v. National Mortgage & Land Co.* (1987) 189 Cal. App. 3d 1420, 1430; *Iverson v. Atlas Pacific Engineering* (1983) 143 Cal. App. 3d 219, 228. According to the court in Iverson, if an employer is informed that an employee has committed an intentional tort and nevertheless declines to "censure, criticize, suspend or discharge" that employee, a claim can be made for ratification. Id.

25.     "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him. A purported agent's

act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.' *Fretland*, supra 69 Cal. App. 4th 1491

26.     At all relevant times alleged herein, DEFENDANTS had actual and constructive knowledge of DEFENDANTS' illegal, unethical, unlawful, criminal behavior. DEFENDANTS endorsed, ratified, authorized, encouraged, and directed the illegal conduct as alleged herein and failed to take any corrective action to protect the BAYVIEW HUNTERS POINT RESIDENTS and the public from the illegal conduct. Hence, DEFENDANTS, and each of them, are liable for all the illegal conduct of their employees.

## V. STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTION
### Historical Background of Hunters Point Naval Shipyard

27.     Hunters Point Shipyard ("HPS" or the "Site") is a deactivated shipyard located in the southeastern portion of San Francisco, California, adjacent to San Francisco Bay. In 1940, the Navy obtained ownership of the shipyard for ship building, repair and maintenance activities. Hunters Point Naval Shipyard ("HPNS") was the transit departure point for Little Boy, the atomic bomb the U.S. dropped on the civilian population of Hiroshima in August 1945.

28.     In addition to using the Site for a Naval Shipyard, The Department of Defense also used these properties to conduct radiological activities on the site, including (1) sandblasting radioactive waste off Navy ships subjected to nuclear testing at the Bikini Atoll, (2) extensive application of fluorescent radium on dials, knobs, and buttons, and (3) operating a radiological defense laboratory on site from 1955 to 1979 in Buildings 364, 815, and 816. Radioactive waste materials generated by the University of California at Berkeley and the Lawrence Livermore Laboratories were shipped to Hunters Point for handling, transport and disposal. Such activities, involving the handling and application of radioactive materials, contaminated the ground, buildings, sewer lines, landfills, and surrounding areas of Hunters Point.

29.     The U.S. Navy established the Naval Radiological Defense Laboratory (NRDL) in 1946 at HPS to study the effects of nuclear weapons, as well as to develop counter measures

to such weapons. NRDL operated until 1969 and conducted studies related to ship shielding, radioactive waste for deep-sea disposal, animal research, radiation detection instrumentation development, and other laboratory studies. NRDL also decontaminated and disposed of some of the ships involved in nuclear weapons testing in the Marshall Islands. During operations at HPNS, the shipyard site grew in size to approximately [500 acres] by filling parts of the San Francisco Bay bordering the Hunters Point Shipyard. The site currently consists of approximately 866 acres, 446 of which are under water.

30. Hunters Point began operating as a Navy shipyard in the early 1940s and soon became the only Navy shipyard in Northern California that could deal with large warships. Although World War II had ended, the U.S. continued its nuclear operations and in July 1946, during *Operation Crossroads*, the U.S. set off two A-bombs at the Bikini Atoll in the Pacific. Nearly 100 "target" and 150 "support ships" sat in surrounding waters.

31. The Navy was interested in how the ships would do in an atomic blast. The Navy was also interested in learning how animals would endure intense radioactive exposure and placed animals, ranging from goats to rats on some of the ships located close to the blasts. [4]

32. The majority of the animals died and many, if not all of the ships who didn't sink sustained contamination with radioactive fallout from the blasts. The Navy did what it could to decontaminate the ships, but, as a Navy fact sheet on Operation Crossroads stated, its efforts "revealed conclusively that removal of radioactive contamination of the type encountered on target ships cannot be accomplished successfully. The factsheet concluded that, after Operation Crossroads, "18 target and observation vessels were decontaminated at Hunters Point" and that they performed "the decontamination of ships associated with Pacific atomic and thermonuclear (H Bomb) weapons testing generated radiological material and waste." Id.

33. Hunters Point was also the home of the Naval Radiological Defense Laboratory until 1969. This facility's "purposes included radiological decontamination of ships exposed to atomic weapons testing," and "conducting research and experiments on decontamination, the

---

[4] http://www.myatomiclife.com/hunters-point-rad-labs.html

effects of radiation on living organisms, and the effects of radiation on materials." It became the "U.S. military's largest facility for nuclear research," and the "shipyard also consolidated radioactive waste from other facilities, including the University of California, Mare Island and McClellan Air Force Base (near Sacramento)." Id.

34.     For 23 years following World War II, Hunters Point Shipyard was the site of the military's largest facility for applied nuclear research - the top-secret Naval Radiological Defense Laboratory ("NDRL"). Over the course of its life, according to declassified government documents, the NRDL handled nearly every kind of radioactive material known to man - including, at one point, enough plutonium to kill 15 million people. The shipyard is also well known as a site where Navy ships were decontaminated after being irradiated during atomic weapons tests. The Navy used the irradiated sand, which turned a shiny black that 'glistened in the sun,' to "pave" side roads and walking paths throughout the Shipyard. Neighborhood children loved to play in it, calling it "black beauty sand." Id.

35.     Evidence illustrating some of the reckless conduct engaged in by scientists at the NRDL includes the following: (1) Conducted human experiments that included requiring people to drink radioactive elements (2) Burned radioactive fuel oil in a boiler, discharging the smoke into the atmosphere. (3) Oversaw the dumping of huge amounts of contaminated sand and acid into the San Francisco Bay after they were used in attempts to clean irradiated ships. (4) Spread radioactive material on- and off-base, as if it were fertilizer, to practice decontamination. (5) Hung a source of cobalt-60, a nuclear isotope that emits high-energy electromagnetic radiation similar to X-rays, in San Francisco Bay for two weeks, apparently just to see what would happen. (6) Experimented with significant amounts of a wide variety of long-lived radiological poisons, including plutonium, cesium, uranium, thorium and radium. (7) Studied and disposed of thousands of irradiated mice, rats, dogs, goats, mules, and pigs, among other animals. Id. Radioisotopes such as radium-226, cesium-137, plutonium and uranium will be around for hundreds of more years, if not millennia. Plutonium-239 has a radioactive life of 240,000 years.

36.     The first use of radioactive materials at Hunters Point Shipyard predated the issuing of licenses by the Atomic Energy Commission ("AEC"). The AEC is the predecessor of

the U.S. Nuclear Regulatory Commission ("NRC"), which was established in 1974. Prior to 1954, AEC issued only authorizations or permits for controlled uses of radioactive material. After 1954, AEC licenses were issued to Hunters Point Shipyard and the NRDL for use of radioactive materials. In the shipyard, multiple AEC licenses were issued for use of radioactive materials. The AEC licenses for NRDL were for a broad array of radioactive materials to be used for research. Radioactive materials specific to nuclear weapon testing used at Hunters Point Shipyard and NRDL are exempted under AEC, or NRC, licensing by the Atomic Energy Act of 1946. For closure of the NRDL in 1969, a license was issued by AEC for decommissioning activities. AEC licenses for the shipyard and NRDL were terminated in the 1970's. Following the termination of licenses, the AEC and NRC ceased exercising regulatory authority at the HPS.[5]

37.     In 1989, the Site was placed on the National Priorities List ("NPL") and in 1991 was selected for closure under the Base Realignment and Closure ("BRAC") program. The lead agency for investigation and cleanup of the Site is the United States Navy ("Navy"). The lead support agency is the United States Environmental Protection Agency, Region IX ("EPA"). State support agencies include the California Environmental Protection Agency, Department of Toxic Substances Control ("DTSC") and the Regional Water Quality Control Board ("RWQCB").[6]

38.     In 1987, contamination was confirmed at a number of Site locations. This finding, combined with the proximity to an off-site drinking water source (the aquifer used by the Albion Springs water bottling company) resulted in the EPA placing the Site on the National Priorities List ("NPL"), in 1989. In 1991, the Department of Defense listed the Site for closure. Id.

39.     In January 1992, the Navy, the EPA, DTSC and RWQCB entered into a Federal Facilities Agreement to better coordinate the environmental investigation and cleanup of the Site. To expedite the investigation and cleanup, the Site was divided into six parcels. Each of the six parcels were assigned a letter, ranging from A to F. Parcel F is an offshore parcel. Fieldwork has

---

[5] https://www.nrc.gov/info-finder/decommissioning/complex/hunters-point-naval-shipyard.html
[6] EXPLANATION OF SIGNIFICANT DIFFERENCES SFUND RECORDS Parcel B, Hunters Point Shipyard Site San Francisco, California August 24, 1998

been completed for all six parcels. The fieldwork showed that the soils and groundwater of the Site are contaminated with a variety of hazardous substances including metals, polychlorinated biphenyls ("PCBs"), volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), polyaromatic hydrocarbons ("PAHs"), and pesticides. In addition, total petroleum hydrocarbons (TPH) are present in Parcel B soil and groundwater. Id.

**Defendant Tetra Tech Contract To Clean Up The Shipyard**

40.     In or about 2004, The United States Navy contracted with Tetra Tech to assist in the cleanup of Hunters Point Naval Shipyard ("the Shipyard" or "HPNS") in San Francisco, California, which the NAVY deemed a National Priorities List Superfund site. Instead of discharging its contractual obligation by remediating HPNS, DEFENDANT TETRA TECH engaged in intentional fraud, greed and disregard for the health and safety of BAYVIEW HUNTERS POINT RESIDENTS, the present and future San Francisco residents as well as the greater Northern California community. Since the 1940's HPNS has disregarded the lives of the largely African American Communities immediately adjacent to the Shipyard. DEFENDANT TETRA TECH "doubled-down" and exacerbated such historical reckless disregard to the health, safety and civil rights of San Francisco's most vulnerable residents who, on account of the Navy's pollution at the HPNS, were already suffering from life threatening illnesses stemming from said pollution.

41.     Radiological Data Review Background: In 2012, as a part of its regular review of contractor data, the Navy discovered a discrepancy in radiological sampling by one contractor, Tetra Tech EC ("TTEC"). Despite sampling the data in question and taking initial corrective actions, it was determined that sample data taken by TTEC had been falsified. [7]

42.     In 2016, a former TTEC contract worker made additional claims about the fraudulent work done before 2012. Additional allegations were made in 2017. Id.

---

[7] EPA Website. September 2017:This is the second in a series of fact sheets and other ongoing communications about the radiological data review being conducted at Hunters Point Naval Shipyard (HPNS). The previous fact sheet (dated February 2017) on the Navy's radiological data review may be found on the HPNS pages of the Navy's website at *www.bracpmo.navy.mil*

43.     In November 2016, the Navy hired an independent team of experts (review team) to further review and evaluate the reliability of the radiological data collected by TTEC. As part of the evaluation, the review team has developed a database of soil data and is analyzing radiological sampling, surveys, and building scan results. **What are the data evaluation objectives?** 1. Evaluate radiological data collected by TTEC 2. Identify data that may have been falsified or improperly collected. Id.

44.     **Extent of Data Review and Analysis:** The data evaluation includes radiological samples taken by TTEC beginning in 2006 from Parcels B, C, D-2, E, G, and the utility corridors (UC-1, UC-2 and UC-3). Id.

45.     **Snapshot of Extensive Analysis:** Radiological Soil Analysis:

- Approximately 300,000 cubic yards of soil
- Over 50,000 soil samples
- More than 900,000 analytical results
- Over 30 former building sites
- Approximately 28 miles of trench lines Radiological Scans
- More than 20 structures (buildings) on approximately 23 acres of land Id.

46.     Based on DEFENDANT Tetra Tech's admitted falsification and "mishandling" of soil samples, none of the Navy or EPA's representations of planned action are reliable, which has greatly elevated the fear, anxiety, and emotional distress among HUNTERS POINT RESIDENTS regarding the now heightened reality of additional life-threatening health problems related to disturbances of toxic releases.

47.     The Navy has divided the site into several subsites to organize and prioritize cleanup activities: *Parcel A:* The EPA's unreliable representation selected "no further action" as the long-term remedy; conditions are protective of human health and the environment. The Navy transferred Parcel A to the San Francisco Redevelopment Agency in 2004.

48.     *Parcel B:* The long-term remedy included excavation and disposal of soils, installation of soil covers, installation of a revetment along the shoreline, a soil vapor extraction system to remove VOCs, groundwater treatment, removal of radiologically contaminated

structures, monitoring and institutional controls to maintain the remedy in the long term and prevent exposure to contaminants. Excavation and disposal of contaminated soil was finished in 2010. Construction of the covers and revetment, operation of the soil vapor extraction system and treatment of contaminated groundwater are ongoing. Access restrictions prevent exposure to contaminants.

49. *Parcel C:* The long-term remedy included excavation and disposal of soils, installation of soil covers, installation of a revetment along the shoreline, a soil vapor extraction system to remove VOCs, groundwater treatment, removal of radiologically contaminated structures, monitoring and institutional controls to maintain the remedy in the long term and prevent exposure to contaminants. Soil excavation and disposal, groundwater treatment, soil vapor extraction and radiological removal activities are ongoing. The Navy will finish covering contaminated soils after it finishes removing radiologically contaminated soils. Access restrictions prevent exposure to contaminants.

50. *Parcel D-1:* The long-term remedy included excavation and disposal of soils, installation of soil covers, groundwater treatment, removal of radiologically contaminated structures, monitoring and institutional controls to maintain the remedy in the long term and prevent exposure to contaminants. Groundwater treatment using zero valent iron injection finished in 2008. Excavation and off-site disposal of contaminated soil and removal of soil stockpiles finished in 2010. Radiological removals are ongoing. The Navy will finish removing and covering contaminated soils after it finishes radiological removal activities. Access restrictions prevent exposure to contaminants.

51. *Parcel D-2:* After removal actions removed contaminated soils and structures at the subsite, EPA selected "no further action" as the final remedy in 2010.

52. *Parcel G:* The long-term remedy included excavation and disposal of soils, installation of soil covers, groundwater treatment, removal of radiologically contaminated structures, monitoring and institutional controls to maintain the remedy in the long term and prevent exposure to contaminants. Groundwater treatment using zero valent iron injection finished in 2008. Excavation and off-site disposal of contaminated soil and removal of soil

stockpiles finished in 2010. Construction of covers is ongoing. The radiologically related parts of the remedy are complete and unrestricted release of radionuclides is ongoing. Access restrictions prevent exposure to contaminants.

53.    *Parcel UC-1:* The long-term remedy included soil covers, soil gas surveys, removal of radiologically contaminated structures, monitoring and institutional controls to prevent exposure to contaminants. The Navy has lowered contaminant levels in soils and sediments by removing and covering contaminated soils. Soil vapor survey activities are ongoing. The radiologically related parts of the remedy are complete and unrestricted release of radionuclides is ongoing.

54.    *Parcel UC-2:* The long-term remedy included soil covers, removal of radiologically contaminated structures, monitored natural attenuation, soil gas surveys, monitoring and institutional controls to prevent exposure to contaminants. The Navy has lowered contaminant levels in soils and sediments by removing and covering contaminated soils. Monitored natural attenuation, which involves letting naturally occurring processes reduce the contamination in groundwater, will reduce levels of radiological and chemical contaminants at the subsite.

55.    *Parcels E, E-2, F and UC-3:* The Navy has conducted several removal actions at these subsites, including removal and disposal of contaminated soils and debris, construction of a landfill cap and removal of radiological contamination. EPA has selected a long-term remedy for Parcel E-2. It included removal and disposal of contaminated soils, radiological surveys, installation of a soil cover with a protective liner, below-ground barriers to limit groundwater flow between the landfill and the San Francisco Bay, removal and treatment of landfill gas, installation of a revetment along the shoreline, monitoring, and institutional controls to prevent exposure to contaminants. Remedial investigation activities, operation and maintenance activities, and monitoring are ongoing for these subsites. EPA has not conducted five-year reviews for these subsites. Id.

## Whistleblowers' Statements of Tetra Tech Fraud

56. Several Tetra Tech employees, including Anthony Smith, Robert McLean, Donald Wadsworth and others, have testified under oath to DEFENDANT TETRA TECH'S fraudulent scheme to place profit over the lives of the BAYVIEW HUNTERS POINT RESIDENTS, resulting in the release of radiative materials still in the soil being swept up by the prevailing winds blowing such materials over the homes of BHP Residents. Anthony Smith's Declaration is attached as Exhibit 2 and all facts therein are incorporated as though fully set forth herein.

57. In 2014, Anthony Smith, a former Tetra Tech Employee, quit his job because he could not live with the fraud his superiors ordered him to commit every day. His Tetra Tech managers ordered him to falsify records, and soil samples. Smith, the former radiation control technician, said his supervisors used to conceal radioactive soil on the Hunters Point 800-acre former Superfund site.[8]

58. Smith stated that the fraudulent conduct he witnessed being carried out by Tetra Tech means that the Hunters Point Shipyard is still radioactive, contaminated, toxic, dangerous, and a public health hazard to the BHPR. Smith said the company repeatedly cut corners to save money. Smith admitted that Tetra Tech supervisors: (1) Ordered him to replace contaminated soil samples with clean soil samples (2) Instructed him to dump contaminated soil into open trenches across Hunters Point. (3) Forced him to sign falsified documents that were later submitted to the government; and (4) Falsified and tampered with computer data that analyzed radiation levels. Id.

59. Smith said he decided to speak out "to clear my name, make everything right and let people know what really happened." Id.

---

[8] *www.nbcbayarea.com/investigations/Former-Hunters-Point-Worker-Claims-Supervisors-Ordered-Him-to-Hide-Radiation-371723561.html*

**<u>Switching Soil Samples and Dumping Soil into Trenches</u>**

60.     Smith moved to the Bay Area from his home in Georgia in 2002 and worked on and off at Hunters Point as a radiation control technician until 2012. He collected soil samples, which were surveyed to determine radiation contamination levels. Smith said beginning in 2009, his supervisors began instructing him to get rid of radiation-contaminated soil samples and replace them with clean soil samples. He said the switching of the soil samples often took place out of public view, inside large Conex bins located around the job site. He estimated that hundreds of samples had been switched. "I didn't like it because it wasn't right," Smith said. "That's not the way it was supposed to be done." Smith said multiple locations across Hunters Point are still contaminated with radiation. Id.

61.     Smith said he collected soil samples underneath a structure referred to as building 351 A, which once housed part of the Navy's radiological laboratory. He recalled a sample tested positive for radium, an element linked to bone cancer. "When I took a sample it came back hot," he said, "and they made me get rid of it." Id.

62.     Smith said the building should have been remediated after he found a hot soil sample, but he questions whether crews subsequently cleaned up the contamination. He said remediating the area would have taken more time and money. He said his supervisors directed him to dump the discarded, contaminated soil into trenches that have since been covered or paved. Smith said there is no way to know what the contamination levels are in the trenches without retesting the soil. He said as far as he can tell, Tetra Tech did not test the trenches after they were backfilled. Id.

//

//

//

//

//

//

## Falsified Documents and Data

63.     Smith also said that Tetra Tech fabricated Chain of Custody documents forms, which are supposed to document the location and time of the soil samples taken by Smith and to certify that the samples stayed under his control. He said sometimes his bosses would fill out the forms instead: "I never got to see them until the end of the day when all I done was sign my name and put the date," Smith said. Id.



Tetra Tech Chain of Custody Form

Anthony Smith says his supervisors fabricated documents called Chain of Custody Forms. The forms are supposed to document where and when Smith collected soil samples and certify that the samples stayed under his control. But Smith says sometimes his supervisors filled out the forms and that he couldn't verify the information contained in the documents. He says sometimes he didn't see the forms until the end of the day, when he was asked to sign his name.

64.     Tetra Tech came up with multiple excuses and theories, but never definitively concluded how or why soil samples were switched and data was falsified. In the report, the Tetra Tech admitted the "mishandling of soil samples", but fraudulently blamed the "sample collectors on the chain of custody forms," including Smith. He said the company made him a scapegoat. "They were blaming me for something [they] were telling me to do every day". Smith said the company failed to identify and retest other questionable locations on the site. He worried the health of people who will work, play and live at Hunters Point may be at stake. He said the cleanup can't be trusted. "It's not good and it's not right," Smith said. Id.

## **DEFENDANT TETRA TECH TYPES OF FRAUD**

65.     Tetra Tech employees and the radiological subcontractors it directly supervised were involved in at least six types of fraud that are discussed in detail in this supplemental disclosure: (1) fake sampling, in which soil samples – potentially thousands of them – were reported to have been taken at one location when they were actually taken from another; (2) discarding samples and analytical results when they came back radiologically too "hot" (i.e., above the cleanup standard); (3) altering scanning data to make them appear radiologically acceptable; (4) conducting false building surveys in which certain scan results were fabricated and others were falsified; (5) remediating radioactive material in soil improperly, resulting in potentially radioactively-contaminated soil being shipped offsite as well as being used as backfill for trenches at the Shipyard; and (6) altering Portal Monitor procedures so potentially radioactively-contaminated soil was allowed to be shipped offsite for commercial purposes to places unknown.

66.     Fraudulent sampling, scanning, and surveys led to fraudulent remediation; sites that required additional cleanup were not remediated and remain contaminated because fake samples indicated areas were "clean" when they were not.

67.     Evidence shows Tetra Tech's top onsite management, its Project Manager and Construction Superintendent, participated in and directed the fraud. Their employees engaged in sustained widespread misconduct, significantly compromising the cleanup.

### **1. Fake Soil Sampling: Parcels C, D, E**

####     **a.     Fraudulent Sampling - Stage 1**

68.     Fraudulent and fabricated soil samples, purportedly taken from various sites on the Shipyard, including the areas around Building 707 (Parcel E), the 500 Series of buildings (Parcel D), and Parcel C, were in fact collected from elsewhere on the site.

69.     Senior Health Physics Technician ("HP") Anthony Smith says fake sampling took place in two stages. At first, HPs were directed to take samples from the general location intended to be sampled, but to fudge the specific location of the samples.

70.     When tasked with soil sampling, proper procedure was to initially scan the soil in order to locate radioactive hot spots. The scanning data was then used by engineers to identify locations of high radioactivity which would then be designated on maps indicating locations of the highest readings and thus, where soil samples should be taken.

71.     HPs followed the correct procedure in the early years at Hunters Point. Proper practice however eroded under the direction of Project Manager William "Bill" Dougherty when efforts for areas to pass inspection and obtain "free release" were difficult to obtain due to remaining radioactive contamination. There is evidence that fraudulent sampling was conducted throughout the 2007-2008 time period, but accelerated in the latter part of 2008 and early 2009. At that time, Tetra Tech was having difficulty obtaining free releases; post-remediation samples came back too "hot."

72.     In response, DEFENDANT TETRA TECH supervisors ordered the HPs not to take samples from the highest radioactive reading spots as designated by the engineers. Rather, the HPs were ordered to make it appear they collected samples from the marked spots, but in actuality gather samples from clean areas close by the radioactive spots. An HP (also known as a Radiation Control Technician, or "RCT,") admitted this form of fraud to the NRC: "the RCT stated that, when sufficiently low contamination levels were not obtained, the RTS [Radiation Task Supervisor] would direct the RCT to move 5 to 10 feet in another direction and obtain a new sample from that location. Meanwhile, the new sample would be represented as having been obtained from the original, specified location."

        b.      **Fraudulent Sampling – Stage 2**

73.     Time and again the fraudulent post-remediation soil samples resulted in laboratory results indicating radioactive contamination above the free release levels. For example, around Building 707, repeated rounds of remediation failed to decontaminate all the soil; successive post-remediation samples came back too "hot." When sample results exceeded the free release levels, Tetra Tech was required to do more clean-up.

74.     Due to the frustration of Tetra Tech's attempts to obtain free release and the desire to cut costs to increase profits, the manner of the fraud changed. No longer did

DEFENDANT TETRA TECH supervisors direct their HPs to obtain false samples in the nearby area of the radioactive sites, but rather in at least three remote locations known from prior sampling to contain "clean" soil. Tetra Tech management pressured its supervisors to have the HPs engage in fraudulent sampling that would guarantee lab results under the free release levels so it could collect payment without incurring the full costs of the cleanup.

75.     Former employees, like Senior HP Anthony Smith, state that he and others took the second-stage type of fraudulent samples from at least three locations known to be low in radiological activity. The specific location was chosen depending on the type of soil they were trying to match.

76.     If HPs needed to match "green serpentine" soil, Smith and others took false samples from one of two locations. Originally, the green serpentine soil used to submit false samples was taken from a sewer trench in front of the Building 500 series of buildings. That site was supplanted by a second one, an area inside the remains of the foundation of an old movie theater in the 500 series area. According to Smith, the theater foundation was preferable to the sewer trench because it afforded greater privacy – employees could take samples there unseen when inside the foundation walls. Smith says he would wait until laborers not involved in the fraud went to lunch or left for the day and he would then fill a 5-gallon bucket with soil from the theater site which he knew to be clean.

77.     If HPs needed to match sandy soil, they would fill five-gallon buckets with soil taken from an area under two palm trees in the vicinity of an old pump house (Building 521) that was also near the old movie theater foundation area.

c.     **Substituting Clean Soil for Potentially "Hot" Soil**

78.     Senior HP Smith states he would take the five-gallon buckets of either green serpentine  or sandy soil to the Conex (a shipping container that acted as a temporary field office), where HP supervisor Steve Rolfe, his wife HP Tina Rolfe, and HP Rick Zahensky would transfer the soil into sample containers to substitute for real samples. The original, and potentially "hot" samples, would be emptied into another 5-gallon bucket and Smith would dump that soil into open trenches that had been dug for sewer removal. In short, the true soil samples

were switched with the soil known to be radiologically clean with the intent to fraudulently "prove" to the Navy, regulators, and the public that all radiological hazards had been removed.

79.     Smith estimates this type of false sampling happened "pretty much every day" over at least the last one and a half years he worked at the Shipyard. He says fake soil samples he took from all three sites – the sewer trench, the palm tree site and the theater – resulted in 800 to 1,000 false samples. Other HPs on the team under Smith's supervisor, Steve Rolfe, also regularly engaged in taking false soil samples, as did HPs under the supervision of Justin Hubbard.

80.     Samples were switched not only from the former site of Building 517, but Smith admits he switched samples taken from the area around Building 707, the "Triangle Area" in Parcel E, and the area of the former 500 series of buildings in Parcel D. Additionally, HPs other than Smith had falsely switched samples in other areas, including North Pier and "shacks" 79 and 80 and Parcel C.

81.     Former employees declare fraudulent soil samples were taken as early as 2007. They also state that the fraudulent practices escalated in the years after Tetra Tech's contract with the Navy changed from a time-and-materials contract to a firm fixed-price contract.  This provided a financial incentive for fraud; the less time and resources Tetra Tech spent on sampling and cleanup, the more profit they would make.

### 2. Destruction of "Hot" Soil Samples and Their Records

#### a.  Building 351A

82.     Building 351A had been used by the Navy's Radiological Defense Laboratory for decades conducting extensive experiments with hazardous radionuclides.  It was one of the last buildings in Parcel G that had not been free released. Clearance of building 351A was holding up final payment to Tetra Tech for all of the work the company had done in that parcel, potentially millions of dollars.

83.     Direct readings from radiological survey detection instruments indicated the presence of elevated radioactivity in a large amount of soil in a crawl space under Building 351A. Remediation attempts within the crawl space were performed in 2008 by a group of laborers who dug up the soil while HPs Anthony Smith and Josh Hooper monitored them. The

laborers used pick axes, shovels and trowels to loosen the soil and a large vacuum truck that sucked the soil from under the building through an 8-inch hose. The soil was ultimately placed in bins to be disposed offsite as radioactive waste.

84.     At the conclusion of approximately two weeks of remediation, HPs Anthony Smith and Josh Hooper took post-remediation soil samples from the crawl space in an attempt to demonstrate that there was no longer any residual radiological contamination above established free-release levels. However, a post-remediation sample came back too "hot," demonstrating the radioactive cleanup had not been successfully completed. Proper procedure mandated another round of soil removal. This additional round of remediation would once again involve laborers and a vacuum truck, followed by another round of post-remediation sampling. However, Tetra Tech's management directed that proper procedures be ignored.

85.     Smith and Hooper were summoned to a meeting that included Tetra Tech's HPNS Project Manager, Bill Dougherty, Tetra Tech's Construction Superintendent Dennis McWade, among other senior Tetra Tech and sub-contractor managers. With respect to costs Tetra Tech was incurring to undertake the cleanup, Dougherty told Hooper and Smith "Do you know how much that machine cost to rent for two weeks? We can't afford to do that again, get rid of that sample," or words to that effect. McWade gave Smith the containerized sample and its Chain of Custody ("COC") document, completely contrary to acceptable procedures, and Smith and Hooper did what they were told. They got rid of the sample and the COC record.

86.     Thereafter, they engaged in the first type of soil-sampling fraud described above and took a false sample under Building 351A. Tetra Tech had its engineers mark the areas under the building that were known to be clean so that Smith could be assured he would not obtain another soil sample that came back too "hot." Smith says he understood, based on what his supervisors told him, that Tetra Tech wanted to get free release of the building despite the remaining contamination so Tetra Tech would get paid the final installment for its work in Parcel G.

87.     Tetra Tech submitted false documents to the Navy, claiming that Building 351A had been properly cleared of all radioactive material above release levels, when significantly

elevated radioactivity, beyond free release levels, was known to still exist in the crawl space under the building. The radioactive contamination was not remediated over the next three-plus years that Smith continued to work at the Shipyard. To the best of his knowledge it never has been remediated. It is still to this day "Hot".

88.     Smith states that the soil sample from under Building 351A was the first instance where he was told to get rid of a sample. As further described below, it was not the last.

### b. Parcel A Background Sample

89.     In July or August 2009, Tetra Tech HP Supervisor Justin Hubbard directed Senior HP Anthony Smith to 'ditch' a soil sample from the Shipyard's Parcel A because it was too "hot" radiologically.

90.     Tetra Tech was about to start, or had just started, a project to remove sewer lines below Fisher Avenue and Spear Streets. Smith was directed by Hubbard to obtain a background reference sample (i.e., a sample known not to be radioactively contaminated) for the Spear/Fisher sewer projects. Smith had been told that Parcel A was never used for any industrial purpose, that it was deemed by the Navy to be free of contamination and, as a result, had been transferred to the City of San Francisco for development in 2004. Because of its close proximity to the Fisher/Spear project and assuming Parcel A was clean, Smith determined it would be an appropriate place to obtain a background sample.

91.     Smith proceeded to a location just north of the intersection of Fisher Avenue and Spear Street.  On the north side of the road next to Fisher Avenue and just beyond the sidewalk, there is a concrete wall which descends in height as it extends west and parallel to Fisher Avenue. Beyond the wall is a hill that rises to the top of Parcel A. Just before the stop sign at the intersection of Fisher and Spear (i.e., just northeast of the intersection) and approximately 20 feet from a light pole on the north side of Fisher Avenue, the wall was about waist-high for Smith. Because of how the hill rose behind the wall, Smith was able to reach over the wall and use a trowel to take a sample without bending over. He dug a hole about 6 inches deep in the hillside and took a sample from the bottom of the hole. He gave the sample to Justin Hubbard, who took

it to the laboratory. In a violation of proper procedure, there was no chain-of-custody document accompanying the sample.

92.     The next day, Hubbard approached Smith and had the sample with him. In the presence of HPs Jeff Rolfe, Ray Roberson and Carey Bell, Hubbard told Smith the sample had come back "hot." Hubbard said it contained 2 to 3 picocuries per gram of cesium-137, which Smith knew was much higher than background levels and the cesium-137 cleanup standard of 0.113 picocuries per gram – 18 to 26 times higher than the set health and safety ceiling. Hubbard gave the sample to Smith and told him to "get rid of it and not say a word," or words to that effect. Smith took the sample back to the site where he had taken it and put the soil back in the hole he created earlier for taking the sample. He disposed of the plastic sample container by putting it in a bin set aside for radiological waste. That same day, Smith took a different sample, to be used as the background sample, from a distant site on the shipyard he knew to be clean from prior sampling and analysis.

93.     To the best of Smith's knowledge, the soil contamination he discovered in Parcel A was never thereafter remediated for cesium-137 or other potential radioactive contaminants.

**3. Fraudulent Building Surveys**

94.     The contract between the Navy and Tetra Tech required the company to perform static scans and smears of buildings to determine if they were contaminated with radioactivity beyond free release levels. When a building was found to have elevated levels of radioactivity, Tetra Tech was contracted to engage in remediation to remove the radioactive contamination and bring contaminant levels below release levels. After remediation, Tetra Tech was required to again scan and take smears of the building to determine if all radioactive readings were within acceptable levels. Tetra Tech ordered the post-remediation building scans be done fraudulently so as to obtain free release.

95.     Tetra Tech supervisors divided building areas into three classes, Class 1, 2 and 3. They classified the floors and lowest two meters (or approximately 6 feet) of the walls to be Class 1. The proper way to conduct a Class 1 survey was to slowly scan the "probable sites" of contamination, such as drains down which radioactive liquids might have been poured, and to

scan each surface (i.e., the floor and lower walls) using a Ludlum 2350 scanner (which measures gamma radiation) in a systematic grid. In addition, smear samples were to be taken from area surfaces which the scans identified as highest in radioactivity.

96.     For Class 2, HPs were supposed to take static scan and smear samples in a systematic grid from the higher sections of the walls, above 2 meters. Class 3 areas were considered the ceiling and roof. Scans and smears were to be taken of these areas, but without requiring the strict grid patterns of a Class 1 or 2.

**4. Proper building survey procedure was not followed.**

97.     Anthony Smith was assigned to perform a large number of building surveys. Sometime between the summer of 2010 and early 2011, he was assigned to do building surveys in Building 707, several buildings and building footprints throughout the 500 series and Buildings 351, 351A, 411, 401, 414, 406, 144, 146, 130, 103, 113, and 521. Smith's Tetra Tech HP supervisor, Steve Rolfe, told his survey team, consisting of Jeff Rolfe, Rick Zahensky and Smith, not to worry about doing Class 2 or 3 scans and smears at all. Rather, they were instructed to "just get some numbers and get it done," or "just set your meter down on the ground and let it count," meaning they should allow the scanner to operate in order to obtain data, but that the scanner should be stationary rather than doing a systematic survey of the area as required. Smith and his co-workers followed instructions, did not do proper Class 2 and 3 scans, and reported fraudulent data for the Class 2 and Class 3 scans for nearly all buildings at Hunters Point.

98.     When Smith challenged this practice, Tetra Tech HP supervisor Steve Rolfe told him, "That's what Bill Dougherty [Tetra Tech's Project Manager] wants." The false scanning was also done on other buildings by HP Supervisor Justin Hubbard's team, including Buildings 103, 114, 145, 130, 439, 366, and 813.

**5. Fraudulent Data Reporting**

99.     The contract between the Navy and Tetra Tech required the company to do scans for radioactive contaminants of buildings, developed areas, and areas of open soil. Tetra Tech directed that scan data be altered that were too high, which would result in having to do

additional expensive remediation, or too low, which would raise questions about the scan integrity and potentially require that the scanning be entirely redone.

100.     Anthony Smith personally witnessed HP Tina Rolfe changing scan results so that they would fall within acceptable limits, i.e., not too high but not too low to raise suspicions. One time when Smith was downloading data from his equipment onto a computer, he came up behind Tina Rolfe and saw her working on a computer changing readouts from a Ludlum 2350.

101.     Smith estimates that the HPs downloaded thousands of scan results per day. He states that changing these scan numbers was a very simple thing to do. He also saw her changing numbers on readings from a Ludlum 2360 (which collects surveillance data for alpha and beta radiation). The fact that Tetra Tech was "changing the numbers" was common knowledge among the HPs. Both HPs Ray Roberson and Joe Cunningham told Smith they were aware that scan results were being altered. Senior HP Donna Watson observed Tetra Tech Supervisor Hubbard changing scan readings taken in the field on a computer as early as 2007 or 2008.

102.     Smith observed that Tina Rolfe was directed to change the numbers by her husband, Steve Rolfe, a Tetra Tech HP supervisor. Several times he heard Steve Rolfe say of one sample or another, "that number's too high, it's way above background," and he directed that it be altered to be lower, to be closer to the background levels. Tetra Tech HP supervisor Justin Hubbard was also aware of the alterations. Smith complained about the scan results being changed, and Hubbard told him that Tetra Tech was doing it everywhere else on the Shipyard.

103.     Smith reports that Senior HP Rick Zahensky told him he also changed scan result numbers for an extended period, involving many months, if not years. On numerous occasions Zahensky took a computer home in order to change scan results overnight. Zahensky told Smith that at times he worked until the early hours of the morning to "get the numbers right." Smith was present on several occasions when Zahensky did not "get the numbers right," and was "chewed out" by Steve Rolfe. Smith also witnessed Tina Rolfe being "chewed out" by her husband Steve, when numbers remained too high or too low.

104.     Tetra Tech also violated proper protocol by holding up the delivery of the scan results to the project management office. Proper procedure was that the scan results were to be

submitted to the office by the end of each day on thumb drives. However, rather than submit scan results by day's end, the scan results were held up so that employees like Zahensky could manipulate results that were deemed too high or too low. When Zahensky was given the scan results to take home in the evening, the thumb drive was not submitted until the following day or later. The office had no objection to the tardy delivery of the scan results, since their fraudulent manipulation was done at the direction and insistence of Tetra Tech's upper-level onsite project management.

105.    Bert Bowers, the former Radiation Safety Officer Representative ("RSOR"), has given a Declaration, each fact in which is incorporated by this reference as though fully set forth herein. (See Exhibit 3). He states that a lab technician, Neil Barrett, and a lab supervisor, Phil Smith, came to him on separate occasions complaining they were being asked by upper level project management to "write away" laboratory analysis results, that is, change the results of sample analyses and scans. Bowers directed the employees to go back to the project management, talk with them, and come back to Bowers if they were not satisfied. At that time, Bowers had not been aware project management had been ordering the falsification of samples and scan results. (Bowers Dec. ¶54)

### TETRA TECH'S ADMISSIONS SUBSTITUTING CLEAN SOIL FOR RADIATIVE SOIL IN SUPERVISOR JUSTIN E. HUBBARD'S FEDERAL CRIMINAL GUILTY PLEA

106.    "I, Justin E. Hubbard, and the United States Attorney's Office for the Northern District of California (hereafter "the government") enter into this written Plea Agreement (the "Agreement") pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

"The Defendant's Promises

(1) I agree to plead guilty to Count One of the captioned Information charging me with destruction, alteration, or falsification of records in federal investigations and bankruptcy, in violation of 18 U.S.C. § 1519. I agree that the elements of the offense are as follows: (1) I knowingly altered, falsified, or made a false entry in a record or document; (2) with the intent to impede, obstruct or influence the investigation or proper administration of any matter or in contemplation of or in relation to any

such matter; (3) within the jurisdiction of an agency of the United States.

I agree that the maximum penalties are as follows:

a. Maximum prison term              20 years
b. Maximum fine                           $250,000, or twice gain/loss
c. Maximum supervised release term   3 years
d. Restitution                         To be determined
e. Mandatory special assessment      $100
f. Forfeiture

(2) I agree that I am guilty of the offense to which I am pleading guilty and I agree that the following facts are true:

I have been working in the nuclear industry since approximately 1989, after completing my formal education. During my twenty-five years in the industry, I have conducted decontamination work at nuclear power plants, medical laboratories handling radioactive material, and a "Superfund Site", among other activities. During that same period, I have received training in radiation contamination control, the proper handling of radiological waste, and the assessment of radionuclides in the environment. I have also supervised others in these activities.

In approximately 1994 or 1995, I began performing nuclear remediation work at the former Hunters Point Naval Shipyard ("HPNS"), located in the Bayview District of San Francisco, California. My first employer at HPNS was New World Environment, Inc. ("New World"). After approximately four years with New World, **I was hired by Tetra Tech EC, Inc. ("Tetra Tech"), as a Radiological Task Supervisor at HPNS. As a supervisor at Tetra Tech, I was in charge of a team of radiation control technicians ("RCTs") engaged in radiological remediation of soil at HPNS.** I was aware that Tetra Tech had been hired by the United States Navy ("U.S. Navy") to perform the radiological remediation at HPNS. My employment with Tetra Tech terminated in December 2013. [Emphasis Added]

While working for Tetra Tech, I reported to a Tetra Tech HPNS Project Manager, and a Tetra Tech HPNS Lead Superintendent, among others. The RCT's I supervised worked for Tetra Tech subcontractor Radiological Survey & Remedial Services, LLC ("RSRS").

I understood that the radiological remediation of HPNS was being conducted by Tetra Tech for the U.S. Navy under established sampling guidelines and protocols. My job at HPNS required me comply with a Task Specific Plan ("TSP") which identified, for a Building Series or Area, the number and type of survey units that were to be sampled at specific locations. In general, I would receive directions on a daily basis, including a survey unit map, identifying the sampling locations for a particular survey unit. Once the

Tetra Tech engineers marked these locations, I would supervise the sampling of them by my RCTs.

The RCTs were expected to take soil from each marked sampling location, bag and label the sample, and then send it to a laboratory for an analysis of, among other data, any radionuclides of concern. Chain of custody ("COC") forms and tags showing the precise location of each soil extraction as identified on the survey map were required for each sample. I was aware that information from the chain of custody forms, including the sample locations, was incorporated into the sampling analysis reports prepared by Tetra Tech and emailed to the U.S. Navy.

**During my work at HPNS, I was aware of U.S. Navy testing protocols which mandated that if a laboratory analysis determined a sample of collected soil to be "hot"--that is, containing a higher-than-allowable level of radionuclides of concern--then additional remediation, including more sampling, of that survey unit was to be undertaken until all new collected samples passed laboratory analysis.** [Emphasis Added]

**During 2012, in direct contravention of the relevant U.S. Navy testing protocols, I obtained "clean" dirt from an area north of Buildings 253 and 211 at HPNS and substituted it for dirt taken from survey units in the North Pier area of HPNS. To effect this illegal switching, I drove my company truck to the area north of Buildings 253 and 211 and filled a five-gallon bucket with "clean" serpentinite soil from an area I knew to be outside the relevant marked survey unit. I then drove the clean dirt back to a "conex box"-style trailer. Once I was inside the conex, I emptied the "legitimate" soil samples previously collected by RCT's from their sampling bags into an empty bucket, and substituted the clean serpentinite soil into each sampling bag.** [Emphasis Added]

I did not alter the markings made earlier on the sampling bags by the RCTs, which included the sample number, time, and date. **I then placed a bar code sticker on an outer bag for each sample. A copy of this bar code sticker was also affixed to a chain of custody ("COC") form for each sample.** The sticker was meant to identify the survey unit location the soil was taken from. **By switching the soil inside the sampling bag, I knew that the data on the COCs, many of which I signed, was false. I also knew that the false data on these COCs was incorporated into maps and reports made by Tetra Tech and submitted to the U.S. Navy for the purpose of demonstrating that the area had been successfully remediated.** [Emphasis Added]

**On or about May 31, 2012, I fraudulently switched soil for four survey units on the North Pier of HPNS: Survey Units 1,8,10, and 11. For Survey Unit I, specifically recall replacing the soil samples with soil I had collected from a clean area.** [Emphasis Added]

(3)     I agree to give up all rights that I would have if I chose to proceed to trial, including the rights to a jury trial with the assistance of an attorney; to confront and cross-examine government witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth Amendment claims; to any

further discovery from the government; and to pursue any affirmative defenses and present evidence.

18.    I confirm that my decision to enter a guilty plea is made knowing the charges that have been brought against me, any possible defense, and the benefits and possible detriments of proceeding to trial.  I also confirm that my decision 10 plead guilty is made voluntarily, and no one coerced or threatened me to enter into this Agreement...." (See Exhibit 4)

## TETRA TECH'S ADMISSIONS SUBSTITUTING CLEAN SOIL FOR RADIATIVE SOIL IN SUPERVISOR STEPHEN C. ROLFE'S FEDERAL CRIMINAL GUILTY PLEA

107.    I, Stephen C. Rolfe, and the United States Attorney's Office for the Northern District of California (hereafter "the government") enter into this written Plea Agreement (the "Agreement") pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

"The Defendant's Promises

(1) I agree to plead guilty to Count One of the captioned Information charging me with destruction, alteration, or falsification of records in federal investigations and bankruptcy, in violation of 18 U.S.C. § 1519. I agree that the elements of the offense are as follows: (1) I knowingly altered, falsified, or made a false entry in a record or document; (2) with the intent to impede, obstruct or influence the investigation or proper administration of any matter or in contemplation of or in relation to any such matter; (3) within the jurisdiction of an agency of the United States.

I agree that the maximum penalties are as follows:

|     |                                  |                             |
| --- | -------------------------------- | --------------------------- |
| a.  | Maximum prison term              | 20 years                    |
| b.  | Maximum fine                     | $250,000, or twice gain/loss |
| c.  | Maximum supervised release term  | 3 years                     |
| d.  | Restitution                      | To be determined            |
| e.  | Mandatory special assessment     | $100                        |
| f.  | Forfeiture                       |                             |

(2)I agree that I am guilty of the offense to which I am pleading guilty and I agree that the following facts are true.

In or about September or October 2007, I was hired by Radiological Survey and Remedial Services, LLC., commonly known as RSRS. Thereafter, **in approximately 2008, I became a supervisor at Tetra Tech EC, Inc. ("Tetra**

Tech"), in charge of a team of radiation control technicians ("RCTs") engaged in the radiological remediation of soil at the former Hunters Point Naval Shipyard ("HPNS") located in the Bayview District of San Francisco, California. I served in that role until approximately August 2014. I was aware that Tetra Tech had been hired by the United States Navy ("U.S. Navy") to perform the radiological remediation at HPNS. [Emphasis Added]

While working for Tetra Tech, I reported to a Tetra Tech HPNS Project Manager, and a Tetra Tech HPNS Lead Field Superintendent, among others. During this time period, RSRS was a sub-contractor of Tetra Tech and I supervised several RSRS RCTs.

I understood that the radiological remediation of HPNS was being conducted by Tetra Tech for the U.S. Navy under established sampling guidelines and protocols. My job at HPNS required me to comply with a Task Specific Plan ("TSP") which identified, for a Building Series or Area, the number and type of survey units that were to be sampled at specific locations. In general, I would receive directions on a daily basis, including a survey unit map, identifying the sampling locations for a particular survey unit. Once the Tetra Tech engineers marked these locations, I would supervise the sampling of them by my RCTs.

Once the engineers had marked the survey unit sampling locations, the RCTs were expected to take soil from each marked sampling location, bag and label the sample, then send it to a laboratory for an analysis of, among other data, any radionuclides of concern. Chain of custody forms and tags showing the precise location of each soil extraction as identified on the survey map were required for each sample. In addition to these chain of custody forms and tags, I was also required to fill out a daily "Building/Site Area Report and Survey Unit Tracking Sheet ('survey unit tracking sheet')," which indicated the number of samples taken each day from a specific survey unit to document my team's daily activities. I was aware that information from the chain of custody forms, including the sample locations, was incorporated into the sampling analysis reports made by Tetra Tech and emailed to the U.S. Navy.

During my work at HPNS, I was aware of U.S. Navy testing protocols which mandated that if a laboratory analysis determined a sample of collected soil to be "hot"-that is, containing a higher than allowable level of radionuclides of concern-then additional remediation, including more sampling, of that survey unit was to be undertaken until all new collected samples passed laboratory analysis.

**During 2012, I told the RCTs on my team to get "clean dirt" from areas known to be clean and taken from outside the marked survey unit areas to use as substitute samples for the dirt from the marked survey unit. did this so that the survey unit would pass the laboratory analysis and not require further remediation.** [Emphasis Added]

I am aware of at least two different sources of dirt for clean samples, "green dirt" from certain locations known to be clean and "brown dirt" from a pile formerly located on H Street, southeast of Building 606 at HPNS. **During**

**this time period, I estimate that I told my RCTs to get clean dirt outside the designated survey units on approximately twenty occasions. On multiple occasions the switching of this dirt was done inside a "conex" trailer on site in my presence. I knew on these occasions that the soil locations reported in the chain of custody forms and the survey unit tracking sheets for these samples were false, that is, that the locations reported on the forms regarding where the soil came from were untrue. I would estimate that there were between ten to twenty occasions when saw a chain of custody from being filled out when I knew the data on the form was inaccurate. I directed the RCTs to switch soil for samples 81-100 for Survey Unit 22, taken on August 23, 2012. On that occasion, I falsified data on the survey unit tracking sheet in that] stated on the form the soil came from within that Survey Unit when I know it did not. I also know that the sampling data from Survey Unit 22 incorporated into the map and analyses sent by Tetra Tech to the U.S. Navy on August 29, 2012 was false.** [Emphasis Added]

I did not receive extra compensation for substituting "clean" soil for potentially contaminated soil in a survey unit. **My motivation came from pressure applied by the Tetra Tech supervisors. One told me on multiple occasions to "get the hell out of that area," in reference to a particular survey unit that was not testing clean. Another told me on more than one occasion that we were "not remediating the whole goddam site." An Assistant HPNS Project Manager told me on numerous occasions to "get clean dirt."** I understood these statements as a direction to go outside the appropriate survey unit and get dirt from other areas that was known to be clean, that is not containing excessive levels of radiation. I knew that my conduct would impede the proper investigation and administration of the radiological remediation being undertaken by the U.S. Navy at HPNS. [Emphasis Added]

(3)    I agree to give up all rights that I would have if I chose to proceed to trial, including the rights to a jury trial with the assistance of an attorney; to confront and cross-examine government witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth Amendment claims; to any further discovery from the government; and to pursue any affirmative defenses and present evidence.

18. I confirm that my decision to enter a guilty plea is made knowing the charges that have been brought against me, any possible defense, and the benefits and possible detriments of proceeding to trial. I also confirm that my decision 10 plead guilty is made voluntarily, and no one coerced or threatened me to enter into this Agreement." [Emphasis Added] (See Exhibit 5)

# VI. DAMAGES



*Workers leaving the shipyard, World War II, circa 1943*

108.    "Tens of thousands of Black workers were recruited from the South to work in Bay Area shipyards. Here, in a photo taken around 1943, workers at the Hunters Point Naval Shipyard have finished the day's shift and are headed home. Some 10,000 of them lived adjacent to the shipyard in Hunters Point. Many of their descendants still do, and they recall their relatives dying of diseases from exposure to the radioactivity and multiple toxins that were and are ubiquitous there."[9] The BAYVIEW HUNTERS POINT RESIDENTS are still, as we speak, dying from exposure to radioactivity and a toxic stew of deadly poisons in the air they breathe, in the water they drink, in their homes where they spend most of their living time, with their

---

[9]  Showdown! Radiological data fraud at Hunters Point Shipyard 2018
January 29, 2018 by Ahimsa Porter Sumchai, M.D, A former physician specialist with the San Francisco Department of Public Health and former attending physician for the Palo Alto VAH Environmental Registry.

children suffering from asthma, mothers sick with breast cancer, fathers struggling with cardiovascular diseases and families suffering with a myriad of other toxic caused illnesses.

109.   "[T]he cost of medical monitoring is a compensable item of where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of a plaintiff's toxic exposure and that the recommended monitoring is reasonable"[10] *Potter v. Firestone Tire Rubber Co.* (1993) 6 Cal.4th 965, at p. 1009).

110.   Radioactive Components Identified as Contaminants of Concern on Hunters Point Ship Yard:[11]

| | |
|---|---|
| **Bismuth 214** | Kidney damage |
| **Cesium 137** | Thyroid cancer; Increases risk of cancer; Bone marrow failure; and Reproductive effects. |
| **Cobalt 60** | Associated carcinogen in humans; Sterility. |
| **Plutonium 239** | Cancer of the lungs, liver, bone and bone marrow. |
| **Radium 226** | Bone cancer |
| **Strontium 90** | Human carcinogen; Cancer of the bone, nose, lungs, skin Leukemia; |

[10]   There is now sufficient mechanistic and epidemiological evidence to accept that exposure to external ionising radiation at low doses < 100 mSv is a risk factor for dementia." Christopher Busby, *A Risk Coefficient for Radiation-Induced Dementia*, June 14, 2018, http://www.scirp.org/Journal/PaperInformation.aspx?PaperID=85279

[11]   **Wilma Subra** Chemist / Technical Adviser
Mrs. Subra holds degrees in Microbiology/Chemistry from the University of Southwestern Louisiana. She received the MacArthur Fellowship "Genius" Award from the MacArthur Foundation for helping ordinary citizens understand, cope with and combat environmental issues in their communities and was one of three finalist in the Environmental Category of the 2004 Volvo for Life Award. Was selected in 2011 as one of the 'Lifetime Remarkable Woman' and most recently won the 2011 Global Exchange, Human Rights Award for her ongoing work with the BP Oil Spill and the communities affected by it.

| | Cancer due to damage to genetic material in cells. |
|---|---|
| | |

      The radioactive components have extremely long half lives, and will remain in the environment hundreds to thousands of years. Thus, if the radioactive components are not addressed on the former Hunters Point Ship Yard, they have the potential to migrate off the former Ship Yard site in the form of particulate emissions as well as potential contaminants in ground water and serve as a source of Fear of Cancer to Bay View community members and potential future occupants on the ship yard property.

      In the areas where the radioactive components still remain unaddressed on the ship yard property, other toxic chemicals are also known to be present. These toxic chemicals consist of volatile organic compounds, semi-volatile organic compounds, polynuclear aromatic hydrocarbons, PCBs, pesticides, petroleum hydrocarbons and dioxins and furans. These toxic chemicals are also know to cause a variety of cancers and serve as a source of Fear of Cancer to Bay View community members and potential future occupants on the ship yard property.

      Applying the methodology of Probability of Causation, and based on my discussions with Bay View Hunters Point Residents' in 2010 and in June 2018, including visiting the HPNS, and having read the guilty pleas of the TTEC supervisors, admitting to taking ""clean" dirt from an area north of Buildings 253 and 211 at HPNS and substituted it for dirt taken from survey units in the North Pier area of HPNS", plus review of the sworn declarations of several whistleblowers confirming the supervisors criminal admissions, it is my opinion to a reasonable reliable scientific probability that the risk of developing cancer in the BHPR has significantly increased by the additional radiation releases from TTEC's admitted actions of leaving radioactive soil in the ground at the ship yard. Further, it is my opinion that TTEC's actions have resulted in significant actual risk of cancer or other toxic related illnesses to the BHPR. These facts support my opinion of the reasonableness of Fear of Cancer to Bay View community members.[12]

111.   Bayview Hunters Point Residents have suffered economic and non-economic damages, including, but not limited to, the following:

      **A. ECONOMIC**

---

[12] Id.

1. MEDICAL BILLS

2. MEDICAL MONITORING--NEXT FIVE (5) GENERATIONS

3. PROPERTY DAMAGE

4. COST OF URGENT SCREENING AND TESTING FOR RADIATION
   RELATED ILLNESSES

5. DIMINUTION IN HOME VALUES DUE TO GROUND WATER
   CONTAMINATION

6. LOST INCOME

112.    On information and belief, the NAVY has sent out to Bayview Hunters Point Residents "Deed notification that soil below the groundwater table in remediated areas may be contaminated."

**B. NON-ECONOMIC**

FEAR

ANXIETY

LOSS OF ENJOYMENT OF LIFE

MENTAL DISTRESS

EMOTIONAL DISTRESS

PAIN

HUMILIATION

SUFFERING

**VII. CLASS ACTION ALLEGATIONS**

113.    PLAINTIFFS bring this lawsuit as a class action and on behalf of themselves and all others who are similarly situated. The class is composed of all persons who are RESIDENTS OF BAYVIEW HUNTERS POINT, consisting of individuals who have been living, working, attending school or had substantial contact with the community from 2004 to present.

114.    The geographic parameter of the BAYVIEW HUNTERS POINT RESIDENTS is limited to the last, 2010, census tract populations as similarly situated.[13]

115.    The members of the class are so numerous, approximately 38,484 Residents, that joining them all individually would be impracticable. PLAINTIFFS don't know the exact number of the members of the class at this time, but the number and identity of the class members is easily ascertainable through DEFENDANTS' business records.

116.    PLAINTIFFS have the same interest in this matter as all other members of the class.

117.    PLAINTIFFS' claims are typical of all the members of the class.

118.    A well-defined community of interest in the questions of law and fact involving all members of the class exists.

119.    Common questions of law and fact predominate over questions that may affect only individual class members.

120.    Questions of law include:

    a.  Common The nature and application of DEFENDANTS' statutory and common law duties to avoid unfair and fraudulent business practices;

    b.  The nature and application of DEFENDANTS' statutory and common law duties to avoid false and misleading communications about the remediation of radiation and toxins at the HPNS, which is causing harm, fear, mental and emotional distress to all PLAINTIFFS;

    c.  The nature and application of the DEFENDANTS' duties with respect to the operation, management and supervision of the soil remediation and clean-up operation of the HPNS;

    d.  DEFENDANTS' applicable standard of care with respect to the operation, management and supervision of the soil remediation and clean-up operation of the HPNS.

---

[13]  See Exhibit 1, Census Tract Map

121.    Common questions of fact include:

    a.   Did DEFENDANTS breach their statutory and common law duties to avoid unfair and fraudulent business practices?

    b.   Did DEFENDANTS breach their statutory and common law duties to avoid false and misleading communications about the soil remediation and clean-up operation of the HPNS?

    c.   Did DEFENDANTS breach their duties with respect to the operations, management and supervision of the soil remediation and clean-up operation of the HPNS?

    d.   What is the measure of restitution, including medical bills, costs for medical monitoring, and other costs DEFENDANTS owe to PLAINTIFFS and class members resulting from the breach of their duties with respect to operations, management and supervision of the soil remediation and clean-up operation of the HPNS?

122.    PLAINTIFFS' claims are typical of all class member claims because all class members' claims for equitable relief and restitution arise from DEFENDANTS' failure to carry proper and professional soil remediation and clean-up of radiation and toxic carcinogenic materials as DEFENDANTS were contracted to do for the benefit of PLAINTIFFS. Instead, DEFENDANTS engaged in unfair and fraudulent business practices, false and misleading statements, breach of the duty of good faith and fair dealing, and bad faith breach of third party beneficiary contract.

123.    The evidence and the legal issues regarding DEFENDANTS' wrongful conduct are substantially identical for PLAINTIFFS and all of the class members.

124.    DEFENDANTS have acted or failed to act on grounds generally applicable to all class members, making equitable relief—e.g., restitution to each class member—appropriate to the class as a whole.

125.     The court should certify the class because common questions of law and fact predominate over individual questions. Legal issues regarding duty and standard of care are

common to all class members' claims. Factual issues regarding breach and the measure of restitution are common to all class members' claims. For example, the financial detriment suffered by each member of the class may be determined with respect to the difference between the fair market value of the medical treatments, medical monitoring or other costs common to the class as a whole. The financial detriment to all class members is directly caused by DEFENDANTS promising—but not delivering—a remediated clean HPNS consistent with applicable federal and state safety and requirements, and DEFENDANTS' failure to monitor, manage, maintain and best practices to prevent release of radioactive and toxic carcinogenic materials into the air, homes, property and persons of Class Members.

126. A class action is superior to all other available procedures for the fair and efficient adjudication of these claims. Even if any individual class member could afford individual litigation, it would be unduly burdensome to the courts in which the separate lawsuits would proceed. A single class action is preferable to separate, individual lawsuits because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.

127. **PLAINTIFFS DANIELLE CARPENTER** and **CATHERINE MUHAMMAD** are educated, articulate, professionals who will fairly and adequately protect the interests of the members of the class. PLAINTIFFS do not have interests that are contrary to or in conflict with those of the members of the class they seek to represent. PLAINTIFFS' undersigned counsel is experienced and capable of managing a class action of this anticipated size and complexity, and will vigorously prosecute the class claims.

128. The prosecution of separate, individual lawsuits by individual members of the class would create a risk of inconsistent or contradictory findings of fact and law—which could impose incompatible standards of conduct for DEFENDANTS—and would lead to repetitious trials of the numerous common questions of fact and law. PLAINTIFFS know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of these claims.

129.    Class members may be identified and notified of developments in this class action through DEFENDANTS' billing data base, DEFENDANTS' marketing data base, DEFENDANTS' website at *http://www.tetratech.com/*, and through state or nationwide publications.

130.    PLAINTIFFS and class members have suffered financial losses and irreparable harm as a result of DEFENDANTS' wrongful conduct. Without a class action, PLAINTIFFS and members of the class will continue to suffer losses, thereby allowing DEFENDANTS' wrongful conduct to proceed without remedy, and allowing DEFENDANTS to retain the proceeds of their ill-gotten profits, contrary to California law and public policy.

## PRIVATE ATTORNEY GENERAL ALLEGATIONS

131.    PLAINTIFFS bring these claims as private attorneys general on behalf of the class and the general public pursuant to Business & Professions Code §17204. PLAINTIFFS seek to enjoin DEFENDANTS from engaging in the unfair and fraudulent business practices alleged, and to require DEFENDANTS to make restitution of all monies wrongfully obtained through their unfair and fraudulent business practices. A private attorney general/representative action is necessary and appropriate because DEFENDANTS have engaged in the wrongful acts alleged as a general business practice.

### FIRST CAUSE OF ACTION
### UNFAIR AND FRAUDULENT BUSINESS PRACTICES
### (Against TETRA TECH EC, INC. TETRA TECH, INC., and Does 1 to 50)

132.    PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

133.    DEFENDANTS' wrongful conduct constitutes unfair and fraudulent business practices that can and have in fact deceived PLAINTIFFS and class members in violation of California Business & Professions Code §17200 et seq. ("UCL"), providing: "unfair competition shall mean and include any unlawful, unfair or **fraudulent business act or practice** and unfair, deceptive, untrue or misleading advertising and any act prohibited by **§ 17500. Prohibiting False or Misleading statements.**

134.    California Business & Professions Code § 17500 expressly states, in pertinent part: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to perform services, professional or otherwise... or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto...to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate... in any newspaper or other publication, or any advertising device,... or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to [perform] ... those services, professional or otherwise, so advertised [or agreed] at the price stated therein....**Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine. [Emphasis Added]**

135.    DEFENDANTS violated California Business & Professions Code §§ 17200-17500 by engaging in the following, but not limited to, unlawful, unfair and **fraudulent business act and practices, and unfair, deceptive, untrue or misleading statements**:

        a.    False and misleading representations about the remediation and clean-up of radiation and toxins at HPNS.

        b.    Failure to carry out the remediation and clean-up of radiation and toxins at HPNS.

        c.    Failure to remove, dispose and remediate, discharge, and clean up radiation and toxins from HPNS.

d. Fraudulently billing tax payers of BAYVIEW HUNTERS POINT

RESIDENTS and U.S. taxpayers for services never performed nor provided,

creating unjust enrichment to DEFENDANTS.

136.    DEFENDANTS' criminal, wrongful, fraudulent conduct is part of an ongoing pattern and practice, a systematic course of conduct which is repeated daily at other locations pursuant to government contracts.

137.    DEFENDANTS' wrongful conduct adversely impacts the public interest. DEFENDANTS' wrongful conduct is a factual and legal cause of financial harm to PLAINTIFFS and class members. PLAINTIFFS and class members would have objected to DEFENDANTS' contract with the government if the true facts were disclosed that DEFENDANTS entered into the contract to remediate HPNS with the intent to not perform the contract, but with the fraudulent, deceptive intent to "take the money and run", and the intent to leave the PLAINTIFFS in a worse environmental disaster than before because DEFENDANTS, pretending to remediate, uncovered, turned over and disturbed radioactive soil, releasing radionuclides into the air, which DEFENDANTS knew would be blowing over PLAINTIFFS.

138.    DEFENDANTS knew the danger posed to the community of low income people, who are without financial means to properly protect their safety, health, and legal rights. DEFENDANTS showed a conscious disregard to the civil rights granted by the creating energy creating all creation, including the right to Life, Liberty, and the Pursuit of Happiness. DEFENDANTS would not have engaged in such reckless, criminal, life threatening conduct in their own communities, or the communities of the rich, famous and powerful. DEFENDANTS' criminal conduct is not only an intentional disregard of the lives of the BAYVIEW HUNTERS POINT RESIDENTS, but also for their offspring for the next foreseeable five (5) generations since the radionuclides DEFENDANTS deliberately, intentionally, conspiratorially left in the ground have a half-life of thousands of years. Several radioactive isotopes released by DEFENDANTS, such as iodine-131, cesium-134 and cesium-137 and strontium-90, Cesium-137 have a half-life of 30 years and remain in the environment for decades. Nuclear waste is loaded

with noble gases. The noble gases, such as xenon or krypton, are called noble because they don't react with anything. **All the noble gases are released when radioactive waste is disturbed.**

139.    DEFENDANTS knew they were undertaking to perform a dangerous task on behalf of the BAYVIEW HUNTERS POINT RESIDENTS, and the San Francisco Community. DEFENDANTS knew they were engaging in an ultra-hazardous activity. DEFENDANTS knew they were handling radioactive material like Plutonium-239, which is particularly long-lived and toxic with a half-life of 24,000 years and remains hazardous for tens of thousands of years. DEFENDANTS knew that the isotope iodine-131 is easily absorbed by the thyroid. Persons exposed to releases of I-131 from any source have a higher risk for developing thyroid cancer or thyroid disease, or both. DEFENDANTS knew that Cesium-137 is also a particular threat because it behaves like potassium-40 and is taken up by cells throughout the body. Radioactivity is defined as the spontaneous decay or disintegration of the nucleus of an atom. Radioactive nuclei decompose by releasing nuclear radiation consisting of high-energy particles or photons.[14] DEFENDANTS knew that "the amount of radiation released by a radioactive material depends on its rate of decay. Potassium-40 is considered a very long-lived radioisotope—it takes an extremely long time for decay to occur. "The rate at which a radioisotope decays is most conveniently described by the half-life, which is defined as the time required for one-half of the atoms of a radioisotope to emit radiation and decay to products. For potassium-40, the half-life is $1.28 \times 10/9$ years."[15]

140.    DEFENDANTS, at all relevant times, knew additionally, that Cs-137 has a long, 30-year-half-life and causes acute radiation sickness, and increases the risk for cancer because of exposure to high-energy gamma radiation. Internal exposure to Cs-137, through ingestion or inhalation, allows the radioactive material to be distributed in the soft tissues, especially muscle tissue, exposing these tissues to the beta particles and gamma radiation and increasing cancer risk. Radiation causes mutations in DNA, resulting in birth defects in future generations and offspring.

---

[14]https://www.flinnsci.ca/api/library/Download/f3dfdff2c4854ad99a385f5e2110b2d4
[15] **Id**.

141.   DEFENDANTS, at all relevant times, knew Strontium-90 behaves like calcium, and tends to deposit in bone and blood-forming tissue (bone marrow). 20–30% of ingested Sr-90 is absorbed and deposited in the bone. Internal exposure to Sr-90 is linked to bone cancer, cancer of the soft tissue near the bone, and leukemia. The risk of cancer increases with increased exposure to Sr-90.[16]

142.   DEFENDANTS, at all relevant times, knew when radiation is released or leaks, it contaminates the environment and poses a serious health threat to humans and other species. The greater the concentration of radiation that escapes, the higher the risk to humans, creating an enhanced threat to human health. Radiation does not readily break down and does not biodegrade in the ground or water or apparatus exposed to it. Research shows that it will persist in the environment for decades, since even a half-life in excess of 77 years is far longer than the life expectancy of humans exposed to it.

143.   Epidemiological studies of ionizing radiation show it causes dementia, specifically the problem of Krypton-85 and its affinity for fatty brain tissue. Studies have shown that Krypton has a 9-fold higher solubility in fats than in water and therefore it would concentrate in the myelin sheathing of nerves and other tissues of the brain which contain large amounts of lipid. Studies show that there is a statistically significant 2-fold excess risk of dementia in people who are experiencing prolonged exposure to radiation.[17]

144.   PLAINTIFFS and class members request that the court enter such orders as may be necessary to restore to PLAINTIFFS and class members all sums which DEFENDANTS wrongfully acquired by means of unfair and fraudulent conduct, as provided in Business & Professions Code §17203, Civil Code §3345, and for other appropriate relief.

145.   Injunction Relief; Court Orders: Business & Professions Code §17203 states: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment

---

[16]  http://en.wikipedia.org/wiki/Radiation_effects_from_the_Fukushima_Daiichi_nuclear_disaster
[17]  Supplementary Expert Report on Causation in case of Lawson v. General Electric, Christopher Busby PhD

by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure."

146.    DEFENDANTS' unlawful and criminal misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of *California Civil Code § 3294*, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

### SECOND CAUSE OF ACTION
### FALSE AND MISLEADING STATEMENTS
**(Against TETRA TECH EC, INC. TETRA TECH, INC., and Does 1 to 50)**

147.    PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

148.    DEFENDANTS' wrongful conduct constitutes unfair and fraudulent business practices that have in fact deceived PLAINTIFFS and class members in violation of California Business & Professions Code § 17500.

149.    DEFENDANTS made untrue and misleading statements about the implementation, execution, disposition, discharge, clean-up, and remediation of radiation and toxins at HPNS.

150.    DEFENDANTS failed to carry out the terms and conditions of the 1.1 Billion Dollars Contract with the Navy, entered into for the benefit of the San Francisco Community, including the community of the BAYVIEW HUNTERS POINT RESIDENTS.

151.    DEFENDANTS' misleading statements are the following:

"At Tetra Tech, we seek clear, sustainable solutions that improve quality of life. We take this responsibility seriously because Tetra Tech's work often places us at the center of our clients' environmental, safety, and sustainability challenges.

These challenges often involve the opinions of public, industry, and government stakeholders who seek Tetra Tech's advice on complex issues. We have helped thousands of towns, cities, industries, and governments find sustainable solutions to complex issues concerning resource management and infrastructure.

To provide solutions to these challenges, we believe in maintaining our technical objectivity. We have earned our reputation for technical objectivity over more than five decades.

We have designed progressive, green buildings in New York City, helped the U.S. Department of Defense with pollution prevention and clean-up, and helped many Fortune 500 companies balance environmental needs with business goals. We are helping Vancouver achieve its goal of becoming the greenest city in the world. Tetra Tech companies hold memberships with the U.S. Green Building Council and the Chicago Climate Exchange.

We also encourage our professionals to participate in outreach programs to help improve the communities in which they live and work. Tetra Tech associates and offices around the globe participate in many financial, in-kind, volunteer, and pro bono activities each year."[18]

152.    DEFENDANTS' self-serving statements are false, as the evidence proves in this case. The preponderance of evidence proves that DEFENDANTS falsified soil samples; covered over, and covered-up radioactive killer toxins in the trenches; switched "Hot" radioactive soil for clean soil to pass inspection in order to get money; ordered employees to engage in fraudulent alteration and spoliation of chain of custody records; intentionally sending trucks loaded with dirt under the cover of night when the Geiger Counter Monitors were turned off so as to avoid radiation detection or lack thereof. This illegal, criminal misconduct was designed with a scheme of misleading the Navy, the EPA and the BAYVIEW HUNTERS POINTS RESIDENTS. This

[18] http://www.tetratech.com/en/social-responsibility

conduct is antithetical to the representations and statements such as "At Tetra Tech, we seek clear, sustainable solutions that improve quality of life. We take this responsibility seriously because Tetra Tech's work often places us at the center of our clients' environmental, safety, and sustainability challenges." This internet statement is a violation of the law.

153. DEFENDANTS' statements and representations that they were cleaning, and removing the radioactive materials from HPNS, coupled with the representations on their website and their publications that they "…believe in maintaining our technical objectivity. We have earned our reputation for technical objectivity over more than five decades"--these representations induced justifiable reliance in the BAYVIEW HUNTERS POINTS RESIDENTS that they were safe. Now they are afraid. They are gripped with fear of contracting cancer, more asthma, breast cancer, testicular cancer, thyroid cancer, and the host of others medical conditions the HPNS has inflicted upon them.

154. As a direct result of DEFENDANTS' violation of §17500, DEFENDANTS have been and will be unjustly enriched at the expense of PLAINTIFFS, class members, and the general public.

155. Pursuant to §17535, PLAINTIFFS and class members seek an order awarding PLAINTIFFS and class members restitution of all monies wrongfully acquired by the DEFENDANTS by means of false statements, plus interest and attorneys' fees pursuant to, inter alia, CCP § 1021.5.[19]

156. DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses

---

[19] Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate....

including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

157.    DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of *California Civil Code § 3294*, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

### THIRD CAUSE OF ACTION
### NEGLIGENCE FEAR OF CANCER
### (Against TETRA TECH EC, INC. TETRA TECH, INC., and Does 1 to 50)

158.    PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

159.    **CALIFORNIA JURY INSTRUCTION:** 1623 Provides: Negligence-Recovery of Damages for Emotional Distress--No Physical Injury-Fear of Cancer, or radiation or toxic caused illness, Malicious, Oppressive, or Fraudulent Conduct-Essential Factual Elements.

160.    BAY VIEW HUNTERS POINT RESIDENTS claim that DEFENDANTS TETRA TECH acted with malice or oppression, or fraudulent or intent in exposing to them to carcinogen and toxic substance, and that this conduct caused BAY VIEW HUNTERS POINT RESIDENTS to suffer serious emotional distress. The preponderance of the evidence proves each of the elements **to establish this claim in favor of BAY VIEW HUNTERS POINT RESIDENTS who must prove all of the following five (5) Elements:**

  1.    That BAY VIEW HUNTERS POINT RESIDENTS were exposed to a radiation related injury, a FEAR of cancer or radiation or toxins related illness as a result of DEFENDANTS TETRA TECH'S negligent conduct;

  2.    That TETRA TECH acted with malice/oppression/fraudulent intent because

    A.    THAT TETRA TECH intended to cause injury to BAY VIEW HUNTERS POINT RESIDENTS; **OR**

B.  TETRA TECH'S conduct was despicable and was carried out with a willful or conscious disregard of BAY VIEW HUNTERS POINT RESIDENTS' rights or safety; **OR**

C.  TETRA TECH'S conduct was despicable and subjected BAY VIEW HUNTERS POINT RESIDENTS to cruel and unjust hardship in conscious disregard of BAY VIEW HUNTERS POINT RESIDENTS' rights; **OR**

D.  TETRA TECH Intentionally misrepresented or concealed a material fact known to TETRA TECH, intending to cause BAY VIEW HUNTERS POINT RESIDENTS harm;

3.  That BAY VIEW HUNTERS POINT RESIDENTS suffered serious emotional distress from a fear that they will develop cancer, as a result of the exposure;

4.  That reliable medical or scientific opinion confirms that BAY VIEW HUNTERS POINT RESIDENTS' risk of developing cancer was significantly increased by the exposure and has resulted in an actual risk that is significant; and

5.  That TETRA TECH'S conduct was a substantial factor in causing BAY VIEW HUNTERS POINT RESIDENTS serious emotional distress.

Emotional distress includes suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame. Serious emotional distress exists if an ordinary, reasonable person would be unable to cope with it. "Despicable conduct" is conduct that is so mean, vile, base, or contemptible that it would be looked down on and despised by reasonable people.

161.  An estimated 20 schools are located within a one mile radius of the Hunters Point shipyard and in 2006, children playing outdoors on a hillside adjacent to grading activities developed a range of cardiorespiratory symptoms and signs of exposure to dust containing asbestos and particulates in concentrations above that allowed by law. According to Your Neighborhood at a Glance prepared by Harder + company community (research for the San

Francisco Department of Public Health, Health Care Services Master Plan Community Meeting held on March 22, 2012), 65% of Bayview Hunters Point residents perceive their safety during the day to be very unsafe or unsafe compared with a citywide average of 26%. Adding to the enormous burden of cardiopulmonary disease documented among residents of 94124, there is the cumulative psychological trauma introduced by chronic exposure to known toxins from adjacency to a Federal Superfund site undergoing remediation.[20]

162. PLAINTIFFS' Experts provide "reliable medical or scientific opinion" confirming that BAY VIEW HUNTERS POINT RESIDENTS' risk of developing cancer was significantly increased by the exposure and has resulted in an actual risk that is significant.

163. PLAINTIFFS' injuries, damages, losses, fear and harm are the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release of the nature and kind that was released at HPNS.

164. DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

165. DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of *California Civil Code § 3294*, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

---

[20] Ahimsa Porter Sumchai, M.D. A former physician specialist with the San Francisco Department of Public Health and former attending physician for the Palo Alto VAH Environmental Registry,

# FOURTH CAUSE OF ACTION
## STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES
### (Against TETRA TECH EC, INC. TETRA TECH, INC., and Does 1 to 50)

166.    PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

167.    DEFENDANTS, and each of them, engaged in an ultra-hazardous activity that caused harm, damages, losses, injuries, including fear of contracting cancer, birth defects for their children, born and unborn, and economic and non-economic damages.

168.    DEFENDANTS, and each of them, are responsible for that harm, injuries, damages, both economic and noneconomic because DEFENDANTS engaged in remediation of nuclear waste, radioactive materials, an ultra-hazardous activity at HPNS.

169.    PLAINTIFFS' injuries, damages, losses, fear and harm are the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release as the nature and kind that was released at HPNS.

170.    DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. PLAINTIFFS will continue to incur losses and damage in the future. Based on PLAINTIFFS' repeated exposure to ionizing radiation, PLAINTIFFS have a reasonable fear that said exposure more likely than not increases their risk of developing cancer in the future.

171.    DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

172.    DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of *California Civil Code § 3294*, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF PROPOSITION 65**
**(Against TETRA TECH EC, INC. TETRA TECH, INC., and Does 1 to 50)**

173.    PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

174.    Proposition 65 California Health and Safety Code sections 25249.5 - 25249.13 imposes: "Prohibition On Contaminating Drinking Water With Chemicals Known to Cause Cancer or Reproductive Toxicity.  No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water, notwithstanding any other provision or authorization of law except as provided in Section 25249.9.

175.    Proposition 65 Section 25249.6 states: "Required Warning Before Exposure To Chemicals Known to Cause Cancer Or Reproductive Toxicity.  No person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual…. (a) Any person that violates or threatens to violate Section 25249.5 or 25249.6 may be enjoined in any court of competent jurisdiction. (b) (1) Any person who has violated Section 25249.5 or 25249.6 shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) per day for each violation in addition to any other penalty established by law.  That civil penalty may be assessed and recovered in a civil action brought in any court of competent jurisdiction.

176.    Since 2006, DEFENDANTS failed to comply with Proposition 65 by failing to notify BAYVIEW HUNTERS POINT RESIDENTS that they were releasing radioactive

materials in the air, and by failing to give warning that DEFENDANTS were leaving, covering over, paving under, and covering up radiative materials on the grounds of HPNS.

177.     DEFENDANTS admitted in 2014 that their soil samples were mishandled, but concealed that their practice and policy was to submit fake, fraudulent soil samples, switching contaminated radiative soil with clean dirt to pass the regulatory inspections.

178.     DEFENDANTS' actions have caused and continued to cause harm, damages, including mental and emotional distress, anxiety, physical and physic injuries, including fear of radiation related injuries to BAYVIEW HUNTERS POINT RESIDENTS.

179.     DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

180.     DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of *California Civil Code § 3294*, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

**SIXTH CAUSE OF ACTION**

**FRAUD**
**(Against TETRA TECH EC, INC., TETRA TECH, INC., and Does 1 to 50)**

181.     PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

182.     DEFENDANTS represented that they were professionals and were skilled at performing radiation remediation and that they would remove and clean-up the radioactive materials from HPNS for the exchange of Billions of dollars. DEFENDANTS lied. DEFENDANTS acted with full knowledge, plan and scheme to defraud the public, including the BAYVIEW HUNTERS POINT RESIDENTS, and did defraud the public and PLAINTIFFS as the evidence herein proves.

183. PLAINTIFFS justifiably relied to their detriment on DEFENDANTS' representations that the community was going to be "safe". Based on this reliance, BAYVIEW HUNTERS POINT RESIDENTS did not take any safety precautions such as demanding the replacement of DEFENDANTS with an honest, capable remediation company. PLAINTIFFS relied on DEFENDANTS' representations that DEFENDANTS were taking all safety measures and following the law, best practices and adhering to the standard of care for similar toxic remediation companies.

184. DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

185. DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of *California Civil Code § 3294*, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

## SEVENTH CAUSE OF ACTION
### NEGLIGENCE PER SE
### CRIMINAL CONVICTIONS
**(Against TETRA TECH EC, INC., TETRA TECH, INC., and Does 1 to 50)**

186. PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

187. DEFENDANTS breached a duty owing the PLAINTIFFS, a duty arising out of the contract with the Navy to remediate HPNS. DEFENDANTS were negligent per se since they violated federal criminal law and the statutory scheme mandated in Proposition 65 expressly for the protection of the class of people in which PLAINTIFFS are members.

188.    DEFENDANTS' negligence per se was a direct and proximate cause of PLAINTIFFS' damages and harm.

189.    DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

190.    DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish Defendants and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

## EIGHTH CAUSE OF ACTION
## BAD FAITH BREACH OF THIRD PARTY CONTRACT
### (Against TETRA TECH EC, INC., TETRA TECH, INC., and Does 1 to 50)

191.    PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

192.    DEFENDANTS entered into a contract with the Navy to remediate the HPNS for the benefit of BAYVIEW HUNTERS POINT RESIDENTS and the San Francisco community. PLAINTIFFS were named in the contract as the beneficiaries to whom the benefit would flow from the discharge of the terms and conditions of the contract.

193.    DEFENDANTS committed fraud, failed to honor and perform their duties under the contract, and created a failure of consideration. DEFENDANTS are liable for all of PLAINTIFFS' damages, including medical expenses and medical monitoring for the next five (5) generations.

WHEREFORE, Plaintiffs pray judgment as hereinafter set forth.

## NINTH CAUSE OF ACTION
## PUBLIC NUISANCE
### (Against TETRA TECH EC, INC., TETRA TECH, INC., and Does 1 to 50)

194.    PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

195.    California Civil Code section 3479: "Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance."

196.    California Civil Code section 3480 provides:  "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

197.    "[M]ere apprehension of injury from a dangerous condition may constitute a nuisance where it interferes with the comfortable enjoyment of property (46 C.J. § 50, p. 680), and that the injured party need not seek an abatement of the nuisance but may sue for damages. McIvor v. Mercer-Fraser Co. (1946) 76 Cal.App.2d 247, 254 [172 P.2d 758].  The public nuisance doctrine is aimed at the protection and redress of community interests and, at least in theory, embodies a kind of collective ideal of civil life which the courts have vindicated by equitable remedies since the beginning of the 16th century." People ex rel. Gallo v. Acuna (1997) 14 Cal.4th 1090, 1103 [60 Cal.Rptr.2d 277, 929 P.2d 596]. "[N]ot every interference with collective social interests constitutes a public nuisance. To qualify . . . the interference must be both substantial and unreasonable." People ex rel. Gallo, supra, 14 Cal.4th at p. 1105.  "The elements 'of a cause of action for public nuisance include the existence of a duty and causation.' Public nuisance liability 'does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the nuisance.' " Melton v. Boustred (2010) 183 Cal.App.4th 521, 542 [107 Cal.Rptr.3d 481].

198.    DEFENDANTS, and each of them, engaged in negligent, reckless, intentional, and criminal conduct by deliberately and premeditatedly leaving and placing radioactive soil in the HPNS, fully aware that dust, debris, and radionuclides would blow with the prevailing winds

over the BAYVIEW HUNTERS POINT RESIDENTS and cause life threatening permanent injuries and death.

199.   BAYVIEW HUNTERS POINT RESIDENTS suffered harm because DEFENDANTS created a nuisance.  DEFENDANTS, by leaving radioactive materials and other toxins at the HPNS created conditions that were harmful and injurious to health and life; were offensive to the senses; were an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life and property; unlawfully obstructed the free passage or use, in the customary manner; and created other dangerous conditions to BHPR'S property by contaminating ground water, soil for vegetation, lawns, and the quality of the air that the BAYVIEW HUNTERS POINT RESIDENTS have to breathe.

200.   DEFENDANTS' intentional, illegal and criminal conduct produced dangerous conditions that affected approximately forty thousand (40,000) people at the same time.

201.   Ordinary people would be reasonably annoyed, disturbed and offended by DEFENDANT'S conduct in admitting that they left radioactive soil in the densely populated residential community.  DEFENDANT TETRA TECH'S criminal admission in their guilty pleas to federal crimes proves there was no social utility to DEFENDANTS' conduct. The serious deadly consequences of BAYVIEW HUNTERS POINT RESIDENTS being exposed to radioactive materials, outweigh DEFENDANTS' conduct. BAYVIEW HUNTERS POINT RESIDENTS did not consent to DEFENDANT TETRA TECH'S conduct.

202.   BAYVIEW HUNTERS POINT RESIDENTS suffered injuries, losses and harms, including, but not limited to, cancer, asthma, respiratory failure, heart attack, stroke and fear of contracting other life-long injuries as well as injuries to their offspring for the next five (5) generations. The harm suffered by the BAYVIEW HUNTERS POINT RESIDENTS was different than any potential harm to the general San Francisco communities.

203.   DEFENDANT TETRA TECH'S conduct was a substantial factor in causing BAYVIEW HUNTERS POINT RESIDENTS injuries, losses and harms, including, but not limited to, cancer, asthma, respiratory failure, heart attack, stroke and fear of contracting other life-long injuries as well as injuries to their offspring for the next five (5) generations.

204.   DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their

property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

205.     DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, Plaintiffs pray judgment as hereinafter set forth.

## TENTH CAUSE OF ACTION
### PRIVATE NUISANCE
### (Against TETRA TECH EC, INC., TETRA TECH, INC., and Does 1 to 50

206.     PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

207.     DEFENDANT TETRA TECH interfered with BAYVIEW HUNTERS POINT RESIDENTS' use and enjoyment of their land. BAYVIEW HUNTERS POINT RESIDENTS owned, leased, occupied, and controlled their property;  DEFENDANT TETRA TECH, by acting or failing to act as hereinabove described, by leaving radioactive materials and other toxins at the HPNS created conditions that were harmful and injurious to health and life; were offensive to the senses; were an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life and property; unlawfully obstructed the free passage or use, in the customary manner; and created other dangerous conditions to BHPR'S property by contaminating ground water, soil for vegetation, lawns, and the quality of the air that the BAYVIEW HUNTERS POINT RESIDENTS have to breathe.

208.     DEFENDANTS' intentional, illegal and criminal conduct produced dangerous conditions that affected approximately forty thousand (40,000) people at the same time. Ordinary people would be reasonably annoyed, disturbed and offended by DEFENDANT'S conduct in admitting that they left radioactive soil in the densely populated residential community. DEFENDANT TETRA TECH'S criminal admission in their guilty pleas to federal crimes proves there was no social utility to DEFENDANTS conduct. The serious deadly consequences of BAYVIEW HUNTERS POINT RESIDENTS being exposed to radioactive

materials outweigh DEFENDANTS conduct. BAYVIEW HUNTERS POINT RESIDENTS did not consent to DEFENDANT TETRA TECH'S conduct.

209.    BAYVIEW HUNTERS POINT RESIDENTS suffered injuries, losses and harms, including, but not limited to, cancer, asthma, respiratory failure, heart attack, stroke and fear of contracting other life-long injuries as well as injuries to their offspring for the next five (5) generations. The harm suffered by the BAYVIEW HUNTERS POINT RESIDENTS was different than any potential harm to the general San Francisco communities.

210.    DEFENDANT TETRA TECH'S conduct was a substantial factor in causing BAYVIEW HUNTERS POINT RESIDENTS injuries, losses and harms, including, but not limited to, cancer, asthma, respiratory failure, heart attack, stroke and fear of contracting other life-long injuries as well as injuries to their offspring for the next five (5) generations.

211.    DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

212.    DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.


**ELEVENTH CAUSE OF ACTION**
**For INJUNCTIVE RELIEF**
**(Against LENNAR, INC., FIVE POINT HOLDINGS, LLC and ALL**
**DEFENDANTS and Does 1 to 50)**

213.    PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

214.    PLAINTIFFS conferred upon DEFENDANTS an economic benefit, in the nature of "Superfund" public funds granted for the cleanup of Bayview Hunter's Point. (UNJUST ENRICHMENT)

215.    DEFENDANTS, and each of them, wrongfully and unlawfully falsified soil samples, failed to contain toxic dust, denied allegations, and endangered the local community.

216.    PLAINTIFFS have repeatedly demanded that DEFENDANTS stop the development until thorough, complete, and verified test results prove that all the toxins and radioactive materials have been removed, but DEFENDANTS have ignored PLAINTIFFS' demands.

217.    PLAINTIFFS have suffered and will continue to suffer irreparable injury unless and until this Court enjoins DEFENDANTS from continuing their wrongful conduct.  When asked at a Hunters Point Community Meeting, on April 27, 2018, 70% of residents responded they knew someone in the area who suffers Cancer and 93% of residents responded they knew someone in the area who suffers from Asthma. DEFENDANTS' wrongful conduct is ongoing and threatens to be continued in the future.

218.    PLAINTIFFS have no adequate remedy at law for the injuries suffered as an award of monetary damages would not provide an adequate remedy as because money damages cannot replace safety, health and lives lost from exposure to radiation and other toxins confirmed now at the HPNS. An INJUNCTION is the only remedy available to PLAINTIFFS to protect themselves, their children and families from the life threatening toxic SUPERFUND HPNS.

WHEREFORE, PLAINTIFFS pray judgment against DEFENDANTS as follows:

## **PRAYER FOR RELIEF**

1.    For an order requiring DEFENDANTS to show cause, if any they have, why they should not be enjoined as set forth in this complaint, during the pendency of this action;

2.    For a preliminary injunction, enjoining DEFENDANTS, and each of them, and their agents, servants, and employees, and all persons acting under, in concert with, or for them to:

   a.    Take "anticipatory action" to prevent harm and through exploration of current toxicity and careful analysis of courses of action in order to present the least threat to residents in Hunters Point. and;

b.    Conduct an immediate Health and Safety assessment for residents, workers and students within Hunters Point in cooperation with the school districts, relevant community organizations and city task forces like SF Asthma Task Force.

c.    **DEFENDANTS, and each of them, must be ordered to STOP ALL DEVELOPMENT, CONSTRUCTION, BUILDING, DIGGING, ERECTING, DISTURBING THE SOIL, DIRT, EARTH, BUILDINGS, STRUCTURES, PIPES, AND ALL ACTIVITY AT HPNS UNTIL INDEPENDENT VERIFIED REPORTS CAN BE OBTAINED SHOWING COMPLETE AND TOTAL REMEDIATION OF ALL TOXIC SUBSTANCES, INCLUDING ALL RADIOACTIVE MATERIALS FROM HPNS. ;**

3.    Monetary damages in the amount of $1 Billion dollars, wrongfully stolen from the taxpayers for Unjust Enrichment, the health problems suffered by previous and current residents, and the waste of public funds received to complete the cleanup of Hunters Point.

4.    For costs of suit incurred in this action; and

5.    For such other and further relief as the Court deems proper.

184.    WHEREFORE, further PLAINTIFFS and members of the Class request that the Court enter an order or judgment against DEFENDANTS, and each of them as named in the future, as follows:

1.    For an order certifying the Class, appointing PLAINTIFFS and their counsel to represent the Class, and notice to the Class to be paid by DEFENDANTS;

2.    For an injunction ordering DEFENDANTS to cease and desist from seeking to engage in any additional remediation at HPNS.

3.    For an order requiring DEFENDANTS to immediately pay for medical screenings for early detection of any radiation related medical conditions.

4. For an order requiring DEFENDANTS to pay for medical monitoring for the next five (5) generations of each PLAINTIFF.

5. For a comprehensive remediation of HPNS, with three (3) independent confirmations from non-government entities and by companies selected with PLAINTIFFS' input and agreement.

6. For payment to PLAINTIFFS' class compensation damages as and for restorative justice in the amount of $27 Billion Dollars for the past and future harm, damages PLAINTIFFS will suffer and for Punitive Damages to punish DEFENDANTS for the blatant, conscious, callous disregard of BAYVIEW HUNTERS POINT RESIDENTS' lives, born and unborn, for the next five (5) generations.

7. For PLAINTIFFS' costs of the proceedings herein and pre-judgment interest;

8. For reasonable attorneys' fees as allowed by statute;

9. For an order prohibiting DEFENDANTS' unfair and fraudulent business practices and false and misleading statements.

10. For any and all such other and further relief that this Court may deem just and proper.

Dated: November 18, 2019

LAW OFFICES OF BONNER & BONNER

*Charles A. Bonner*
/s/Charles A. Bonner
Attorney for Plaintiffs