CHARLES A. BONNER, ESQ.  SB# 85413
A. CABRAL BONNER, ESQ. SB# 247528
**LAW OFFICES OF CHARLES A. BONNER**
475 GATE FIVE RD, SUITE 211
SAUSALITO, CA 94965
TEL: (415) 331-3070
FAX: (415) 331-2738
cbonner799@aol.com
cabral@bonnerlaw.com

ATTORNEYS FOR PLAINTIFFS

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| BAYVIEW HUNTERS POINT RESIDENTS, DANIELLE CARPENTER, CHRISTOPHER CARPENTER, DECEASED, BY DANIELLE CARPENTER, REPRESENTATIVE AND SUCCESSOR IN INTEREST; CATHERINE MUHAMMAD, ***Including All Parties Listed In Exhibit A***; and Doe Plaintiffs 1-40,000, on behalf of themselves, and all others similarly situated,<br><br>          Plaintiffs,<br><br>          vs.<br><br>TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *In his Individual and Official Capacity*, CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH; STEVEN M. BURDICK, *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT, CHIEF FINANCIAL OFFICER OF TETRA TECH; STEPHEN C. ROLFE, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; JUSTIN E. HUBBARD, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; LENNAR CORPORATION; and FIVE POINT HOLDINGS, LLC., and DOES 1-100 Inclusive,<br><br>          Defendants. | **Case No.: 3:19-cv-01417-JD**<br><br><u>**A CLASS ACTION LAWSUIT**</u><br><br><u>**FIFTH AMENDED** COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u><br><br>   **1. NEGLIGENCE FEAR OF CANCER**<br>   **2. STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES**<br>   **3. VIOLATION OF PROPOSITION 65**<br>   **4. FRAUD**<br>   **5. NEGLIGENCE PER SE-VIOLATION OF CRIMINAL LAW**<br>   **6. BAD FAITH BREACH OF THIRD-PARTY CONTRACT**<br>   **7. PUBLIC NUISANCE**<br>   **8. PRIVATE NUISANCE**<br>   **9. SURVIVAL ACTION**<br>   **10. WRONGFUL DEATH**<br>   **11. NEGLIGENCE PER SE-LENNAR**<br>   **12. INJUNCTIVE RELIEF**<br><br><br>**JURY TRIAL DEMANDED** |

## Table of Contents

I. INTRODUCTION ................................................................................................ 1

II. THE PARTIES ................................................................................................ 4

  A. PLAINTIFFS ................................................................................................ 4

DOE PLAINTIFFS ................................................................................................ 5

  B. DEFENDANTS ................................................................................................ 6

DOE DEFENDANTS ................................................................................................ 7

III. JURISDICTION AND VENUE ................................................................................ 7

IV. RESPONDEAT SUPERIOR ................................................................................ 7

DEFENDANTS' RATIFICATION, ADOPTION AND AUTHORIZATION ............................ 8

V. STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTION ............................ 9

  Historical Background of Hunters Point Naval Shipyard ........................................ 9

  Defendant Tetra Tech Contract To Clean Up The Shipyard .................................... 12

  Whistleblowers' Statements of Tetra Tech Fraud ................................................ 15

  Switching Soil Samples and Dumping Soil into Trenches ...................................... 16

  Falsified Documents and Data ........................................................................ 17

  DEFENDANT TETRA TECH TYPES OF FRAUD ................................................ 18

    1.  Fake Soil Sampling: Parcels C, D, E ........................................................ 19

    2.  Destruction of "Hot" Soil Samples and Their Records .................................. 22

    3.  Fraudulent Building Surveys .................................................................... 25

    4.  Proper building survey procedure was not followed ...................................... 25

    5.  Fraudulent Data Reporting ...................................................................... 26

DEFENDANTS TETRA TECH EC, INC.'S ("TTEC") ADMISSIONS SUBSTITUTING
CLEAN SOIL FOR RADIATIVE SOIL IN SUPERVISOR JUSTIN E. HUBBARD'S
FEDERAL CRIMINAL GUILTY PLEA ................................................................ 28

TETRA TECH EC INC.'S ADMISSIONS SUBSTITUTING CLEAN SOIL FOR
RADIATIVE SOIL IN SUPERVISOR STEPHEN C. ROLFE'S FEDERAL CRIMINAL
GUILTY PLEA ................................................................................................ 31

DEFENDANT LENNAR'S LIABILITY ................................................................ 33

  A. CONSPIRACY ............................................................................................ 33

B. Pattern and Practice of Violations of Proposition 65 ........................................ 34

C. Conspiracy: EPA CA Region 9, LENNAR, and Amy Brownell OF SFDPH .................... 38

A. PLAINTIFFS RELIED ON LENNAR FIVE POINT'S FRAUD ..................................... 42

   1. Conflict of Interest: "Paying the Wolf to Guard the Sheep" ........................... 42

   2. Helicopter Fraud .................................................................................... 44

   3. Home Selling Fraud on Parcel A .............................................................. 47

DEFENDANT FIVE POINT'S LIABILITY ............................................................. 49

VI. DAMAGES-FEAR OF CANCER ..................................................................... 51

A. ECONOMIC ................................................................................................ 53

B. NON-ECONOMIC ........................................................................................ 54

   A. Monica Miranda Arevalo ......................................................................... 56

   B. 74 Year Old Hunters Point Resident ......................................................... 56

   C. .......................................................................................................... 57

   D. Christopher Carpenter ............................................................................ 57

VII. CLASS ACTION ALLEGATIONS ................................................................... 66

VIII. PRIVATE ATTORNEY GENERAL ALLEGATIONS .......................................... 70

FIRST CAUSE OF ACTION NEGLIGENCE FEAR OF CANCER ............................... 70

SECOND CAUSE OF ACTION STRICT LIABILITY FOR ULTRAHAZARDOUS

ACTIVITIES ...................................................................................................... 75

THIRD CAUSE OF ACTION VIOLATION OF PROPOSITION 65 ............................. 76

FOURTH CAUSE OF ACTION FRAUD ................................................................. 81

SIXTH CAUSE OF ACTION BAD FAITH BREACH OF THIRD PARTY BENEFICARY

CONTRACT ....................................................................................................... 83

SEVENTH CAUSE OF ACTION PUBLIC NUISANCE ............................................. 84

EIGHTH CAUSE OF ACTION PRIVATE NUISANCE .............................................. 87

NINTH CAUSE OF ACTION SURVIVAL ACTION by Representatives and Successor In

Interest ............................................................................................................. 88

ELEVENTH CAUSE OF ACTION NEGLIGENCE PER SE ........................................................ 90

TWELFTH CAUSE OF ACTION FOR INJUNCTIVE RELIEF ................................................. 93

PRAYER FOR RELIEF ........................................................................................................ 94

Plaintiffs BAYVIEW HUNTERS POINT RESIDENTS ("BHPR" or "PLAINTIFFS"), individually and on behalf of all others similarly situated, allege the following:

## I. INTRODUCTION

### *"[T]he biggest case of eco-fraud in U.S. history."[1]*

1. "They told us we were safe! Tetra Tech Lied!" "This is shocking; frightening!" The distressed pleas from the predominantly African American neighborhoods in Bayview Hunters Point have grown louder and more urgent since the Navy and the Environmental Protection Agency ("EPA") have found that Defendant TETRA TECH, after being paid 1.1 Billion Dollars to clean up one of the most highly toxic Superfund sites in America, the 522-acre Hunters Point Naval Shipyard, fraudulently falsified soil samples taken during its contracted cleanup. As victims of environmental racism, many BHP residents believe that on account of TETRA TECH's conduct, the cancers, asthma, and debilitating respiratory illnesses caused by the toxic conditions at the Navy's Superfund site, have been exceedingly exacerbated. TETRA TECH's conduct has equally exacerbated and exponentially intensified the reasonable FEAR that BHP residents carry with respect to contracting cancer and other medical illnesses caused by exposure to radioactive dust and particles.

2. Hunters Point Naval Shipyard housed the Naval Radiological Defense Laboratory ("NRDL") from 1948 to 1969. NRDL activities and concerns included radiological decontamination of ships exposed to atomic weapons testing, experimentation and research on radiological decontamination, the overall effects of radiation on material substances,[2] and the effect of radiation on humans and other living organisms.

3. Such focus resulted in an excessive contamination of the Shipyard's soils, sediments, surface water and groundwater by petroleum fuels, pesticides, heavy metals, radiation releases,

---

[1] Jeff Ruch, PEER's executive director Public Employees for Environmental Responsibility, an advocacy group based in the Washington, D.C.

[2] Historians estimate that 7,000 to 10,000 Native Americans inhabited the San Francisco Bay Region at one point. The Ohlone people likely settled in the Hunters Point area due to the availability of seasonal hunting and fishing. Hunters Point was a private commercial dry dock facility from 1869 until 1939, when the Navy purchased the property. From 1945 until 1974, the Navy used the site mostly as a naval submarine and ship repair facility. The site also housed the Naval Radiological Defense Laboratory (NRDL) from 1948 to 1969. NRDL activities included radiological decontamination of ships exposed to atomic weapons testing as well as research and experiments on radiological decontamination, the effect of radiation on living organisms, and the effects of radiation on materials. *https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0902722*

polychlorinated biphenyls ("PCBs"), volatile organic compounds ("VOCs") and other such radionuclides released from the fusion process required to manufacture Atomic Bombs. In addition to the above contaminants deposited by the Navy on the Shipyard's soils, there exists naturally occurring asbestos and metals within the soils distributed throughout the Shipyard.

4. The U.S. Navy additionally operated the site as a shipyard until 1974, predominantly using it to clean ships exposed radiation from atom bombs, as well as for research on nuclear weapons defense.

5. In 1989, the heavily contaminated shipyard was designated as an EPA Superfund site, which held the distinction as one of the most toxic cleanup sites in the nation. On or about 2002, TETRA TECH, a company specializing in toxic cleanup, was hired by the United States Navy to undertake cleanup and removal of the toxic waste deposited by the Navy throughout the approximately 25 years of its residency.

6. On Jan. 30, 2018, the Navy issued a preliminary report, compiled by five outside consultants, which concluded that nearly half of the data TETRA TECH had collected from the Superfund site was fundamentally flawed. The data included samples collected mostly between 2006 and 2012 from 300,000 cubic yards of soil, 20 buildings, 30 former building sites and 28 miles of storm drains.

7. In April 2018, an environmental watchdog group released a Dec. 27, 2017 letter written by John Chesnutt, manager of the EPA's local Superfund Division. The letter stated that as much as 97 percent of TETRA TECH's cleanup data from two parcels on the site was found to be suspect and should be retested.[3]

8. The EPA found: "In Parcel B, the Navy recommended resampling in 15% of soil survey units in trenches, fill, and building sites. EPA, Department of Toxic Substances Control ("DTSC") and California Department of Public Health, (CDPH) found signs of potential falsification, data manipulation, and/or data quality concerns that call into question the reliability of soil data in an additional 76% of survey units, bringing to 90% the total suspect soil survey units in Parcel B. (These do not add exactly due to rounding). In Parcel G, the Navy recommended resampling 49%

---

[3] EPA December 27, 2017, John Chesnutt, Manager, Pacific Islands and Federal Facilities Section Superfund Division.

of survey units, and regulatory agencies recommended 49% more, for a total of 97% of survey units as suspect…." Chesnutt further found that "the data analyzed demonstrates a widespread pattern of practices that appear to show deliberate falsification, failure to perform the work in a manner required to ensure (the EPA's approval) requirements were met, or both."

9. Over the decades, asbestos, PCBs, solvents, lead and radioactive materials were all dumped at the site bordering the Naval Shipyard.

10.    The City of San Francisco first adopted a redevelopment plan for the shipyard in 1997. Whistleblowers came forward in 2012 with allegations that their superiors at TETRA TECH had ordered them to fake soil samples, in an effort to expedite the $1 billion cleanup.

11.    In 2014, the Navy admitted that it had become aware of the mishandling of data and fake testing by TETRA TECH employees which triggered an investigation by the Nuclear Regulatory Commission. The revelations led to TETRA TECH shifting blame onto low-level employees and declaring that they were re-cleaning the sites.

12.    Also in 2014, whistleblowers exposed Navy contractor TETRA TECH's internal report which documented a deliberate and orchestrated fraud in the collection of 2,500 anomalous radioactive soil samples that were collected at multiple sites around the Naval base. The Nuclear Regulatory Commission fined TETRA TECH $7,000 after confirming that their soil samples had been falsified. Recent reviews by both the U.S. Navy and the EPA corroborate allegations made by former TETRA TECH employees, whistleblowers and their advocates over the last six years.

13.    TETRA TECH first admitted to providing false soil samples in 2014, but the Navy permitted the company to continue working after TETRA TECH blamed the problem on low-level employees and agreed to subject other workers to "ethics training." The Navy apparently accepted TETRA TECH's excuses and solutions until recently, when more whistleblowers came forward, alleging further widespread and systemic fraud. Their allegations have now been affirmatively sustained.

## II.  THE PARTIES

### A.  PLAINTIFFS

14.     **CLASS REPRESENTATIVE PLAINTIFFS DANIELLE CARPENTER** and **CATHERINE MUHAMMAD;** DANIELLE CARPENTER, CHRISTOPHER CARPENTER, DECEASED, BY DANIELLE CARPENTER, REPRESENTIVE AND *SUCCESSOR IN INTEREST*; CATHERINE MUHAMMAD, ***including All Parties Listed In Exhibit A***; and Doe Plaintiffs 1-40,000, on behalf of themselves, and all others similarly situated Class Plaintiffs.  Class Plaintiffs are residents of BAYVIEW HUNTERS POINT, consisting of approximately 40,000 individuals who have been living in, or had substantial contact with, the Bayview Hunters Point community, Postal Zip Code 94124 from 2004 to present.  All Class Plaintiffs in this action are set forth in **Exhibit A**, which is incorporated by this reference as fully set forth herein.

15.     The geographic parameters of the BAYVIEW HUNTERS POINT RESIDENT PLAINTIFFS are limited to the 2010, census tract populations who reside or who have resided within locations that fall within Postal Zip Code 94124.

| Census Tract No. | Population |
|---|---:|
| 9809 | 350 |
| 610 | 3,610 |
| 233 | 5,216 |
| 234 | 3,660 |
| 232 | 4,582 |
| 231.03 | 3,725 |
| 230.01 | 5,216 |
| 230.03 | 4,093 |
| 230.03 | 4,093 |
| 612 | 4,087 |
| **TOTAL POPULATION** | **38,484** |



### DOE PLAINTIFFS

16.     DOE PLAINTIFFS 1-40,000 are Residents of BAYVIEW HUNTERS POINT who

have been living in or had substantial contact with the Bayview Hunters Point Community that

consists of locations falling within Postal Zip Code 94124, from 2004 to present, but to date have

not discovered the elements of their causes of action. This action will be amended to include those

DOE PLAINTIFFS 1-40,000 when they have ascertained and discovered each element of each cause of action against each of the named DEFENDANTS herein.

**B. DEFENDANTS**

17.     DEFENDANT TETRA TECH EC, INC. ("TTEC") is a California corporation that has contracted with the United States Navy and United States government to perform clean-up and remediation services at the Hunters Point Shipyard in San Francisco. On information and belief, it is alleged that TETRA TECH EC, INC is a Delaware Corporation, with a principal place of business located in Morris Plains, New Jersey.

18.     DEFENDANT TETRA TECH EC, Inc. and, collectively with TETRA TECH, INC., is a wholly owned subsidiary of TETRA TECH INC, with its headquarters and principal place of business located in Morris Plains, New Jersey. TTEC does business in California, including in San Francisco.

19.     DEFENDANT TETRA TECH, INC., ("TTI"; "TETRA TECH") is a California corporation that has contracted with the United States Navy and United States government to perform clean-up and remediation services at the Hunters Point Shipyard in San Francisco. On information and belief, it is alleged that TETRA TECH, INC is a Delaware Corporation, with a principal place located in Pasadena, California.

20.     DEFENDANT DAN L. BATRACK, sued *In his Individual and Official Capacity*, is the CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH INC.

21.     DEFENDANT STEVEN M. BURDICK, sued *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT and CHIEF FINANCIAL OFFICER OF TETRA TECH INC.

22.      DEFENDANT STEPHEN C. ROLFE, sued *In his Individual and Official Capacity,* is a MANAGING AGENT OF DEFENDANT TETRA TECH EC INC.

23.     DEFENDANT JUSTIN E. HUBBARD, sued *In his Individual and Official Capacity,* is a MANAGING AGENT OF DEFENDANT TETRA TECH EC INC**.**

24.     DEFENDANT LENNAR CORPORATION is incorporated in the state of Delaware and headquartered in the city of Miami, Florida. Lennar Homes of California, Inc., is

the home building subsidiary of LENNAR CORPORATION, and conducts substantial business in the state of California as well as in other states. Lennar Homes of California, Inc., is incorporated in the state of California and headquartered in the city of Miami, Florida. DEFENDANT LENNAR CORPORATION (LENNAR) is headquartered in Miami, Florida and does substantial business in California.

25.     DEFENDANT FIVE POINT HOLDINGS, LLC., and DOES 1-100 Inclusive is a California Corporation, headquartered in Aliso Viejo, California.

## DOE DEFENDANTS

26.     The true names and capacities, whether individual, corporate, associate, subsidiary, officer, director, employee, other representative, or otherwise, of DOE DEFENDANTS 1 through 50 inclusive, are unknown to the PLAINTIFFS, who therefore sue each DEFENDANT by a fictitious name. PLAINTIFFS are informed and believe and thereupon allege that each of these fictitiously named DEFENDANTS are responsible, in some manner, for the damages alleged herein. PLAINTIFFS therefore designate DOE DEFENDANTS 1 through 50 by such fictitious names, and when their names have been ascertained, PLAINTIFFS will amend this complaint to allege their true names and capacities.

## III.  JURISDICTION AND VENUE

27.     Jurisdiction is pursuant to California Code of Civil Procedure § 382 providing: "When the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." This court also has jurisdiction under California Business & Professions Code §17203. Venue is proper in this judicial district because BAYVIEW HUNTERS POINT RESIDENTS' injuries, damages and harms occurred within the Northern District of California. Further, one or more of the DEFENDANTS reside, are headquartered and conduct business in the Northern District of California. DEFENDANTS' wrongful acts and omissions give rise to PLAINTIFFS' claims for restitution and equitable relief.

## IV.  RESPONDEAT SUPERIOR

28.     All the described conduct, acts, and failures to act are attributed to agents and employees under the direction and control, and with the permission, consent and authorization of

DEFENDANTS. Said acts, conduct and failures to act were within the scope of such agency and/or employment, and each of the DEFENDANTS ratified, endorsed, and agreed to the acts and omissions of each of the other DEFENDANTS. Each of these acts and failures to act is alleged against each DEFENDANT, whether acting individually, jointly, or severally. At all times relevant herein, each DEFENDANT was acting within the course and scope of his or her employment, agreement, and ratification.

### DEFENDANTS' RATIFICATION, ADOPTION AND AUTHORIZATION

29.     DEFENDANT DAN L. BATRACK, sued *In his Individual and Official Capacity*, is the CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH INC. and at all relevant times to the facts herein, on information and belief, directed, managed, supervised, ordered, and ratified the illegal conduct reflected in the claims of this action, including the criminal conduct of DEFENDANTS STEPHEN C. ROLFE and JUSTIN E. HUBBARD.

30.     DEFENDANT DAN L. BATRACK, on information and belief, joined TETRA TECH in 1980 and served in numerous capacities, including environmental data analyst, project and program manager, President of the Engineering Division, Chief Operating Officer, and President. He was named Chief Executive Officer in 2005. "In 2008 Mr. Batrack was named Chairman and established the firm's strategic direction and focus on *Leading with Science*". He continues to serve as corporate sponsor Hunters Point Development and engages in the day-to-day cleanup operations at Hunters Point Naval base.

31.     DEFENDANT STEVEN M. BURDICK, sued *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT and CHIEF FINANCIAL OFFICER OF TETRA TECH INC and at all relevant time to the facts herein, on information and belief, directed, managed, supervised, ordered, and ratified the illegal conduct reflected in the claims of this action, including the criminal conduct of DEFENDANTS STEPHEN C. ROLFE and JUSTIN E. HUBBARD.

32.     DEFENDANT STEVEN M. BURDICK was named Chief Financial Officer and Treasurer in July 2011. He served as Tetra Tech's Senior Vice President and Corporate Controller from January 2004 to March 2011 and acting Chief Financial Officer between March 2011 and

July 2011. He joined Tetra Tech in 2003 as Vice President, Management Audit. In his Management Audit role, DEFENDANT STEVEN M. BURDICK knew, or should have known, of the fraud committed by DEFENDANTS TETRA TECH's supervisors and employees, including the criminal conduct of DEFENDANTS STEPHEN C. ROLFE and JUSTIN E. HUBBARD; was well apprised of the financial windfall TETRA TECH was enjoying as a direct result of the fraud perpetrated by TETRA TECH's supervisors and employees as these supervisors, on information and belief, reported their fraud to DEFENDANTS TETRA TECH'S managers, including DEFENDANT STEVEN M. BURDICK and DEFENDANT DAN L. BATRACK.

33.     DEFENDANTS knew, or should have known, that DEFENDANTS' employees obediently carried out the directives, orders, and mandates of their TETRA TECH's superiors and managers, even when those directives, orders and mandates were fraudulent, criminal and otherwise in violation of the law.

34.     At all relevant times alleged herein, DEFENDANTS, and each of them, had actual and constructive knowledge of DEFENDANTS' illegal, unethical, unlawful, criminal behavior. DEFENDANTS endorsed, ratified, authorized, encouraged, and directed the illegal conduct as alleged herein and failed to take any corrective action to protect the BAYVIEW HUNTERS POINT RESIDENTS and the public from the illegal conduct. Hence, DEFENDANTS, and each of them, are liable for all the illegal conduct of their employees.

## V. STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTION
### Historical Background of Hunters Point Naval Shipyard

35.     Hunters Point Shipyard ("HPS" or the "Site") is a deactivated shipyard located in the southeastern portion of San Francisco, California, adjacent to San Francisco Bay. In 1940, the Navy obtained ownership of the shipyard for ship building, repair and maintenance activities. Hunters Point Naval Shipyard ("HPNS") was the transit departure point for Little Boy, the atomic bomb that the United States dropped on the civilian population of Hiroshima, Japan in August 1945.

36.     In addition to using the Site for a Naval Shipyard, the Department of Defense also used the properties comprising the Naval Shipyard to conduct radiological activities on the site,

including (1) sandblasting radioactive waste off Naval ships involved with nuclear weapons testing at the Bikini Atoll, (2) extensive application of fluorescent radium on dials, knobs, and buttons, and (3) operating a radiological defense laboratory on site from 1955 to 1979 in Naval Shipyard Buildings 364, 815, and 816. Radioactive waste materials generated by the University of California at Berkeley and the Lawrence Livermore Laboratories were shipped to Hunters Point for handling, transport and disposal. Such activities contaminated the ground, buildings, sewer lines, landfills, and surrounding areas of Hunters Point.

37.     The U.S. Navy established the Naval Radiological Defense Laboratory (NRDL) in 1946 at HPS to study the effects of nuclear weapons, as well as to develop counter measures to such weapons. NRDL operated until 1969 and conducted studies related to ship shielding, radioactive waste for deep-sea disposal, animal research, radiation detection instrumentation development, and other laboratory studies. NRDL was also instrumental in decontaminating and disposing of ships involved in nuclear weapons testing in the Marshall Islands. During operations at HPNS, the shipyard site grew to approximately [500 acres] by filling parts of the San Francisco Bay bordering the Hunters Point Shipyard. The site currently consists of approximately 866 acres, 446 of which are under water.

38.     The Navy was interested in how the ships would respond in the event of an atomic blast. The Navy was also interested in learning how animals would respond and endure intense radioactive exposure, placing various animals, ranging from goats to rats, on vessels located close to the atomic blasts.[4]

39.     Most of the animals died and many, if not all, of the ships that did not sink sustained contamination with radioactive fallout from the blasts. The Navy did what it could to decontaminate the ships, but, as a Navy fact sheet on Operation Crossroads stated, its efforts "revealed conclusively that removal of radioactive contamination of the type encountered on target ships cannot be accomplished successfully." The factsheet concluded that, after Operation Crossroads, "18 target and observation vessels were decontaminated at Hunters Point" and that

---

[4] *http://www.myatomiclife.com/hunters-point-rad-labs.html*

"the decontamination of ships associated with Pacific atomic and thermonuclear (H Bomb) weapons testing generated radiological material and waste." *Id.*

40.     For 23 years following World War II, Hunters Point Shipyard was the site of the military's largest facility for applied nuclear research - the top-secret Naval Radiological Defense Laboratory ("NDRL"). Over the course of its life, according to declassified government documents, the NRDL handled nearly every kind of radioactive material known to man - including, at one point, enough plutonium to kill 15 million people. The shipyard is also well known as a site where Navy ships were decontaminated after returning from conducting atomic weapons testing. The Navy used the irradiated sand, which turned a shiny black that 'glistened in the sun,' to "pave" side roads and walking paths throughout the Shipyard. Neighborhood children loved to play in it, calling it "black beauty sand." *Id.*

41.     In 1989, the Site was placed on the National Priorities List ("NPL") and in 1991 was selected for closure under the Base Realignment and Closure program("BRAC"). The United States Navy ("Navy") was designated as the lead agency for investigation and cleanup of the Site while the United States Environmental Protection Agency, Region IX ("EPA") was assigned the role of lead support agency. California provided the support of state agencies including the California Environmental Protection Agency, Department of Toxic Substances Control ("DTSC") and the Regional Water Quality Control Board ("RWQCB").[6]

42.     In 1987, contamination was confirmed at a number of Site locations. This finding, combined with the proximity to an off-site drinking water source (the aquifer used by the Albion Springs water bottling company) resulted in the EPA placing the Site on the National Priorities List ("NPL") in 1989. In 1991, the Department of Defense listed the Site for closure. *Id.*

43.     In January 1992, the Navy, the EPA, DTSC and RWQCB entered into a Federal Facilities Agreement to better coordinate the environmental investigation and cleanup of the Site. To expedite the investigation and cleanup, the Site was divided into six parcels. Each of the six parcels were assigned a letter, ranging from A to F. Parcel F is an offshore parcel. Fieldwork has been completed for all six parcels. The fieldwork showed that the soils and groundwater of the Site

---

[6] EXPLANATION OF SIGNIFICANT DIFFERENCES Super FUND RECORDS Parcel B, Hunters Point Shipyard Site San Francisco, California August 24, 1998

are contaminated with a variety of hazardous substances including metals, polychlorinated biphenyls ("PCBs"), volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), polyaromatic hydrocarbons ("PAHs"), and pesticides. In addition, total petroleum hydrocarbons (TPH) are present in Parcel B soil and groundwater. *Id.*

## Defendant Tetra Tech Contract To Clean Up The Shipyard

44.     In or about 2004, The United States Navy contracted with Tetra Tech to assist in the cleanup of the Naval Shipyard, which the Navy deemed a National Priorities List Superfund site. Instead of discharging its contractual obligation by remediating the Shipyard, DEFENDANT TETRA TECH resorted to engaging in intentional fraud and greed, thereby disregarding the health and safety of BAYVIEW HUNTERS POINT RESIDENTS, the present and future San Francisco residents as well as the greater Northern California community. Since the 1940's, HPNS has disregarded the lives of the largely African American Communities immediately adjacent to the Shipyard. DEFENDANT TETRA TECH "doubled-down" and exacerbated such historical 'intentional' and reckless disregard to the health, safety and civil rights of San Francisco's most vulnerable residents who, due to the Navy's pollution at the HPNS, were already suffering from life threatening illnesses stemming from decades of contamination.

45.     Radiological Data Review Background: In 2012, as a part of its regular review of contractor data, the Navy discovered a discrepancy in radiological sampling by one contractor, Tetra Tech EC ("TTEC"). Despite sampling the data in question and taking initial corrective actions, it was determined that sample data taken by TTEC had been falsified. [7]

46.     In 2016, a former DEFENDANT TTEC contract worker made additional claims about the fraudulent work done before 2012. Additional allegations were made in 2017. *Id.*

47.     In November 2016, the Navy hired an independent team of experts (review team) to further review and evaluate the reliability of the radiological data collected by DEFENDANT TTEC. As part of the evaluation, the review team has developed a database of soil data and is analyzing radiological sampling, surveys, and building scan results. What are the data evaluation

---

[7] EPA Website. September 2017: This is the second in a series of fact sheets and other ongoing communications about the radiological data review being conducted at Hunters Point Naval Shipyard (HPNS). The previous fact sheet (dated February 2017) on the Navy's radiological data review may be found on the HPNS pages of the Navy's website at *https://www.bracpmo.navy.mil.*

objectives? 1. Evaluate radiological data collected by TTEC and 2. Identify data that may have been falsified or improperly collected. *Id.*

48.     Extent of Data Review and Analysis: The data evaluation includes radiological samples taken by TTEC beginning in 2006 from Parcels B, C, D-2, E, G, and the utility corridors (UC-1, UC-2 and UC-3). *Id.*

49.     Snapshot of Extensive Analysis: Radiological Soil Analysis:

Approximately 300,000 cubic yards of soil

- Over 50,000 soil samples

- More than 900,000 analytical results

- Over 30 former building sites

- Approximately 28 miles of trench lines Radiological Scans

- More than 20 structures (buildings) on approximately 23 acres of land *Id.*

50.     Based on DEFENDANT TETRA TECH's admitted falsification and "mishandling" of soil samples, none of the Navy or EPA's representations of planned action are reliable, which has greatly exacerbated fear, anxiety, and emotional distress among HUNTERS POINT RESIDENTS regarding the now heightened reality of additional life-threatening health problems related to DEFENDANTS' conduct and the increased toxic releases stemming therefrom.

51.     The Navy has divided the site into several subsites to organize and prioritize cleanup activities: Parcel A: The EPA's questionably unreliable representation selected "no further action" as the long-term remedy; conditions are protective of human health and the environment. The Navy transferred Parcel A to the San Francisco Redevelopment Agency in 2004.

52.     Parcel B: The long-term remedy included excavation and disposal of soils, installation of soil covers, installation of a revetment along the shoreline, a soil vapor extraction system to remove VOCs, groundwater treatment, removal of radiologically contaminated structures, and monitoring and institutional controls to maintain the above remedies for the long term. Excavation and disposal of contaminated soil was finished in 2010. Construction of the

covers and revetment, operation of the soil vapor extraction system and treatment of contaminated groundwater are ongoing. Access restrictions prevent exposure to contaminants.

53.     Parcel C: The long-term remedy included excavation and disposal of soils, installation of soil covers, installation of a revetment along the shoreline, a soil vapor extraction system to remove VOCs, groundwater treatment, removal of radiologically contaminated structures, and monitoring and institutional controls to maintain the above remedies for the long term in order to prevent exposure to contaminants. Soil excavation and disposal, groundwater treatment, soil vapor extraction and radiological removal activities are ongoing. The Navy will finish covering contaminated soils after it finishes removing radiologically contaminated soils. Access restrictions prevent exposure to contaminants.

54.     Parcel D-1: The long-term remedy included excavation and disposal of soils, installation of soil covers, groundwater treatment, removal of radiologically contaminated structures, and monitoring and institutional controls to maintain the above remedies for the long term in order to prevent exposure to contaminants. Groundwater treatment using zero valent iron injection finished in 2008. Excavation and off-site disposal of contaminated soil and removal of soil stockpiles finished in 2010. Radiological removals are ongoing. The Navy will finish removing and covering contaminated soils after it finishes radiological removal activities. Access restrictions prevent exposure to contaminants.

55.     Parcel D-2: After removal actions serving to remove contaminated soils and structures at the subsite, EPA selected "no further action" as the final remedy in 2010.

56.     Parcel G: The long-term remedy included excavation and disposal of soils, installation of soil covers, groundwater treatment, removal of radiologically contaminated structures, and monitoring and institutional controls to maintain the above remedies for the long term in order to prevent exposure to contaminants. Groundwater treatment using zero valent iron injection finished in 2008. Excavation and off-site disposal of contaminated soil and removal of soil stockpiles finished in 2010. Construction of covers is ongoing. The radiologically related parts of the remedy are complete and unrestricted release of radionuclides is ongoing. Access restrictions prevent exposure to contaminants.

57.     Parcel UC-1: The long-term remedy included soil covers, soil gas surveys, removal of radiologically contaminated structures, and monitoring and institutional controls to prevent exposure to contaminants. The Navy has lowered contaminant levels in soils and sediments by removing and covering over contaminated soils. Soil vapor survey activities are ongoing. The radiologically related parts of the remedy are complete and unrestricted release of radionuclides is ongoing.

58.     Parcel UC-2: The long-term remedy included soil covers, removal of radiologically contaminated structures, monitored natural attenuation, soil gas surveys, monitoring and institutional controls to prevent exposure to contaminants. The Navy has lowered contaminant levels in soils and sediments by removing and covering over contaminated soils. Monitored natural attenuation, which involves letting naturally occurring processes reduce the contamination in groundwater will reduce levels of radiological and chemical contaminants at the subsite.

59.     Parcels E, E-2, F and UC-3: The Navy has conducted several removal actions at these subsites, including removal and disposal of contaminated soils and debris, construction of a landfill cap and removal of radiological contamination. The EPA has selected a long-term remedy for Parcel E-2. It included removal and disposal of contaminated soils, radiological surveys, installation of a soil cover with a protective liner, below-ground barriers to limit groundwater flow between the landfill and the San Francisco Bay, removal and treatment of landfill gas, installation of a revetment along the shoreline, and monitoring, and institutional controls to prevent exposure to contaminants. Remedial investigation activities, operation and maintenance activities, and monitoring are ongoing for these subsites. EPA has not conducted five-year reviews for these subsites. *Id.*

### Whistleblowers' Statements of Tetra Tech Fraud

60.     Several TETRA TECH employees, including Anthony Smith, Robert McLean, Donald Wadsworth and others, have testified under oath to DEFENDANT TETRA TECH'S fraudulent scheme to place profit over the lives of the BAYVIEW HUNTERS POINT RESIDENTS, where such conduct has resulted in the release of radiative materials that had otherwise lied dormant and now swept up by the prevailing winds and deposited over the homes

and commercial ventures of BHP Residents. Anthony Smith's Declaration is attached as Exhibit 2, and all facts therein are incorporated as though fully set forth herein.

61.    In 2014, Anthony Smith, a former TETRA TECH employee, quit his job because he could not live with the fraud his superiors ordered him to commit every day. His TETRA TECH managers ordered him to falsify records and soil samples. Smith, the former radiation control technician, said his supervisors used to conceal radioactive soil excavated on the Hunters Point 800-acre Superfund site. [8]

62.    Smith stated that the fraudulent conduct that he witnessed being carried out by TETRA TECH means that the Hunters Point Shipyard is still radioactive, contaminated, toxic, dangerous, and a public health hazard to the BHP residents. Smith said the company repeatedly cut corners to save money. Smith admitted that TETRA TECH supervisors: (1) Ordered him to replace contaminated soil samples with clean soil samples; (2) instructed him to dump contaminated soil into open trenches across Hunters Point; (3) forced him to sign falsified documents that were later submitted to the government; and (4) falsified and tampered with computer data that analyzed radiation levels. *Id.*

63.    Smith said he decided to speak out "to clear my name, make everything right and let people know what really happened." *Id.*

### Switching Soil Samples and Dumping Soil into Trenches

64.    Smith moved to the Bay Area from his home in Georgia in 2002 and worked on and off at Hunters Point as a radiation control technician until 2012. He collected soil samples to be surveyed in order to determine radiation contamination levels. Smith said beginning in 2009, his supervisors began instructing him to get rid of radiation-contaminated soil samples and replace them with clean soil samples. He said the switching of the soil samples often took place out of public view, inside large Conex bins located around the job site. He estimated that hundreds of samples had been switched. "I didn't like it because it wasn't right," Smith said. "That's not the way it was supposed to be done." Smith said multiple locations across Hunters Point are still contaminated with radiation. *Id.*

---

[8] *https://www.nbcbayarea.com/investigations/Former-Hunters-Point-Worker-Claims-Supervisors-Ordered-Him-to-Hide-Radiation-371723561.html*

65.     Smith said he collected soil samples underneath a structure referred to as building 351 A, which once housed a component of the Navy's radiological laboratory. He recalled collecting a sample that tested positive for radium, an element linked to bone cancer. "When I took a sample it came back hot," he said, "and they made me get rid of it." *Id.*

66.     Smith said the building should have been remediated after he found a hot soil sample, but he questions whether crews subsequently cleaned up the contamination. He said remediating the area would have taken more time and money. He said his supervisors directed him to dump the discarded, contaminated soil into trenches that have since been covered or paved. Smith said there is no way to know what the contamination levels are in the trenches without retesting the soil. He said as far as he can tell, TETRA TECH did not test the trenches after they were backfilled. *Id.*

**Falsified Documents and Data**

67.     Smith also said that TETRA TECH fabricated chain of custody document forms, which are supposed to document the location and time of the soil samples taken and to certify that the samples stayed under the technician's control. Smith said that sometimes his bosses, rather

**Tetra Tech Chain of Custody Form**



Anthony Smith says his supervisors fabricated documents called Chain of Custody Forms. The forms are supposed to document where and when Smith collected soil samples and certify that the samples stayed under his control. But Smith says sometimes his supervisors filled out the forms and that he couldn't verify the information contained in the documents. He says sometimes he didn't see the forms until the end of the day, when he was asked to sign his name.

than he, would fill out the forms: "I never got to see them until the end of the day when all I done was sign my name and put the date," Smith said. *Id.*

68.     TETRA TECH concocted multiple excuses and theories, but never definitively concluded how or why soil samples were switched and the data falsified. In the report, TETRA TECH admitted the "mishandling of soil samples," but egregiously blamed the falsification on the "sample collectors" and their designations on the "chain of custody forms." Smith said that TETRA TECH made him a scapegoat. "They were blaming me for something [they] were telling me to do every day". Smith said the company failed to identify and retest other questionable locations on the site. He worried about the health of the people who will work, play and live at Hunters Point. He said TETRA TECH's cleanup cannot be trusted. "It's not good and it's not right," Smith said. *Id.*

## DEFENDANT TETRA TECH TYPES OF FRAUD

69.     TETRA TECH employees and the radiological subcontractors it directly supervised were involved in at least six types of fraud that are discussed in detail in this supplemental disclosure: (1) fake sampling, in which soil samples – potentially thousands of them – were reported to have been taken at one location when they were actually taken from another; (2) discarding samples and analytical results when they came back radiologically too "hot," i.e., above the cleanup standard; (3) altering scanning data to make them appear radiologically acceptable; (4) conducting false building surveys in which certain scan results were fabricated and others were falsified; (5) remediating radioactive material in soil improperly, resulting in potentially radioactively-contaminated soil being shipped offsite as well as being used as backfill for trenches at the Shipyard; and (6) altering Portal Monitor procedures so potentially radioactively-contaminated soil was allowed to be shipped offsite for commercial purposes to places unknown.

70.     Fraudulent sampling, scanning, and surveys led to fraudulent remediation; sites that required additional cleanup were not remediated and remain contaminated because fake samples indicated areas were "clean" when they were not.

71.     Evidence shows TETRA TECH's top onsite management, its Project Manager and Construction Superintendent, participated in and directed the fraud. Their employees engaged in sustained widespread misconduct, significantly compromising the cleanup.

**1.   Fake Soil Sampling: Parcels C, D, E**

*a.   Fraudulent Sampling - Stage 1*

72.     Fraudulent and fabricated soil samples purportedly taken from various sites on the Shipyard, including the areas around Building 707 (Parcel E), the 500 Series of buildings (Parcel D), and Parcel C, were in fact collected from elsewhere on the site.

73.     Senior Health Physics Technician ("HP") Anthony Smith says fake sampling took place in two stages. At first, HPs were directed to take samples from the general location intended to be sampled, but to fudge the specific location of the samples.

74.     When tasked with soil sampling, proper procedure was to initially scan the soil in order to locate radioactive hot spots. The scanning data was then used by engineers to identify locations of high radioactivity which would then be designated on maps indicating locations of the highest readings and thus, where soil samples should be taken.

75.     HPs followed the correct procedure in the early years remediating at Hunters Point. Proper practice however eroded under the direction of Project Manager William "Bill" Dougherty when efforts for areas to pass inspection and obtain "free release" were difficult to obtain due to remaining radioactive contamination. There is evidence that some fraudulent sampling was conducted throughout the time period of 2007-2008, but accelerated in the latter part of 2008 and early 2009. At that time, TETRA TECH was having difficulty obtaining free releases; post-remediation samples came back too "hot."

76.     In response, DEFENDANT TETRA TECH supervisors ordered the HPs not to take samples from the highest radioactive reading spots as designated by the engineers. Rather, the HPs were ordered to make it appear that they collected samples from the marked spots, but actually should gather samples from clean areas in proximity to  the radioactive spots. An HP (also known as a Radiation Control Technician, or "RCT") admitted this fraudulent conduct to the NRC: "the RCT stated that, when sufficiently low contamination levels were not obtained, the RTS [Radiation

Task Supervisor] would direct the RCT to move 5 to 10 feet in another direction and obtain a new sample from that location. Meanwhile, the new sample would be represented as having been obtained from the original, specified location."

### b. *Fraudulent Sampling – Stage 2*

77.    Time and again, the fraudulent post-remediation soil samples resulted in laboratory results indicating radioactive contamination above the free release levels. For example, in proximity to Building 707, repeated rounds of remediation failed to decontaminate all the soil as successive post-remediation samples came back too "hot." When sample results exceeded the free release levels, TETRA TECH was required to undertake further clean-up.

78.    On account of TETRA TECH's frustration in obtaining free release levels which further frustrated its desire to cut costs in order to increase profits, the means by which TETRA TECH perpetrated its fraudulent conduct changed. No longer did DEFENDANT TETRA TECH supervisors direct their HPs to obtain false samples in areas close in proximity to  the radioactive sites, but rather were directed to gather samples in at least three remote locations known from prior sampling to contain "clean" soil. TETRA TECH management pressured its supervisors to have the HPs engage in fraudulent sampling that would guarantee lab results well under free release levels so it could collect payment without incurring the full costs of the cleanup.

79.    Former employees, like Senior HP Anthony Smith, state that he and others took these second-stage fraudulent samples from at least three locations known to be low in radiological activity. The specific location was chosen depending on the soil types that they were trying to match.

80.    If HPs needed to match "green serpentine" soil, Smith and others took false samples from one of two locations. Originally, the green serpentine soil used to submit false samples was taken from a sewer trench in front of buildings comprising the Building 500 series. This site was then supplanted by a second one in the 500 series located in an area inside the remains of the foundation of an old movie theater. According to Smith, the theater foundation was preferable to the sewer trench because it afforded greater privacy – employees could take unobservable samples when within confines of the theatre's foundation walls. Smith says he would wait until those

laborers not privy to the fraud went to lunch or left for the day before he would then fill a 5-gallon bucket with soil from the theater site which he knew to be clean.

81.    If HPs needed to match sandy soil, they would fill five-gallon buckets with soil taken from an area under two palm trees in the vicinity of an old pump house (Building 521) that was also near the old movie theater foundation area.

### c.    Substituting Clean Soil for Potentially "Hot" Soil

82.    Senior HP Smith states he would take the five-gallon buckets of either green serpentine or sandy soil to the Conex (a shipping container that acted as a temporary field office), where HP supervisor Steve Rolfe, his wife HP Tina Rolfe, and HP Rick Zahensky would transfer the soil into sample containers as substitution for the actual samples from the stated location. The original and potentially "hot" samples would then be emptied into another 5-gallon bucket which Smith would then dump onto open trenches that had been dug for sewer removal. In short, the true soil samples were switched with soil known to be radiologically clean with the intention of fraudulently "proving" to the Navy, regulators, and the public that all radiological hazards had been removed.

83.    Smith estimates this type of false sampling happened "pretty much every day" over at least the last one and a half years he worked at the Shipyard. He says fake soil samples he took from all three sites – the sewer trench, the palm tree site and the theater – resulted in 800 to 1,000 false samples. Other HPs on the team under Smith's supervisor, Steve Rolfe, also regularly engaged in taking false soil samples, as did HPs under the supervision of Justin Hubbard.

84.    Samples were switched not only from the former site of Building 517, but Smith admits that he switched samples taken from the area around Building 707, the "Triangle Area" in Parcel E, and the area of the former 500 series of buildings in Parcel D. Additionally, HPs other than Smith had falsely switched samples in other areas, including North Pier and "shacks" 79 and 80, as well as Parcel C.

85.    Former TETRA TECH employees have declared that fraudulent soil samples had been initiated as early as 2007.  They also state that the fraudulent practices escalated in the years after TETRA TECH's contract with the Navy changed from a time-and-materials contract to a

firm fixed-price contract.  This provided a financial incentive for fraud; the less time and resources TETRA TECH spent on sampling and cleanup, the more profit they would derive.

**2.  Destruction of "Hot" Soil Samples and Their Records**

*a.  Building 351A*

86.    Building 351A had been used by the Navy's Radiological Defense Laboratory for decades in conducting extensive experiments with hazardous radionuclides.  It was one of the last buildings in Parcel G that had not been free released. Clearance of building 351A was holding up final payment to TETRA TECH for all the work the company had done in that parcel adding up to millions of unpaid dollars.

87.    Direct readings from radiological survey detection instruments indicated the presence of elevated radioactivity in a large amount of soil in a crawl space under Building 351A. Remediation attempts within the crawl space were performed in 2008 by a group of laborers who dug up the soil while HPs Anthony Smith and Josh Hooper monitored them. The laborers used pickaxes, shovels and trowels to loosen the soil and a large vacuum truck that sucked the soil from under the building through an 8-inch hose. The soil was ultimately placed in bins to be disposed offsite as radioactive waste.

88.    At the conclusion of approximately two weeks of remediation, HPs Anthony Smith and Josh Hooper took post-remediation soil samples from the crawl space, in an attempt to demonstrate that there was no longer any residual radiological contamination above established free-release levels. However, a post-remediation sample came back too "hot," demonstrating the radioactive cleanup had not been successfully completed. Proper procedure mandated another round of soil removal. This additional round of remediation would once again involve laborers and a vacuum truck, followed by another round of post-remediation sampling. However, TETRA TECH's management directed that such proper procedures be intentionally disregarded.

89.    Smith and Hooper were summoned to a meeting that included TETRA TECH's HPNS Project Manager, Bill Dougherty, TETRA TECH's Construction Superintendent Dennis McWade, among other senior TETRA TECH and sub-contractor managers. With respect to the costs TETRA TECH was incurring to undertake the cleanup, Dougherty told Hooper and Smith

"Do you know how much that machine cost to rent for two weeks? We can't afford to do that again, get rid of that sample," or words to that effect. Despite a complete and utter disregard of proper protocol and procedure, McWade gave Smith the containerized sample and its Chain of Custody ("COC") document, and Smith and Hooper did what they were told. They got rid of the sample and the COC record.

90.     Thereafter, they engaged in the first type of soil-sampling fraud described above and took a false sample under Building 351A. TETRA TECH then had its engineers mark the areas under the building that were known to be clean so that Smith could be assured that he would not obtain another soil sample that came back too "hot."  Smith says he understood, based on what his supervisors told him, that TETRA TECH wanted to get free release of the building despite the remaining contamination in order to permit TETRA TECH to receive its final imbursement for the work 'completed' on Parcel G.

91.     TETRA TECH submitted false documents to the Navy, claiming that Building 351A had been properly cleared of all radioactive material above release levels, when in actuality, there still existed significantly elevated levels of radioactivity that were well beyond free release levels located in the crawl space under the building. The radioactive contamination was not remediated over the next three-plus years that Smith continued to work at the Shipyard. To the best of his knowledge, it had never has been remediated. To this day, it is still radioactively "hot".

92.     Smith states that the soil sample from under Building 351A was the first instance where he was directly told to get rid of a sample. As further described below, it unfortunately was not the last.

### b. Parcel A Background Sample

93.     In July or August 2009, TETRA TECH HP Supervisor Justin Hubbard directed Senior HP Anthony Smith to 'ditch' a soil sample from the Shipyard's Parcel A because it was too radiologically "hot."

94.     TETRA TECH was about to start, or had just started, a project to remove sewer lines below Fisher Avenue and Spear Streets. Smith was directed by Hubbard to obtain a background reference sample (i.e., a sample known not to be radioactively contaminated) for the

Spear/Fisher sewer projects. Smith had been told that Parcel A was never used for any industrial purpose, and as such, it was deemed by the Navy to be free of contamination. Based on this understanding, these areas had been transferred to the City of San Francisco for development in 2004. Because of its close proximity to the Fisher/Spear project and with the assumption that Parcel A was 'clean,' Smith determined that it would be an appropriate place to obtain a background sample.

95.     Smith proceeded to a location just north of the intersection of Fisher Avenue and Spear Street.  On the north side of the road next to Fisher Avenue and just beyond the sidewalk, there existed a concrete wall that descended in height as it extended west and parallel to Fisher Avenue. Beyond the wall was a hill that rose to the top of Parcel A. Just before the stop sign at the intersection of Fisher and Spear (i.e., just northeast of the intersection) and approximately 20 feet from a light pole on the north side of Fisher Avenue, the wall was about waist-high for Smith. Because of how the hill rose behind the wall, Smith was able to reach over the wall and use a trowel to take a sample without bending over. He dug a hole about 6 inches deep in the hillside and took a sample from the bottom of the hole. He gave the sample to Justin Hubbard, who took it to the laboratory. In a violation of proper procedure, there was no chain-of-custody document accompanying the sample.

96.     The next day, Hubbard approached Smith who had the sample with him. In the presence of HPs Jeff Rolfe, Ray Roberson and Carey Bell, Hubbard told Smith that the sample had come back "hot." Hubbard said it contained 2 to 3 picocuries per gram of Cesium-137, which Smith knew was much higher than background levels, as well as above the Cesium-137 cleanup standard of 0.113 picocuries per gram. Thus, the sample had an amount of Cesium-137 that was 18 to 26 times higher than the set health and safety ceiling. Hubbard gave the sample to Smith and told him to "get rid of it and not say a word," or words to that effect. Smith took the sample back to the site where he had taken it and put the soil back into the hole he had created earlier for taking the sample. He disposed of the plastic sample container by putting it in a bin set aside for radiological waste. That same day, Smith took a different sample that he intended to be used as

the 'new' background sample from a distant site on the Shipyard that he knew to be clean from prior sampling and analysis.

97.    To the best of Smith's knowledge, the soil contamination he discovered in Parcel A was thereafter never remediated for Cesium-137 or any other potential radioactive contaminants.

**3.    Fraudulent Building Surveys**

98.    The contract between the Navy and TETRA TECH required the company to perform static scans and smears of buildings to determine if they were contaminated with radioactivity beyond free release levels. When a building was found to have elevated levels of radioactivity, TETRA TECH was contracted to engage in remediation to remove the radioactive contamination and bring contaminant levels below release levels. After remediation, TETRA TECH was required to again scan and take smears of the building to determine if all radioactive readings were within acceptable levels. TETRA TECH instructed that the post-remediation building scans were to be done fraudulently so as to ensure free release status.

99.    TETRA TECH supervisors divided building areas into three classes, Class 1, 2 and 3. They classified the floors and lowest two meters (or approximately 6 feet) of the walls to be Class 1. The proper way to conduct a Class 1 survey was to slowly scan the "probable sites" of contamination, such as drainpipes where radioactive liquids might have been discarded, and to scan each surface (i.e., the floor and lower walls) using a Ludlum 2350 scanner (which measures gamma radiation) and conducted systematically following a grid pattern. In addition, smear samples were to be taken from area surfaces which the scans identified as highest in radioactivity.

100.    For Class 2, HPs were supposed to take static scan and smear samples in a systematic grid pattern from the higher sections of the walls, i.e., above 2 meters. Class 3 areas were considered the ceiling and roof. Scans and smears were to be taken of these areas, but without requiring the strict grid patterns of a Class 1 or 2 designation.

**4.    Proper building survey procedure was not followed.**

101.    Anthony Smith was assigned to perform a large number of building surveys. Sometime between the summer of 2010 and early 2011, he was assigned to do building surveys in Building 707, several buildings and building footprints throughout the 500 series and Buildings

351, 351A, 411, 401, 414, 406, 144, 146, 130, 103, 113, and 521.   Smith's Tetra Tech HP supervisor, Steve Rolfe, told his survey team that consisted of Jeff Rolfe, Rick Zahensky and Smith, not to worry about doing Class 2 or 3 scans and smears at all. Rather, they were instructed to "just get some numbers and get it done," or "just set your meter down on the ground and let it count," meaning they should allow the scanner to operate in order to obtain data, but that the scanner should be stationary rather than doing a systematic survey of the area as required. Smith and his co-workers followed instructions by refraining from undertaking proper Class 2 and 3 scans and thus, reporting fraudulent data for the Class 2 and Class 3 scans for nearly all buildings at Hunters Point.

102.    When Smith challenged this practice, Tetra Tech HP supervisor Steve Rolfe told him, "That's what Bill Dougherty [Tetra Tech's Project Manager] wants." The false scanning was also done on other buildings by HP Supervisor Justin Hubbard's team, including Buildings 103, 114, 145, 130, 439, 366, and 813.

**5.    Fraudulent Data Reporting**

103.    The contract between the Navy and TETRA TECH required the company to do scans for radioactive contaminants of buildings, developed areas, and areas of open soil. Rather than following proper protocols for conducting such scans,  TETRA TECH directed its employees to alter scan data that returned either a reading too high, which would then require additional expensive remediation, or a reading too low which would raise concerns as to the scan's integrity and thus the potential for having to repeat the scan.

104.    Anthony Smith personally witnessed HP Tina Rolfe changing scan results so that they would fall within acceptable limits, i.e., not too high but not too low to raise suspicions. One time when Smith was downloading data from his equipment onto a computer, he came up behind Tina Rolfe and saw her working on a computer, changing readouts from a Ludlum 2350.

105.    Smith estimates that the HPs downloaded thousands of scan results per day. He states that changing these scan numbers was a very easy thing to do. He also saw her changing numbers on readings from a Ludlum 2360 (which collects surveillance data for alpha and beta radiation). The fact that TETRA TECH was "changing the numbers" was common knowledge

among the HPs. Both HPs Ray Roberson and Joe Cunningham told Smith that they were aware that scan results were being altered.  Senior HP Donna Watson observed Tetra Tech Supervisor Hubbard changing scan readings taken in the field on a computer as early as 2007 or 2008.

106.    Smith observed that Tina Rolfe was directed to change the numbers by her husband, Steve Rolfe, a Tetra Tech HP supervisor. Several times he heard Steve Rolfe say of one sample or another, "that number's too high, it's way above background," and he directed that it be altered to be lower, to be closer to the background levels.  Tetra Tech HP supervisor Justin Hubbard was also aware of the alterations. Smith complained about the scan results being changed, and Hubbard told him that Tetra Tech was doing it everywhere else on the Shipyard.

107.    Smith reports that Senior HP Rick Zahensky told him he also changed scan result numbers for an extended period, involving many months, if not years. On numerous occasions Zahensky took a computer home in order to change scan results overnight. Zahensky told Smith that at times he worked until the early hours of the morning to "get the numbers right." Smith was present on several occasions when Zahensky did not "get the numbers right," and was "chewed out" by Steve Rolfe. Smith also witnessed Tina Rolfe being "chewed out" by her husband Steve, when numbers remained too high or too low.

108.    TETRA TECH also violated proper protocol by holding up the delivery of the scan results to the project management office. Proper procedure was that the scan results were to be submitted to the office by the end of each day on thumb drives. However, rather than submit scan results by day's end, the scan results were held up so that employees like Zahensky could manipulate results that were deemed too high or too low. When Zahensky was given the scan results to take home in the evening, the thumb drive was not submitted until the following day or later. The management office had no objection to the tardy delivery of the scan results since their fraudulent manipulation was done at the direction and insistence of TETRA TECH's upper-level onsite project management.

109.    Bert Bowers, the former Radiation Safety Officer Representative ("RSOR"), has given a Declaration, each fact in which is incorporated by this reference as though fully set forth herein. (See Exhibit 3).  He states that a lab technician, Neil Barrett, and a lab supervisor, Phil

Smith, came to him on separate occasions complaining that they were being directed by upper-level project management to "write away" laboratory analysis results, that is, change the results of sample analyses and scans. Bowers directed the employees to go back to the project management, talk with them, and come back to Bowers if they were not satisfied. At that time, Bowers had not been aware project management had been ordering the falsification of samples and scan results. (Bowers Dec. ¶54)

## DEFENDANTS TETRA TECH EC, INC.'S ("TTEC") ADMISSIONS SUBSTITUTING CLEAN SOIL FOR RADIATIVE SOIL IN SUPERVISOR JUSTIN E. HUBBARD'S FEDERAL CRIMINAL GUILTY PLEA

110.   "I, **Justin E. Hubbard**, and the United States Attorney's Office for the Northern District of California (hereafter "the government") enter into this written Plea Agreement (the "Agreement") pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

The Defendant's Promises

(1) I agree to plead guilty to Count One of the captioned Information charging me with destruction, alteration, or falsification of records in federal investigations and bankruptcy, in violation of 18 U.S.C. § 1519. I agree that the elements of the offense are as follows: (1) I knowingly altered, falsified, or made a false entry in a record or document; (2) with the intent to impede, obstruct or influence the investigation or proper administration of any matter or in contemplation of or in relation to any such matter; (3) within the jurisdiction of an agency of the United States. I agree that the maximum penalties are as follows:

a.  Maximum prison term                20 years
b.  Maximum fine                       $250,000, or twice gain/loss
c.  Maximum supervised release term    3 years
d.  Restitution                        To be determined
e.  Mandatory special assessment       $100
f.  Forfeiture

(2) I agree that I am guilty of the offense to which I am pleading guilty and I agree that the following facts are true:

I have been working in the nuclear industry since approximately 1989, after completing my formal education.  During my twenty-five years in the industry, I have conducted decontamination work at nuclear power plants,

medical laboratories handling radioactive material, and a "Superfund Site", among other activities.  During that same period, I have received training in radiation contamination control, the proper handling of radiological waste, and the assessment of radionuclides in the environment.  I have also supervised others in these activities.

In approximately 1994 or 1995, I began performing nuclear remediation work at the former Hunters Point Naval Shipyard ("HPNS"), located in the Bayview District of San Francisco, California. My first employer at HPNS was New World Environment, Inc. ("New World").  After approximately four years with New World, **I was hired by Tetra Tech EC, Inc. ("Tetra Tech"), as a Radiological Task Supervisor at HPNS.  As a supervisor at Tetra Tech, I was in charge of a team of radiation control technicians ("RCTs") engaged in radiological remediation of soil at HPNS.**  I was aware that Tetra Tech had been hired by the United States Navy ("U.S. Navy") to perform the radiological remediation at HPNS.  My employment with Tetra Tech terminated in December 2013. [Emphasis Added]

While working for Tetra Tech, I reported to a Tetra Tech HPNS Project Manager, and a Tetra Tech HPNS Lead Superintendent, among others. The RCT's I supervised worked for Tetra Tech subcontractor Radiological Survey & Remedial Services, LLC ("RSRS").

I understood that the radiological remediation of HPNS was being conducted by Tetra Tech for the U.S. Navy under established sampling guidelines and protocols. My job at HPNS required me comply with a Task Specific Plan ("TSP") which identified, for a Building Series or Area, the number and type of survey units that were to be sampled at specific locations. In general, I would receive directions on a daily basis, including a survey unit map, identifying the sampling locations for a particular survey unit. Once the Tetra Tech engineers marked these locations, I would supervise the sampling of them by my RCTs.

The RCTs were expected to take soil from each marked sampling location, bag and label the sample, and then send it to a laboratory for an analysis of, among other data, any radionuclides of concern. Chain of custody ("COC') forms and tags showing the precise location of each soil extraction as identified on the survey map were required for each sample. I was aware that information from the chain of custody forms, including the sample locations, was incorporated into the sampling analysis reports prepared by Tetra Tech and emailed to the U.S. Navy.

**During my work at HPNS, I was aware of U.S. Navy testing protocols which mandated that if a laboratory analysis determined a sample of collected soil to be "hot"--that is, containing a higher-than-allowable level of radionuclides of concern--then additional remediation, including more sampling, of that survey unit was to be undertaken until all new collected samples passed laboratory analysis**. [Emphasis Added]

**During 2012, in direct contravention of the relevant U.S. Navy testing protocols, I obtained "clean" dirt from an area north of Buildings 253 and 211 at HPNS and substituted it for dirt taken from survey units in the North Pier area of HPNS. To effect this illegal switching, I drove my company truck to the area north of Buildings 253 and 211 and filled a five-gallon bucket with "clean" serpentinite soil from an area I knew to be outside the relevant marked survey unit. I then drove the clean dirt back to a "conex box"-style trailer. Once I was inside the conex, I emptied the "legitimate" soil samples previously collected by RCT's from their sampling bags into an empty bucket and substituted the clean serpentinite soil into each sampling bag.** [Emphasis Added]

I did not alter the markings made earlier on the sampling bags by the RCTs, which included the sample number, time, and date. **I then placed a bar code sticker on an outer bag for each sample. A copy of this bar code sticker was also affixed to a chain of custody ("COC") form for each sample.** The sticker was meant to identify the survey unit location the soil was taken from. **By switching the soil inside the sampling bag, I knew that the data on the COCs, many of which I signed, was false. I also knew that the false data on these COCs was incorporated into maps and reports made by Tetra Tech and submitted to the U.S. Navy for the purpose of demonstrating that the area had been successfully remediated.** [Emphasis Added]

**On or about May 31, 2012, I fraudulently switched soil for four survey units on the North Pier of HPNS: Survey Units 1,8,10, and 11. For Survey Unit I, specifically recall replacing the soil samples with soil I had collected from a clean area.** [Emphasis Added]

(3) I agree to give up all rights that I would have if I chose to proceed to trial, including the rights to a jury trial with the assistance of an attorney; to confront and cross-examine government witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth Amendment claims; to any further discovery from the government; and to pursue any affirmative defenses and present evidence.

18.     I confirm that my decision to enter a guilty plea is made knowing the charges that have been brought against me, any possible defense, and the benefits and possible detriments of proceeding to trial.  I also confirm that my decision 10 plead guilty is made voluntarily, and no one coerced or threatened me to enter into this Agreement…." (See Exhibit 4)

**TETRA TECH EC INC.'S ADMISSIONS SUBSTITUTING CLEAN SOIL FOR RADIATIVE SOIL IN SUPERVISOR STEPHEN C. ROLFE'S FEDERAL CRIMINAL GUILTY PLEA**

111.   "I, **Stephen C. Rolfe**, and the United States Attorney's Office for the Northern District of California (hereafter "the government") enter into this written Plea Agreement (the "Agreement") pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

The Defendant's Promises

(1) I agree to plead guilty to Count One of the captioned Information charging me with destruction, alteration, or falsification of records in federal investigations and bankruptcy, in violation of 18 U.S.C. § 1519. I agree that the elements of the offense are as follows: (1) I knowingly altered, falsified, or made a false entry in a record or document; (2) with the intent to impede, obstruct or influence the investigation or proper administration of any matter or in contemplation of or in relation to any such matter; (3) within the jurisdiction of an agency of the United States.
I agree that the maximum penalties are as follows:

| | | |
|---|---|---|
| a. | Maximum prison term | 20 years |
| b. | Maximum fine | $250,000, or twice gain/loss |
| c. | Maximum supervised release term | 3 years |
| d. | Restitution | To be determined |
| e. | Mandatory special assessment | $100 |
| f. | Forfeiture | |

(2) I agree that I am guilty of the offense to which I am pleading guilty and I agree that the following facts are true.
In or about September or October 2007, I was hired by Radiological Survey and Remedial Services, LLC., commonly known as RSRS. Thereafter, **in approximately 2008, I became a supervisor at Tetra Tech EC, Inc** ("Tetra Tech"), in charge of a team of radiation control technicians ("RCTs") engaged in the radiological remediation of soil at the former Hunters Point Naval Shipyard ("HPNS") located in the Bayview District of San Francisco, California. I served in that role until approximately August 2014. I was aware that Tetra Tech had been hired by the United States Navy ("U.S. Navy") to perform the radiological remediation at HPNS. [Emphasis Added]
While working for Tetra Tech, I reported to a Tetra Tech HPNS Project Manager, and a Tetra Tech HPNS Lead Field Superintendent, among others. During this time period, RSRS was a sub-contractor of Tetra Tech and I supervised several RSRS RCTs.

I understood that the radiological remediation of HPNS was being conducted by Tetra Tech for the U.S. Navy under established sampling guidelines and protocols. My job at HPNS required me to comply with a Task Specific Plan ("TSP") which identified, for a Building Series or Area, the number and type of survey units that were to be sampled at specific locations. In general, I would receive directions on a daily basis, including a survey unit map, identifying the sampling locations for a particular survey unit. Once the Tetra Tech engineers marked these locations, I would supervise the sampling of them by my RCTs.

Once the engineers had marked the survey unit sampling locations, the RCTs were expected to take soil from each marked sampling location, bag and label the sample, then send it to a laboratory for an analysis of, among other data, any radionuclides of concern. Chain of custody forms and tags showing the precise location of each soil extraction as identified on the survey map were required for each sample. In addition to these chain of custody forms and tags, I was also required to fill out a daily "Building/Site Area Report and Survey Unit Tracking Sheet ('survey unit tracking sheet')," which indicated the number of samples taken each day from a specific survey unit to document my team's daily activities. I was aware that information from the chain of custody forms, including the sample locations, was incorporated into the sampling analysis reports made by Tetra Tech and emailed to the U.S. Navy.

During my work at HPNS, I was aware of U.S. Navy testing protocols which mandated that if a laboratory analysis determined a sample of collected soil to be "hot"-that is, containing a higher than allowable level of radionuclides of concern-then additional remediation, including more sampling, of that survey unit was to be undertaken until all new collected samples passed laboratory analysis.

During 2012, I told the RCTs on my team to get "clean dirt" from areas known to be clean and taken from outside the marked survey unit areas to use as substitute samples for the dirt from the marked survey unit.  did this so that the survey unit would pass the laboratory analysis and not require further remediation. [Emphasis Added]

I am aware of at least two different sources of dirt for clean samples, "green dirt" from certain locations known to be clean and "brown dirt" from a pile formerly located on H Street, southeast of Building 606 at HPNS. **During this time period, I estimate that I told my RCTs to get clean dirt outside the designated survey units on approximately twenty occasions. On multiple occasions the switching of this dirt was done inside a "conex" trailer on site in my presence. I knew on these occasions that the soil locations reported in the chain of custody forms and the survey unit tracking sheets for these samples were false, that is, that the locations reported on the forms regarding where the soil came from were untrue. I would estimate that there were between ten to twenty occasions when  saw a chain of custody from being**

**filled out when I knew the data on the form was inaccurate. I directed the RCTs to switch soil for samples 81-100 for Survey Unit 22, taken on August 23, 2012. On that occasion, I falsified data on the survey unit tracking sheet in that] stated on the form the soil came from within that Survey Unit when I know it did not. I also know that the sampling data from Survey Unit 22 incorporated into the map and analyses sent by Tetra Tech to the U.S. Navy on August 29, 2012 was false.** [Emphasis Added]

I did not receive extra compensation for substituting "clean" soil for potentially contaminated soil in a survey unit. **My motivation came from pressure applied by the Tetra Tech supervisors. One told me on multiple occasions to "get the hell out of that area," in reference to a particular survey unit that was not testing clean. Another told me on more than one occasion that we were "not remediating the whole goddam site." An Assistant HPNS Project Manager told me on numerous occasions to "get clean dirt."** I understood these statements as a direction to go outside the appropriate survey unit and get dirt from other areas that was known to be clean, that is not containing excessive levels of radiation.  I knew that my conduct would impede the proper investigation and administration of the radiological remediation being undertaken by the U.S. Navy at HPNS.  [Emphasis Added]

(3) I agree to give up all rights that I would have if I chose to proceed to trial, including the rights to a jury trial with the assistance of an attorney; to confront and cross-examine government witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth Amendment claims; to any further discovery from the government; and to pursue any affirmative defenses and present evidence.

18.    I confirm that my decision to enter a guilty plea is made knowing the charges that have been brought against me, any possible defense, and the benefits and possible detriments of proceeding to trial.  I also confirm that my decision 10 plead guilty is made voluntarily, and no one coerced or threatened me to enter into this Agreement." [Emphasis Added] (See Exhibit 5)

## DEFENDANT LENNAR'S LIABILITY

## A.  CONSPIRACY

112.    On or about October 2, 2008, the Bay Area Air Quality Management District fined DEFENDANT LENNAR $515,000 because of the land developer's failure to monitor and control asbestos dust at Hunters Point Shipyard. Although monitoring was supposed to begin in July 2005, LENNAR's negligence resulted in the absence of any evidence as to what exactly the asbestos dust levels were at the site prior to September 2006. Nevertheless, despite such absence of any

baseline level of asbestos dust level, LENNAR proceeded to undertake soil removal and surface grading in a location directly adjacent to a local K-12 school where children played and studied, with only a chain link fence separating them from LENNAR's machinery and the harmful dust emitted as a result.[9]

113.    Bay View Hunters Point residents asked the air district to address their concerns with DEFENDANT LENNAR's repeated asbestos dust violations that were detrimentally impacting their community.

114.    An October 2, 2008 Air District press release claimed that the settlement between the Air District and LENNAR was the "largest of its kind in California." "Our Air District team negotiated an appropriate penalty based on the circumstances of the case," "This settlement will deter the kind of conduct Lennar engaged in that led to these violations." Air District spokesperson Lisa Fasano told the *Guardian* that "the $515,000 fine is "the biggest fine for a dust violation in the Bay Area air district."

115.    Fasano told the *Guardian*: "There were three basic violations involved," "Failing to maintain air monitoring systems appropriately; failing to maintain wash stations properly and failing to contain properly what they were receiving from those wash stations." LENNAR was required to monitor asbestos dust at their worksite and ensure that vehicles leaving the site were washed down properly so that the asbestos dust would not navigate out from the site. LENNAR's penalty was based on the type, duration and negligence of such violations.

116.    Today, DEFENDANT LENNAR is again not only engaging in the same violations of failing to mitigate toxic dust, but they have also failed to comply with their Proposition 65 requirement of notifying the community of the potential hazards of their work engagement.

117.    DEFENDANT LENNAR's conduct is beyond egregious, given their knowledge of DEFENDANT TETRA TECH's admission of leaving toxic radiative soil in the shipyard.

**B. Pattern and Practice of Violations of Proposition 65**

118.    PLAINTIFFS only became apprised of LENNAR's egregious violation of their requirements under Proposition 65 as recently as June 2020 where DEFENDANT LENNAR had

---

[9] *https://sfbgarchive.48hills.org/sfbgarchive/2008/10/02/air-district-fined-lennar-half-million-dollars-last-month/*

been engaging in a pattern and practice Proposition 65 violations since July 2005 which from that time, has been causing PLAINTIFF's untold injuries, damages and harms, including a significantly heightened and well-founded fear of contracting cancerous conditions.

119.    "According to Brownell, the air monitors have detected exceedances in asbestos levels greater than 16,000 structures per cubic meter in recent weeks. This is the concentration designated as a "work suspension level." Inside sources report that in January of 2007, asbestos detected by Parcel A air monitors reached critical levels warranting work suspensions, but Lennar Corp. refused to shut down shipyard operations." 10

120.    "In August 2006 the San Francisco Redevelopment Commission shut down Lennar's operations following a series of work suspensions due to elevated asbestos levels detected by the system of air monitors on the base operated by both Lennar and the Bay Area Air Quality Management District." [11]

121.    "As a result of a cursory investigation conducted by the Department of Public Health that included no laboratory tests for arsenic, lead or pulmonary function tests, exposed workers and school children were deemed "unharmed" by the toxic dust exposure, according to a memo to the SFRA from Health Director Dr. Mitchell Katz."

122.    "Asbestos levels on Jan. 24, 2007, were 24,600 structures per cubic meter. I don't understand why Lennar did not shut down construction operations." – Mike Wall, Enforcement Division, Bay Area Air Quality Management District."[12]

123.    DEFENDANT LENNAR is relying on the "green light" to dig in Parcel A and Parcel A-1, on account of representations from the EPA and the San Francisco Department of Public Health, as represented by Amy Brownell and advised by UCSF Medical doctors, led by John Balmes, MD. Each of these entities and individuals hold a conflict of interest, as some have received and are receiving monetary remuneration from LENNAR.

124.    On April 21, 2021, at 4:37:26 PM, the undersigned attorney for PLAINTIFFS received an email from Bradley Angel, Executive Director of Greenaction for Health and

---

[10] https://sfbayview.com/2007/03/bvhp-fights-dirty-transfer-development-of-hp-shipyard/
[11] Id.
[12] Id.

Environmental Justice, communicating the response Greenaction received from the EPA with respect to questions posed on behalf of the HUNTERS POINTS COMMUNITY: "Can you tell me if Lennar, or anyone else, is allowed to be moving dirt with bulldozers etc. on parcels that have not been cleared as clean?"

125.    On Wed, April 21, 2021 at 22:53, Yolanda Anita Sanchez, MS, MPA, US Environmental Protection Agency Community Involvement for Superfund representative replied:

The Navy is performing cleanup work on many Parcels at the Hunters Point Naval Shipyard site.  This work includes digging up (or excavating) potentially contaminated soils, backfilling areas with imported soils, and staging/moving soil around onsite.  A little more specifically:

- The Navy is finishing work on Parcel E-2, which includes work to complete the soil cover (using imported soil).  This ongoing work on Parcel E-2 is briefly described in the July 2020 Parcel E-2 fact sheet (see the Navy's website link ).  Parcel E-2 is not part of the areas that need to be addressed by the radiological retesting work.  This work is an essential part of the remedy for Parcel E-2.
- The Navy is completing clean-up work on chemically contaminated soils on Parcel E, which includes backfilling areas with imported soil. The Navy described its work on Parcel E in a series of three fact sheets in Fall 2019 (see the Navy's website link here). These portions of Parcel E are not areas that need to be addressed by the radiological retesting work.  This work is an essential part of the remedy for Parcel E.
- The Navy's radiological retesting work also includes soil movement.  On Parcel G, this radiological retesting work began in August 2020.  It is currently paused due to the winter rains, but it should start again soon.

For all this ongoing work, the Navy has dust management plans and is performing dust/air monitoring.

All areas of Parcel A are no longer part of the Superfund site and the Navy has transferred the Parcel for redevelopment.  These areas are suitable for work, recreation, and residential use, including construction.  The Office of Community Investment and Infrastructure (successor agency to the San Francisco Redevelopment Agency) is redeveloping Parcel A, working with its development partners.  (See Exhibit 6)

126.    As the above EPA communication makes plain, despite the existence of residual radioactive contamination on Parcel A, LENNAR, along with DEFENDANT FIVE POINT HOLDINGS, LLC persists in its excavation and development of its own property located within the still contaminated Parcel A.

127.     DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC, as "development partners" at all relevant times, knew, or should have known that the EPA has documented and published radioactive material found in September 2018 on Parcel A: "Radiological Contamination the Navy has found glow-in-the-dark dials and markers during several excavations. These devices were painted with radium, which is a radioactive material that is no longer used. The Navy has excavated the two areas most likely to have such devices; there may be more buried throughout the landfill. The radiation levels from these devices are low and do not pose a risk to human health or the environment if they remain underground." (See Exhibit 16 EPA FACT SHEET Hunters Point Naval Shipyard Parcel E-2 Landfill: Remedy and Management); see the Navy's website link[5] ("this ongoing work on Parcel E-2 is briefly described in the July 2020 Parcel E-2 fact sheet." The Navy website link reflects the discovery of radioactive "glow-in-the-dark dials").

128.     On or about September 14, 2018, DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC, at all relevant times, knew, or should have known, that "A highly radioactive object has been discovered at the former Hunters Point Naval Shipyard next to a housing area that has been declared safe and free of radioactive contamination for more than a decade. …The object — a radium deck marker about the size of a silver dollar, 1½ inches across — was unearthed Tuesday on a grassy slope beneath a stretch of newly built condos, less than a foot below ground. The state health department revealed the information Thursday in a "Progress Update" The housing area is known as Parcel A.  But the discovery of a radium device is startling because the city and multiple government agencies have said for years that any contamination on Parcel A was cleaned up long ago. The Navy transferred the 75-acre parcel to the city in 2004. The land is now owned by home builder and developer Lennar Corp. Public officials have repeatedly assured residents that no harmful radioactivity exists near their homes and they have nothing to worry about."[13] "The coin-shaped marker, less than two inches in diameter, was reportedly found 10 inches deep at Donahue St. and Galvez Ave., behind a fence close to new homes and the construction site for 150 more housing units…[A] radium-laced deck marker emerged less than a

---

[5] https://www.bracpmo.navy.mil/brac_bases/california/former_shipyard_hunters_point/documents1.html#Parcele
[13] https://www.sfchronicle.com/bayarea/article/Radioactive-object-found-near-homes-at-Hunters-13228476.php

foot underground near 300 new homes, according to the San Francisco Chronicle. The location has been ruled free of radiation and safe for at least a decade."[14]

### C.  Conspiracy: EPA CA Region 9, LENNAR, and Amy Brownell OF SFDPH

129.    Since at least May 14, 2009, DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC, "development partners" at all relevant times, conspired with the EPA, San Francisco Department of Public Health, ("SFDPH") and John Balmes, MD, to harm PLAINTIFFS as residents of Bayview Hunters Point. Proof of this conspiracy beyond a pixel of a doubt is found in a series of emails between Mark Ripperda, EPA CA Region 9, LENNAR, and Amy Brownell OF SFDPH. (See Exhibit 7 Emails Ripperda)

130.    DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC "development partners" at all relevant times, in carrying out their agreement, and engaging in overt acts to further and perpetuate the illegal conspiracy, wrote the following email exchanges with co-conspirator, Mark Ripperda and Amy Brownell:

**1) May 14, 2009, 3:37 p.m.**

**From: Mark Ripperda, EPA Region 9**

**To: Jeff Austin, Lennar Corp. employee**

"Hi, Jeff, as you've probably heard, the NOI [Nation of Islam]* is now beating on our door about asbestos."

*Note: The Nation of Islam operates a school for children ages 3 to 18 that is located next to the Hunters Point Naval Shipyard in the Bayview Hunters Point community.

**2) June 24, 2009, 10:00 a.m**.

**From: Mark Ripperda, EPA Region 9**

**To: Rob Balas, principal of Iris Environmental, Inc., consultant to the Lennar Corp**.

Re: Asbestos data flow chart call – 6/22

"We would like to take Lennar up on their offer to analyze the additional 8 samples from Lennar monitors so that we can do 16 filters from the City. This will also help lower the worst case risk' by including more samples with lower counts."

**3) Oct. 28, 2009, 1:26 p.m.**

---

[14] https://www.bizjournals.com/sanfrancisco/news/2018/09/14/highly-radioactive-object-hunters-point-lennar.html

**From: Mark Ripperda, EPA Region 9**

**To: Rob Balas, principal of Iris Environmental, Inc., consultant to the Lennar Corp.**

Re: Hunters Point data re-analysis

"We're meeting with the BAAQMD [Bay Area Air Quality Municipal District] and the City on November 3, and would like to meet with you soon thereafter to discuss the details and talking points. I prefer to keep our message as simple as possible and stay away from health assessments and from shutdown days. Something along the lines of: Our analysis using more detailed methodology showed that there are fewer 'health risks fibers'* present than what the Air District assumed in setting the trigger levels.* Thus the Air District's methods and levels are appropriate and we will defer all regulatory issues concerning asbestos to the District.

"I'm not the asbestos expert, so is this a true statement?"

*Note: "Health risk fibers" refer to a concentration of asbestos that can cause adverse health effects. "Trigger levels" refer to the standards set by the Bay Area Air Quality Municipal District that require the shutdown of redevelopment activities by the Lennar Corp.at the Hunters Point Naval Shipyard when an air monitor detects 16,000 or more asbestos fibers in a cubic meter.

**4) May 29, 2009, 4:16 p.m.**

**From: Rob Balas, principal of Iris Environmental, Inc., consultant to the Lennar Corp.**

**To: Mark Ripperda, EPA Region 9**

Subject: Re: Hunters Point – Follow-up to Tuesday's conference call

"[I]if we proceed with the limited sampling to check the correlation between the two different counting rules as it pertains to the fiber distributions, it is unlikely that we would use this initial evaluation to reach publicly communicable risk conclusions – say by using any found correlation to draw risk conclusions about current AHERA* dataset. To make any conclusions, a more robust, statistically significant sampling would need to be conducted. Even then, robust risk conclusions, ready for public consumption, may be impossible without activity-based sampling.* Ultimately this will be a policy management decision."

\*Notes: AHERA stands for Asbestos Hazard Emergency Response Act and refers to onemethod of counting asbestos fibers in a given sample of dust.

**San Francisco Department of Public Health email excerpts: Asbestos exposure coverup**

**1) Jan. 19, 2007, 8:26 a.m.**

**From: David Rizzolo, San Francisco Department of Public Health**

**To: Amy Brownell, San Francisco Department of Public Health**

Cc: Rajiv Batia, San Francisco Department of Public Health

Subject: Re: Fwd: worst case exposure assumption

"there may be other problems with reanalyzing worker exposure samples by TEM.\* you would have to get the okay from Gordon Ball. the big problem i see is that measurements that were low by PCM\* often turn out to be very high when reanalyzed by TEM. this is not a problem with OSHA because OSHA does not recognize TEM measurements. however, explaining to workers what this new information means for them can be a problem (pandora's box). that may be a bigger problem in reality than the one were are trying to address.

"in general, i see that in trying to put together a case to argue that exposure was 'low,' we are legitimizing the allegations. it seems to me that the available facts are on our side, so we should stay away from trying to create more data. more data might not help us. we can talk more about this directly."

**2) Oct. 13, 2006, 3:52 p.m.**

**From: Amy Brownell, San Francisco Department of Public Health**

**To: Sheila Roebuck and Jeff Austin, Lennar Corp. employees**

**Subject: very, very rough draft**

***"I'm sure you will also want to change my wording on how I portray the problems***, lack of monitors, etc. Go ahead and change any way you want. I may change some of it back but I'm willing to read your versions. as noted, don't bother adding the worker monitoring information. I don't want to use it. I understand your sensitivity on this issue and if specifically asked in a public meeting, I will be willing to verbally state the facts related to worker monitoring. But I'm not willing to make it part of this narrative."

**EPA email excerpt: Concocting reasons for the Lennar redevelopment plan to move forward**

**1) Nov. 3, 2009, 12:10 PM**

**From: Mark Ripperda, EPA Region 9**

**To: Rob Balas, principal of Iris Environmental, Inc., consultant to the Lennar Corp., and Amy Brownell**

Subject: EPA's preliminary results and conclusions from asbestos slide re-analysis

"Hi Rob, here are the main talking points that we will be presenting at this afternoon's meeting. You've been a careful reviewer of my language in the past – do you see any problems in how I've worded any of these points?"

**2) Nov. 4, 2009 9:25 a.m.**

**From: Mark Ripperda, EPA Region 9**

**To: Rob Balas, principal of Iris Environmental, Inc., consultant to the Lennar Corp.**

**RE: HP [Hunters Point] asbestos re-analysis conclusions (2).doc**.

"Thanks Rob, I appreciate your input and yes, you can share this internally with Lennar. These were talking points for yesterday's meeting with the City and the Air District. … I need a different focus for meeting with both the NOI [Nation of Islam, administrator of the school located next to Hunters Point Shipyard] and the greater community. The conclusions for general communication will probably stay similar, with one addition, a statement that EPA sees no reason to stop the development.

(See Exhibit 7 )"Emails Show Criminal Conspiracy by EPA, Region 9 and San Francisco Health Department Officials to Cover-up Dangers of the Lennar Corp.'s Development Project at the Hunters Point Naval Shipyard *Officials Suppress Data Showing Asbestos Exposures in the Bayview Hunters Point Community*"

*131.*   DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC "development partners" at all relevant times engaged in illegal patterns and practices of environmental violations throughout the United States that are substantially similar to the violations and abuses that LENNAR and FIVE POINT HOLDING's have engaged in while developing in the Bayview Hunters Point vicinity.

This ugly 23-pound fragmentation bomb was found 2 feet under the surface in the yard of a house being built by Lennar in 2007 in an upscale subdivision in Orlando, Florida. It was one of many live, undetonated munitions including bombs up to 500 pounds, rockets, rifle grenades and incendiary bombs found on the land, which had been a World War II bombing range. Families that had already moved into the subdivision discovered Lennar had neglected to investigate the property before building 54 homes there. Homebuyers were furious when bombs were found on all 54 lots. Now Lennar is refusing to ensure cleanup of dangerous conditions at the Hunters Point Shipyard in San Francisco prior to constructing thousands of new upscale condos. – Photo: Orlando Channel 13

Lennar is facing lawsuits in Texas, Florida, Arizona and San Diego, California, where it has built on toxic land. In Orlando, Florida, Lennar built homes on top of a World War II bombing range. People began to find undetonated bombs underneath their homes, including a 23-pound fragment bomb. The City of Orlando called for a forced evacuation of surrounding homes and a day care center.[15]

## A. PLAINTIFFS RELIED ON LENNAR FIVE POINT'S FRAUD

### 1. Conflict of Interest: "Paying the Wolf to Guard the Sheep"

132.    DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC "development partners" at all relevant times, pursuant to San Francisco Board of Supervisors Resolution Article 31[16] were paying $197 per hour for consultation and site visits by Amy Brownell, Environmental Engineer at San Francisco Department of Public Health, (SFDPH). This conflict of interest prompted a civil Grand Jury for 2010-2011, to admonish San Francisco:

> Finding 2: The Jury found the City has placed itself in a potentially compromising situation with Lennar where in essence the wolf is paying the shepherd to guard the flock. By having the developer, Lennar, reimburse the city for monitoring expenses associated with the HPS redevelopment project, the SFDPH has created

---

[15] *https://sfbayview.com/2011/03/emails-show-regulators-conspiring-with-lennar-to-cover-up-shipyard-development-danger/*

[16] Article 31-**SEC. 3108.  FEES.**

The Director is authorized to charge the following fees to defray the costs of document processing and review, consultation with Applicants, and administration of this Article: for Fiscal Year 2010-2011, the fees are as follows: Application Fee = $592 for up to three hours of document review/consultation and $197 for each additional hour, including site visits. No later than April 15 of each year, the Controller shall adjust the allowable fees to reflect changes in the relevant Consumer Price Index, without further action by the Board of Supervisors. In adjusting the fees, the Controller may round these fees up or down to the nearest dollar, half-dollar or quarter-dollar. The Director shall perform an annual review of the fees scheduled to be assessed for the following fiscal year and shall file a report with the Controller no later than May 1st of each year, proposing, if necessary, an adjustment to the fees to ensure that costs are fully recovered and that fees do not produce significantly more revenue than required to cover the costs of operating the program. The Controller shall adjust fees when necessary in either case.

(Added by Ord. 6-05, File No. 041664, App. 1/8/2005; Ord. 204-10, File No. 100575, App. 8/3/2010)

a situation that could raise doubt in the public's mind about its commitment to proactively and impartially enforce environmental health regulations even when it might adversely impact Lennar. Public trust in the SFDPH has been further jeopardized by its failure to update its website in a timely manner, and its apparent reluctance to comment publicly on the best method to deal with the cleanup of Parcel E-2.[17]

133.    DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC "development partners" at all relevant times, also committed a fraud in the context of their conflict of interest with scientists and medical doctors at the University of California, San Francisco, led by Dr. John Balmes. Dr. Balmes was also paid by LENNAR, an important fact which Dr. Balmes later disclosed. Dr. John Balmes, the UCSF scientist providing advice to the Mayor and SFDPH, permitting LENNAR to dig, admitted: **"I had unintentionally misrepresented my relationship with Lennar regarding asbestos dust levels during the grading of Parcel A as an early step in residential development at the former Hunters Point Naval Shipyard."** [Emphasis Added]

"To the Editor:

I read with interest Dr. Reza Shirazi's article "University of California's disservice to the Bayview Hunters Point community." Dr. Shirazi interviewed me for this article and made me aware that *I had unintentionally misrepresented my relationship with Lennar regarding asbestos dust levels during the grading of Parcel A as an early step in residential development at the former Hunters Point Naval Shipyard.* I was asked by the San Francisco Department of Public Health and the California Department of Public Health to provide advice about the issue of asbestos dust generation during Parcel A construction in 2006-2007. I said at a public meeting on 1/28/2020 that I had not been paid for this consulting work. When I made that statement, *I did not remember that the UCSF Division of Occupational and Environmental Medicine had been reimbursed for the time I spent on this work.* I now want to make a sincere apology to the Bayview/Hunters Point community and to Dr. Ahimsa Porter Sumchai in particular for my mistake in making the incorrect statement at the January meeting that Dr. Shirazi reported on in his recent article. I respect Dr. Sumchai's deep commitment to address the environmental injustice that the Bayview Community has experienced over many decades.

John R. Balmes, MD
Professor of Medicine, UCSF
Professor of Environmental Health Sciences, School of Public Health, UC Berkeley
(See Exhibit 8 See John Balmes letter attached)

---

[17] https://civilgrandjury.sfgov.org/2010_2011/Hunters_Point_Shipyard.pdf

134.     The UCSF committee that provided LENNAR the "green light" to dig and excavate have subsequently changed their reports after admitting radioactive materials may be buried deep in the soil of Parcel A-1. Dr. Balmes wrote:

"Second, I think Dr. Tascoe is essentially correct in her characterization of the phone call that I had with her and Dr. Sumchai in August of last year**. I did tell them that the committee agreed that the gamma scan conducted by the CDPH of Parcel A-1 could have missed alpha and beta emitting material buried deep in the soil of the parcel. This remains the committee's opinion."**

**That said, it is the committee's opinion it is unlikely that such radioactive materials would be found buried deep in Parcel A-1 because of the extensive excavation of that parcel and the fact that much of the excavated soil was moved to Parcel A-2, which was also scanned by the CDPH**. Gamma rays travel through soil better than alpha and beta particles which are easily blocked. **The CDPH gamma scan did detect the radium-containing deck marker at the periphery of Parcel A-1 but no other radioactive material.** The committee's opinion that any further testing of Parcel A-1 for alpha and beta emitting materials should be discussed with the current residents regarding the cost in disruption of deep soil testing versus the benefit in terms of residents' confidence in the absence of such materials.

Regarding Parcel G re-testing, one of the main issues about which Drs. Tascoe and Sumchai were concerned on the call was the remediation standards that the Navy was proposing to use to clean-up Parcel G. **The committee agrees with Drs. Tascoe and Sumchai, as well as with Dr. Hirsch and the US EPA, that using outdated standards to set remediation goals is not acceptable**. Please note that an assessment of the remediation goals for Parcel G was outside of the committee's charge. That said, the committee report says quite clearly that we agreed with the US EPA that a final protectiveness determination regarding Parcel G should not be made until all of the retesting data are available for review.

(See Exhibit 8 attached Email thread with John Balmes)

## 2.  Helicopter Fraud[6]

135.     On August 19, 2012, DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC "development partners" at all relevant times, knew that co-conspirator Amy Brownell was willfully and intentionally misrepresenting the unlikelihood that a helicopter fly over would find buried radioactive materials, and that she and LENNAR could use this predestined fact

---

[6] **Exhibit 15 CHRONICLE INVESTIGATION 'Extremely unlikely that they will find anything'**
https://www.sfchronicle.com/bayarea/article/Extremely-Unlikely-That-They-Will-Find-15519861.php

as a selling tool to mislead homebuyers into believing Parcel A was safe to purchase their new homes. Co-conspirator Brownell's fraudulent representation on behalf of LENNAR is as follows:

> "Extremely unlikely that they will find anything," Brownell **wrote on Aug. 19, 2012,** "because they are just doing a gamma survey at 300 feet — the instruments and lab tests that Navy does on the surface at HPS (Hunters Point Shipyard) are much more sensitive."[18]

136.   DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC "development partners" at all relevant times, knew that the helicopter operated by the U.S. Department of Energy was designed to fly 300 feet above the ground and quickly scan wide areas for radiation during nuclear emergencies. It was meant to measure the extent of radiation leakage after a power plant meltdown or to search for "dirty bombs." It was not built for the more subtle work of spotting patches of poisoned soil or small, buried radioactive objects, and it was not normally used for that purpose.

137.   DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC "development partners" at all relevant times, knew that in summer 2012 the U.S. government announced it would fly the helicopter above some parts of the Bay Area as part of a research project to study background radiation levels. DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC "development partners" at all relevant times, knew the flight, ordered by the Department of Homeland Security, was not part of any environmental or cleanup project and that as originally intended, the government did not intend to fly above Hunters Point and Treasure Island.

138.   DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC "development partners" at all relevant times, as part of their plan and scheme to deceive Plaintiffs and Bayview Residents, agreed that their co-conspirator, Amy Brownell would write: "If they don't find anything, it will be another layer of evidence to add to all our other information that provides assurance that the property transfers are safe." Co-conspirator Amy Brownell of the San Francisco Department of Public Health, spoke at a community meeting on August 15, 2018 about

---

[18] *https://www.sfchronicle.com/bayarea/article/Extremely-Unlikely-That-They-Will-Find-15519861.php*

the Hunters Point Naval Shipyard and pollution, assuring Plaintiffs and the Bayview Hunters Point Residents that their community was safe. Again, she fraudulently asserted that the results of the helicopter flyover by Homeland Security was affirmative verification that there was no radioactive material on Parcel A and within the Shipyard. She stated to the Bayview community that the Homeland Security helicopter flyover of HPNS had used "sophisticated radiation detection instruments" and "found nothing of concern. Amy Brownell knowingly and falsely represented that the helicopter scan "can detect very, very, very low levels, and they can tell you whether there's background [radiation] or whether there are any anomalies on the surface." Co-conspirator Amy Brownell made such assertions due to her financial interest with LENNAR, and permitted LENNAR to provide language that she then communicated to PLAINTIFFS and the Bayview community that assured them that LENNAR was responsibly considering risks to their health when undertaking their development projects in the Shipyard.

139.    One month later in  September 2018, after co-conspirator Amy Brownell assured Plaintiffs and Bayview Residents that the community was safe based on "science" and "multiple lines of evidence," DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC "development partners" at all relevant times, knew that on September 2018 Parcel A was still contaminated: "Radiological Contamination: the Navy has found glow-in-the-dark dials and markers during several excavations. These devices were painted with radium, which is a radioactive material that is no longer used. The Navy has excavated the two areas most likely to have such devices; there may be more buried throughout the landfill. The radiation levels from these devices are low and do not pose a risk to human health or the environment if they remain underground."



*Radioactive glow-in-the-dark dials found in Parcel A ten (10) inches below the ground surface.*

140.   After that finding and other earlier discoveries of contamination, the Navy decided that Treasure Island's large housing area known as Site 12 was "radiologically impacted" and must be investigated. Since then, Navy contractors have found more than 700 radioactive objects in Site 12, most in old landfills and some near occupied homes, parks and playgrounds. Most were contaminated with radium-226, an isotope linked to blood disorders and a wide range of cancers.

**3. Home Selling Fraud on Parcel A**

141.   DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC "development partners" at all relevant times, knew that Brownell is the City of San Francisco's point person on the Shipyard, having worked on the project for 25 years. Officially, the cleanup is a federal project managed by the Navy and overseen by the U.S. Environmental Protection Agency, but San Francisco also has important oversight powers. The S.F. Health Department is responsible for monitoring the cleanup and for regulating construction activities related to development to ensure that companies like LENNAR are not exposing workers or the public to hazardous substances. Under the City of San Francisco's Health Code, Brownell has the authority to take enforcement action and issue violations to LENNAR which she has rightfully executed in the past.

142.    DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC "development partners" at all relevant times, solicited agreements with Co-Conspirator Brownell which caused her to turn from her official and designated responsibility of  protecting PLAINTIFFS, as San Francisco residents and tax payers, and instead affirmatively and intentionally support the interests of her Co-Conspirators, DEFENDANTS LEANNAR AND FIVE POINT.  Upon the request and financial incentives of LENNAR's officials and sales agents, Brownell has affirmatively aided LENNAR with its mega-developers $8 billion shipyard project by reassuring PLAINTIFFS, as justifiably nervous Bayview Hunters Point residents and potential home buyers that the community was safe despite the scale of LENNAR's development upon land lying on one of the largest and hazardous Superfund fund sites in the United States.

143.    "There's a conflict of interest here," said Deborah Sivas, professor of environmental law at Stanford and director of the University law school's Environmental Law Clinic. Sivas has advised local governments in the Bay Area on how to handle hazardous cleanups. She said that even if Brownell didn't explicitly tell Lennar's clients they should buy the homes, her upbeat take on the shipyard carried extra weight because of her position as the city's shipyard expert. "It was highly inappropriate for her to be advocating one way or another," Sivas said, calling Brownell's involvement "extremely odd." "You're supposed to protect the health of the city's residents and, in fact, you're giving them assurances that maybe help them go through with the transaction."

144.    At the direction, agreement, plan, and conspiracy of DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC, Co-conspirator Brownell had made the same unsupported claim at a Board of Supervisors committee hearing, saying that "the entire shipyard, Parcel A, Parcel G, Parcel E, name any alphabet soup" had been found to contain "nothing out of the ordinary." At the hearing, Brownell also speculated about the cause of high rates of asthma and heart disease in the Bayview-Hunters Point neighborhood, which includes the Shipyard and many industrial facilities. The community is one of the poorest in the city and suffers from air pollution, according to health department studies. But Brownell said that health issues there might be caused by the "stress" of learning about the cleanup problems.

145.    DEFENDANTS LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC actively concealed from PLAINTIFFS that these DEFENDANTS had chosen to not comply with the requirements of Proposition 65, by providing proper warning of the release of chemicals and toxic materials that cause cancer and have deleterious impact on reproductive health. PLAINTIFFS justifiably relied on to their detriment on DEFENDANTS LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC actively concealment by compliancy, and not demanding enforcement of Proposition by the Attorney General or the District Attorney. Had the PLAINTIFFS know of DEFENDANTS LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC actively concealment, PLAINTIFFS could have engaged in direct action to compel compliance, like PLAINTIFFS are demanding in this action, by DEFENDANTS LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC with the mandates of Proposition 65.

### DEFENDANT FIVE POINT'S LIABILITY

146.    On about April  10, 2017, FIVE POINT HOLDINGS LLC, the megadeveloper spin-off of LENNAR,  filed to go public. The Aliso Viejo-based developer is building the second phase of the San Francisco Shipyard and Candlestick Point, totaling 12,000 homes.  As one of the country's largest homebuilders, LENNAR formed FIVE POINT in 2009 to manage its California master-plan developments. LENNAR remains a major shareholder in the company. At the end of 2016, LENNAR owned shares representing about 45 percent of FIVE POINTS outstanding voting interests according to  SEC filing data.

147.    DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING LLC engaged in violations of law jointly and as one entity as LENNAR created and owned FIVE POINTS HOLDINGS LLC and used FIVE POINTS HOLDINGS to develop the HPNS.

148.    DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING LLC were informed by DEFENDANTS TETRA TECH INC, AND DEFENDANT TETRA TECH EC INC's employee, Anthony Smith in or about 2014 that:

"Parcel A Cesium-137
The fraudulent sampling at Building 35 IA was not an isolated incident; in fact, it was just the first of many. For example, less than a year later, around July or August of 2009, I was assigned to HP Supervisor Justin Hubbard's crew and tasked with performing surveys and sampling as part of a project remediating sewer lines along

Fisher Avenue and Spear Street. At the beginning of the project, Justin Hubbard directed me to take a background sample from somewhere in a nearby adjoining area that did not have radioactive contamination in order to establish naturally occurring levels of radiation for the sewer line work. I chose to take a sample along the border of Parcel A - an area we were told had never been used for radiological purposes and was already transferred to the City of San Francisco for development because it was believed to be free of any radioactive contamination above free release levels.

The next morning or so, Justin Hubbard brought the soil sample out to our meeting spot and told me the sample tested "hot" for radiation at a level of two to three picocuries of cesium. Other members of the project crew at the meeting point that morning included HPs Ray Roberson, Carey Bell, and Jeff Rolfe. Hubbard stated to all of us in regard to the soil sample from Parcel A - "get rid of it and not say a word," or words to that effect." (See Exhibit 2, Declaration of Anthony Smith¶¶ 12-13)

149.   DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING LLC are jointly and severally liable for all the damages, harms and injuries these DEFENDANTS caused to PLAINTIFFS as herein alleged because these DEFENDANTS were well aware and apprised that their land, Parcel A contained radioactive levels that exceeded what was deemed safe despite representing otherwise as they were informed by their employees, in or about 2014 that Parcel A was "hot" for radiation at a level of two to three picocuries of Cesium.

# VI. DAMAGES-FEAR OF CANCER



Workers leaving the shipyard, World War II, circa 1943

150.    "Tens of thousands of Black workers were recruited from the South to work in private and government shipyards in the Bay Area. Here, in a photo taken around 1943, workers at the Hunters Point Naval Shipyard have finished the day's shift and are headed home. Some 10,000 of them lived adjacent to the shipyard in Hunters Point. Many of their descendants still do, and they recall their relatives dying of diseases from exposure to the radioactivity and multiple toxins that were and are ubiquitous at the Shipyard."[19] The BAYVIEW HUNTERS POINT RESIDENTS are still, as we speak, dying from exposure to radioactivity and a toxic stew of deadly poisons in the air they breathe, in the water they drink, and in the walls of the homes where they spend their lives. Children from the Bayview suffer from exceedingly high rates of  asthma, mothers from the Bayview fall persistently sick with breast cancer, Bayview fathers struggle with unusually high incidences of cardiovascular diseases, while Bayview families overall suffer with

[19] Showdown! Radiological data fraud at Hunters Point Shipyard 2018
January 29, 2018 by Ahimsa Porter Sumchai, M.D, A former physician specialist with the San Francisco Department of Public Health and former attending physician for the Palo Alto VAH Environmental Registry.

a myriad of illnesses caused predominantly by exposure to the toxic soup left by the United States when it relied upon the Shipyard as a place to experiment with the use of the most deadly and toxic substances found and created on the planet.

151.   "[T]he cost of medical monitoring is a compensable item of where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of a plaintiff's toxic exposure and that the recommended monitoring is reasonable"[20] Potter v. Firestone Tire Rubber Co. (1993) 6 Cal.4th 965, at p. 1009).

152.   Radioactive Components Identified as Contaminants of Concern on Hunters Point Ship Yard:[21]

| | |
|---|---|
| **Bismuth 214** | Kidney damage |
| **Cesium 137** | Thyroid cancer;<br>Increases risk of cancer;<br>Bone marrow failure; and<br>Reproductive effects. |
| **Cobalt 60** | Associated carcinogen in humans;<br>Sterility |
| **Plutonium 239** | Cancer of the lungs, liver, bone and bone marrow. |
| **Radium 226** | Bone cancer |
| **Strontium 90** | Human carcinogen;<br>Cancer of the bone, nose, lungs, skin |

---

[20] There is now sufficient mechanistic and epidemiological evidence to accept that exposure to external ionizing radiation at low doses < 100 mSv is a risk factor for dementia." Christopher  Busby,  *A Risk Coefficient for Radiation-Induced Dementia,* June 14, 2018, *http://www.scirp.org/Journal/PaperInformation.aspx?PaperID=85279*

[21] As authored by Wilma Subra Chemist / Technical Adviser
Mrs. Subra holds degrees in Microbiology/Chemistry from the University of Southwestern Louisiana. She received the MacArthur Fellowship "Genius" Award from the MacArthur Foundation for helping ordinary citizens understand, cope with and combat environmental issues in their communities and was one of three finalists in the Environmental Category of the 2004 Volvo for Life Award. Was selected in 2011 as one of the 'Lifetime Remarkable Woman' and most recently won the 2011 Global Exchange, Human Rights Award for her ongoing work with the BP Oil Spill and the communities affected by it.

| | Leukemia;<br>Cancer due to damage to genetic material in cells. |
|---|---|

The radioactive components have extremely long half-lives and will remain in the environment hundreds to thousands of years. Thus, if the radioactive components are not addressed on the former Hunters Point Ship Yard, they have the potential to migrate off the former Ship Yard site in the form of particulate emissions as well as potential contaminants in ground water and serve as a source of Fear of Cancer to Bay View community members and potential future occupants on the ship yard property.

In the areas where the radioactive components remain unaddressed on the shipyard property, other toxic chemicals are also known to be present. These toxic chemicals consist of volatile organic compounds, semi-volatile organic compounds, polynuclear aromatic hydrocarbons, PCBs, pesticides, petroleum hydrocarbons and dioxins and furans. These toxic chemicals are also known to cause a variety of cancers and serve as a source of Fear of Cancer to Bay View community members and potential future occupants on the shipyard property.

Applying the methodology of Probability of Causation, and based on my discussions with Bay View Hunters Point Residents' in 2010 and in June 2018, including visiting the HPNS, and having read the guilty pleas of the TTEC supervisors, admitting to taking ""clean" dirt from an area north of Buildings 253 and 211 at HPNS and substituted it for dirt taken from survey units in the North Pier area of HPNS", plus review of the sworn declarations of several whistleblowers confirming the supervisors criminal admissions, it is my opinion to a reasonable reliable scientific probability that the risk of developing cancer in the BHPR has significantly increased by the additional radiation releases from TTEC's admitted actions of leaving radioactive soil in the ground at the ship yard. Further, it is my opinion that TTEC's actions have resulted in significant actual risk of cancer or other toxic related illnesses to the BHPR. These facts support my opinion of the reasonableness of Fear of Cancer to Bay View community members.[22]

153.   Bayview Hunters Point Residents have suffered economic and non-economic damages, including, but not limited to, the following:

**A. ECONOMIC**

1. MEDICAL BILLS

2. MEDICAL MONITORING--NEXT FIVE (5) GENERATIONS

---

[22] *Id.*

3.  PROPERTY DAMAGE

4. COST OF URGENT SCREENING AND TESTING FOR RADIATION
   RELATED ILLNESSES

5.  DIMINUTION IN HOME VALUES DUE TO GROUND WATER
   CONTAMINATION

6. LOST INCOME

154.    On information and belief, the NAVY has sent out to BAYVIEW HUNTERS POINT RESIDENTS "Deed notification that soil below the groundwater table in remediated areas may be contaminated."

**B. NON-ECONOMIC**

155.    BAYVIEW HUNTERS POINT RESIDENT, Class PLAINTIFFS have suffered and continued to suffer the following injuries, damages and harms: Fear, Anxiety, Loss Of Enjoyment Of Life, Mental Distress, Emotional Distress, Pain, Humiliation, Discomfort, Inconvenience, Suffering and the extreme Fear of contracting cancer caused by radiation exposure and exposure to other toxic and chemical releases still in the soil at the Hunters Point Navy Shipyard. The gripping fear Bayview Hunters Point residents are suffering began back in 2004, when they protested TETRA TECH's digging and construction because they did not believe TETRA TECH was acting in the best interest of the residents' health and safety.  The residents' fears were exacerbated and elevated by the metal, glossy signs TETRA TECH attached to the properties, including the schools abutting the Shipyard. Defendant TETRA TECH's signs stated the following:

156.    Biomonitoring Urine test have confirmed high levels of radionuclides in the bodies of Bayview Hunters Point Residents. The following is some of the test recent results:

**A.  Monica Miranda Arevalo**

Monica Miranda Arevalo requested biomonitoring evaluation and urine toxicological screening out of concern for her personal welfare and safety. Her father is a long-time employee of UCSF LARC sited in Building 830 on Crisp Avenue. His urinary screening detected elements in concentrations above reference range documented to be present in shipyard soils.

Most notably uranium is detected in concentrations 17X greater than the reference range maximum of 0.026. The noted concentration level 0.457 ug/g creatinine is the first time HP Biomonitoring has detected uranium in radiochemical and toxic chemical hazard zones. Uranium excretion is mostly by urine and feel can be elevated if the body burden is high. Fatigue is a common symptom of uranium exposure. The uranyl ion bonds to phosphates in bone displacing calcium and uranium bound to bicarbonate damages renal function. Obvious sources of exposure are nuclear waste sites**. (**Hunters Point Community Biomonitoring Program; Biomonitoring Report Analysis by Dr. Ahimsa Sumchai)



**B.  74 Year Old Hunters Point Resident**

A 74-year-old female evaluated during an acute asthmatic episode has lived for over 30 years at Mabrey Court on Hunters Point hilltop adjacent to Innes, Galvez and India Basin

and less than half a mile west of the federal Superfund site at the Hunters Point Shipyard. Patient reports her asthma is triggered by dust exposure.

She presents with multiple radionuclides and chemicals of concern detected using Genova Diagnostics Comprehensive Urine Elements Profile test. The radionuclides Rubidium and Thallium are detected above the reference range. Indeed, Rubidium concentrations exceed the Tentative Maximum Permissible Level (TMPL) of 2,263 ug/ g creatinine and are documented at 3,207 ug/g creatinine.

Manganese is detected in concentrations exceeding TMPL at 2,30 ug/g creatinine. Nickel is detected in elevated concentrations at 3,61 ug/g creatinine. (The reference range is < 3,88 ug/g creatinine). Zinc concentrations are elevated and are approaching TMPL at 680 ug/g creatinine. (Reference range 63-688). The patient is not taking potassium supplements yet presents with a potassium level in the TMPL zone of 5,705 ug/creatinine (759-4653 ug/g creatinine reference range) This finding raises the question of whether radioactive K+ that has been detected in hundreds of above background gamma-emitting readings in scans conducted at Parcel A1 and Parcel A2…(Hunters Point Community Biomonitoring Program; Biomonitoring Report Analysis by Dr. Ahimsa Sumchai)

## C.  Carolyn Ann Nash-DOB: 11/30/43

The radionuclides Rubidium and Thallium are detected above reference range. Rubidium concentrations exceed Tentative Maximum Permissible levels. Manganese concentrations exceed TMPL. Nickel is detected in elevated concentrations. Zinc concentrations are above the reference range and approaching TMPL. Potassium concentrations exceed TMPL and must be considered potentially toxic in a person not taking potassium supplements. This finding is historically significant given the abundance of radioactive potassium 40 documented in soils at HPNS. The ubiquitous presence of K40 in shipyard soils has been interpreted as naturally occurring. K40 is documented in the HRA as being a radionuclide of concern with a preliminary remediation goal assigned by the EPA for cleanup. It was used at HPNS in human research on muscle mass by the NRDL, in fireworks and explosives and in photography. A recent gamma scan conducted by CADPH at HPNS detected approximately 250 above background gamma emitting anomalies on residential Parcel A1 and Parcel A2.

## D.  Christopher Carpenter

In 2005, Mr. Carpenter started working for Gordon Ball, a sub-contractor with Defendant Tetra Tech. In 2006, Mr. Carpenter began working at the Hunters Point Navy Shipyard and expressed extreme fear of developing cancer. After a day's work, Mr. Carpenter would wear his work clothes home, where his wife would take care of the laundry.   In 2007, Chris suffered episodes of excessive itching and again expressed his fear that working on this Tetra Tech project was exposing him to unsafe and unhealthy work environment. Mr. Carpenter also complained to his employer his fear of contracting cancer because his observations of Tetra Tech's reckless handling of soils with a total disregard to the three (3) neighboring schools next to Tetra Tech's construction at the shipyard. Mr. Carpenter also complained that his working conditions were unsafe and not in alignment with the training he had been given for his position.

During the period of 2009 – 2012, after observing several years of Tetra Tech's repeated releasing of highly radioactive toxic dirt onto the schools, Mr. Carpenter went and advised the School Officials at adjacent University of Islam primary and secondary school of the danger of the radioactive saturated dust and other chemical releases blowing with the prevailing wind resolutely into the playgrounds where children were playing.

Whistleblower & Friend, Mr. Carpenter was the first to stand up and alert the Community to the toxic genocide being perpetrated against them.  Mr. Carpenter was hailed a hero of the Bay View Hunters Point environmental justice movement.

Mr. Carpenter was fired by his employer for his courage to protect the community.

In 2013, Mr. Carpenter's itching became worse and he began Psoriasis Treatment at UCSF Medical Hospital. Shortly thereafter, Mr. Carpenter was diagnosed with cancer and was admitted to the hospital for testing and treatment at UCSF (Parnassus Campus). From 2014–2016 he battled cancer with radiation, chemo and stem cell transplant until his untimely death on March 6, 2016 at age 52, after suffering a painful cancer from the toxic exposures.







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28









## VII. CLASS ACTION ALLEGATIONS

157.    Mrs. Danielle Carpenter is now living in fear that she and her three (3) adult children and three (3) grandchildren are at risk of contracting cancer caused by the radiation contaminated clothing she laundered for her husband.

158.    REPRESENTATIVE PLAINTIFFS DANIELLE CARPENTER and CATHERINE MUHAMMAD bring this lawsuit as a class action and on behalf of themselves and all others who are similarly situated. The class is composed of all persons who are RESIDENTS OF BAYVIEW

HUNTERS POINT, consisting of individuals who have been living, working, attending school or had substantial contact with the community in the Hunters Point Zip Code 94124 from 2004 to present to date of Judgment in this matter.

159.   The geographic parameter of the BAYVIEW HUNTERS POINT RESIDENTS is limited to the 2010 census tract populations as similarly situated.[23]

160.   The members of the class are so numerous, approximately 38,484 Residents, that joining them all individually would be impracticable. PLAINTIFFS do not know the exact number of the members of the class at this time, but the number and identity of the class members is easily ascertainable through DEFENDANTS' business records.

161.   PLAINTIFFS have the same interest in this matter as all other members of the class.

162.   PLAINTIFFS' claims are typical of all the members of the class.

163.   A well-defined community of interest in the questions of law and fact involving all members of the class exists.

164.   Common questions of law and fact predominate over questions that may affect only individual class members.

1.   Questions of law include:

a.   Common The nature and application of DEFENDANTS' statutory and common law duties to avoid unfair and fraudulent business practices;

b.   The nature and application of DEFENDANTS' statutory and common law duties to avoid false and misleading communications about the remediation of radiation and toxins at the HPNS, which is causing harm, fear, mental and emotional distress to all PLAINTIFFS;

c.   The nature and application of the DEFENDANTS' duties with respect to the operation, management and supervision of the soil remediation and clean-up operation of the HPNS;

---

[23] See Exhibit 1, Census Tract Map

d.  DEFENDANTS' applicable standard of care with respect to the operation, management and supervision of the soil remediation and clean-up operation of the HPNS.

2.  Common questions of fact include:

a.  Did DEFENDANTS breach their statutory and common law duties to avoid unfair and fraudulent business practices?

b.  Did DEFENDANTS breach their statutory and common law duties to avoid false and misleading communications about the soil remediation and clean-up operation of the HPNS?

c.  Did DEFENDANTS breach their duties with respect to the operations, management and supervision of the soil remediation and clean-up operation of the HPNS?

d.  What is the measure of restitution, including medical bills, costs for medical monitoring, and other costs DEFENDANTS owe to PLAINTIFFS and class members resulting from the breach of their duties with respect to operations, management and supervision of the soil remediation and clean-up operation of the HPNS?

165.   PLAINTIFFS' claims are typical of all class member claims because all class members' claims for equitable relief and restitution arise from DEFENDANTS' failure to carry proper and professional soil remediation and clean-up of radiation and toxic carcinogenic materials as DEFENDANTS were contracted to do for the benefit of PLAINTIFFS. Instead, DEFENDANTS engaged in unfair and fraudulent business practices, false and misleading statements, breach of the duty of good faith and fair dealing, and bad faith breach of third-party beneficiary contract.

166.   The evidence and the legal issues regarding DEFENDANTS' wrongful conduct are substantially identical for PLAINTIFFS and all the class members.

167.   DEFENDANTS have acted or failed to act on grounds generally applicable to all class members, making equitable relief—e.g., restitution to each class member—appropriate to the class as a whole.

168.   The Court should certify the class because common questions of law and fact predominate over individual questions. Legal issues regarding duty and standard of care are common to all class members' claims. Factual issues regarding breach and the measure of restitution are common to all class members' claims. For example, the financial detriment suffered by each member of the class may be determined with respect to the difference between the fair market value of the medical treatments, medical monitoring or other costs common to the class as a whole. The financial detriment to all class members is directly caused by DEFENDANTS promising—but not delivering—a remediated clean HPNS consistent with applicable federal and state safety and requirements, and DEFENDANTS' failure to monitor, manage, maintain and best practices to prevent release of radioactive and toxic carcinogenic materials into the air, homes, property and persons of Class Members.

169.   A class action is superior to all other available procedures for the fair and efficient adjudication of these claims. Even if any individual class member could afford individual litigation, it would be unduly burdensome to the courts in which the separate lawsuits would proceed. A single class action is preferable to separate, individual lawsuits because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.

170.   PLAINTIFFS DANIELLE CARPENTER and CATHERINE MUHAMMAD are educated, articulate professionals who will fairly and adequately protect the interests of the members of the class. PLAINTIFFS do not have interests that are contrary to or in conflict with those of the members of the class they seek to represent. PLAINTIFFS' undersigned counsel is experienced and capable of managing a class action of this anticipated size and complexity and will vigorously prosecute the class claims.

171.   The prosecution of separate, individual lawsuits by individual members of the class would create a risk of inconsistent or contradictory findings of fact and law—which could impose

incompatible standards of conduct for DEFENDANTS—and would lead to repetitious trials of the numerous common questions of fact and law. PLAINTIFFS know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of these claims.

172.    Class members may be identified and notified of developments in this class action through DEFENDANTS' billing data base, DEFENDANTS' marketing data base, DEFENDANTS' website at http://www.tetratech.com/, and through state or nationwide publications.

173.    PLAINTIFFS and class members have suffered financial losses and irreparable harm as a result of DEFENDANTS' wrongful conduct. Without a class action, PLAINTIFFS and members of the class will continue to suffer losses, thereby allowing DEFENDANTS' wrongful conduct to proceed without remedy and allowing DEFENDANTS to retain the proceeds of their ill-gotten profits, contrary to California law and public policy.

## VIII.  PRIVATE ATTORNEY GENERAL ALLEGATIONS

174.    PLAINTIFFS bring these claims as private attorneys general on behalf of the class and the general public pursuant to Business & Professions Code §17204. PLAINTIFFS seek to enjoin DEFENDANTS from engaging in the unfair and fraudulent business practices alleged, and to require DEFENDANTS to make restitution of all monies wrongfully obtained through their unfair and fraudulent business practices. A private attorney general/representative action is necessary and appropriate because DEFENDANTS have engaged in the wrongful acts alleged as a general business practice.

## FIRST CAUSE OF ACTION
### NEGLIGENCE FEAR OF CANCER

**(Against** TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *In his Individual and Official Capacity*, CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH; STEVEN M. BURDICK, *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT, CHIEF FINANCIAL OFFICER OF TETRA TECH; STEPHEN C. ROLFE, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; JUSTIN E. HUBBARD, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; LENNAR CORPORATION; and FIVE POINT HOLDINGS, LLC., and DOES 1-100 Inclusive)

175.    PLAINTIFFS and class members hereby incorporate allegations contain in the preceding paragraphs, as though fully set forth herein.

176.    DEFENDANTS, and each of them, are liable and responsible for engaging in conduct, including acts of omission and commission, that resulted in digging and excavation of the soil, releasing toxic substances and toxic materials, including radionuclides. According to the Environmental Protection Agency ("EPA"), "Hunters Point Navy Shipyard Contaminant List"[24] the following are a few examples of contaminants present at HPNS (Exhibit 14):

| Contaminant Name: | Contaminated Media: | Area of Site Found (Operable Unit) |
|---|---|---|
| I. I. I - TRICHLOROETHANE | SOIL | PARCEL B (02) |
| I, I, 2 - TRICHLOROETHANE | SOIL | PARCEL B (02) |
| 1, 1-DICHLOROETHANE | SOIL | PARCEL E-2 |
| I .2.4- TRICHLOROBENZENE | SOIL | PARCEL B (02) |
| I .2.4- TRICHLOROBENZENE | SOIL | PARCEL B (5) |
| BENZENE | SOIL | PARCEL B |
| BENZENE | SOIL | PARCEL C |
| BENZENE | SOIL | PARCEL E |
| COBALT-60 | SOIL | PARCEL D-1 (04) |
| COBALT-60 | SOIL | PARCEL E (05) |
| COBALT-60 | SOIL | PARCEL E-2 (Landfill) (07) |
| PLUTONIUM-239 | SOIL | PARCEL D-1 (04) |
| PLUTONIUM-239 | SOIL | PARCEL E (05) |

---

[24] US EPA Hunters Point Navy Shipyard Contamination List:
https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.contams&id=0902722

| PLUTONIUM-239 | SOIL | PARCEL G (09) |
| URANIUM-235 | SOIL | PARCEL G (09) |
| URANIUM-235 | SOIL | PARCEL D-1 (04) |
| URANIUM-235 | SOIL | PARCEL E (05) |
| VOC | SOIL GAS | PARCEL E (05) |

177.    CALIFORNIA JURY INSTRUCTION: 1623 Provides: Negligence-Recovery of Damages for Emotional Distress--No Physical Injury-Fear of Cancer, or radiation or toxic caused illness, Malicious, Oppressive, or Fraudulent Conduct-Essential Factual Elements.

178.    BAY VIEW HUNTERS POINT RESIDENTS claim that DEFENDANTS TETRA TECH acted with malice or oppression, or fraudulent or intent in exposing to them to carcinogen and toxic substance, and that this conduct caused BAY VIEW HUNTERS POINT RESIDENTS to suffer serious emotional distress. The preponderance of the evidence proves each of the elements to establish this claim in favor of BAY VIEW HUNTERS POINT RESIDENTS who must prove all the following five (5) Elements:

1.    That BAY VIEW HUNTERS POINT RESIDENTS were exposed to a radiation related injury, a FEAR of cancer or radiation or toxins related illness as a result of DEFENDANTS TETRA TECH'S negligent conduct;

2.    That TETRA TECH acted with malice/oppression/fraudulent intent because

A.    TETRA TECH intended to cause injury to BAY VIEW HUNTERS POINT RESIDENTS; **OR**

B.    TETRA TECH'S conduct was despicable and was carried out with a willful or conscious disregard of BAY VIEW HUNTERS POINT RESIDENTS' rights or safety; **OR**

C.    TETRA TECH'S conduct was despicable and subjected BAY VIEW HUNTERS POINT RESIDENTS to cruel and unjust hardship in

conscious   disregard   of   BAY   VIEW   HUNTERS   POINT
RESIDENTS' rights; **OR**

D.     TETRA TECH Intentionally misrepresented or concealed a material
fact known to TETRA TECH, intending to cause BAY VIEW
HUNTERS POINT RESIDENTS harm;

3.     That BAY VIEW HUNTERS POINT RESIDENTS suffered serious
emotional distress from a fear that they will develop cancer, as a result of the
exposure;

4.     That reliable medical or scientific opinion confirms that BAY VIEW
HUNTERS POINT RESIDENTS' risk of developing cancer was significantly
increased by the exposure and has resulted in an actual risk that is significant; and

5.     That TETRA TECH'S conduct was a substantial factor in causing BAY
VIEW HUNTERS POINT RESIDENTS serious emotional distress.

Emotional distress includes suffering, anguish, fright, horror, nervousness, grief,
anxiety, worry, shock, humiliation, and shame. Serious emotional distress exists if
an ordinary, reasonable person would be unable to cope with it. "Despicable
conduct" is conduct that is so mean, vile, base, or contemptible that it would be
looked down on and despised by reasonable people.

179.     An estimated 20 schools are located within a one-mile radius of the Hunters Point
shipyard and in 2006, children playing outdoors on a hillside adjacent to grading activities
developed a range of cardiorespiratory symptoms and signs of exposure to dust containing asbestos
and particulates in concentrations above that allowed by law. According to Your Neighborhood at
a Glance prepared by Harder + company community (research for the San Francisco Department
of Public Health, Health Care Services Master Plan Community Meeting held on March 22, 2012),
65% of Bayview Hunters Point residents perceive their safety during the day to be very unsafe or
unsafe compared with a citywide average of 26%.    Adding to the enormous burden of
cardiopulmonary disease documented among residents of the 94124 zipcode, there is the
cumulative psychological trauma introduced by chronic exposure to known toxins stemming from

their physical proximity to an exceptionally contaminated Federal Superfund site undergoing remediation.[25]

180.    PLAINTIFFS' Experts provide "reliable medical or scientific opinion" confirming that BAY VIEW HUNTERS POINT RESIDENTS' risk of developing cancer was significantly increased by the exposure and has resulted in an actual risk that is significant.

181.    On March 27, 2021, an article entitled, Brain Cancer Biomonitoring in Bayview Hunters Point, published by Ahimsa Porter Sumchai, MD made the following findings regarding a brain cancer cluster, along with other increased risks of cancers in people in the Bayview Hunters Point Community:

> HP Biomonitoring has evidenced that a rare cancer of the glial cells of the human brain called a brainstem glioma -proven to be induced by prolonged exposure to ionizing radiation and heavy metals -has been detected in Hunters Point residents and workers.

> The environmental science, environmental justice and public health consequences of detecting a cluster of rare brain cancers in a neighborhood located within a one-mile radius of three EPA designated federal Superfund sites are enormous!

> Disparities in cancer incidences in Bayview Hunters Point residents were first documented in 1995 when a cluster of breast cancers was discovered by Health Department researchers. Between 1988 and 1992, 60 African American women were diagnosed with breast cancer - 41 percent were under the age of 50.

> A 2019 review of breast cancer disparities analyzed in "Cancer Epidemiology, Biomarkers and Prevention" found that while African American women comprised only 7 .2 percent of breast cancer diagnoses in San Francisco from 2006 to 2015, in Bayview Hunters Point Black women represent 25.5 percent of breast cancer diagnoses and had the worst five-year survival rate.

> Gliomas arise as a result of genetic changes in glial cells. Several research studies document an increase in glioma incidence in people with prolonged exposure to heavy metals-specifically, lead, nickel, chromium and cadmium. Brainstem gliomas are also linked to ionizing radiation exposure. [26]

---

[25] Ahimsa Porter Sumchai, M.D. A former physician specialist with the San Francisco Department of Public Health and former attending physician for the Palo Alto VAH Environmental Registry,
[26] *Brain Cancer Biomonitoring In Bayview Hunters Point:*
*https://sfbayview.com/2021/03/brain-cancer-biomonitoring-in-bayview-hunters-point/*

182.   DEFENDANTS, and each of them, caused PLAINTIFFS' injuries, damages, losses, fear and harm are the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release of the nature and kind that was released at HPNS.

183.   DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

184.   DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

## SECOND CAUSE OF ACTION
### STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

**(Against** TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *In his Individual and Official Capacity*, CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH; STEVEN M. BURDICK, *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT,CHIEF FINANCIAL OFFICER OF TETRA TECH; STEPHEN C. ROLFE, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; JUSTIN E. HUBBARD, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; LENNAR CORPORATION; and FIVE POINT HOLDINGS, LLC., and DOES 1-100 Inclusive,)

185.   PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

186.   DEFENDANTS, and each of them, engaged in an ultra-hazardous activity that caused harm, damages, losses, injuries, including fear of contracting cancer, birth defects for their children, born and unborn, and economic and non-economic damages.

187.   DEFENDANTS, and each of them, are responsible for that harm, injuries, damages, both economic and noneconomic because DEFENDANTS engaged in remediation of nuclear waste, radioactive materials, an ultra-hazardous activity at HPNS.

188.   PLAINTIFFS' injuries, damages, losses, fear and harm are the kind of harm that would be anticipated as a result of the risk created by exposure to a radiation release as the nature and kind that was released at HPNS.

189.   DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money. PLAINTIFFS will continue to incur losses and damage in the future. Based on PLAINTIFFS' repeated exposure to ionizing radiation, PLAINTIFFS have a reasonable fear that said exposure more likely than not increases their risk of developing cancer in the future.

190.   DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

191.   DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

### THIRD CAUSE OF ACTION
### VIOLATION OF PROPOSITION 65

**(Against** TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *In his Individual and Official Capacity*, CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH; STEVEN M. BURDICK, *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT, CHIEF FINANCIAL OFFICER OF TETRA TECH; STEPHEN C. ROLFE, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; JUSTIN E. HUBBARD, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; LENNAR CORPORATION; and FIVE POINT HOLDINGS, LLC., and DOES 1-100 Inclusive,)

192.    PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

193.    Proposition 65 California Health and Safety Code sections 25249.5 - 25249.13 imposes: "Prohibition on Contaminating Drinking Water With Chemicals Known to Cause Cancer or Reproductive Toxicity.  No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water, notwithstanding any other provision or authorization of law except as provided in Section 25249.9.

194.    Proposition 65 Section 25249.6 states: "Required Warning Before Exposure To Chemicals Known to Cause Cancer Or Reproductive Toxicity.  No person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual…. (a) Any person that violates or threatens to violate Section 25249.5 or 25249.6 may be enjoined in any court of competent jurisdiction. (b) (1) Any person who has violated Section 25249.5 or 25249.6 shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) per day for each violation in addition to any other penalty established by law. That civil penalty may be assessed and recovered in a civil action brought in any court of competent jurisdiction.

195.    Since 2006, DEFENDANT TETRA TECH, DEFENDANT TETRA TECH EC INC., and each of their managing agents herein above referenced, failed to comply with Proposition 65 by failing to notify BAYVIEW HUNTERS POINT RESIDENTS that they were releasing radioactive material and other toxins into the air, and by failing to give warning that DEFENDANTS were leaving in the ground, covering over, paving under, and covering up radioactive materials and other toxins in the soil in the grounds of HPNS.

196.    DEFENDANT TETRA TECH, DEFENDANT TETRA TECH EC INC admitted in 2014 that their soil samples were mishandled but concealed that their practice and policy was

to submit fake, fraudulent soil samples, switching contaminated radiative soil with clean dirt to pass the regulatory inspections.

197.     DEFENDANT LENNAR CORPORATION and DEFENDANT FIVE POINT HOLDINGS, LLC knew and were put on actual and constructive notice by whistleblowers employed by DEFENDANTS TETRA TECH and DEFENDANT TETRA TECH EC INC., that those whistleblower employees had falsified soil samples, leaving radioactive materials in the grounds at HPNS per the instructions of their supervisors, including DEFENDANT STEVEN C. ROLFE, Managing Agent of TETRA TECH EC INC.,  and JUSTIN E. HUBBARD, Managing Agent of TETRA TECH EC INC. DEFENDANT LENNAR CORPORATION and DEFENDANT FIVE POINT HOLDINGS, LLC, armed with this knowledge of actual fraud by DEFENDANT TETRA TECH and TETRA TECH EC INC., ignored these true facts and continued excavation and digging into the soil which released toxins and radioactive materials embedded in the soil into the air, water, and structures of Bayview Hunters Point community that were purposefully left there by DEFENDANT TETRA TECH and TETRA TECH EC INC., and their Managing Agents including DEFENDANT STEVEN C. ROLFE, Managing Agent of TETRA TECH EC INC, and JUSTIN E. HUBBARD, Managing Agent of TETRA TECH EC INC. On account of such conduct, Plaintiffs' have incurred injuries, damage, harms and fear of contracting cancer.

198.     On June 17, 2020 PLAINTIFFS learned that DEFENDANTS' LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC had commenced their development efforts and were digging up of dirt in the Hunters Point Shipyard, in a location directly contiguous to a chain-link fence dividing the Shipyard from a school and residences along Kiska Road. DEFENDANTS' LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC violated Proposition 65 by willfully failing to provide the "Required Warning Before Exposure To Chemicals Known to Cause Cancer Or Reproductive Toxicity" and by failing to follow proper protocols to mitigate the releases of such chemicals.

199.     On July 2, 2020, employees of one of the three (3) schools adjacent to the Shipyard and separated only by a chain link fence, videotaped LENNAR's digging and excavation without any proper containment or notice to the community in violation of Proposition 65. (See digging

video link depicting the violation of Proposition 65 by releasing toxic radiation and other toxic materials into the atmosphere of the Hunters Point Neighborhood, *https://youtu.be/TivDZKqbYVo*; *https://youtu.be/r-2N43b9eMo*)



200. DEFENDANTS' LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC violated Proposition 65 by willfully failing to provide the "Required Warning Before Exposure To Chemicals Known to Cause Cancer Or Reproductive Toxicity" and by failing to follow proper protocols to mitigate the releases of such chemicals.

201. DEFENDANTS' LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC violations of Proposition 65 by excavating and moving toxic earth without proper protocol is causing palpable fear of contracting cancer and other sicknesses and medical conditions caused by chemicals and toxic materials, including radioactive materials.

202. On July 3, 2020, pursuant to Proposition 65, Plaintiffs received confirmation on Proposition 65 Notice of Violation from Attorney General Javier Becerra (See Exhibit 9).

203.    On July 3, 2020, pursuant to Proposition 65, Plaintiffs served Proposition 65 Notice of Violation on each of the DEFENDANTS. (See Exhibit 10)

204.    On October 6, 2020, pursuant to Proposition 65, Plaintiffs served Amended Proposition 65 Notice of Violation on Attorney General Javier Becerra with four (4) Expert Declarations regarding the health risk to Bayview Hunters Point Residents and Biomonitoring Testing, from Dr. Wilma Subra, MS, Chemist; Dr. Mark Alexander, Ph.D., MPH Epidemiologist; Dr. Ahimsa Porter Sumchai, MD; and Michael Boyd, Physicist, Engineer and Archaeologist.  (See Exhibit 11)

205.    On October 8, 2020, pursuant to Proposition 65, Plaintiffs served Amended Proposition 65 Notice of Violation with four (4) Expert Declarations regarding the health risk to Bayview Hunters Point Residents and Biomonitoring Testing, from Dr. Wilma Subra, MS Chemist; Dr. Mark Alexander, Ph.D., MPH Epidemiologist; Dr. Ahimsa Porter Sumchai, MD; and Michael Boyd, Physicist, Engineer and Archaeologist.   (See Exhibit 11) to each of the DEFENDANTS (See Exhibit 12)

206.    On October 9, 2020, pursuant to Proposition 65, PLAINTIFFS received confirmation of their Proposition 65 Notice of Violation from Attorney General Javier Becerra. (Exhibit 13).

207.    DEFENDANTS' actions have caused and continued to cause harm, damages, including mental and emotional distress, anxiety, physical and physic injuries, including fear of radiation related injuries to BAYVIEW HUNTERS POINT RESIDENTS.

208.    DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

209.    DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of

exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

**FOURTH CAUSE OF ACTION**
**FRAUD**

**(Against** TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *In his Individual and Official Capacity*, CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH; STEVEN M. BURDICK, *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT,CHIEF FINANCIAL OFFICER OF TETRA TECH; STEPHEN C. ROLFE, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; JUSTIN E. HUBBARD, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; LENNAR CORPORATION; and FIVE POINT HOLDINGS, LLC., and DOES 1-100 Inclusive)

210.    PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

211.    DEFENDANTS represented that they were professionals and were skilled at performing radiation remediation and that they would remove and clean-up the radioactive materials from HPNS for the exchange of Billions of tax-payer dollars. DEFENDANTS lied. DEFENDANTS acted with full knowledge, plan and scheme to defraud the public, including the BAYVIEW HUNTERS POINT RESIDENTS, and did defraud the public and PLAINTIFFS as the evidence herein proves.

212.    PLAINTIFFS justifiably relied to their detriment on DEFENDANTS' representations that the community was going to be "safe". Based on this reliance, BAYVIEW HUNTERS POINT RESIDENTS did not take any safety precautions such as demanding the replacement of DEFENDANTS with an honest, capable remediation company. PLAINTIFFS relied on DEFENDANTS' representations that DEFENDANTS were taking all safety measures and following the law, best practices and adhering to the standard of care of similar superfund toxic remediation companies.

213.    DEFENDANTS LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC actively concealed from PLAINTIFFS that these DEFENDANTS had chosen to not comply with the requirements of Proposition 65, by providing proper warning of the release of chemicals and

toxic materials that cause cancer and have deleterious impact on reproductive health. PLAINTIFFS justifiably relied on to their detriment on DEFENDANTS LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC actively concealment by compliancy, and not demanding enforcement of Proposition by the Attorney General or the District Attorney. Had the PLAINTIFFS know of DEFENDANTS LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC actively concealment, PLAINTIFFS could have engaged in direct action to compel compliance, like PLAINTIFFS are demanding in this action, by DEFENDANTS LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC with the mandates of Proposition 65.

214.    DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

215.    DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

### FIFTH CAUSE OF ACTION
### NEGLIGENCE PER SE
### CRIMINAL CONVICTIONS

(**Against** TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *In his Individual and Official Capacity*, CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH; STEVEN M. BURDICK, *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT,CHIEF FINANCIAL OFFICER OF TETRA TECH; STEPHEN C. ROLFE, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; JUSTIN E. HUBBARD, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; and DOES 1-100 Inclusive)

216.    PLAINTIFFS and cass members hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

217.    DEFENDANTS breached a duty owed to PLAINTIFFS; a duty arising out of the contract with the Navy to remediate HPNS. DEFENDANTS were negligent per se since they violated federal criminal law and the statutory scheme mandated in Proposition 65 promulgated expressly for the protection of the class of people in which PLAINTIFFS are members.

218.    DEFENDANTS' negligence per se was a direct and proximate cause of PLAINTIFFS' damages and harm.

219.    DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

220.    DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish Defendants and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

## SIXTH CAUSE OF ACTION
### BAD FAITH BREACH OF THIRD PARTY BENEFICARY CONTRACT
(**Against** TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *In his Individual and Official Capacity*, CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH; STEVEN M. BURDICK, *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT,CHIEF FINANCIAL OFFICER OF TETRA TECH; STEPHEN C. ROLFE, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; JUSTIN E. HUBBARD, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; and DOES 1-100 Inclusive)

221.    PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

222.    DEFENDANTS entered into a contract with the Navy to remediate the HPNS for the benefit of BAYVIEW HUNTERS POINT RESIDENTS and the San Francisco community.

PLAINTIFFS were named in the contract as the beneficiaries to whom the benefit would flow from the discharge of the terms and conditions of the contract.

223.    DEFENDANTS committed fraud, failed to honor and perform their duties under the contract, and created a failure of consideration. DEFENDANTS are liable for all of PLAINTIFFS' damages, including medical expenses and medical monitoring for the next five (5) generations.

WHEREFORE, Plaintiffs pray judgment as hereinafter set forth.

## SEVENTH CAUSE OF ACTION
### PUBLIC NUISANCE

**(Against** TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *In his Individual and Official Capacity*, CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH; STEVEN M. BURDICK, *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT,CHIEF FINANCIAL OFFICER OF TETRA TECH; STEPHEN C. ROLFE, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; JUSTIN E. HUBBARD, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; LENNAR CORPORATION; and FIVE POINT HOLDINGS, LLC., and DOES 1-100 Inclusive)

224.    PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

225.    California Civil Code section 3479: "Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance."

226.    California Civil Code section 3480 provides: "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

227.    "[M]ere apprehension of injury from a dangerous condition may constitute a nuisance where it interferes with the comfortable enjoyment of property (46 C.J. § 50, p. 680), and

that the injured party need not seek an abatement of the nuisance but may sue for damages.  McIvor v. Mercer-Fraser Co. (1946) 76 Cal.App.2d 247, 254 [172 P.2d 758].  The public nuisance doctrine is aimed at the protection and redress of community interests and, at least in theory, embodies a kind of collective ideal of civil life which the courts have vindicated by equitable remedies since the beginning of the 16th century." People ex rel. Gallo v. Acuna (1997) 14 Cal.4th 1090, 1103 [60 Cal.Rptr.2d 277, 929 P.2d 596]. "Not every interference with collective social interests constitutes a public nuisance. To qualify . . . the interference must be both substantial and unreasonable." People ex rel. Gallo, supra, 14 Cal.4th at p. 1105.  "The elements 'of a cause of action for public nuisance include the existence of a duty and causation.' Public nuisance liability 'does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the nuisance.' " Melton v. Boustred (2010) 183 Cal.App.4th 521, 542 [107 Cal.Rptr.3d 481].

228.   DEFENDANTS, and each of them, engaged in negligent, reckless, intentional, and criminal conduct by deliberately and premeditatedly leaving and redistributing  radioactive soil throughout the HPNS, when fully aware that dust, debris, and radionuclides would blow with the prevailing winds over the BAYVIEW HUNTERS POINT RESIDENTS which would verifiably cause life threatening permanent injuries and death.

229.   BAYVIEW   HUNTERS   POINT   RESIDENTS   suffered   harm   because DEFENDANTS created a nuisance.  DEFENDANTS,  by digging up and then leaving radioactive materials and other toxins at the HPNS, as well as redistributing toxic soils throughout and beyond the Shipyards perimeter created conditions that were harmful and injurious to health and life; were offensive to the senses; were an obstruction to the free use of property so as to interfere with the comfortable enjoyment of life and property; unlawfully obstructed the free passage or use, in the customary manner; and created other dangerous conditions to BHPR'S property by contaminating ground water, soil for vegetation, lawns, and the quality of the air that the BAYVIEW HUNTERS POINT RESIDENTS were forced to take into their lungs.

230.   DEFENDANTS' intentional, illegal and criminal conduct produced dangerous conditions that affected approximately forty thousand (40,000) people over the course of DEFENDANTS reprehensible conduct.

231.   Ordinary people would be reasonably annoyed, disturbed and offended by DEFENDANT'S conduct in admitting that they knowingly and intentionally left radioactive soil in close proximity of the densely populated residential community of Bayview Hunters Point. DEFENDANT TETRA TECH'S criminal admission in their guilty pleas to federal crimes proves there was no social utility to DEFENDANTS' conduct. The serious deadly consequences of BAYVIEW HUNTERS POINT RESIDENTS being exposed to radioactive materials, outweigh DEFENDANTS' conduct. BAYVIEW HUNTERS POINT RESIDENTS did not consent to DEFENDANT TETRA TECH'S conduct.

232.   BAYVIEW HUNTERS POINT RESIDENTS suffered injuries, losses and harms, including, but not limited to, cancer, asthma, respiratory failure, heart attack, stroke and fear of contracting other life-long injuries as well as injuries to their offspring for the next five (5) generations. The harm suffered by the BAYVIEW HUNTERS POINT RESIDENTS was different than any potential harm to the general San Francisco communities.

233.   DEFENDANTS' conduct was a substantial factor in causing BAYVIEW HUNTERS POINT RESIDENTS injuries, losses and harms, including, but not limited to, cancer, asthma, respiratory failure, heart attack, stroke and fear of contracting other life-long injuries as well as injuries to their offspring for the next five (5) generations.

234.   DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

235.   DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of

exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, Plaintiffs pray judgment as hereinafter set forth.

<u>EIGHTH CAUSE OF ACTION</u>
**PRIVATE NUISANCE**
**(Against** TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *In his Individual and Official Capacity*, CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH; STEVEN M. BURDICK, *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT,CHIEF FINANCIAL OFFICER OF TETRA TECH; STEPHEN C. ROLFE, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; JUSTIN E. HUBBARD, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; LENNAR CORPORATION; and FIVE POINT HOLDINGS, LLC., and DOES 1-100 Inclusive)

236.    PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

237.    DEFENDANT TETRA TECH AND LENNAR interfered with BAYVIEW HUNTERS POINT RESIDENTS' use and enjoyment of their land. BAYVIEW HUNTERS POINT RESIDENTS owned, leased, occupied, and controlled their property;  DEFENDANT TETRA TECH, by acting or failing to act as hereinabove described, by leaving radioactive materials and other toxins at the HPNS created conditions that were harmful and injurious to health and life; were  offensive to the senses; were an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life and property; unlawfully obstructed the free passage or use, in the customary manner; and created other dangerous conditions to BHPR'S property by contaminating ground water, soil for vegetation, lawns, and the quality of the air that the BAYVIEW HUNTERS POINT RESIDENTS were forced to breathe into their lungs.

238.    DEFENDANTS' intentional, illegal and criminal conduct produced dangerous conditions that affected approximately forty thousand (40,000) people at the same time.  Ordinary people would be reasonably annoyed, disturbed and offended by DEFENDANT'S conduct in admitting that they left radioactive soil in the densely populated residential community. DEFENDANT TETRA TECH'S criminal admission in their guilty pleas to federal crimes proves there was no social utility to DEFENDANTS conduct. The serious deadly consequences of

BAYVIEW HUNTERS POINT RESIDENTS being exposed to radioactive materials outweigh DEFENDANTS conduct. BAYVIEW HUNTERS POINT RESIDENTS did not consent to DEFENDANT TETRA TECH'S conduct.

239.     BAYVIEW HUNTERS POINT RESIDENTS suffered injuries, losses and harms, including, but not limited to, cancer, asthma, respiratory failure, heart attack, stroke and fear of contracting other life-long injuries as well as injuries to their offspring for the next five (5) generations. The harm suffered by the BAYVIEW HUNTERS POINT RESIDENTS was different than any potential harm to the general San Francisco communities.

240.     DEFENDANT TETRA TECH'S conduct was a substantial factor in causing BAYVIEW HUNTERS POINT RESIDENTS injuries, losses and harms, including, but not limited to, cancer, asthma, respiratory failure, heart attack, stroke and fear of contracting other life-long injuries as well as injuries to their offspring for the next five (5) generations.

241.     DEFENDANTS' acts, conduct and behavior proximately caused harm and damage to the PLAINTIFFS, including personal injury, pain, anxiety, mental and emotional distress, discomfort, fear, incontinence, suffering, property damage, loss of enjoyment of their property and life, the need for periodic examination and treatment, as well as economic losses including loss of earnings, stigma damages, the cost of obtaining potential cure, and other needless expenditures of time and money.

242.     DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

## NINTH CAUSE OF ACTION
### SURVIVAL ACTION by Representatives and Successor In Interest
**(Against** TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *In his Individual and Official Capacity*, CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH; STEVEN M. BURDICK, *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT, CHIEF FINANCIAL OFFICER OF TETRA TECH; STEPHEN C. ROLFE, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.;

JUSTIN E. HUBBARD, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; LENNAR CORPORATION; and FIVE POINT HOLDINGS, LLC., and DOES 1-100 Inclusive)

243.   PLAINTIFFS and class members, and the Heirs. Successors in Interest and Representatives of the Deceased Plaintiffs, hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

244.   Pursuant to Code of Civil Procedure 377.30, PLAINTIFFS and class members, and the Heirs, Successors in Interest, and Representatives of the Deceased Plaintiffs assert claims for damages, injuries and harm suffered by their loved ones before their deaths.

245.   Code of Civil Procedure 377.30 provides: "A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest…and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest."

246.    Defendants TETRA TECH DEFENDANTS, and each of them, were the actual and proximate cause of foreseeable and preventable damages, injures and harm, including worry, fear, mental and emotional distress, loss of enjoyment of life, misery, discomfort, and anguish to deceased Plaintiffs before their untimely and premature deaths.

247.   DEFENDANTS' misconduct was deliberate, and undertaken with oppression, fraud or malice within the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish DEFENDANTS and to deter them from such misconduct in the future.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

## TENTH CAUSE OF ACTION
### WRONGFUL DEATH

**(Against** TETRA TECH EC, INC.; TETRA TECH, INC; DAN L. BATRACK, *In his Individual and Official Capacity*, CHAIRMAN, CHIEF EXECUTIVE OFFICER and PRESIDENT of TETRA TECH; STEVEN M. BURDICK, *In his Individual and Official Capacity,* EXECUTIVE VICE PRESIDENT,CHIEF FINANCIAL OFFICER OF TETRA TECH; STEPHEN C. ROLFE, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; JUSTIN E. HUBBARD, *In his Individual and Official Capacity,* MANAGING AGENT OF TETRA TECH EC INC.; LENNAR CORPORATION; and FIVE POINT HOLDINGS, LLC., and DOES 1-100 Inclusive)

248.    PLAINTIFFS and class members, and the Heirs. Successors in Interest and

249.    Representatives of the Deceased Plaintiffs, hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

250.    PLAINTIFFS and class members, and the Heirs. Successors in Interest and

251.    Representatives of the Deceased Plaintiffs bring claims for wrongful death, including lost financial support: the loss of gifts or benefit that the PLAINTIFFS and class member would have expected to receive from the deceased; funeral and burial expenses; and the reasonable value of household services that the decedent would have provided.

252.    PLAINTIFFS and class members, and the Heirs. Successors in Interest and Representatives of the Deceased Plaintiffs also bring Claims for noneconomic damages: The loss of the decedent's love, companionship, comfort, care, assistance, protection, affection, society, moral support; the loss of the enjoyment of sexual relations; 3. The loss of decedent's training and guidance and solace.

WHEREFORE, PLAINTIFFS pray judgment as hereinafter set forth.

### ELEVENTH CAUSE OF ACTION
### NEGLIGENCE PER SE
**(Against** LENNAR CORPORATION FIVE POINT HOLDINGS, LLC and Does 1 to 50)

253.    PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

254.    Proposition 65 California Health and Safety Code sections 25249.5 - 25249.13 imposes: "Prohibition on Contaminating Drinking Water With Chemicals Known to Cause Cancer or Reproductive Toxicity.  No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water, notwithstanding any other provision or authorization of law except as provided in Section 25249.9.

255.    Proposition 65 Section 25249.6 states: "Required Warning Before Exposure To Chemicals Known to Cause Cancer Or Reproductive Toxicity.  No person in the course of doing

business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual…. (a) Any person that violates or threatens to violate Section 25249.5 or 25249.6 may be enjoined in any court of competent jurisdiction. (b) (1) Any person who has violated Section 25249.5 or 25249.6 shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) per day for each violation in addition to any other penalty established by law. That civil penalty may be assessed and recovered in a civil action brought in any court of competent jurisdiction.

256.    Since 2006, DEFENDANT TETRA TECH, DEFENDANT TETRA TECH EC INC., and each of their managing agents herein above referenced, failed to comply with Proposition 65 by failing to notify BAYVIEW HUNTERS POINT RESIDENTS that they were releasing radioactive material and other toxins into the air, and by failing to give warning that DEFENDANTS were leaving in the ground, covering over, paving under, and covering up radioactive materials and other toxins in the soil in the grounds of HPNS.

257.    DEFENDANT TETRA TECH, DEFENDANT TETRA TECH EC INC admitted in 2014 that their soil samples were mishandled but concealed that their practice and policy was to submit fake, fraudulent soil samples, switching contaminated radiative soil with clean dirt to pass the regulatory inspections.

258.    DEFENDANT LENNAR CORPORATION and DEFENDANT FIVE POINT HOLDINGS, LLC knew and were put on actual and constructive notice by whistleblowers employed by DEFENDANTS TETRA TECH and DEFENDANT TETRA TECH EC INC., that those whistleblower employees had falsified soil samples, leaving radioactive materials in the grounds at HPNS per the instructions of their supervisors, including DEFENDANT STEVEN C. ROLFE, Managing Agent of TETRA TECH EC INC.,  and JUSTIN E. HUBBARD, Managing Agent of TETRA TECH EC INC. DEFENDANT LENNAR CORPORATION and DEFENDANT FIVE POINT HOLDINGS, LLC, armed with this knowledge of actual fraud by DEFENDANT TETRA TECH and TETRA TECH EC INC., ignored these true facts and continued excavation and digging into the soil which released toxins and radioactive materials embedded in the soil into

the air, water, and structures of Bayview Hunters Point community that were purposefully left there by DEFENDANT TETRA TECH and TETRA TECH EC INC., and their Managing Agents including DEFENDANT STEVEN C. ROLFE, Managing Agent of TETRA TECH EC INC, and JUSTIN E. HUBBARD, Managing Agent of TETRA TECH EC INC. On account of such conduct, Plaintiffs' have incurred injuries, damage, harms and fear of contracting cancer.

259.    On June 17, 2020 PLAINTIFFS learned that DEFENDANTS' LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC had commenced their development efforts and were digging up of dirt in the Hunters Point Shipyard, in a location directly contiguous to a chain-link fence dividing the Shipyard from a school and residences along Kiska Road.

260.    On July 2, 2020, employees of one of the three (3) schools adjacent to the Shipyard and separated only by a chain link fence, videotaped LENNAR's digging and excavation without any proper containment or notice to the community in violation of Proposition 65. (See digging video link depicting the violation of Proposition 65 by releasing toxic radiation and other toxic materials into the atmosphere of the Hunters Point Neighborhood, *https://youtu.be/TivDZKqbYVo; https://youtu.be/r-2N43b9eMo*)

261.    DEFENDANTS' LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC violated Proposition 65 by willfully failing to provide the "Required Warning Before Exposure To Chemicals Known to Cause Cancer Or Reproductive Toxicity" and by failing to follow proper protocols to mitigate the releases of such chemicals.

262.    DEFENDANTS' LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC violations of Proposition 65 is a substantial factor, causing plaintiff damages, harms and injuries, including brain cancer clusters. PLAINTIFFS have suffered and will continue to suffer irreparable injury unless and until this Court enjoins DEFENDANTS from continuing their wrongful conduct.  When queried at a Hunters Point Community Meeting on April 27, 2018 whether they knew of someone in the area who was currently suffering from cancer, 70% of residents responded they knew of someone while 93% responded they knew someone in the area who suffers from Asthma. DEFENDANTS' wrongful conduct is ongoing and threatens to be continued in the future.

263.    DEFENDANTS' LENNAR CORPORATION and FIVE POINT HOLDINGS, LLC violations of Proposition 65 created negligence per se liability.

WHEREFORE, PLAINTIFFS pray judgment against DEFENDANTS as follows:

**TWELFTH CAUSE OF ACTION**
**FOR INJUNCTIVE RELIEF**
(**Against** LENNAR CORPORATION, FIVE POINT HOLDINGS, LLC and Does 1 to 50)

264.    PLAINTIFFS and class members hereby incorporate allegations contained in the preceding paragraphs, as though fully set forth herein.

265.    DEFENDANT LENNAR and DEFENDANT FIVE POINT HOLDING, LLC "development partners" at all relevant times, knew, or should have known that Parcel A-and A1 were safe as represented but still contained radioactive material as documented by the TETRA TECH "Whistleblowers" in 2014. (See Exhibit 2 regarding statement dirty) Moreover, as confirmed by the EPA, radiation and toxins, which exist in copious quantities on the 500-acre Shipyard do not lie anchored to their location of origin. Rather, such toxins totaling over 5507 toxins including aromatic hydrocarbons, VOC's, radionuclides, arsenic, asbestos and others, move, are released in the air, and migrate from one Parcel to the next. (See Exhibit 14 HPNS Contaminant list)

266.    Such toxins are also transmitted and carried as dust and particulate matter on equipment transported by  LENNAR when accessing their excavation, digging and construction sites throughout the Shipyard. These facts compel court intervention to grant a temporary restraining order for a short Moratorium of approximate four (4) to six months until this Court can appoint a team of experts, including Medial Doctors, Toxicologist, Epidemiologist and others to (1) ascertain the nature and extent of toxic materials in the parcels where LENNAR is digging and the parcels where LENNAR is transporting their equipment for excavation, digging and construction; (2) determine a safe protocol for the containment of the release any radioactive or

---

[7] US EPA Hunters Point Navy Shipyard Contamination List link:
https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.contams&id=0902722

any toxic materials; and (3) monitor the excavations and digging for the duration of LENNAR's excavation and construction activities.

267.   PLAINTIFFS conferred upon DEFENDANTS an economic benefit, in the nature of "Superfund" public funds granted for the cleanup of Bayview Hunter's Point.

268.   DEFENDANTS, and each of them, wrongfully and unlawfully misrepresented soil samples, failed to contain toxic dust, denied allegations, and endangered the local community.

269.   PLAINTIFFS have repeatedly demanded that DEFENDANTS stop the development until thorough, complete, and verified test results prove that all the toxins and radioactive materials have been removed, but DEFENDANTS have ignored PLAINTIFFS' demands.

270.   PLAINTIFFS have suffered and will continue to suffer irreparable injury unless and until this Court enjoins DEFENDANTS from continuing their wrongful conduct.  When queried at a Hunters Point Community Meeting on April 27, 2018 whether they knew of someone in the area who was currently suffering from cancer, 70% of residents responded they knew of someone while 93% responded they knew someone in the area who suffers from Asthma. DEFENDANTS' wrongful conduct is ongoing and threatens to be continued in the future.

271.   PLAINTIFFS have no adequate remedy at law for the injuries suffered as an award of monetary damages would not provide an adequate remedy because money damages cannot replace the safety, health and lives lost from exposure to radiation and other toxins confirmed now at the HPNS. An INJUNCTION is the only remedy available to PLAINTIFFS to protect themselves, their children and families from the life-threatening toxic SUPERFUND HPNS.

272.   PLAINTIFFS have an extremely high likelihood of succeeding on the merits of their action.

WHEREFORE, PLAINTIFFS pray judgment against DEFENDANTS as follows:

## PRAYER FOR RELIEF

1.   For an order requiring DEFENDANT LENNAR and FIVE POINTS HOLDING, LLC to show cause, if any they have, why they should not be enjoined as set forth in this complaint, during the pendency of this action.

2.      For a preliminary injunction, enjoining DEFENDANTS LENNAR and FIVE
        POINTS HOLDING, LLC, and each of them, and their agents, servants, and
        employees, and all persons acting under, in concert with, mandating the following
        conduct:

      a.      Take "anticipatory action" to prevent harm and through exploration of
                current toxicity and careful analysis of courses of action in order to present
                the least threat to residents in Hunters Point; and

      b.      Conduct an immediate Health and Safety assessment for residents,
                workers and students within Hunters Point in cooperation with the school
                districts, relevant community organizations and city task forces like SF
                Asthma Task Force.

      c.      **DEFENDANTS, and each of them, must be ordered to STOP ALL
                DEVELOPMENT, CONSTRUCTION, BUILDING, DIGGING,
                ERECTING, DISTURBING THE SOIL, DIRT, EARTH,
                BUILDINGS, STRUCTURES, PIPES,  AND ALL ACTIVITY AT
                HPNS UNTIL INDEPENDENT VERIFIED REPORTS CAN BE
                OBTAINED SHOWING COMPLETE AND TOTAL
                REMEDIATION OF ALL TOXIC SUBSTANCES, INCLUDING
                ALL RADIOACTIVE MATERIALS FROM HPNS**. ;

3.      Monetary damages in the amount of $1 Billion dollars against DEFENDANTS
        LENNAR CORPORATION and FIVE POINTS HOLDING, LLC, and each of
        them as compensatory damages for pain, suffering, anxiety, fear of contracting
        cancer and other medical conditions caused by toxic chemical and radioactive
        materials, loss of enjoyment of live, damage to health, injury to spiritual wellbeing,
        severe mental and emotional distress, humiliation, shame, inconvenience and other
        items of non-economic and economic damages.

4.      For costs of suit incurred in this action; and

5.      For such other and further relief as the Court deems proper.

WHEREFORE, further PLAINTIFFS and members of the Class request that the Court enter an order or judgment against DEFENDANTS, and each of them as named in the as follows:

6.      For an order certifying the Class, appointing PLAINTIFFS and their counsel to represent the Class, and notice to the Class to be paid by DEFENDANTS.

7.      For an injunction ordering DEFENDANTS LENNAR CORPORATION and FIVE POINTS HOLDING, LLC, to cease and desist from seeking to engage in any additional excavation, digging, earth moving and construction at HPNS until the Court can appoint a team of experts, including toxicologists, medical physicians, epidemiologist, and other experts to ascertain the nature and extent of toxic materials on the locations of  the excavation and construction by DEFENDANTS LENNAR CORPORATION and FIVE POINTS HOLDING, LLC.; and for the team of experts to design a protocol for containment of all toxic and chemical materials, including radioactive materials;  and for the team of experts to monitor the constructions by these DEFENDANTS until the completion of the construction, with reports to the Court.

8.      For an order requiring all DEFENDANTS to immediately pay for medical screenings for early detection of any radiation or toxic materials related medical conditions.

9.      For an order requiring all DEFENDANTS to pay for medical monitoring for the next five (5) generations of each PLAINTIFF.

10.    For a comprehensive remediation of HPNS, with three (3) independent confirmations from non-government entities and by companies selected with PLAINTIFFS' input and agreement.

11.    As against DEFENDANT TETRA TECH and TETRA TECH EC INC , and each of their agents, managers, and named DEFENDANTS managing agents and supervisors herein, for payment to PLAINTIFFS' class compensation damages as and for restorative justice in the amount of $27 Billion Dollars ($675,000 x 40,000 Class Residents in the affected and impacted Bayview Hunters Point Zip Code

94124) for the past and future harm, damages PLAINTIFFS will suffer and for Punitive Damages to punish DEFENDANTS for the blatant, conscious, callous disregard of BAYVIEW HUNTERS POINT RESIDENTS' lives, born and unborn, for the next five (5) generations.

12.  For PLAINTIFFS' court costs of the proceedings herein and pre-judgment and post judgment interest.

13.  For reasonable attorneys' fees as allowed by statute, equity and law.

14.  For any and all such other and further relief that this Court may deem just and proper.

**Dated: April 30, 2021**

**LAW OFFICES OF BONNER & BONNER**

_Charles A. Bonner_____
/s/Charles A. Bonner
Attorney for Plaintiffs