1  WILMER CUTLER PICKERING
    HALE AND DORR LLP
2  DAVINA PUJARI (SBN 183407)
   davina.pujari@wilmerhale.com
3  CHRISTOPHER A. RHEINHEIMER (SBN 253890)
   chris.rheinheimer@wilmerhale.com
4  1 Front Street, Suite 3500
   San Francisco, California 94111
5  Telephone:    (628) 235-1002
   Facsimile:    (628) 235-1001
6
   CHRISTOPHER T. CASAMASSIMA (SBN 211280)
7  chris.casamassima@wilmerhale.com
   350 South Grand Avenue, Suite 2400
8  Los Angeles, CA 90071
   Telephone:    (213) 443-5300
9  Facsimile:    (213) 443-5400

10 MICHAEL J. BROWN (Admitted *Pro Hac Vice*)
   mike.brown@wilmerhale.com
11 60 State Street, Boston MA 02109
   Telephone:    (617) 526-6310
12 Facsimile:    (617) 526-5000

13 Attorneys for Defendants
   TETRA TECH, INC., TETRA TECH EC, INC.,
14 and ANDREW BOLT

15              **UNITED STATES DISTRICT COURT**

16            **NORTHERN DISTRICT OF CALIFORNIA**

17 | DANIELLE CARPENTER, et al., | Case No.'s     3:19-cv-01417-JD |
|---|---|
18 | Plaintiffs, | 3:19-cv-07510-JD |
|  |  | 3:18-cv-05330-JD |
19 | vs. | Assigned to Hon. James Donato |
20 |  | Courtroom 11 |
   | TETRA TECH EC, INC., et al., |  |
21 | Defendants. | **DEFENDANTS TETRA TECH EC, INC., TETRA TECH, INC., AND ANDREW BOLT'S NOTICE OF** |
22 |  | **MOTION AND MEMORANDUM OF** |
   | KEVIN ABBEY, et al., | **POINTS AND AUTHORITIES IN** |
23 |  | **SUPPORT OF MOTION FOR** |
   | Plaintiffs, | **SUMMARY JUDGMENT ON** |
24 |  | **NUISANCE CAUSES OF ACTIONS** |
   | vs. |  |
25 |  | Date: February 1, 2024 |
   | TETRA TECH, INC., et al., | Time: 10:00 am |
26 |  | Courtroom: 11 |
   | Defendants. | Judge: Hon. James A. Donato |
27
28

LINDA PARKER PENNINGTON, et al.,

          Plaintiffs,

v.

TETRA TECH, INC., et al.,

Defendants.

# NOTICE OF MOTION

Please take notice that on February 1, 2024, at 10:00 a.m., or as soon thereafter as this matter may be heard by the Honorable Judge Donato, United States District Court Judge of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, Courtroom 11, 19th Floor, San Francisco, California, Defendants Tetra Tech EC, Inc. ("TtEC"), Tetra Tech, Inc., and Andrew Bolt[1] (collectively, "Tetra Tech Defendants") will and hereby do move the Court pursuant Federal Rule of Civil Procedure 56 for an order granting summary judgment in favor of the Tetra Tech Defendants on each nuisance cause of action in the above-captioned litigations.

Specifically, summary judgment is proper on the Sixth Cause of Action (Public Nuisance) and Seventh Cause of Action (Private Nuisance) in the Sixth Amended Complaint filed in *Carpenter et al. v. Tetra Tech EC, Inc. et al.*, 19-cv-01417 (ECF 223); on the Second Cause of Action (Public Nuisance) in the First Amended Complaint filed in *Abbey et al. v. Tetra Tech EC, Inc. at al.*, 19-cv-07510 (ECF 40); and the First Claim (Permanent Public Nuisance) and Second Claim (Permanent Private Nuisance) in the Consolidated Third Amended Complaint in *Pennington et al. v. Tetra Tech EC, Inc. et al.*, 18-cv-05330 (ECF 157).

Partial summary judgment is also proper as to Plaintiffs' requests for nuisance damages in the form of appreciation impairment in the *Pennington* matter for the independent reason that such damages are improper as a matter of law.

This Motion is made upon the Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Michael J. Brown filed herewith, and such other written and oral argument as the Court may entertain on this Motion.

This Motion was initially filed on September 1, 2023 and taken off calendar after the parties stipulated to allowing Plaintiffs additional time to take discovery, if necessary. ECF 238. After more than two months, the Tetra Tech Defendants now refile their Motion.

---

[1] Mr. Bolt is a defendant in the *Pennington* case only.

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES.................................................................1

I.      INTRODUCTION.....................................................................................................1

II.     STATEMENT OF THE ISSUES TO BE DECIDED ................................................2

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS .........................................2

        A.      Background ...................................................................................................2

                1.      Contamination by the Navy and Triple A .........................................2

                2.      Site Remediation Plan ......................................................................3

        B.      Undisputed Facts Determinative of This Motion ........................................5

IV.     STANDARD OF REVIEW........................................................................................8

V.      ARGUMENT .............................................................................................................9

        A.      Plaintiffs' Nuisance Claims Fail Because the Tetra Tech Defendants
                Did Not Create or Assist in the Creation of the Contamination,
                Never Possessed the Land, and Never Leased the Land ...............................9

                1.      Tetra Tech Did Not Create or Assist in the Creation of the
                        Contamination ................................................................................10

                2.      Tetra Tech Never Possessed Hunters Point, Precluding
                        Possessor Liability..........................................................................13

                3.      Tetra Tech Never Had a Right of Possession to Lease to a
                        Third Party......................................................................................15

        B.      Appreciation Impairment Damages Are Unavailable for Nuisance
                Claims..........................................................................................................16

VI.     CONCLUSION ........................................................................................................18

# TABLE OF AUTHORITIES

### CASES

Page(s)

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................. 9

*Bd. of Trs. of the Leland Stanford Junior Univ. v. Agilent Techs*.,
    628 F. Supp. 3d 972 (N.D. Cal. 2022)........................................................... 16, 17

*Birke v. Oakwood Worldwide*,
    169 Cal.App.4th 1540 (2009) ............................................................................. 10

*Carson Harbor Vill., Ltd. V. Unocal Corp.*,
    287 F. Supp. 2d 1118 (C.D. Cal. 2003) ............................................................. 17

*City of Los Angeles v. San Pedro Boat Works*,
    635 F.3d 440 (9th Cir. 2011) .............................................................................. 15

*City of Modesto Redevelopment Agency v. Superior Court*,
    119 Cal.App.4th 28 (2004) ................................................................... 10, 11, 12

*City of W. Sacramento, Cal. v. R and L Bus. Mgmt.*,
    2018 WL 3198118 (E.D. Cal. June 27, 2018) .................................................... 9

*Coppola v. Smith*,
    2015 WL 224730 (E.D. Cal. Jan. 15, 2015) ..................................................... 13

*Coppola v. Smith*,
    935 F.Supp.2d 993 (E.D. Cal. 2013) .......................................................... 10, 15

*Estate of Renzel v. Ventura*,
    2015 WL 8527522 (N.D. Cal. Dec. 11, 2015) ................................................... 9

*F.D.I.C. v. Jackson-Shaw Partners No. 46, Ltd.*,
    850 F. Supp. 839 (N.D. Cal. 1994) .................................................................... 17

*Gehr v. Baker Hughes Oil Field Operations*,
    165 Cal. App. 4th 660 (2008) ............................................................................ 17

*Gregory Village Partners, L.P. v. Chevron U.S.A., Inc*.,
    805 F.Supp.2d 888 (N.D. Cal. 2011)........................................................... 10, 12

*Jarose v. County of Humboldt*,
    2022 WL 1601407 (N.D. Cal. March 17, 2022) .............................................. 13

*Lyles v. State of California*,
    153 Cal. App. 4th 281 (2007) ............................................................................ 16

*Mangini v. Aerojet-General Corp*.,
    230 Cal.App.3d 1125 (1991) ............................................................................. 13

*Matsushita Elec. Indus. Co v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................ 8

*Redevelopment Agency of City of Stockton v. BNSF Ry. Co.*,
    643 F.3d 668 (9th Cir. 2011) ............................................... 10, 12, 13

*Santa Fe P'ship v. ARCO Prod. Co.*,
    46 Cal. App. 4th 967 (1996) ............................................................ 17

*Schaeffer v. Gregory Village Partners*,
    105 F.Supp.3d 951 (N.D. Cal. 2015) ............................................... 10

*Sprecher v. Adamson Companies*,
    30 Cal.3d 358 (Cal. 1981) ......................................................... 13, 14

*Steverson v. United States*,
    2008 WL 11512021 (E.D. Cal. Jan. 25, 2008) ............................... 13

*Torres v. Igdaloff*,
    2018 WL 6118554 (C.D. Cal. Jan. 29, 2018) .......................... *passim*

*U.S. v. Johnson*,
    34 F. 3d 1352 (9th Cir. 1994) ......................................................... 14

*Watson Lab'ys, Inc. v. Rhone-Poulenc Rorer, Inc.*,
    178 F. Supp. 2d 1099 (C.D. Cal. 2001) .......................................... 16

## STATUTES, RULES, AND REGULATIONS

42 U.S.C. § 9607 .................................................................................. 5

Cal. Civ. Code § 3334 ........................................................................ 17

California Health and Safety Code § 25323.5(a) ................................. 5

Fed. R. Civ. P. 56 ........................................................................ *passim*

## OTHER AUTHORITIES

*Blacks Law Dictionary,* 1046 (5th ed. 1979) .................................... 14

Restatement (Second) of Torts, § 328E ............................................. 13

Restatement (Second) of Torts, § 838 ............................................... 15

Restatement (Second) of Torts, § 839 .......................................... 13, 15

TETRA TECH DEFENDANTS' MEM. ISO SUMMARY JUDGMENT (NUISANCE)

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

## I.     INTRODUCTION

3      Summary judgment is proper on all nuisance claims against the Tetra Tech Defendants

4 because the Tetra Tech Defendants did not cause the purported harm underlying those claims. To

5 the extent a nuisance exists at the Hunters Point Naval Shipyard ("HPNS") as a result of alleged

6 contamination (which the Tetra Tech Defendants dispute), the contamination was caused by the

7 Navy and its lessee Triple A Machine Shop. TtEC's efforts to abate that contamination, no matter

8 how flawed Plaintiffs allege them to be, did not cause the alleged nuisance. Accordingly, the

9 nuisance claims fail as a matter of law.

10      Danielle Carpenter and other Bayview Hunters Point residents ("Bayview Plaintiffs"),

11 police officers stationed at HPNS ("Abbey Plaintiffs"), and residents of the Shipyard Development

12 on what was previously known as Parcel A ("Pennington Plaintiffs") (collectively, "Plaintiffs")

13 are all pursuing similar nuisance claims against the Tetra Tech Defendants in three separate

14 litigations. The Abbey and Bayview Plaintiffs assert public nuisance, the Bayview Plaintiffs assert

15 private nuisance, and the Pennington Plaintiffs assert permanent public nuisance and permanent

16 private nuisance. All of these nuisance claims share three fundamental flaws—the Tetra Tech

17 Defendants did not create or assist in creating the alleged nuisance, did not possess the land at

18 HPNS where the nuisance is alleged to exist, and never leased that land to a third party who

19 created a nuisance. These undisputed facts are dispositive here because a claim for nuisance based

20 on alleged environmental contamination requires either that a defendant (1) contaminated the land;

21 (2) perpetuated such contamination *while in possession of the property*; or (3) permitted a third

22 party to create a nuisance *while in possession of the property.* There is no genuine dispute

23 regarding any of the material facts relating to these elements, and Plaintiffs cannot satisfy any of

24 them here. As a result, without waiving any arguments as to liability or otherwise, or the ability to

25 move for summary judgment on any other claim, the Tetra Tech Defendants move for summary

26 judgment on Plaintiffs' claims for public nuisance, private nuisance, permanent public nuisance,

27 and permanent private nuisance.

28      In addition, summary judgment is proper on the Pennington Plaintiffs' request for

TETRA TECH DEFENDANTS' MEM. ISO SUMMARY JUDGMENT (NUISANCE)

appreciation impairment damages for their nuisance claims for the independent reason that such damages are unavailable where the alleged nuisance is continuing rather than permanent.

## II.   STATEMENT OF THE ISSUES TO BE DECIDED

1.   Whether, based on the questions below, the Tetra Tech Defendants have satisfied the requirements for summary judgment on Plaintiffs' nuisance claims?

   a)   Whether the Tetra Tech Defendants affirmatively caused the contamination at HPNS?

   b)   Whether the Tetra Tech Defendants possessed HPNS?

   c)   Whether the Tetra Tech Defendants leased the land at HPNS to a third party?

2.   Whether Plaintiffs in the *Pennington* litigation may seek appreciation impairment damages pursuant to their nuisance claims?

## III.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   Background

#### 1.   Contamination by the Navy and Triple A

The Navy bought the land underlying HPNS in 1939. Brown Decl., Ex. A (Historical Radiological Assessment, Volume II) at Sec. 6.1. Thereafter, HPNS served as a loading and returning dock for ships contaminated by WWII nuclear weapons testing. *Id.* It also served as a place for refurbishment and handling of radioluminescent devices, gamma radiography, instrument calibration, and ship decontamination. *Id.* From 1976 to 1986, the Navy leased most of HPNS to Triple A Machine Shop, Inc. ("Triple A"), who operated as a ship repair company at the site. Ex. A, Sec. 6.1.6. The Navy then resumed possession. *Id.*

As the Plaintiffs themselves allege, operations by the Navy and Triple A caused the contamination at HPNS, and those operations occurred prior to TtEC's involvement at the site. The Pennington Plaintiffs explain, for example, that "[t]he Hunters Point Naval Shipyard . . .  once housed a U.S. nuclear-warfare research lab (the Naval Radiological Defense Laboratory, or 'NRDL'), from 1946 to 1969, and a ship-repair company from 1976 to 1986" and that "[t]he Navy and its successor used the site as a dumping ground for industrial chemicals, and toxic and

TETRA TECH DEFENDANTS' MEM. ISO SUMMARY JUDGMENT (NUISANCE)

radioactive waste." *Pennington* Third Am. Compl., 18-cv-05330 (ECF 157) ("Pennington Complaint"), ¶ 4. The Abbey Plaintiffs contend that "[f]rom the mid-1800s to about 1989, Hunters Point Naval Shipyard (HPNS) in San Francisco was used by private entities and the U.S. Navy for ship maintenance and repair activities" and that "[o]ver the decades, these ship maintenance and repair activities caused the release of waste oils, cleaning solvents, sandblasting materials, acid, and other hazardous substances throughout the HPNS base." *Abbey* First Am. Compl., 19-cv-07510 (ECF 40) ("Abbey Complaint"), ¶¶ 2-3. And the Bayview Plaintiffs assert that "Hunters Point Naval Shipyard housed the Naval Radiological Defense Laboratory ('NRDL') from 1948 to 1969"; that "NRDL activities and concerns included radiological decontamination of ships exposed to atomic weapons testing, experimentation and research on radiological decontamination, the overall effects of radiation on material substances, and the effect of radiation on humans and other living organisms"; and that "[s]uch focus resulted in excessive contamination of the Shipyard's soils, sediments, surface water and groundwater by petroleum fuels, pesticides, heavy metals, radiation releases, polychlorinated biphenylys ('PCBs'), volatile organic compounds ('VOCs') and other such radionuclides released from the fusion process required to manufacture Atomic Bombs. . . .  deposited by the Navy on the Shipyard's soils." *Carpenter* Sixth Am. Compl., 19-cv-01417 (ECF 223) ("Bayview Complaint"), ¶¶ 2-3.

As a result of the Navy and Triple A's activities, in 1989—well before TtEC entered or did any work at HPNS—the area was designated an EPA Superfund site. Brown Decl., Ex. B (Department of the Navy, Hazardous Ranking System Package, Mar. 31, 1988) at 1. And, also before TtEC entered the site—others were held responsible for polluting. In 1992, "Triple A's management was convicted of five counts of illegal hazardous waste disposal at HPNS." Abbey Complaint, ¶ 81; *see also* Brown Decl., Ex. C (Parcel A Remedial Investigation Report) at pp. 2-3 to 2-7, 8-1 to 8-7; Brown Decl. at Ex. D, (Kay, Jane, *Shipyard guilty of dumping toxic waste*, San Francisco Examiner (Aug. 4, 1992)).

### 2.   Site Remediation Plan

After designation as a Superfund site, HPNS was divided into Parcels to aid with remediation. *See* Brown Decl. at Ex. E (Parcel Map). The borders of the parcels have changed

over time, but in the 1990s, the Navy commissioned Remedial Investigation Reports for each then-existing Parcel to document the extent of the contamination. At the time, these included Parcels A, B, C, D, and E. *See id*.

The Remedial Investigation Report for Parcel A explains that virtually none of the conduct of concern occurred on Parcel A, and more generally, that the Navy was responsible for activities that "generated hazardous and potentially hazardous wastes" throughout HPNS. Ex. C, pp. 2-3 - 2-7; 8-1 - 8-7.

The Parcel B Report explained that the Navy had used Parcel B as an industrial production area for structural machinery, electrical, and shipyard activities and reported the presence of metals, volatile organic compounds (VOCs), semi-volatile organic compounds (SVOCs), pesticides, polychlorinated biphenyls (PCBs), and petroleum hydrocarbons. Brown Decl. at Ex. F (Parcel B Remedial Investigation Report), pp. ES-12 - ES-13, 3-1.

Parcel C historically had housed a power plant and electrical substations, several types of machine shops, a firehouse, a saltwater pump house, a paint shop, and a sheet metal annex, and the Report noted the presence of metals, petroleum hydrocarbons, Aroclor-1260 (a PCB), and VOCs. Brown Decl., Ex. G (Parcel C Remedial Investigation Report) at Table 3.2-1; Brown Decl., Ex. K at Secs. 5.3.1 - 5.3.2.

Parcel D was historically used for offices, commercial buildings, warehouses, sandblasting, paint operations, machining, acid mixing, and metal fabrication, and the Report noted the existence of chromium, lead, petroleum hydrocarbons (some of which originated from Parcel C), benzene, SVOCs, and PCBs. Brown Decl., Ex. H (Parcel D Remedial Investigation Report) at pp. ES-3, ES-13 - ES-20.

Finally, Parcel E was "predominantly used as a landfill and as a waste, construction, and industrial materials storage area as well as for office and laboratory space"; and the Report noted the presence of various metals, PCBs, VOCs, SVOCs, and radium-226. Brown Decl., Ex. I (Parcel E Remedial Investigation Report, Executive Summary).

**B.      Undisputed Facts Determinative of This Motion**

TtEC, one of multiple contractors that worked at HPNS during the remediation, did not begin remediation work at Hunters Point until after the site was contaminated. Bayview Complaint, ¶ 5 ("On or about *2002*, TETRA TECH, a company specializing in toxic cleanup, was hired by the United States Navy to undertake cleanup and removal of the toxic waste deposited by the Navy throughout the approximately 25 years of its residency.") (emphasis added); Pennington Complaint ¶ 160 ("In *2002*, the U.S. Navy entered into a contract with Tetra Tech to remediate the industrial and radioactive waste still located at HPNS.") (emphasis added); Abbey Complaint ¶¶ 4, 17 (discussing Navy activities leading to contamination from 1956 to 1969 and Tetra Tech testing and remediation from 1992 to 2014); Brown Decl., Ex. J (Award/Contract for Contract No. N44255-01-D-2000) (first contract for TtEC remediation work dated December 19, 2001).

The Navy and/or Triple A possessed the property during the time the land was contaminated. Ex. A, Sec. 6. Plaintiffs do not dispute this. *See* Abbey Complaint, ¶ 80 ("From 1976 to 1987, while HPNS remained under the Navy's ownership and control, Triple A conducted commercial ship repair operations at HPNS that resulted in widespread releases of hazardous substances, including instances of illegal dumping of hazardous wastes at more than 20 locations throughout HPNS.") (emphasis added); Bayview Complaint ¶ 30-38 (explaining that "[i]n 1940, the Navy obtained ownership of the shipyard for shipbuilding, repair, and maintenance activities" and describing Navy uses from 1940 through 1989); Pennington Complaint ¶ 4 (providing that HPNS housed the Naval Radiological Defense Laboratory from 1946 to 1969 and "a ship-repair company from 1976 to 1986").

And the Navy continued to possess the land at HPNS after naval operations ceased. A 1992 Federal Facilities Agreement executed among the Navy, the EPA, and the State of California clarifies that HPNS was a "facility under the jurisdiction, custody, or control of the Department of Defense" and that "[t]he Department of the Navy is authorized to act on behalf of the Secretary of Defense" for purposes of remediating the site because "with respect to the releases, the Navy is an owner, operator, and/or generator subject to the provisions of 42 U.S.C. Section 9607 and within the meaning of California Health and Safety Code section 25323.5(a)." Brown Decl., Ex. L (1992

TETRA TECH DEFENDANTS' MEM. ISO SUMMARY JUDGMENT (NUISANCE)

Federal Facilities Agreement) at 7. Through that Agreement, "the Navy agree(d) to undertake, seek adequate funding for, fully implement and report on the following tasks…(a) Remedial Investigations of the Site; (b) Feasibility Studies for the Site; (c) All response actions, including Operable Units, for the Site; (d) Operation and maintenance of response actions at the Site; [and] (e) Federal and State Natural Resources Trustee notification and coordination for the Site." *Id.* at 8-9. Among the Navy's responsibilities are "to obtain permits necessary for the performance of any work under this Agreement." *Id.* at 31. And, given the Navy's possession of the site, the Agreement specially carved out access rights for the EPA, the State, and contractors (like TtEC). *Id.* at 35 ("[t]he Navy shall honor all reasonable requests for access by the EPA or the State, conditioned upon presentation of proper credentials"; the Navy will "coordinate access and escort [EPA and State personnel] to restricted or controlled-access areas, arrange for base passes and coordinate any other access requests which arise"; and the "Navy shall not restrict the access rights of the EPA or the State to any greater extent than the Navy restricts the access rights of its contractors.") The Navy had the responsibility of "ensuring that its contractors comply with the terms and conditions of [the] Agreement." *Id.* at 3.

As the Navy explained in its Final Basewide Dust Control Plan, applicable to all remediation contractors across the site, control of the property moved between Navy divisions (but never leaving the Department) from the time when the land was designated a Superfund site in 1989 through the years of the remediation, but at all times the land was the Navy's. Brown Decl., Ex. M (Final Basewide Dust Control Plan) ("On March 31, 1994, control of HPNS was transferred from the Treasure Island Naval Station to the Naval Facilities Engineering Command, Western Division (now Engineering Field Activity West) in San Bruno, California. In October 1999, Naval Facilities Engineering Command Southwest assumed management of HPS."); *see also* Brown Decl., Ex. N (2023 Navy Annual Update of Cleanup Achievements), *available at https://www.navy.mil/Press-Office/News-Stories/Article/3412609/2023-annual-update-of-cleanup-achievements-for-hunters-point-naval-shipyard/* (Last visited Aug. 29, 2023) at 1 ("The shipyard was an active Navy Base until 1974. In 1976, Triple A Machine Shop leased much of the property and repaired commercial and Naval vessels on the site until 1986, when the Navy reclaimed it.").

TETRA TECH DEFENDANTS' MEM. ISO SUMMARY JUDGMENT (NUISANCE)

The Navy remains actively involved in the day-to-day control and management of the site. *Id.*, at 2 ("The Navy's BRAC Program manages the cleanup program at HPNS. The Navy works closely with USEPA, DTSC, SF Bay Water Board, other agencies, and the City of San Francisco. Together, they ensure that HNPS will be safe for planned redevelopment activities."); *id.* at 4 ("Each year, the Navy reaches more than 180,000 community members with information on meetings, events, bus tours, surveys, and other communications.").

There can be no credible dispute that the Navy possessed the land at HPNS during the entire period it contracted with TtEC to perform work at the site (and still possesses it today). The Navy hired TtEC and numerous other contractors to perform remediation services on its land, but never relinquished possession. Each of the eight contracts between the United States and TtEC strictly concern the provision of "*services* for performing remedial actions at environmentally contaminated sites predominantly located at Navy and Marine Corps installations," and none of the contracts ceded possession of HPNS from the Navy to TtEC. *See* Brown Decl., Ex. O, Sec. 1.1 (Contract No. N44255-01-D-200) (emphasis added); Brown Decl., Ex. P, Sec. 1.1 (Contract No. N62473-08-D-8823); Brown Decl., Ex. Q, Sec. 1.1 (Contract No. N62473-07-D-3211); Brown Decl., Ex. R, Sec. 1.1 (Contract No. N62473-12-D-2006); Brown Decl., Ex. S, Sec. 1.1 (Contract No. N62473-10-D-0809); Brown Decl., Ex. T, Sec. 1.1 (Contract No. N62473-12-D-4808); Brown Decl., Ex. U, Sec. 1.1 (Contract No. N62473-06-D-2201); Brown Decl., Ex. V, Sec. 1.1 (Contract No. N687711-98-5713). As possessor of the land, the Navy maintained complete control over all aspects of the site cleanup, inclusive of TtEC and other contractors' activities. Brown Decl., Ex. W (Oct. 2, 2016 EPA Circular for Parcel A) ("The Navy is the lead agency responsible for the investigation and cleanup of the Shipyard and holds the Administrative Record for the site."). Brown Decl. Ex. L at 30 ("The Remedial Project Manager for the Navy shall be responsible for day-to-day field activities at the site."). As Melanie Kito—the Navy's Lead Remedial Project Manager at HPNS from 2006-2013—agreed to in deposition, the Navy "always has ultimate oversight responsibility for the cleanup of its naval bases." Brown Decl., Ex. Z (Kito Depo. Tr.), 77:23-78:2. Hunters Point is no different.

In fact, Plaintiffs allege only that TtEC's obligation was to assist the Navy in meeting *the*

TETRA TECH DEFENDANTS' MEM. ISO SUMMARY JUDGMENT (NUISANCE)

*Navy's* goals for the remediation of the existing contamination on *the Navy's* land—not that TtEC was in possession of the land. *See* Abbey Complaint, ¶¶ 17-21 ("Tetra Tech was required . . . to determine whether suspected hazardous substances were present in levels above the cleanup goals set by the Navy in conjunction with the US EPA and other agencies."); Pennington Complaint ¶ 5 n.2 ("[w]hile a small percentage of the SF Shipyard, including the plot of land known as Parcel A, is no longer considered part of the Superfund Site, the vast majority remains under U.S. Navy purview.").

There is no dispute that HPNS is still being actively remediated. The work continues at HPNS so that remaining parcels can also be transferred by the Navy for development. *See* Brown Decl., Ex. X, (map showing parcels pending transfer between October 2023 and September 2028). *See also* Ex. N at 1 ("The Navy is completing its extensive investigation of contaminated land and groundwater."); *id.* at 2 ("The Navy will conduct post-remediation monitoring at HPNS until all property is transferred."). It is also not in dispute that the contamination complained of in Plaintiffs' nuisance claim is one that can be (and in fact is being) remediated. Navy Contracting Officer Karen Barba testified in deposition that the goal of the Navy's work at the site is to get "the property to a designated safe level," which meant "that it would be safe for whatever the reuse is of that land." Ex. AA (Barba Depo. Tr.) at 79:20-81:13. And Melanie Kito, the Navy's Lead Remedial Project Manager at HPNS for years, confirmed that "the Navy's not going to release property that it thinks is going to harm human health to be used by the public."  Ex. Z at 104:9-14. Even the *Pennington* class representative, Linda Parker Pennington, testified in her deposition that "the condition of the shipyard, it can be eliminated." Brown Decl., Ex. Y (Pennington Depo. Tr.), 190:10 – 19.

## IV.    STANDARD OF REVIEW

Summary judgment "shall" be granted where the moving party shows, based on the materials in the record, including depositions, documents, and admissions, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see also Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A fact is only material if it affects the outcome of the claims on which

summary judgment is sought. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## V.    ARGUMENT

### A.    Plaintiffs' Nuisance Claims Fail Because the Tetra Tech Defendants Did Not Create or Assist in the Creation of the Contamination, Never Possessed the Land, and Never Leased the Land

"[F]or a defendant to be held liable for a nuisance, his actions need to fall under one of three theories. First, the defendant need have created or assisted in the creation of the nuisance. Second, the defendant must have unreasonably failed to abate a nuisance *when he is in possession* of the land. Third, the defendant need have *a right of possession* in the land and have consented or unreasonably permitted a third party to create a nuisance on the land." *Torres v. Igdaloff*, 2018 WL 6118554, at *2 (C.D. Cal. Jan. 29, 2018) (emphases added and internal citations omitted). *See also Estate of Renzel v. Ventura*, 2015 WL 8527522, at *5 (N.D. Cal. Dec. 11, 2015) ("The parties agree that there are three possible theories of nuisance liability: (1) creating or assisting in the creation of the nuisance; (2) possessor liability for unreasonably failing to abate the nuisance (which requires, among other elements, a defendant's knowledge of the nuisance and the plaintiff's lack of consent); and (3) permitting a third party to create the nuisance."); *City of W. Sacramento, Cal. v. R and L Bus. Mgmt.*, 2018 WL 3198118, at *6 (E.D. Cal. June 27, 2018) (same).

The undisputed facts show that the Tetra Tech Defendants cannot be liable under any of these three theories of nuisance and summary judgment on the nuisance claims is therefore proper. It is undisputed that the Navy and Triple A caused the alleged contamination at Hunters Point. The undisputed facts also demonstrate that the Tetra Tech Defendants never possessed the land at Hunters Point—the Navy did at all times between 1939 and when TtEC concluded its work, and the Navy leased an interest in certain parts of the land to Triple A from 1976 to 1986. The Navy never sold, leased, or otherwise passed possession of any real property to the Tetra Tech Defendants. As a matter of undisputed fact, the Tetra Tech Defendants never contaminated the land at Hunters Point, never possessed the land, and never permitted third parties to contaminate the land. Therefore, as a matter of law, Plaintiffs' nuisance claims cannot succeed.

1.     **Tetra Tech Did Not Create or Assist in the Creation of the Contamination**

All parties to these cases agree: the Navy and Triple A contaminated Hunters Point Naval Shipyard. And that alleged contamination, which predated TtEC's work, created any nuisance that Plaintiffs seek damages to redress. "[T]o state a cause of action for public nuisance, a plaintiff must allege that a defendant *created (or had active involvement in creating)* a condition that was harmful to health or interfered with the comfortable enjoyment of life or property; that the condition affected a substantial number of people at the same time; that an ordinary person would be reasonably annoyed or disturbed by the condition; that the seriousness of the harm outweighs the social utility of the defendant's conduct; that the plaintiff did not consent to the conduct; that the plaintiff suffered harm that was different from the type of harm suffered by the general public; and that the defendant's conduct was a substantial factor in causing the plaintiff's harm." *Gregory Village Partners, L.P. v. Chevron U.S.A., Inc.*, 805 F.Supp.2d 888, 901 (N.D. Cal. 2011), *citing Birke v. Oakwood Worldwide*, 169 Cal.App.4th 1540, 1548 (2009) (emphasis added); *see also* CACI 2020. [2]

Merely being a but-for cause of the nuisance is insufficient to establish liability under the creation-of-nuisance theory. *Coppola v. Smith*, 935 F.Supp.2d 993, 1018 (E.D. Cal. 2013), *citing Redevelopment Agency of City of Stockton v. BNSF Ry. Co.*, 643 F.3d 668, 674 (9th Cir. 2011). A defendant can be directly liable only if the defendant created or assisted in creating a nuisance through affirmative action. *Coppola*, 935 F. Supp. 2d at 1018 (emphasis added); *see also Redevelopment Agency of City of Stockton*, 643 F.3d at 674, *citing City of Modesto Redevelopment Agency v. Superior Court*, 119 Cal.App.4th 28, 43 (2004) (nuisance is committed by "those who took affirmative steps directed toward the improper discharge of hazardous wastes").

This is true for both public and private nuisance.  "[T]he elements of a private nuisance claim are the same as those for public nuisance, except that a plaintiff asserting a private nuisance does not have to prove that the nuisance is one that affects a community or neighborhood and that

---

[2] "Since the alleged tort occurred in California, California tort law applies." *Steverson v. United States*, 2008 WL 11512021, at *2 (E.D. Cal. Jan. 25, 2008).

they suffered a special injury." *Schaeffer v. Gregory Village Partners*, 105 F.Supp.3d 951, 967 (N.D. Cal. 2015). Thus, a private nuisance claim also requires creation or assistance in the establishment of the nuisance. *See id.* at 966; *see also City of Modesto*, 119 Cal.App.4th at 38 (in a case where plaintiff alleged both public and private nuisance, "the critical question is whether the defendant created or assisted in the creation of the nuisance.")

Here, there is no material dispute as to which entities "created or assisted in the creation" of the alleged nuisance at HPNS. The Tetra Tech Defendants did not affirmatively cause contamination to enter Hunters Point. All Plaintiffs allege only that TtEC failed to properly remediate Hunters Point—not that TtEC was an active polluter.

For example, throughout the Abbey Complaint, there are numerous allegations of the Navy and Triple A disposing of radioactive material and other contaminants onsite as they worked at Hunters Point. *See* Abbey Complaint, ¶¶ 7, 49, 68, 69, 70, 79, 80, 81, 94, 95, 131, 191, 192. The Bayview Complaint likewise alleges the Navy's creation of the contamination. *See* Bayview Complaint, ¶ 9, 31, 34, 37. And the Pennington Complaint does the same. *See* Pennington Complaint, ¶ 204 ("the radioactive nature of the U.S. Navy's activities at HPNS"); *see also* Pennington Complaint, ¶¶ 4, 149, 151, 154, 155. No plaintiff alleges the Tetra Tech Defendants affirmatively added to the alleged contamination at Hunters Point. *See* Abbey Complaint, ¶ 19 ("Tetra Tech was required to safely contain and dispose of any contaminated soil it processed"); Bayview Complaint, ¶ 65 ("Fraudulent sampling, scanning, and surveys led to fraudulent remediation; sites that required additional cleanup were not remediated and remain contaminated because fake samples indicated areas were 'clean' when they were not"); Pennington Complaint, ¶ 115 ("All Plaintiffs have been harmed by the Tetra Tech Defendants' fraudulent clean-up of the former HPNS.").

*Torres*, 2018 WL 6118554, at *2 (C.D. Cal. Jan. 29, 2018) is instructive. There, the court granted defendant EFI Global's motion to dismiss. EFI Global was hired to conduct environmental testing on a polluted site, inclusive of soil sampling. "Since the 1970s, the [p]roperty ha[d] been home to various industrial and commercial businesses[, and] . . . . [a]s a result of equipment malfunction, equipment dismantling and hazardous materials storage, these businesses []

TETRA TECH DEFENDANTS' MEM. ISO SUMMARY JUDGMENT (NUISANCE)

accidentally and intentionally discharged hazardous waste, and spilled water contaminated with PCE at the [p]roperty." *Id.* at *1. EFI Global was not one of the polluting companies, but rather was hired to come onto the already polluted site and run environmental testing.

The Court held EFI Global could not be liable for nuisance because EFI Global, responsible for conducting environmental assessments of the site, "neither created, nor assisted in the creation of the nuisance. Defendant came to be on the Property for the first time in 2006. This put Defendant on the *already* contaminated Property, decades after PCE had been leftover by other property owners." *Id.* at *3 (emphasis in original and citation omitted). The court stressed that even "[a]ssuming *arguendo* Defendant accidentally displaced clean soil with contaminated soil during its ESAs [Environmental Site Assessments], case law is plain; a 'but-for-cause of the nuisance' does not rise to the culpability threshold of 'active, affirmative, or knowing conduct.'"

The same is true here. The Navy and Triple A were the contaminators. The Navy prepared the Historical Radiological Assessment to address its own radiological contamination. The Navy stored and decontaminated ships, handled radioluminescent devices, and conducted gamma radiography at the site. *See* Ex. A, Secs. 6.1.1 - 6.1.5. The Navy's activities "generated hazardous and potentially hazardous wastes including spent petroleum products, solvents, acids, caustics, detergent, paint sludges, sandblast grit, radioactive materials, and various other waste chemicals and liquids" over the course of decades. *See* Ex. C, pp. 2-3 - 2-7. From 1976 to 1986, the Navy leased most of Hunters Point to Triple A, which was found guilty of contaminating Hunters Point in a criminal proceeding. *See* Ex. C, pp. 2-3 - 2-7.

The radiological and chemical contamination at Hunters Point already existed when TtEC started work, and thus the Tetra Tech Defendants did not "create or assist in creating" the alleged nuisance. *See Gregory Village Partners,* 805 F.Supp.2d at 901. Plaintiffs cannot show the Tetra Tech Defendants took "affirmative steps directed toward the improper discharge of hazardous wastes." *See Redevelopment Agency of City of Stockton*, 643 F.3d at 674, *citing City of Modesto Redevelopment Agency v. Superior Court*, 119 Cal.App.4th at 43. *See also Torres*, 2018 WL 6118554, at *1-2 (handling and moving contaminated soil during environmental assessment is not synonymous with causation).

1

2

**2.      Tetra Tech Never Possessed Hunters Point, Precluding Possessor Liability**

3    In the absence of affirmative causation, under California law, the Tetra Tech Defendants

4    can only be held liable for maintaining a nuisance if they possessed the land. *See Redevelopment*

5    *Agency of City of Stockton*, 643 F.3d at 673-74 ("[i]f the Railroads did not create or assist in the

6    creation of the nuisance, they can only be held liable if they acted unreasonably *as possessors* of

7    the Property…") (emphasis added); *Jarose v. County of Humboldt*, 2022 WL 1601407, at *18

8    (N.D. Cal. March 17, 2022) (possessor liability may only be imposed if the defendant had

9    possession while the nuisance was created); *Coppola v. Smith*, 2015 WL 224730, at *16 (E.D. Cal.

10   Jan. 15, 2015) (holding the question at summary judgment was "whether a nuisance exists or

11   existed on the Property at a time when M&M was in possession of the Property"); *Mangini v.*

12   *Aerojet-General Corp.*, 230 Cal.App.3d 1125, 1137-38 (1991) (a party that maintains a nuisance

13   through a possessory interest in property could be liable); *Sprecher v. Adamson Companies*, 30

14   Cal.3d 358, 368-69 (Cal. 1981) ("duties owed in connection with the condition of the land" are

15   owed by "the person in possession of the land" because "[p]ossession ordinarily brings with it the

16   right of supervision and control," which "goes to the very heart of the ascription of tortious

17   responsibility") (internal quotation marks and citation omitted).

18   The Tetra Tech Defendants never possessed the land. California follows the Restatement

19   for establishing what constitutes possession. *Redevelopment Agency of City of Stockton*, 643 F.3d

20   at 675, *citing* Restatement (Second) of Torts § 839. Under the Restatement, "A possessor of land

21   is (a) a person who is in occupation of the land with intent to control it or (b) a person who has

22   been in occupation of land with intent to control it, if no other person has subsequently occupied it

23   with intent to control it, or (c) a person who is entitled to immediate occupation of the land, if no

24   other person is in possession under Clauses (a) and (b)." Restatement (Second) of Torts, § 328E.

25   "As for defining possession, case law is plain, 'possess' is defined as 'to have in one's actual and

26   physical control; to have the ***exclusive detention and control of***.'" *Torres*, 2018 WL 6118554, at

27   *2 (emphasis added and internal citations omitted). *See also Sprecher*, 30 Cal.3d at 368-69 (noting

28   control is synonymous with "supervisory power").

1   There was nothing exclusive about TtEC's—or any other contractor's—ability to enter and

2   work at HPNS. At all times while TtEC was working at HPNS, the Navy possessed the land. It

3   was the Navy, on behalf of the Department of Defense, that held "jurisdiction, custody, or control"

4   of the site and was the "owner" and "operator" of the land and operations thereon. Ex. L at 7. It

5   was the Navy's responsibility to oversee operations and maintenance at HPNS, inclusive of the

6   remediation activities. *Id.* at 8-9. And the Navy controlled who was allowed access to HPNS,

7   including other government actors and contractors such as TtEC. *Id.* at 35.  The Federal Facility

8   Agreement for HPNS explicitly provides that "[t]he Remedial Project Manager for the Navy shall

9   be responsible for day-to-day field activities at the site." Ex. L at 30. As a result, it is the Navy that

10  touts responsibility for the cleanup, continues to control access to the site, and coordinates public

11  messaging about progress at the site. Ex. W. The Navy has custody over the administrative record

12  for the site. *Id.* The Navy, not TtEC, at all times held "exclusive detention and control" of HPNS,

13  and thus was in possession of it. *Torres*, 2018 WL 6118554, at *2. *See also U.S. v. Johnson*, 34 F.

14  3d 1352, 1354 (9th Cir. 1994) ("The plain meaning of the word 'possessed'…is defined as 'to

15  have in one's actual and physical control; to have the exclusive detention and control of.'" (citing

16  *Blacks Law Dictionary* 1046 (5th ed. 1979)).

17  Again, *Torres* is instructive. There, the court dismissed nuisance claims against EFI Global

18  connected to their environmental testing work on a polluted site. As discussed *supra*, the Court

19  held that EFI Global could not be liable for nuisance because "the defendant neither created, nor

20  assisted in the creation of the nuisance." *Torres*, 2018 WL 6118554, at *3. But the court also held

21  that EFI Global could not be held liable for nuisance in connection with its sampling work because

22  "there is no factual allegation that Defendant owned or possessed the Property when the PCE was

23  used, spilled, released or disposed of." *Id.* at *3. The court focused on the fact that "[n]ot once in

24  the second or third cause of action is [EFI Global] listed as a part or current owner or possessor of

25  the Property," nor were there "factual allegations asserting Defendant was ever a lessor of the

26  Property." *Id.* In this case, the same result is warranted because the Tetra Tech Defendants never

27  possessed the land at Hunters Point.

28  A contractual obligation to make a site clean does not create a possessory right in the real

TETRA TECH DEFENDANTS' MEM. ISO SUMMARY JUDGMENT (NUISANCE)

property. In *City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 453-54 (9th Cir. 2011), the Ninth Circuit held that even though the parent company held a revocable permit that obligated it to keep a berth "in a safe, clean, wholesome, sanitary and sightly condition," liability for maintaining a nuisance could not attach because "[Sec.] 839 applies only when the defendant is 'in possession' of the subject property" and the parent company's subsidiary (not the defendant company itself) held the leasehold and possessed the property. *Id.* Where no possession exists, no nuisance liability attaches for failure to abate. *Id.* Here, the Navy possessed the property during the time of the alleged contamination and at all times thereafter. It is undisputed the Navy never leased or passed title to the Tetra Tech Defendants. Because the Tetra Tech Defendants never possessed the land, Plaintiffs' nuisance claims must fail.

### 3. Tetra Tech Never Had a Right of Possession to Lease to a Third Party

The last option for Plaintiffs, having failed to show the Tetra Tech Defendants affirmatively created the contamination or possessed the land, would be to show the Tetra Tech Defendants had "a right of possession in the land and [] consented or unreasonably permitted a third party to create a nuisance on the land." Restatement (Second) of Torts, § 838 (to be responsible for failure to prevent nuisance by a third party, one must be a possessor); *Torres*, 2018 WL 6118554, at *2 (internal quotation marks and citation omitted); *see also San Pedro Boat Works*, 635 F.3d at 453-54 (it is a nuisance if a possessor has reason to know a third-party lessee is causing a nuisance). "[T]his theory relates to a defendant who leases land to third parties." *Torres*, 2018 WL 6118554, at *3 (citing *Coppola*, 935 F. Supp. 2d at 1019). This factual scenario is not at issue in the case. As explained, the Tetra Tech Defendants did not own or possess the property, so they could not have been responsible for the actions of someone else's lessee under Section 838, and no party contends they leased the land to a third-party who contaminated the land. *See also*, 10 McQuillin Mun. Corp. § 28:38 n. 10 (3d ed.) (an entity cannot convey or lease property it does not own). Thus, the third basis for nuisance liability is wholly inapplicable.

TETRA TECH DEFENDANTS' MEM. ISO SUMMARY JUDGMENT (NUISANCE)

**B.     Appreciation Impairment Damages Are Unavailable for Nuisance Claims**

Partial summary judgment is also proper as to Plaintiffs' nuisance claims in *Pennington* to the extent Plaintiffs seek damages based on alleged appreciation impairment. Such damages are not available under the law.

A motion for partial summary judgment as to certain types of damages is proper under Rule 56(a). *See also Watson Lab'ys, Inc. v. Rhone-Poulenc Rorer, Inc*., 178 F. Supp. 2d 1099, 1122 (C.D. Cal. 2001) (granting motion for partial summary judgment to bar a plaintiff from recovering lost profits damages was proper). Plaintiffs in the *Pennington* matter seek nuisance damages in part for "diminution in the value of, and future harm to, their property." Pennington Complaint ¶¶ 241, 253. Such damages are unavailable as a matter of law where the alleged injuries are due to a *continuing* nuisance, not a *permanent* one.

Here, the alleged nuisance at issue would be a continuing nuisance. The Pennington Plaintiffs contend that the nuisance is "the nuclear toxicity and other environmental toxicity" at Parcel A and the "adjoining property." ECF 157 ¶ 240. However, the alleged nuisance is not a permanent nuisance—it is, rather, a continuing nuisance because the harm complained of can be, and in fact is being, remediated. *See Lyles v. State of California*, 153 Cal. App. 4th 281, 291 (2007) ("Permanent nuisances are of a type where by one act a permanent injury is done and damages are assessed once for all.") (cleaned up); *see also Bd. of Trs. of the Leland Stanford Junior Univ. v. Agilent Techs*., 628 F. Supp. 3d 972, 974 (N.D. Cal. 2022) ("A continuous nuisance is one that can be abated at a reasonable cost; a permanent nuisance cannot be"). If the harm can "be abated by some means," the nuisance is continuing. *Starrh*, 153 Cal. App. 4th. at 596-97 ("where some means of abatement exist, classifying the trespass or nuisance as permanent will discourage remedial efforts").

Environmental cleanup cases where there is or will be a determination that a once-contaminated site will be safe for public recreation and residence are continuing nuisance cases, not permanent nuisance cases. For example, in *Capogeannis*, the court presumed "that cleanup standards set by responsible public agencies sufficiently reflect expert appraisal of the best that can be done to abate contamination in particular cases" and rejected the argument that "because it

TETRA TECH DEFENDANTS' MEM. ISO SUMMARY JUDGMENT (NUISANCE)

does not appear the contamination can ever by *wholly* removed the nuisance must be deemed permanent." 12 Cal. App. 4th at 682; *see also Bd. of Trs. of the Leland Stanford Junior Univ*., 628 F. Supp. 3d at 976 (explaining that because "[a]batement can include attempts to minimize the effects of a nuisance, even if the nuisance cannot be entirely stopped or removed," environmental contamination at issue was not a permanent nuisance).

Here, remedial efforts are ongoing. The Navy continually updates the public on its remediation progress and stated in its update this year that it continues to implement the remediation and will do so until all property is transferred. *See* Ex. N. In fact, the Navy's 2023 update details by parcel which remediation activities have been completed and which are in progress. Ex. N at 2. The Navy expects site remediation to be fully completed in September 2028, with transfer of remediated parcels as they are completed between October 2023 and September 2028. *See* Ex. X; *see also* Ex. AA (Barba Depo. Tr.) at 79:20-81:13 (the goal of the Navy's work at the site is to get "the property to a designated safe level," which meant "that it would be safe for whatever the reuse is of that land"). Even Plaintiffs' class representative, Linda Parker Pennington, testified that "the condition of the shipyard, it can be eliminated." Ex. Y at 190:10-19. Therefore, the alleged nuisance is a continuing one.

And in continuing nuisance cases, it is black-letter law that diminution in value damages are *not* recoverable. *See Santa Fe P'ship v. ARCO Prod. Co.*, 46 Cal. App. 4th 967, 984 (1996) (affirming judgment denying claim for diminution where "nuisance was abatable and temporary, rather than permanent or indefinite"). In instances of continuing nuisance, recoverable damages are limited to "the value of the use of the property, reasonable cost of repair or restoration to the property's original condition, and the costs of recovering possession." *Starrh*, 153 Cal. App. 4th at 592 (citing Cal. Civ. Code § 3334). "California law limits damages for continuing trespass and continuing nuisance to abatement and loss of use." *F.D.I.C. v. Jackson-Shaw Partners No. 46, Ltd.*, 850 F. Supp. 839, 842-43 (N.D. Cal. 1994); *Carson Harbor Vill., Ltd. V. Unocal Corp.*, 287 F. Supp. 2d 1118, 1202 (C.D. Cal. 2003); *Gehr v. Baker Hughes Oil Field Operations*, Inc., 165 Cal. App. 4th 660, 668 (2008). Because the alleged nuisance is continuing, The Tetra Tech Defendants are entitled to summary judgment on the Pennington Plaintiffs' claims for appreciation

TETRA TECH DEFENDANTS' MEM. ISO SUMMARY JUDGMENT (NUISANCE)

1   impairment based on nuisance.

2   **VI.      CONCLUSION**

3           Summary judgment should enter for the Tetra Tech Defendants on Plaintiffs' claims for

4   public nuisance, private nuisance, permanent public nuisance, and permanent private nuisance,

5   because the Tetra Tech Defendants did not create or assist in the creation of any contamination of

6   Hunters Point, nor did they possess the land. And because the Tetra Tech Defendants never owned

7   or possessed the land, they did not and could not have permitted a third party to enter and

8   contaminate the land at the time the contamination occurred. In addition, for independent reasons,

9   Plaintiffs in the *Pennington* matter are precluded from seeking appreciation impairment damages

10  for their nuisance claims.

11

12  DATED: November 10, 2023                    Respectfully submitted,

13                                              WILMER CUTLER PICKERING HALE
                                                AND DORR LLP
14

15                                      By:     */s/ Michael J. Brown*

16                                              Davina Pujari
                                                Christopher T. Casamassima
17                                              Christopher A. Rheinheimer
                                                Michael J. Brown

18                                              Attorneys for Defendants TETRA TECH EC,
                                                INC., TETRA TECH, INC., and ANDREW
19                                              BOLT

20

21

22

23

24

25

26

27

28

TETRA TECH DEFENDANTS' MEM. ISO SUMMARY JUDGMENT (NUISANCE)