UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BAYVIEW HUNTERS POINT RESIDENTS, et al.,<br><br>   Plaintiffs,<br><br>  v.<br><br>TETRA TECH EC, INC., et al.,<br><br>   Defendants. | Case No. 19-cv-01417-JD<br><br>**ORDER RE GOOD FAITH SETTLEMENT DETERMINATION AND MINORS' COMPROMISES** |

During the hearing of the request for a good-faith determination of the proposed settlement, the Court denied approval from the bench. Dkt. No. 312. This order provides additional detail for why the good-faith determination request by Lennar Corporation and Five Point Holdings, LLC (Homebuilder defendants), Dkt. No. 270, is a non-starter. It also resolves plaintiffs' motion for an order approving the proposed compromise of the claims of minors. Dkt. No. 276.

**I. GOOD-FAITH SETTLEMENT DETERMINATION**

This request was the Homebuilder defendants' second attempt to settle this action with plaintiffs with the Court's approval, and without the participation of the Tetra Tech defendants. The Court denied the prior request on multiple grounds. *See* Dkt. No. 191. To summarize the highlights, in November 2022, plaintiffs moved for preliminary approval of a proposed class settlement pursuant to Federal Rule of Civil Procedure 23, proposing a settlement with the Homebuilder defendants only, and excluding the Tetra Tech defendants, for a $5.4 million cash payment by the Homebuilder defendants. *See* Dkt. No. 186. On December 8, 2022, the Court denied preliminary approval because, among other reasons, plaintiffs had not "adequately explained why a $5.4 million settlement is fair and reasonable when the complaint sought $1

billion in damages against these defendants." Dkt. No. 191 at 1.  The denial was without prejudice to a renewed request for approval if the parties were inclined to address the shortcomings identified by the Court.  *Id*. at 2.

The present motion for good-faith settlement determination, Dkt. No. 270, which was filed in September 2024, did not do that.  For the most part, the request largely repeats the proposal that failed under Rule 23 in the first instance.  The request is even more egregious this time around in light of troubling evidence of collusion between plaintiffs and the Homebuilder defendants that was not apparent in the prior proceedings.

The determination of a good-faith settlement is governed by California Code of Civil Procedure (CCP) Sections 877 and 877.6.  Under CCP Section 877, "[w]here a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, . . . : (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the great; [and] (b) It shall discharge the party to whom it is given from all liability for any contribution to any other parties."  Section 877.6(c) states that a "determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault."  The party "asserting the lack of good faith shall have the burden of proof on that issue."  *Id*. § 877.6(d).

The goals of these statutes are the "equitable sharing of costs among the parties at fault" and the "encouragement of settlements."  *Pennington v. Tetra Tech EC, Inc.*, No. 18-cv-05330-JD, 2022 WL 899843, at *2 (Mar. 28, 2022) (quoting *Tech-Bilt, Inc. v. Woodward-Clyde & Assocs.*, 38 Cal. 3d 488, 494 (1985)).  In determining whether a settlement was made "in good faith," the Court examines a number of factors, including "a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability."  *Id*. (quoting *Tech-Bilt*, 38 Cal. 3d at 499).  The "existence of collusion" is another important factor.  *Id*.

Tetra Tech objected to the Homebuilder defendants' request for a good-faith determination. One of its main arguments is that the record presents substantial evidence that the plaintiffs' settlement with the Homebuilder defendants was the product of collusion. *See* Dkt. No. 278 at 11-13.

The evidence of collusion is striking. After the Court denied preliminary approval of a proposed class settlement in December 2022, *see supra* and Dkt. No. 191, plaintiffs and the Homebuilder defendants were presumed to have returned to adversarial positions as party opponents in an ongoing lawsuit. This presumption proved false. Rather than conduct this litigation as adversaries, plaintiffs and each of the Homebuilder defendants, Lennar and Five Point, entered into a written "common interest" agreement on February 2, 2023. *See* Dkt. No. 278-15 at 4; Dkt. No. 278-16 at 5.

The common interest doctrine is not a standalone privilege, but rather "an exception to ordinary waiver rules designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012) (citations omitted). The common interest doctrine allows groups of plaintiffs or defendants "to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims." *United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012) (quotations and citation omitted). For a common interest exception to apply, "the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement -- whether written or unwritten." *Pac. Pictures*, 679 F.3d at 1129. A common interest agreement typically comes into play when multiple parties of the same status as plaintiffs or defendants wish to share communications and strategies jointly without risk of disclosing their litigation positions to the other side.

A common interest agreement between adversaries is far outside this practice, and a good argument can be made that such an agreement has no application to plaintiffs and the Homebuilder defendants here. Assuming this arrangement were plausible, which is highly doubtful, the only reason for trying to claim a common interest among such adverse parties would be to jointly act against another party that has been excluded from the arrangement. That is the situation here. The

3

record demonstrates that plaintiffs and the Homebuilder defendants entered into the common interest agreement expressly to target Tetra Tech. *See* Dkt. No. 278-16 at 7 (Lennar interrogatory response stating that Lennar and plaintiffs "share a common interest and a common purpose in prosecuting their legal claims against Tetra Tech and the United States and *in seeing Tetra Tech . . . found civilly liable for damages for their alleged conduct*." (emphasis added)).

All of this in itself is enough to raise a big red flag of collusion, but there is more. After entering into the "common interest" agreements with the Homebuilder defendants, plaintiffs petitioned the Court for permission to file a sixth amended complaint (6AC). Dkt. No. 218. The 6AC drastically narrowed plaintiffs' claims against the Homebuilder defendants, dropped the class allegations against them, and deleted the damages demand of $1 billion. Dkt. No. 223 ¶¶ 132-224 & Prayer for Relief; *see also* Dkt. No. 270 at 3. In effect, plaintiffs gave the Homebuilder defendants an amended complaint that radically reduced the claims against them, without facts in the body of the 6AC that might have made this sensible or at least understandable. Unsurprisingly, Lennar filed a "statement of non-opposition" to plaintiffs' request. Dkt. No. 219. The Court granted permission and the 6AC was filed on August 10, 2023. Dkt. Nos. 222, 223. During these proceedings, neither plaintiffs nor the Homebuilder defendants disclosed to the Court that they had signed a common interest agreement several months before plaintiffs asked to file the 6AC.

Plaintiffs and the Homebuilder defendants then entered into the settlement agreement for which they now seek a good-faith determination. The terms are quite similar to the proposed class settlement that the Court determined to be inadequate. The Homebuilder defendants will pay a total $5.4 million to plaintiffs, which is the same paltry amount the Court rejected for the proposed class. Attorneys' fees in the amount of $1.4 million for plaintiffs' counsel will be deducted, leaving a net fund of $4 million to be paid to approximately 6,500 plaintiffs. The substantial cuts in the allegations of the 6AC reduced the number of claimants to 6,464 from a proposed class of approximately 35,000. Dkt. No. 270 at 4; Dkt. No. 186 at 8-9.

Plaintiffs' main response to the prior disapproval was to abandon a settlement under Rule 23, with its attendant scrutiny of fairness, reasonableness, and adequacy, for a mass tort settlement

with each individual plaintiff. Were this another try at a class settlement, disapproval would be certain. There is no question that the proposed terms are unfair to the class members. For example, the scope of the claims released by plaintiffs is massively overbroad. The settlement expressly states that each plaintiff, including heirs, releases the Homebuilder defendants from all "Settled Claims." These are defined as "any and all legal, equitable, administrative or other claims" that "have been asserted, could have been asserted, or could be asserted, whether now or in the future," on any grounds "existing now or arising in the future" that "are in any way connected with (i) Developers' [the Homebuilder defendants] ownership or development of Hunters Point, (ii) any alleged representations, promises, statements, omissions, warranties (express or implied), or guarantees given or made by anyone affiliated" with the Homebuilder defendants relating to Hunters Point, and "(iii) this Settlement." Dkt. No. 271-3 § 1.04. The settlement takes pains to emphasize that "Settled Claims" includes every claim "now recognized or that may be created or recognized in the future" by law "arising out of relating to Hunters Point," including without limitation all claims of personal injury, consumer fraud and deception, lost wages, damages, and injunctive relief. *Id.* In effect, each individual plaintiff will release the Homebuilder defendants from any claim they or their heirs might have had, hold currently, or may have in the future, to the apparent end of time. As if that were not sweeping enough, the settlement states that the release is intended "to be as broad as can possibly be created by Plaintiff" and their heirs and other affiliated parties. *Id*. § 1.05.

The settlement imposes an extraordinarily broad obligation on each plaintiff to indemnify the Homebuilder defendants. Each plaintiff is required to pay for any damages, liabilities, expenses and the like, including attorney's fees, that the Homebuilder defendants might incur in connection with a perceived breach of the settlement agreement. *Id*. § 1.07. Plaintiffs specifically agree to indemnify the Homebuilder defendants for "any fees, costs, expenses, damage, liability, reimbursement, or loss, including reasonable attorneys' fees and disbursements, incurred as a result of any (i) claim by any of the Releasing Parties asserting Settled Claims against a Released Party; (ii) reimbursement obligations, liens, subrogated interests/rights, claims, causes of action, or encumbrances pertaining to the Settled Claims against the Released Parties," and so on. *Id*.

5

"Releasing Parties" means all plaintiffs who execute a release, and any of their "family members, heirs, guardians, executors, administrators, lenders, insurers, trustees, beneficiaries, representatives, agents, attorneys, partners, successors, and assigns, as well as any other person or entity purporting to claim on their behalf." *Id*. § 1.02. Under this plain language, one plaintiff would be on the hook to indemnify the Homebuilder defendants, including their attorney's fees, for any claim that any family member or heir of another plaintiff might bring at some point against a Homebuilder defendant that in any way relates to Hunters Point. Plaintiffs may also be required to indemnify the Homebuilder defendants against any "reimbursement obligations" the Homebuilder defendants may later be found to have as against Tetra Tech.

More could be said about other unfair provisions in the settlement, but this is enough to illustrate the profound problems with this agreement. Plaintiffs and their heirs will give up any conceivable claim about Hunters Point that they might have now or in the future against the Homebuilder defendants, irrespective of whether the claim has anything at all to do with the issues in this case. Plaintiffs will also pay for any fees or costs these corporations might incur should a released claim ripen into a dispute, among other contingencies. In exchange for these massive sacrifices of their legal rights, the settling parties anticipate that each plaintiff will be paid $606.00. *See* Dkt. No. 270 at 4.

Whether the releases and other provisions are enforceable raises a serious question on the merits. That is because counsel for plaintiffs revealed at the hearing on the good-faith motion that he may not have adequately advised his clients about the scope of the release and other settlement terms. Counsel said he did not understand that the release covered all past, present and future claims against the Homebuilder defendants, whether related to this case or not. He also said he did not advise his clients about the indemnity provision they would be saddled with, or disclose to them the common interest agreements counsel had entered into on plaintiffs' behalf with Lennar and Five Point. These shortcomings cast substantial doubt on whether the clients were adequately advised before signing their releases, and so whether the settlement and release can be enforced against them.

The heavily one-sided nature of the settlement is further evidence of collusion between plaintiffs and the Homebuilder defendants. It is indicative of an arrangement, negotiated between ostensibly adverse parties under the cloak of a common interest agreement, to seal a deal that specifically targets another party, namely Tetra Tech. "Any negotiated settlement involves cooperation, but not necessarily collusion." *River Garden Farms, Inc. v. Superior Court*, 26 Cal. App. 3d 986, 996 (1972). A settlement "becomes collusive when it is aimed to injure the interests of an absent tortfeasor." *Id*.

The record as a whole shows that plaintiffs and the Homebuilder defendants did not act in good faith with respect to Tetra Tech. *See Commercial Union Ins. Co. v. Ford Motor Co.*, 640 F.2d 210, 213 (9th Cir. 1981) ("Section 877 applies to settlements made in good faith only. Individuals not participating in the settlement are barred from seeking contribution only if the settling parties acted in good faith with respect to them."). If this settlement had been presented to the Court under FRCP 23, the Court would not have approved it as a fair, reasonable, and adequate settlement for the plaintiffs. The highly unfavorable release and indemnification provisions, among other terms, that were agreed to after the parties entered into a common interest arrangement and plaintiffs slashed their claims in the sixth amended complaint, amply demonstrate that the settlement with the Homebuilder defendants is a "tactical maneuver" intended to unduly compromise the rights of the excluded tortfeasor, Tetra Tech. *Commercial Union*, 640 F.2d at 213-14. The settlement lacks the indicia of "cooperative decision-making between parties which is the earmark of settlement." *Id*.

As a closing point, Tetra Tech objected that the settlement does not reflect a rough approximation of the Homebuilder defendants' proportionate liability. *See* Dkt. No. 278 at 6-11; *Tech-Bilt*, 38 Cal. 3d at 499-500. That is certainly true with respect to plaintiffs' prior demand of $1 billion against the Homebuilder defendants. The problem with the current settlement is that plaintiffs this time avoided making any assessment of potential damages against these defendants. This decision foreclosed a determination of the maximum theoretical recovery against which the Homebuilder defendants' settlement should be measured. This also weighs against a good-faith determination.

## II. MINORS' COMPROMISE

Plaintiffs' motion for the approval of the minor plaintiffs' compromise of their claims against the Lennar and Five Point Holdings defendants, Dkt. No. 276, is also denied for the same reasons. In determining whether a minor's compromise of their claim should be approved, the Court reviews "whether the net amount distributed to each minor plaintiff in the settlement is fair and reasonable, in light of the facts of the case, the minor's specific claim, and recovery in similar cases." *Robidoux v. Rosengren*, 638 F.3d 1177, 1181-82 (9th Cir. 2011). Our circuit has emphasized that "the district court should evaluate the fairness of each minor plaintiff's net recovery without regard to the proportion of the total settlement value designated for adult co-plaintiffs or plaintiffs' counsel -- whose interests the district court has no special duty to safeguard." *Id*. at 1182 (citation omitted). "So long as the net recovery to each minor plaintiff is fair and reasonable in light of their claims and average recovery in similar cases, the district court should approve the settlement as proposed by the parties." *Id*.

The minor plaintiffs, who are now asserting claims against the Homebuilder defendants that are significantly reduced in scope, are estimated to recover approximately $600 per person. Dkt. No. 276 at 5-6. Plaintiffs' counsel did not specifically address the average recovery in similar cases, or make any other effort to demonstrate that this proposed recovery for the minors would be fair and reasonable as contemplated in *Robidoux*. There is no basis in the record for the Court to approve the proposed compromise.

**IT IS SO ORDERED.**

Dated: February 20, 2025

JAMES DONATO
United States District Judge